FILED

2016 May-26  PM 02:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| JIMMY DAVIS, JR., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV 07-S-518-E |
| | ) | |
| RICHARD F. ALLEN, | ) | |
| Commissioner, Alabama | ) | |
| Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OF OPINION

The petitioner, Jimmy Davis, Jr. ("Davis"), seeks *habeas corpus* relief from his

state court capital murder conviction and death sentence.  *See* 28 U.S.C. § 2254.

### Table of Contents

I.      PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.     THE OFFENSE OF CONVICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.    THE SENTENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.     INTRODUCTION TO A DISCUSSION OF DAVIS'S SUBSTANTIVE CLAIMS:
        *The Scope of Federal* Habeas *Review.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.    Exhaustion of State Court Remedies: *the First Condition Precedent*
              *to Federal* Habeas *Review.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        B.    The Procedural Default Doctrine: *the Second Condition Precedent*
              *to Federal* Habeas *Review.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

              1.    *General principles.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       2.    *Overcoming procedural default.* . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            a.    *The "cause and prejudice" standard.* . . . . . . . . . . . . . . . . . . 28

                  i.    *"Cause".* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                  ii.    *"Prejudice".* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            b.    *The "fundamental miscarriage of justice" standard.* . . . . . . . 31

   **C.**    **The Statutory Overlay:** *The Effect of "the Antiterrorism and Effective Death Penalty Act of 1996" on* Habeas *Review* . . . . . . . . . . . . . . . 32

       1.    *28 U.S.C § 2254(e)(1).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

       2.    *28 U.S.C § 2254(d).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

            a.    *The meaning of § 2254(d)(1)'s "contrary to" clause* . . . . . . 36

            b.    *The meaning of § 2254(d)(1)'s "unreasonable application" clause.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

            c.    *The meaning of § 2254(d)(2)'s clause addressing an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding"* . . . . . . 41

            d.    *Evaluating state court factual determinations under 28 U.S.C. §§ 2254(d)(2) and (e)(1)* . . . . . . . . . . . . . . . . . . . . . 42

   **D.**    **The Burden of Proof and Heightened Pleading Requirements for** *Habeas* **Petitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

   **E.**    **Introduction to Ineffective Assistance of Counsel Claims** . . . . . . . . . . . . 46

       1.    *The performance prong.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

       2.    *The prejudice prong.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

       3.    *Deference accorded state court findings of historical fact, when evaluating ineffective assistance of counsel claims.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**V.**    **DAVIS'S CLAIMS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

**A.**      **Ineffective Assistance of Counsel During Guilt Phase of Trial** . . . . . . . . . 56

     1.    *Failure to adequately investigate the capital murder charge.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

         a.    *Time spent in preparation for trial.* . . . . . . . . . . . . . . . . . . . . 57

         b.    *Scope of investigation.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

         c.    *Failure to transcribe preliminary hearing.* . . . . . . . . . . . . . . . 60

     2.    *Failure to locate, interview, and present exculpatory witnesses.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

     3.    *Failure to challenge the state's investigation and presentation of its case-in-chief.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

     4.    *Failure to present, argue adequately, and seek favorable rulings on pre-trial motions.* . . . . . . . . . . . . . . . . . . . . . . . 72

     5.    *Failure to present additional substantive evidence.* . . . . . . . . . . . . . 79

**B.**      **Ineffective Assistance of Counsel During Penalty Stage** . . . . . . . . . . . . . . 82

     1.    *Failure to obtain mitigation evidence relating to childhood trauma and depravity.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

         a.    *Conclusions of the trial court.* . . . . . . . . . . . . . . . . . . . . . . . . 90

         b.    *Alabama Court of Criminal Appeals' initial opinion* (dicta). . 100

         c.    *Opinion of Alabama Court of Criminal Appeals on remand.* . 104

         d.    *Analysis.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

             i.    *Performance.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

             ii.    *Prejudice.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

     2.    *Failure to obtain or present any testimony regarding Davis's mental health.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

— and —

3.    *Failure to obtain mental health evidence relating to mental/psychological dysfunction and brain damage.* . . . . . . . . . . 120

     a.    *Evidence presented in state court.* . . . . . . . . . . . . . . . . . . . . 121

     b.    *Rule 32 court's order of denial.* . . . . . . . . . . . . . . . . . . . . . 123

     c.    *Decision of Alabama Court of Criminal Appeals.* . . . . . . . . . 126

     d.    *Analysis.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

4.    *Failure to discover and present mitigation evidence about prior felony conviction.* . . . . . . . . . . . . . . . . . . . . . . . . . . 128

5.    *Failure to object to the submission of the penalty phase case to the jury on a Friday at 4:30 p.m..* . . . . . . . . . . . . . . . 140

C.    **Counsel Was Ineffective for Not Objecting to Prosecutorial Misconduct**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

1.    *Implying that Davis had been involved in a gang prior to his arrest.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

2.    *Improperly telling the jury that one purpose of convicting was to decrease crime in general.* . . . . . . . . . . . . . . . . . . 149

3.    *Misstating the law and arguing facts not in evidence* . . . . . . . . . . . 151

4.    *Improperly vouching for the veracity and quality of state witnesses.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

5.    *Improperly commenting on Davis's failure to testify.* . . . . . . . . . . . 159

6.    *Improperly arguing that the jury could not consider mercy in reaching a verdict.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

7.    *Improperly instructing the jury that it was their duty to impose death.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

8.    *Improperly arguing nonstatutory aggravating circumstances in support of conviction and sentence.* . . . . . . . . . . . 174

4

9.    *Improperly denigrating Davis's right to an attorney.* . . . . . . . . . . . . 178

D.    **Counsel were Ineffective for Failing to Preserve Investigation Records and Files for Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

E.    ***Brady* Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

1.    *The state failed to disclose Alphonso Phillips's known gang involvement and prior adjudications of delinquency charges against both Phillips cousins.* . . . . . . . . . . . . . 190

2.    *The state suppressed and/or mishandled material evidence recovered by police.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

3.    *The state failed to disclose death threats against Davis and his mother and the existence of a confidential informant who feared for his life.* . . . . . . . . . . . . . . . . . . 196

F.    **The Admission of Highly Prejudicial Hearsay Testimony** . . . . . . . . . . . . 199

1.    *Willie Smith* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200

2.    *Shannon Hardy Wilson.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

G.    **Admission of a Note Found in the Pocket of Davis's Clothing.** . . . . . . . . 208

H.    **Improper Consideration Through the Pre-Sentencing Report of Davis's Juvenile Record and Allegations of Gang Involvement.** . . . . . . . 213

I.    **Conviction and Sentence Obtained Through the Use of Uncorroborated Accomplice Testimony.** . . . . . . . . . . . . . . . . . . . . . . . . . 217

J.    **The State Court Violated Davis's Constitutional Rights by Applying a Blanket Rule That Hearsay Evidence Is Inadmissible in Rule 32 Proceedings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

K.    **The State Court Violated Davis's Constitutional Rights When it Excluded the Testifying Expert's Social History Exhibit as Cumulative.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

L.    **The State Court Violated Davis's Constitutional Rights By Adopting Verbatim the State's Proposed Factual Findings and Legal Conclusions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

M.   The State Failed to Meet its Burden of Proving Capital Murder
During the Course of a Robbery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   233

N.   Double Counting of Robbery as an Element of the Underlying
Offense and as an Aggravating Circumstance at Sentencing
Violated the Fifth, Sixth, Eighth, and Fourteenth Amendments . . . . . . .   236

O.   The Trial Court's Failure to Conduct Individual Sequestered
*Voir Dire* Deprived Davis of His Rights to Due Process and a Fair
Trial by an Impartial Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   238

P.   Davis's Rights to Due Process, a Fair Trial, and a Reliable
Verdict From a Fair and Impartial Jury Were Violated When
the Trial Court failed to "Life Qualify" the Veniremembers in
Accordance with *Morgan v. Illinois* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   240

Q.   The Trial Court Erred By Granting the State's Motions to Strike
for Cause Potential Jurors Elaine Thomas and Sandra Tilley . . . . . . . . .   243

R.   The Trial Court's Failure to Strike for Cause Jurors Who
Demonstrated Bias Against Davis Deprived Him of His Rights to
Due Process and a Fair Trial by an Impartial Jury . . . . . . . . . . . . . . . . .   254

S.   The Use of Improper Jury Instructions Deprived Davis of His
Fifth, Sixth, Eighth, and Fourteenth Amendment Rights . . . . . . . . . . . . .   262

   1.   *Reasonable doubt* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   262

   2.   *Aggravating circumstances* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   269

T.   The Trial Court's Instructions on Accomplices and
Corroboration Constituted Reversible Error . . . . . . . . . . . . . . . . . . . . . .   272

U.   The Penalty Phase Jury Instructions Implied That Aggravating
Circumstances Did Not Have to Be Found Unanimously . . . . . . . . . . . . .   278

V.   Misconduct by Jurors Deprived Davis of His Constitutional Right
to Be Tried by an Impartial Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   281

W.   Alabama's Fee Cap Foreclosed Effective Representation . . . . . . . . . . . .   286

X.   Davis's Death Sentence Was Improperly Sought and Imposed
Pursuant to a Pattern of Racial Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . .   289

Y.    **The Manner of Execution Used by the State of Alabama Constitutes Cruel and Unusual Punishment**. . . . . . . . . . . . . . . . . . . . . 292

Z.    **The Execution of Mentally Retarded Persons With Borderline I.Q. levels and Brain Damage is Cruel and Unusual** . . . . . . . . . . . . . . . . 294

VII.  **EVIDENTIARY HEARING**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299

VIII.  **CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300

# I. PROCEDURAL HISTORY

Jimmy Davis, Jr., was indicted in the Circuit Court of Calhoun County, Alabama, on May 17, 1993, for the capital offense of murder committed during a robbery in the first degree,[1] arising from the March 17, 1993 shooting death of Johnny Hazle, a fifty-year old service station attendant at Direct Oil, in Anniston, Alabama.[2] Davis was represented at trial by Steven D. Giddens and Jonathan L. Adams. The guilt phase of trial commenced on December 6, 1993, and Davis was convicted as charged on December 10, 1993.[3] After the penalty phase of the trial,[4] the jury

---

[1] *See Alabama Code* § 13A-5-40(a)(2) (1975).

[2] C.R. Vol. 1, Tab 1, at C-2.  The court will utilize the following method of citation to the record.  References to specific pages of the court record on direct appeal are designated "C.R.\_\_\_\_," and references to the transcript on direct appeal are designated "R.\_\_\_\_."  References to the court record of the Rule 32 proceedings are designated "Rule 32 C.R. \_\_\_\_," and references to the transcript of the Rule 32 hearing are designated "Rule 32 R. \_\_\_\_."  The court will strive to list any page number associated with the court records by reference to the numbers at the bottom of each page of a particular document, if said numbers are the most readily discoverable for purposes of expedient examination of that part of the record.  Otherwise, the page numbers shall correspond with those listed at the upper right hand corner of the record.  Additionally, if there is an easily identifiable tab number close to any cited material, the court has made reference to that for the reader's benefit.

[3] R. Vol. 1, Tab 2, at 11 - R. Vol. 7, Tab 16, at 1289.

[4] R. Vol. 7, Tab 16, at 1289 - R. Vol. 8, Tab 25, at 1380.

recommended by a vote of 11-1 that Davis be sentenced to death.[5]   At the March 4,

1994 sentencing hearing,[6] the trial court followed the jury's recommendation and

sentenced Davis to death.[7]   Trial counsel were permitted to withdraw following

sentencing.[8]

The trial court appointed H. Wayne Love to represent the Davis on direct

appeal.  Five issues were raised.[9]  The case was remanded twice to the trial court.

*Davis v. State*, 718 So. 2d 1148 (Ala. Crim. App. 1995).  On the first remand, the trial

court was directed to prepare and enter a formal sentencing order "encompassing all

of the requirements of [Alabama Code] § 13A-5-47(d)[ (1975)]."   *Id.* at 1152

(alterations supplied).  On return from remand, but due to "intervening caselaw," the

appellate court remanded the case a second time with instructions for the trial court

"to enter additional findings of fact regarding its denial of Davis's *Batson* motion and,

if necessary, to conduct a new hearing on the issue."   *Id.*  On the second return from

remand, the Alabama Court of Criminal Appeals addressed the merits of Davis's

---

[5] R. Vol. 8, Tab 25, at 1377-80.

[6] R. Vol. 8, Tab 26, at 1381 - R. Vol. 8, Tab 28, at 1429.

[7] R. Vol. 8, Tab 28, at 1427.

[8] C.R. Vol. 1, Tab 1, at C-28.

[9] Davis claimed that: 1) the trial court erred in denying his motion to prohibit death-qualification of prospective jurors or for separate juries for the guilt and penalty phases of the trial; 2) the trial court erred in denying his *Batson* claim; 3) the trial court erred in allowing testimony regarding the autopsy of the victim's body without establishing the proper chain of custody; 4) the trial court erred in sentencing him to death without entering a written finding as required by statute; and 5) the death sentence was improper in his case.  C.R. Vol. 9, Tab 31, at 4.

claims, and on March 21, 1997, affirmed the conviction and sentence of death. *Id.* at 1153-66.

Davis filed a petition for writ of *certiorari* with the Supreme Court of Alabama and reasserted three of the issues he had raised on direct appeal.[10]   Thereafter, Davis obtained new counsel, Ellen L. Wiesner, and she filed a second brief in support of the petition for writ of *certiorari*, raising many additional claims for the first time on direct appeal.[11]   The Alabama Supreme Court affirmed the ruling of the Alabama Court of Criminal Appeals on February 13, 1998.  *Ex parte Davis*, 718 So. 2d 1166 (Ala. 1998).

Davis filed a petition for writ of *certiorari* with the United States Supreme Court, but the petition was denied on March 1, 1999.  *Davis v. Alabama*, 525 U.S. 1179 (1999).

Davis then sought postconviction relief pursuant to Rule 32 of the *Alabama Rules of Criminal Procedure*.[12]   An evidentiary hearing was held from August 26-29, 2002.  Davis called nineteen witnesses in an effort to prove a variety of ineffective

---

[10] C.R. Vol. 9, Tab 34, at 3.

[11] C.R. Vol. 10, Tab 35.

[12] The second amended petition was the operative petition during state court collateral proceedings.  Rule 32 C.R. Vol. 14, Tab 52, at 1-49.

9

assistance of counsel claims, as well as other claims.[13]  Neither Davis nor his trial

attorney, Jonathan L. Adams, testified.

The Rule 32 court issued a "Stipulated Post-Trial Briefing Order" on

December 1, 2003, giving the parties deadlines for submitting proposed findings of

fact and conclusions of law, and responses thereto.[14]  Davis submitted his Proposed

Findings of Fact and Conclusions of Law on January 20, 2004.[15]  The State submitted

its proposed findings of fact and conclusions of law on March 10, 2004, in a

document entitled "Proposed Order."[16]  Davis submitted an opposition to the State's

proposed order on March 22, 2004.[17]

The trial court denied Davis's Rule 32 petition on August 3, 2004.[18]  Davis

filed "Objections to Court's Adoption of the State's Proposed Order Denying his Rule

32 Petition."[19]  He then appealed.[20]  The Alabama Court of Criminal Appeals affirmed

the trial court's judgment on March 3, 2006.  That court found, *sua sponte*, that the

---

[13] The transcript of the evidentiary hearing is located at Rule 32 R. Vol. 18, Tab. 58, at 1-144 and Rule 32 R. Vols. 19 - 24.

[14] Rule 32 C.R. Vol. 17, at 1004.

[15] *Id.* at 1034-1113.

[16] The state court record does not include a copy of the state's proposed order.  Evenso, references were made to its existence and date of filing in Davis's objection to the court's adaption of the state's proposed order.  *See Id.* at 1197.

[17] *Id.* at 1115-1131.

[18] Rule 32 C.R. Vol. 62, Tab 80.

[19] Rule 32 C.R. Vol. 17, at 1197-1205.

[20] Rule 32 C.R. Vol. 57, Tab. 60, at 1-80.

vast majority of Davis's claims, including his claims for ineffective assistance of trial counsel, were procedurally barred because they had not been raised on direct appeal. *Davis v. State*, 9 So. 3d 514 (Ala. Crim. App. 2006). Although the court denied relief, it discussed the ineffective assistance of trial counsel claims in detail, most notably with regard to counsels' preparations for the penalty phase. The court concluded that:

> Davis's most troubling claim is that counsel failed to investigate and present mitigation evidence at the penalty phase. The evidence Davis alleges should have been discovered and presented is powerful. *Had this issue not been procedurally barred we would be compelled to grant relief and order a new sentencing hearing.*

*Davis v. State*, 9 So. 3d 514, 522 (Ala. Crim. App. 2006) (emphasis supplied).

Davis moved for rehearing[21] but the Alabama Court of Criminal Appeals denied the application on August 25, 2006. *Davis*, 9 So. 3d 514. Davis then pursued a petition for writ of *certiorari*,[22] but it was denied by the Alabama Supreme Court on February 16, 2007. Even so, on May 4, 2007, the Alabama Supreme Court withdrew its certificate of judgment and granted Davis's petition for *certiorari*[23] in light of the rule announced in *Ex parte Clemons*, 55 So. 3d 348 (Ala. 2007).[24]

---

[21] Rule 32 C.R. Vol. 58, Tab 64.

[22] Rule 32 C.R. Vol. 59, Tab 67, at 1-107.

[23] Doc. no. 14-1, at 2; doc. no. 14-2, at 2.

[24] In *Ex parte Clemons*, the Alabama Supreme Court held "that the procedural bars to postconviction relief contained in Rule 32.2(a), Ala. R. Crim. P., were not jurisdictional and

The Alabama Supreme Court reversed the procedural bar ruling against Davis on August 3, 2007, and remanded the case to the Court of Criminal Appeals "for that court to consider all of Davis's ineffective-assistance-of-counsel claims on their merits." *Ex parte Davis*, 9 So. 3d 537, 539 (Ala. 2007). The Alabama Court of Criminal Appeals affirmed the Circuit Court's denial of Davis's Rule 32 petition on April 4, 2008, holding that, "upon further research and review of the record we have reconsidered our comments *in dicta* in our previous opinion, and we now conclude that the circuit court did not abuse its discretion in denying Davis relief on his claims of ineffective assistance of trial counsel at the penalty phase." *Davis v. State*, 9 So. 3d 539, 553 (Ala. Crim. App. 2008) (emphasis supplied). Davis filed an application for rehearing on May 9, 2008,[25] but it was denied on June 13, 2008. *Id.* at 539. Davis again petitioned the Alabama Supreme Court for a writ of *certiorari*,[26] but the petition was denied on November 26, 2008. *Ex parte Davis*, 9 So. 3d 571 (Ala. 2008).

Davis, through counsel, filed an amended § 2254 petition in this court on February 20, 2009.[27] For its consideration of this petition, the court has the

---

therefore could be waived, abrogating the Court of Criminal Appeals' holding in this case." *Ex parte Davis*, 9 So. 2d 537, 538 (Ala. 2007).

[25] Rule 32 C.R. Vol. 60, Tab. 71. Davis's federal *habeas* petition was filed on March 22, 2007, but was stayed after the Alabama Supreme Court withdrew its certificate of judgment and granted Davis's petition for *certiorari* to reconsider the *Clemons* question.

[26] Rule 32 C.R. Vol. 61, Tab. 72.

[27] Doc. no. 33.

respondent's response to an order to show cause with multiple exhibits comprising

the underlying state court record,[28] the petitioner's reply and attachment,[29] and the

petitioner's notices of supplemental authority in support of his petition.[30]

## II. THE OFFENSE OF CONVICTION

The Alabama Supreme Court set out the facts, quoting from the Court of

Criminal Appeals' March 21, 1997 opinion:

> The state's evidence showed that on March 17, 1993,
> the appellant[ petitioner Jimmie Davis, Jr.], Alphonso
> Phillips, and Terrance Phillips made plans to rob the Direct
> Oil Station, a gasoline service station in Anniston.
> According to the plan, the appellant, who possessed a .25
> caliber semiautomatic pistol, would point the pistol at the
> station operator, Alphonso would grab the money, and
> Terrance would act as a lookout. The state's evidence
> supports the conclusion that the appellant was the principal
> actor in the conspiracy. He conceived the idea to rob the
> station and he recruited the others to help him. As the trio
> approached the station, Terrance changed his mind,
> abandoned the conspiracy, and walked away. Alphonso
> and the appellant approached the station; the appellant
> confronted the operator, Johnny Hazle, in the doorway of
> the station, pointed the pistol at him, and said, "Give it up,
> fuck-nigger." The appellant almost immediately fired two
> shots from the pistol, which struck Hazle in the chest and
> abdomen. Terrance testified that he was about a block
> from the station, walking toward his home, when he heard
> two or three shots fired. After the shooting, the appellant

---

[28] Doc. nos. 35, 36, 37.

[29] Doc. no. 39.

[30] Doc. nos. 40, 41.

and Alphonso ran from the scene.  Hazle died from these wounds shortly thereafter.  Three empty .25 caliber shell casings were recovered at the scene, and two bullets of the same caliber were recovered from Hazle's body.  The pistol was subsequently recovered.  The ballistics evidence showed that the two bullets recovered from Hazle's body and the three empty shell casings found at the scene had been fired from the appellant's pistol.  Alphonso and Terrance entered into agreements with the state pursuant to which in return for their testimony against the appellant they would be permitted to plead guilty to conspiracy to commit robbery in the first degree.

Alphonso, testifying for the state, stated that as he and the appellant reached the door of the station, the appellant pointed the pistol at Hazle and said, "Give it up, fuck-nigger"; that Hazle looked inside the store and smiled; and that the appellant shot Hazle when he smiled. Several witnesses for the state testified that the appellant told them shortly after the shooting that he had shot the Direct Oil Station operator.  In his testimony, Terrance described his conversation with the appellant as follows:

He [petitioner Jimmie Davis, Jr.] said he had told him [the operator], "Give it up, fuck-nigger." And then he said the man had smiled or something at him, laughed or something.  And then he said he had shot and the man had kicked the door.  And then he shot again.  I don't know — I can't remember how many times he said he shot.  And then he said they ran.

Alphonso testified as follows: "[petitioner, Jimmie Davis, Jr.] said, 'Man, I shot that fuck-nigger, I shot him.'  And then he said, 'The second time felt even better than the first time.'"   Willie James Smith, an acquaintance of the appellant, testified, "[petitioner Jimmie Davis, Jr.] . . . told me he had shot someone. . . [a]nd told me he had robbed

14

Direct and shot someone."  Smith also testified that the appellant told him that Alphonso and Terrance were with him and that the appellant "said that the man wouldn't give up the money, so he shot him three times."  Shannon Hardy Wilson, another acquaintance of the appellant, testified as follows about his conversation with the appellant:

> Before they got in there, he said they pulled up their bandannas and they went in there.   And when he got to the door [petitioner Jimmie Davis, Jr.] said, "Give it up."  And that Mr. Hazle laughed at him and that Alphonso ran.  And then he said he told him to give it up again.   And he said Mr. Hazle laughed at him and then he shot him.

Wilson further testified that the appellant said he "wasn't going to let no cracker laugh at him."

718 So. 2d at 1155.

Davis did not give a confession to the police and, as the foregoing statement of facts indicates, much of the evidence against him consisted of testimony from Terrance Phillips, Alphonso Phillips, Willie James Smith, and other acquaintances.  Davis did not testify at trial, and his primary trial strategy was to attempt to discredit the testimony of the state's witnesses through cross-examination and arguments to the jury and the trial court.

*Ex parte Davis,* 718 So. 2d 1166, 1169-70 (Ala. 1998) (third and sixth alterations in original, other alterations supplied).

### III.  THE SENTENCE

The following excerpt is taken from the sentencing court's written order on remand.[31]

> In accordance with the mandate of § 13A-5-47, *Code of Alabama*, 1975, the Court proceeded to determine sentence in this cause. The Court received a written pre-sentence investigation report by Probation Officer Feehan. The report was made a part of the record and the Court noted several objections and denials made by the Defendant to matters stated therein.
>
> The Court make[s] the following findings in regard to the aggravating circumstances set out by § 13A-5-49:
>
> 1. That the capital offense was <u>not</u> committed by a person under sentence of imprisonment;
>
> 2. That the defendant has <u>not</u> been previously convicted of another capital offense, but that the defendant <u>was</u> previously convicted of a felony involving the use or threat of violence to the person, namely, robbery in the third degree;
>
> 3. That the defendant <u>did not</u> knowingly create a great risk of death to many persons;
>
> 4. That the capital offense <u>was committed</u> while the defendant was engaged in the commission of, or an attempt to commit robbery, specifically robbery in the first degree.

---

[31] On October 20, 1995, the Alabama Court of Criminal Appeals held that the trial court had failed to comply with the requirements of § 13A-5-47(d), and remanded the case to the trial court for the preparation of a formal sentencing order. *See Davis v. State*, 718 So. 2d 1148 (Ala. Crim. App. 1995). The Sentencing Order was entered pursuant to the appellate court's remand order.

5.      That the capital offense <u>was not</u> committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

6.      That the capital offense <u>was not</u> committed for pecuniary gain;

7.      That the capital offense <u>was not</u> committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; and

8.      That the capital offense <u>was not</u> especially heinous, atrocious or cruel as compared to other capital offenses.

The Court makes the following findings under § 13A-5-51 *Code of Alabama,* 1975, in regard to mitigating circumstances:

1.      That the defendant in fact <u>does have</u> a significant history of prior criminal activity. The written pre-sentence investigation report reflects that since 1982 the Defendant's Juvenile Court history reflects adjudications of delinquency for theft, receiving stolen property and trespass. The Defendant's misdemeanor history since 1987 reflects adjudications of guilt for theft, resisting arrest, assault, and trespass. The defendant was, in addition[,] convicted of the felony robbery 3rd degree in 1992.

2.      That the Defendant was <u>not</u> under the influence of extreme mental or emotional disturbances during the commission of the capital offense charged in this case;

3.   That the victim, Johnny Hazel [*sic*], <u>was not</u> a participant in the Defendant's conduct and <u>did not</u> consent to it;

4.   That the defendant <u>was not</u> merely an accomplice in the capital offense committed by another and that his participation <u>was not</u> relatively minor;

5.   That the defendant <u>did not</u> act under extreme duress or under the substantial domination of another person;

6.   That the Defendant <u>did have</u> the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirement of the law. This finding is made even though the defense presented evidence that the defendant's intellectual quotient was 77 and in the borderline range;

7.   That the defendant's age at the time of sentencing is 23 years of age, and that while he is an adult that his age <u>is</u> a mitigating factor or circumstance in this case.

In addition to the above, the Court has considered all testimony and evidence presented to the jury and to the Court in regard to the defendant's background, character, education achievement level, and circumstances as the same pertain to the mitigating circumstances that should be properly considered by the Court.

After due consideration of all matters that were presented to the Court during this hearing, both in mitigation and aggravation, and taking into consideration all other matters that are properly before the Court as herein above stated in this Order, this Court does now find and is convinced beyond a reasonable doubt that the aggravating circumstances as shown above and brought before the Court far outweigh the mitigating circumstances shown to the Court, that the said aggravating

circumstances outweigh the said mitigating circumstances in all regards and that they are sufficient in both quantity and quality to more than uphold the jury's verdict recommending the death penalty in this case.

It is therefore the Judgment of this Court that the Defendant, Jimmy Davis, be sentenced to death by electrocution.

C.R. Vol. 62, Tab 76, at 17-20 (alterations supplied, underlined emphasis in original).

## IV.  INTRODUCTION TO A DISCUSSION OF DAVIS'S SUBSTANTIVE CLAIMS:
### *The Scope of Federal* Habeas *Review*

"The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)).  As such, this court's review of claims seeking *habeas* relief is limited to questions of federal constitutional and statutory law.  Claims that turn solely upon state law principles fall outside the ambit of this court's authority to provide relief under § 2254.  *See Alston v. Department of Corrections*, 610 F.3d 1318, 1325-26 (11th Cir. 2010) (holding that a claim addressing either "an alleged defect in a collateral proceeding," or a state court's "interpretation of its own law or rules," does not provide a basis for federal *habeas* relief) (citations omitted).

A.    **Exhaustion of State Court Remedies**:  *The First Condition Precedent to Federal* Habeas *Review*

A *habeas* petitioner is required to present his federal claims to the state court, and to exhaust all of the procedures available in the state court system, before seeking relief in federal court.  28 U.S.C. § 2254(b)(1); *Medellin v. Dretke*, 544 U.S. 660, 666 (2005) (holding that a petitioner "can seek federal habeas relief only on claims that have been exhausted in state court").   That requirement serves the purpose of ensuring that state courts are afforded the first opportunity to address federal questions affecting the validity of state court convictions and, if necessary, correct violations of a state prisoner's federal constitutional rights.   As explained by the Eleventh Circuit:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies.  28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."). "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction. . . . The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials." *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)).
>
> Exhaustion of state remedies requires that the state prisoner "fairly presen[t][32] federal claims to the state courts in order to give the

---

[32] The phrases "fairly presented" and "properly exhausted" are synonymous.  *O'Sullivan v. Boerckel,* 526 U.S. 838, 848 (1999) (observing that the question is "not only whether a prisoner has exhausted his state remedies, but also whether he has *properly exhausted* those remedies, *i.e.*,

State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted). The Supreme Court has written these words:

> [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. . . . Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

*Picard*, 404 U.S. at 275, 92 S. Ct. at 512. *See also Duncan*, 513 U.S. at 365, 115 S. Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").

> Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (alterations and ellipses in original) (footnote supplied).

**B.** **The Procedural Default Doctrine**: *The Second Condition Precedent to Federal* Habeas *Review*

    **1.** *General principles*

---

whether he has *fairly presented* his claims to the state courts") ("properly" emphasized in original, all other emphasis supplied).

It is well established that, if a *habeas* petitioner fails to raise his federal claim in the state court system at the time and in the manner dictated by the state's procedural rules, the state court can decide that the claim is not entitled to a review on the merits. Stated differently, "the petitioner will have *procedurally defaulted* on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2009) (emphasis supplied). This so-called "procedural default" doctrine was explained by the Supreme Court in *Woodford v. Ngo,* 548 U.S. 81 (2006), as follows:

> In habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default, although the habeas doctrines of exhaustion and procedural default "are similar in purpose and design and implicate similar concerns," *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 7 (1992). See also *Coleman v. Thompson*, 501 U.S. 722, 731–732, 111 S. Ct. 2546 (1991). In habeas, state-court remedies are described as having been "exhausted" when they are no longer available, regardless of the reason for their unavailability. See *Gray v. Netherland*, 518 U.S. 152, 161, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996). Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, *ibid*., but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding. *Id*., at 162, 116 S. Ct. 2074; *Coleman*, *supra*, at 744–751, 111 S. Ct. 2546.

*Woodford,* 548 U.S. at 92-93.

Generally, if the last state court to examine a claim states clearly and explicitly that the claim is barred because the petitioner failed to follow state procedural rules, *and*, and that procedural bar provides an adequate and independent state ground for denying relief, then federal review of the claim also is precluded by federal procedural default principles. *See Cone v. Bell,* 556 U.S. 449, 465 (2009) ("[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.") (citing *Coleman*, 501 U.S. at 731) (alteration supplied).

The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. *Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar*, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), *and that bar provides an adequate and independent state ground for denying relief. See id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991) (emphasis supplied).[33]

Federal deference to a state court's clear finding of procedural default under its own rules is so strong that:

> "[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Harris*, 489 U.S. at 264 n.10, 109 S. Ct. 1038 (emphasis in original). *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. 1994) (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lack merit based on the evidence, "this ruling in the alternative did not have an effect . . . of blurring the clear determination by the [Georgia habeas corpus] court

---

[33] "When the last state court rendering judgment affirms without explanation, [the federal court will] presume that it rests on the reasons given in the last reasoned decision." *Mason v. Allen*, 605 F.3d 1114, 1118 n.2 (11th Cir. 2009) (alteration supplied). As the Supreme Court observed in *Ylst v. Nunnemaker*, 501 U.S. 797 (1991):

> The problem we face arises, of course, because many formulary orders are not meant to convey *anything* as to the reason for the decision. Attributing a reason is therefore both difficult and artificial. We think that the attribution necessary for federal habeas purposes can be facilitated, and sound results more often assured, by applying the following presumption: *Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.* If an earlier opinion "fairly appear[s] to rest primarily upon federal law," we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place. Similarly where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

*Id.* at 803 (first emphasis and alteration in original, second emphasis supplied) (citation omitted).

that the allegations was procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S. Ct. 673, 130 L. Ed. 2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (alterations and emphasis in original).

The Supreme Court defines an "adequate and independent" state court decision as one that "'rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'" *Lee v. Kemna,* 534 U.S. 362, 375 (2002) (quoting *Coleman,* 501 U.S. at 729) (emphasis in *Lee*). The questions of whether a state procedural rule is "independent" of the federal question and "adequate" to support the state court's judgment, so as to have a preclusive effect on federal review of the claim, "'is itself a federal question.'" *Id.* (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

To be considered "independent" of the federal question, "the state court's decision must rest solidly on state law grounds, and may not be 'intertwined with an interpretation of federal law.'" *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). An example of intertwining would be when "the State has made application of the procedural bar depend on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed." *Ake v. Oklahoma*, 470 U.S.

25

68, 75 (1985). Stated differently, if "the state court must rule, either explicitly or implicitly, on the merits of the constitutional question" before applying the state's procedural rule to a federal constitutional question, then the rule is *not* independent of federal law. *Id.*

To be considered "adequate" to support the state court's judgment, the state procedural rule must be both "'firmly established and regularly followed.'" *Lee,* 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). In other words, the rule must be "clear [and] closely hewn to" by the state for a federal court to consider it as "adequate." *James*, 466 U.S. at 346 (alteration supplied). That does not mean that the state's procedural rule must be rigidly applied in every instance, or that occasional failure to do so will render the rule "inadequate." "To the contrary, a [state's] discretionary [procedural] rule can be 'firmly established' and 'regularly followed' — even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009) (alterations supplied). Rather, the "adequacy" requirement means only that the procedural rule "must not be applied in *an arbitrary or unprecedented fashion*." *Judd,* 250 F.3d at 1313 (emphasis supplied).

In summary, if the procedural rule is not firmly established, or if it is applied in an arbitrary, unprecedented, or manifestly unfair fashion, it will not be considered

"adequate," and the state court decision based upon such a rule can be reviewed by a federal court. *Card,* 911 F.2d at 1517. Conversely, if the rule is deemed "adequate," the decision will not be reviewed by this court.

**2.** *Overcoming procedural default*

There are three circumstances in which an otherwise valid state-law ground will *not* bar a federal *habeas* court from considering a constitutional claim that was procedurally defaulted in state court: *i.e., (i)* where the petitioner demonstrates that he had good "cause" for not following the state procedural rule, *and*, that he was actually "prejudiced" by the alleged constitutional violation; *or (ii)* where the state procedural rule was not "firmly established and regularly followed"; *or (iii)* where failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring) (citations omitted); *see also*, *e.g.*, *Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may

27

grant the writ even in the absence of a showing of cause for the procedural default.")
(alteration supplied); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It
would be considered a fundamental miscarriage of justice if 'a constitutional violation
has probably resulted in the conviction of one who is actually innocent.'") (quoting
*Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn quoting *Murray*, 477 U.S. at 496)).

### a.    The "cause and prejudice" standard

"A federal court may still address the merits of a procedurally defaulted claim
if the petitioner can show cause for the default *and* actual prejudice resulting from the
alleged constitutional violation."  *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010)
(citing *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)) (emphasis supplied).  This
so-called "cause *and* prejudice" standard is clearly framed in the conjunctive;
therefore, a petitioner must prove both parts.

### i.    "Cause"

To show "cause," a petitioner must prove that "some objective factor external
to the defense impeded counsel's efforts" to raise the claim in the state courts.
*Murray*, 477 U.S. at 488; *see also Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988).

> Objective factors that constitute cause include "'interference by
> officials'" that makes compliance with the State's procedural rule
> impracticable, and "a showing that the factual or legal basis for a claim
> was not reasonably available to counsel."  In addition, constitutionally
> "[i]neffective assistance of counsel . . . [on direct review] is cause."

> Attorney error short of ineffective assistance of counsel [on direct review], however, does not constitute cause and will not excuse a procedural default.

*McCleskey*, 499 U.S. at 493-94 (citations omitted) (first alteration in original, all other alterations supplied).

While "[a]ttorney error [on direct review] that constitutes ineffective assistance of counsel" has long been accepted as "cause" to overcome a procedural default, the constitutional ineffectiveness of *post-conviction counsel on collateral review* generally will not support a finding of cause and prejudice to overcome a procedural default. *Coleman,* 501 U.S. at 753-54 (alterations supplied). That is because "[t]here is no constitutional right to an attorney in state post-conviction proceedings." *Id.* at 752 (alteration supplied) (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989)).

Even so, in three recent landmark cases, the Supreme Court extended its prior decision in *Coleman* when it decided that, as a matter of *equity, and, under specific, limited circumstances*, errors by counsel on post-conviction, collateral review could establish the necessary "cause" to overcome a procedurally defaulted claim. In the first such case, *Maples v. Thomas*, — U.S. —, 132 S. Ct. 912 (2012), the Supreme Court found that post-conviction counsel's gross professional misconduct (*e.g.* abandonment of the petitioner) severed the agency relationship between counsel and

the petitioner and, thus, established the necessary "cause" to overcome a procedural default. *Id.* at 922-23.

In the second case, *Martinez v. Ryan*, 569 U.S. —, 132 S. Ct. 1309 (2012), the Supreme Court held that post-conviction counsel's failure to raise an ineffective assistance of trial counsel claim at an initial review collateral proceeding could serve as the necessary "cause" to overcome the procedural default of that type of claim when the state prohibits it from being raised during the direct review process. *Id.* at 1317.

Finally, in *Trevino v. Thaler*, – U.S. – , 133 S. Ct. 1911 (2013), the Supreme Court extended the exception carved out in *Martinez* to situations in which a state's procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal. *Trevino*, 133 S. Ct. at 1921.

### *ii.* *"Prejudice"*

In addition to proving the existence of "cause" for a procedural default, a *habeas* petitioner must show that he was actually "prejudiced" by the alleged constitutional violation. He must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."

*United States v. Frady*, 456 U.S. 152, 170 (1982); *see also McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992) (*per curiam*). If the "cause" is of the type described in the Supreme Court's 2012 decision in *Martinez v. Ryan, supra*, then the reviewing court should consider whether the petitioner can demonstrate "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1318-19 (citing for comparison *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)).

b.    *The "fundamental miscarriage of justice" standard*

In a "rare," "extraordinary," and "narrow class of cases," a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the default if *either*: (a) a fundamental miscarriage of justice "'has probably resulted in the conviction of one who is actually innocent,'" *Smith*, 477 U.S. at 537-38 (quoting *Carrier*, 477 U.S. at 496); *or* (b) the petitioner shows "'by *clear and convincing* evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty.'" *Schlup*, 513 U.S. at 323 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)) (emphasis in *Schlup*, alteration supplied).

C.    **The Statutory Overlay:**  *The Effect of "the Antiterrorism and Effective Death Penalty Act of 1996" on* Habeas *Review*

The writ of *habeas corpus* "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).  That is especially true when federal courts are asked to engage in *habeas* review of a state court conviction pursuant to 28 U.S.C. § 2254.

> Direct review is the principal avenue for challenging a conviction. "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, *is secondary and limited.  Federal courts are not forums in which to relitigate state trials*."

*Id*. (emphasis and redaction supplied) (quoting *Barefoot*, 463 U.S. at 887).  "Those few who are ultimately successful [in obtaining federal *habeas* relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963), *overruled on other grounds by Wainwright v. Sykes*, 433 U.S. 72 (1977) (alteration supplied).

"Accordingly, . . . an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634 (citations, quotation marks, and footnote omitted).  That is due to the fact that, under the federal system of governments created by the United States Constitution,

32

[t]he States possess primary authority for defining and enforcing the criminal law.  In criminal trials they also hold the initial responsibility for vindicating constitutional rights.  Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.

*Engle v. Isaac*, 456 U.S. 107, 128 (1982) (alteration supplied).[34]

These principles were reinforced by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended preexisting *habeas* law.[35]  Among other things, several provisions of the AEDPA require federal courts to give greater deference to state court determinations of federal constitutional claims than before.

1.    *28 U.S.C. § 2254(e)(1)*

Section 2254(e)(1) requires district courts to *presume* that a state court's factual determinations are correct, unless the *habeas* petitioner rebuts the presumption of correctness with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *see also, e.g., Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001) (observing that §

_____

[34] "The reason most frequently advanced in our cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system."  *Brecht*, 507 U.S. at 635 (citing *Wright v. West*, 505 U.S. 277, 293 (1992); *McCleskey*, 499 U.S. at 491; and *Wainwright*, 433 U.S. at 90).

[35] The Antiterrorism and Effective Death Penalty Act ("AEDPA") was signed into law by President Clinton on April 24, 1996.  *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996).  The present petition was filed after that date.  Accordingly, the *habeas* statutes as amended by AEDPA apply to the claims asserted in this case.  *See id.* § 107(c), 110 Stat. at 1226; *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (applying AEDPA to *habeas* petitions filed after Act's effective date); *Hightower v. Schofield*, 365 F.3d 1008, 1013 (11th Cir. 2004) (same).  *Cf. Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (holding that AEDPA's amendments do not apply to *habeas* petitions filed prior to the Act's effective date); *Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001) (same); *Thompson v. Haley*, 255 F.3d 1292, 1295 (11th Cir. 2001) (same).

33

2254(e)(1) provides "a highly deferential standard of review for factual determinations made by a state court"). Section 2254(e)(1) "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)).

The deference that attends state court findings of fact pursuant to Section 2254(e)(1) applies to all *habeas* claims, regardless of their procedural stance. Thus, a presumption of correctness must be afforded to a state court's factual findings, even when the *habeas* claim is being examined *de novo*. *See Mansfield v. Secretary, Department of Corrections*, 679 F.3d 1301, 1313 (11th Cir. 2012) (acknowledging the federal court's obligation to accept a state court's factual findings as correct, *if* unrebutted by clear and convincing evidence, and proceeding to conduct a *de novo* review of the *habeas* claim)

The presumption of correctness also applies to *habeas* claims that were adjudicated on the merits by the state court and, therefore, are subject to the standards of review set out in 28 U.S.C. §§ 2254(d)(1) and (d)(2), discussed in the following section.

2.     *28 U.S.C. § 2254(d)*

34

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). It does not matter whether the state court decision contains a lengthy analysis of the claim, or is a summary ruling "unaccompanied by explanation." *Id.*

Further, the "backward-looking language" of the statute requires an examination of the state-court decision *on the date it was made. Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). That is, "[s]tate court decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'" *Id.* (alterations supplied) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)).

Finally, "review under §[§] 2254(d)(1) [and (d)(2)] is limited to the *record* that was before the state court that adjudicated the claim on the merits." *Id.* at 181 (alterations and emphasis supplied). Therefore, a federal *habeas* court conducting 2254(d) review should not consider new evidence "in the first instance effectively *de novo*." *Id.* at 182.

A closer look at the separate provisions of 28 U.S.C. § 2254(d)(1) and (d)(2) reveals that, when a state court has made a decision on a petitioner's constitutional claim, *habeas* relief cannot be granted, *unless* it is determined that the state court's adjudication of the claim *either*:

35

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; *or*

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis supplied).[36]

The "contrary to" and "unreasonable application of" clauses of § 2254(d) have been interpreted as "independent statutory modes of analysis." *Alderman v. Terry,* 468 F.3d 775, 791 (11th Cir. 2006) (citing *Williams,* 529 U.S. at 405-07).[37] When considering a state court's adjudication of a petitioner's claim, therefore, the *habeas* court must not conflate the two inquiries.

      a.      *The meaning of § 2254(d)(1)'s "contrary to" clause*

---

[36] Section 2254(d)(1)'s reference to "clearly established federal law, as determined by the Supreme Court of the United States" has been interpreted by the Supreme Court as referencing only "the *holdings,* as opposed to the *dicta,* of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams,* 529 U.S. at 412 (O'Connor, J., majority opinion) (emphasis and alteration supplied); *see also, e.g., Carey v. Musladin,* 549 U.S. 70, 74 (2006) (same); *Osborne v. Terry,* 466 F.3d 1298, 1305 (11th Cir. 2006) (same); *Warren v. Kyler,* 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted) (alteration supplied).

[37] *See also Williams,* 529 U.S. at 404 (O'Connor, J., majority opinion) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) '*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) '*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States.'") (emphasis and ellipses in original).

A state-court determination can be "contrary to" clearly established Supreme

Court precedent in at least two ways:

> *First*, a state-court decision is contrary to this Court's precedent if the
> state court arrives at a conclusion opposite to that reached by this Court
> on a question of law.  *Second*, a state-court decision is also contrary to
> this Court's precedent if the state court confronts facts that are
> materially indistinguishable from a relevant Supreme Court precedent
> and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405 (emphasis supplied).  *See also*, *e.g.*, *Brown v. Payton*, 544

U.S. 133, 141 (2005) (same); *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*)

(same); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (same).

The Eleventh Circuit has observed that the Supreme Court's majority opinion

in *Williams* does not limit the construction of § 2254(d)(1)'s "contrary to" clause to

the two examples set forth above.[38]  Instead, the statutory language "simply implies

---

[38] Indeed, as one commentator has observed, the possible permutations are not just two, but at least four in number:

> The word "contrary" denotes incompatibility or logical inconsistency.  Two
> propositions are incompatible with one another if both cannot be true or correct.
> Thus, a state court decision is contrary to federal law if that decision and the
> applicable federal law cannot both be true or correct.  Given this premise, there
> appears to be four possible combinations of state court adjudications and resulting
> decisions that are pertinent to this textual inquiry:
>
> • the state court applies the correct federal standard and arrives at a correct
>   outcome;
>
> • the state court applies an incorrect federal standard and arrives at an incorrect
>   outcome;
>
> • the state court applies an incorrect federal standard and arrives at a correct

37

that 'the state court's decision must be substantially different from the relevant precedent of [the Supreme] Court.'" *Alderman*, 468 F.3d at 791 (quoting *Williams*, 529 U.S. at 405) (alteration supplied).

> **b.**  *The meaning of § 2254(d)(1)'s "unreasonable application" clause*

A state court's determination of a federal constitutional claim can result in an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> *First*, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. *Second*, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407 (emphasis supplied). *See also*, *e.g.*, *Putman*, 268 F.3d at 1240-41 (same).

---

outcome; and,

•     the state court applies the correct federal standard and arrives at an incorrect outcome.

Allan Ides, *Habeas Standards of Review Under 28 U.S.C. § 2254(d)(1): A Commentary on Statutory Text and Supreme Court Precedent*, 60 WASH. & LEE L. REV. 677, 685 (2003) (footnotes omitted).

It is important to notice that "an *unreasonable* application of federal law is different from an *incorrect* application." *Williams*, 529 U.S. at 410 (emphasis in original). A federal *habeas* court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law *erroneously* or *incorrectly*. Rather, that application must also be *unreasonable*." *Id*. at 411 (emphasis supplied).

In other words, the question that should be asked is *not* whether the state court "correctly" applied Supreme Court precedent when deciding the federal constitutional issue, but whether the state court's determination was "unreasonable." *Id*. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.") (alteration supplied). *See also*, *e.g.*, *Bell*, 535 U.S. at 694 (observing that the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established federal law is objectively unreasonable," and stating that "an unreasonable application is different from an incorrect one"); *Harrington v. Richter*, 562 U.S. 86, 101-04 (2011) (same).[39]

---

[39] The Eleventh Circuit has observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

In order to demonstrate that a state court's application of clearly established federal law was "objectively unreasonable," the *habeas* petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement*." *Id.* at 103 (emphasis supplied). Stated another way, if the state-court's resolution of a claim is *debatable among fairminded jurists*, it is *not* "objectively unreasonable."

"By its very language, [the phrase] 'unreasonable application' refers to mixed questions of law and fact, when a state court has 'unreasonably' applied clear Supreme Court precedent to the facts of a given case." *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir. 1998), *abrogated on other grounds by Williams*, 529 U.S. at 413 (citation and footnote omitted) (alteration supplied). Mixed questions of constitutional law and fact are those decisions "which require the application of a legal standard to the historical-fact determinations." *Townsend v. Sain*, 372 U.S. 293,

---

In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."

*Id.* (quoting *Williams*, 529 U.S. at 409) (emphasis in original).

309 n.6 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).

        c.     *The meaning of § 2254(d)(2)'s clause addressing an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding"*

"28 U.S.C. § 2254(d)(2) imposes a 'daunting standard — one that will be satisfied in relatively few cases.'" *Cash v. Maxwell*, — U.S. —, 132 S. Ct. 611, 612 (2012) (quoting *Maxwell v. Roe*, 628 F.3d 486, 500 (9th Cir. 2010) (internal quotation marks omitted in original)).

> As we have observed in related contexts, "[t]he term 'unreasonable' is no doubt difficult to define." *Williams v. Taylor,* 529 U.S. 362, 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). It suffices to say, however, that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Cf. id.,* at 411, 120 S. Ct. 1495.

*Wood v. Allen,* 558 U.S. 290, 301 (2010) (alteration in original). Therefore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination." *Id.* (quoting *Rice v. Collins,* 546 U.S. 333, 341-42 (2006)) (alteration and ellipses in original). Conversely,

> when a state court's adjudication of a habeas claim result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, this Court

is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them.

*Adkins v. Warden, Holman Correctional Facility*, 710 F.3d 1241, 1249 -1250 (11th Cir. 2013) (quoting *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (*en banc*) (alterations in original) (quotation marks and citations omitted in original)).

        d.    *Evaluating state court factual determinations under 28 U.S.C. §§ 2254(d)(2) and (e)(1)*

As set out in the previous parts of this opinion, 28 U.S.C. § 2254(d)(2) regulates federal court review of state court findings of fact by limiting the availability of federal *habeas* relief on any claims by a state prisoner that are grounded in a state court's factual findings, unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

It also must be remembered that 28 U.S.C. § 2254(e)(1) affords a presumption of correctness to factual determinations made by a state court, and that the *habeas* petitioner bears the burden of rebutting that presumption "by *clear and convincing evidence*." 28 U.S.C. § 2254(e)(1) (emphasis supplied); *see also Ward*, 592 F.3d at 1155-56 (holding that the presumption of correctness attending a state court's findings of fact can be overcome only by clear and convincing evidence).

The Eleventh Circuit has observed that the relationship between subsections 2254(d)(2) and (e)(1) remains an open question. *See Cave v. Secretary for Department of Corrections*, 638 F.3d 739, 744-46 (11th Cir. 2011) ("'[N]o court has fully explored the interaction of § 2254(d)(2)'s 'unreasonableness' standard and § 2254(e)(1)'s 'clear and convincing evidence' standard.") (quoting *Gore v. Secretary for Department of Corrections*, 492 F.3d 1273, 1294 n.51 (11th Cir. 2007)) (alteration supplied). Even so, the Eleventh Circuit's earlier opinion in *Ward v. Hall*, 592 F.3d 1144 (2010), clearly held that federal *habeas* courts "must presume the state court's factual findings to be correct *unless the petitioner rebuts that presumption by clear and convincing evidence*." *Id.* at 1177 (citing § 2254(e)(1); *Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001)) (emphasis supplied). That same opinion also observed that "28 U.S.C. § 2254(e)(1) commands that for a writ to issue because the state court made an 'unreasonable determination of the facts,' the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155-56 (alteration in original).

## D.    The Burden of Proof and Heightened Pleading Requirements for *Habeas* Petitions

*Habeas* review "exists only to review errors of constitutional dimension." *McFarland v. Scott*, 512 U.S. 849, 861 (1994) (O'Connor, J., concurring); *see also*

28 U.S.C. § 2254(a).[40] "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Barefoot*, 463 U.S. at 887 (ellipses supplied). Two consequences flow from those fundamental propositions.

*First*, the *habeas* petitioner bears the burden of overcoming the presumption of "legality" that attaches to the state court conviction and sentence, and of establishing a factual basis demonstrating that federal post-conviction relief should be granted. *See, e.g.*, 28 U.S.C. §§ 2254(d) and (e)(1);[41] *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983) ("The burden of proof in a habeas proceeding is always on the petitioner.") (citing *Henson v. Estelle*, 641 F.2d 250, 253 (5th Cir. 1981)).

---

[40] The statute cited in text provides that: "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody *in violation of the Constitution or laws or treaties of the United States*." 28 U.S.C. § 2254(a) (emphasis supplied). It follows that claims pertaining solely to questions of state law fall outside the parameters of this court's authority to provide relief under § 2254.

[41] As discussed in Part IV.C. *supra*, Section 2254(d) provides that the state courts' adjudication of a *habeas* petitioner's claims can be overturned only if the petitioner carries the burden of demonstrating that a particular determination *either* (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," *or* (2) that the ruling "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Further, § 2254(e)(1) provides that:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

44

Case 1:07-cv-00518-CLS   Document 50   Filed 05/26/16   Page 45 of 300

*Second*, the *habeas* petitioner must meet "heightened pleading requirements." *McFarland*, 512 U.S. at 856 (citations omitted); *Borden v Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (Section 2254 requires "fact pleading," and not merely "notice pleading"). The mere assertion of a ground for relief, without concomitant allegation of sufficient factual detail, does not satisfy either the petitioner's burden of proof under 28 U.S.C. § 2254(e)(1), or the requirements of Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts*, which provides that a state prisoner must "specify all the grounds for relief available to the petitioner," and to then "*state the facts supporting each ground.*" 28 U.S.C. § 2254 app. Rule 2(c), *Rules Governing Section 2254 Cases in the United States District Courts* (emphasis supplied).[42]  *See also* 28 U.S.C. § 2242 (stating that an application for writ of *habeas corpus* "shall allege *the facts* concerning the applicant's commitment or detention") (emphasis supplied).

In short, a *habeas* petitioner must include in his statement of each claim sufficient supporting facts to justify a decision for the petitioner if the alleged facts are proven true.  *See*, *e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (observing that a *habeas* petition must "state facts that point to a 'real possibility of constitutional error'") (quoting Advisory Committee Notes to Rule 4 of the *Rules*

---

[42] *Accord* Rule 2(b) of the *Rules Governing Section 2255 Proceedings for the United States District Courts*.

*Governing Section 2254 Cases in the United States District Courts*).  *Cf. Diaz v.*

*United States*, 930 F.2d 832, 835 (11th Cir. 1991) (holding in a case premised upon

28 U.S.C. § 2255 that, despite the liberal construction due a *pro se* petitioner's

allegations, dismissal was appropriate because the movant did not allege "facts that,

if proven, would entitle him to relief").[43]

In addition, "[c]itation of the controlling constitutional, statutory, or other bases

for relief for each claim also should be stated." 1 Randy Hertz & James S. Liebman,

*Federal Habeas Corpus Practice and Procedure* § 11.6, at 654 (5th ed. 2005)

(alteration supplied).  As another district judge has stated:

> It is not the duty of federal courts to try to second guess the meanings of
> statements and intentions of petitioners.  Rather the duty is upon the
> individual who asserts a denial of his constitutional rights to come forth
> with a statement of sufficient clarity and sufficient supporting facts to
> enable a court to understand his argument and to render a decision on
> the matter.

*Nail v. Slayton*, 353 F. Supp. 1013, 1019 (W.D. Va. 1972).

## E.    Introduction to Ineffective Assistance of Counsel Claims

An introduction to ineffective assistance of counsel claims is included here

because of the relationship between such claims — which are governed by a highly

---

[43] *Cf. Hill v. Lockart*, 474 U.S. 52, 60 (1986) ("Petitioner did not allege in his habeas petition
that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not
guilty and insisted on going to trial.  *He alleged no special circumstances that might support the
conclusion that he placed particular emphasis on his parole eligibility in deciding whether or not
to plead guilty*.") (emphasis supplied).

deferential standard of constitutional law — and 28 U.S.C. § 2254(d), which itself requires the exercise of deference.  A general discussion also provides a central reference point, because Davis has divided his allegations that trial counsel provided ineffective assistance into several separate *habeas* claims.

With the sole exceptions of the situations discussed in the Supreme Court's *Martinez* and *Trevino* decisions,[44] ineffective assistance of counsel claims are specifically limited to the performance of attorneys who represented a state prisoner at trial, or on direct appeal from the conviction.  *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").  *See also Coleman*, 501 U.S. at 752 ("There is no constitutional right to an attorney in state post-conviction proceedings. . . . Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted).

The Supreme Court's "benchmark" standard for judging any claim that a trial or appellate attorney provided representational assistance to a state prisoner that was so professionally incompetent as to create issues of federal constitutional proportions is the question of "whether counsel's conduct so undermined the proper functioning

---

[44] *See supra,* page 30.

of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  If an objective answer to that question is "yes," then counsel was constitutionally ineffective.  Even so, *Strickland* requires that the issue be approached in two steps: *i.e.,*

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. *First, the defendant must show that counsel's performance was deficient.*  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second, the defendant must show that the deficient performance prejudiced the defense.*  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687 (emphasis supplied); *see also*, *e.g.*, *Williams*, 529 U.S. at 390 (quoting *strickland*); *Grayson v. Thompson*, 257 F.3d 1194, 1215 (11th Cir. 2001) (same).

Both parts of the *Strickland* standard must be satisfied: that is, a *habeas* petitioner bears the burden of proving, by "a preponderance of competent evidence," *both* that the performance of his trial or appellate attorney was *deficient*; *and*, that such deficient performance *prejudiced his defense. Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*).  Thus, a federal court is not required to address both parts of the *Strickland* standard when the *habeas* petitioner makes an

insufficient showing on one of the prongs.  *See*, *e.g.*, *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, . . . or vice versa.") (citation to *Strickland* omitted).

1.    *The performance prong*

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler*, 218 F.3d at 1313).   To satisfy the performance prong of the *Strickland* test, a defendant must prove that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687.   The standard for gauging attorney performance is "reasonableness under prevailing professional norms."   *Id*. at 688.   "The test for reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance at trial." *Stewart*, 476 F.3d at 1209 (citing *Chandler*, 218 F.3d at 1313).   Furthermore, courts must "recognize that omissions are inevitable.  B ut, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." *Id.*

49

(quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)) (internal quotation marks omitted). The Sixth Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only an attorney who performed reasonably well within the broad range of professional norms. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

The reasonableness of counsel's performance is judged from the perspective of the attorney at the time of the alleged error, and in light of all the circumstances. *See*, *e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1286 (11th Cir. 1998) (noting that *Strickland* performance review is a "'deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors'") (quoting *Baldwin v. Johnson*, 152 F.3d 1304, 1311 (11th Cir. 1998)).

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317. Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence — which is also constitutionally protected — and would restrict the wide latitude

50

counsel have in making tactical decisions." *Putman v. Head*, 268 F.3d
1223, 1244 (11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (first alteration supplied,

second alteration in original).  Judicial scrutiny of counsel's performance must be

"highly deferential," because representation is an art, and an act or omission that is

unprofessional in one case may be sound or even brilliant in another.  *See Strickland*,

466 U.S. at 697.

> It is all too tempting for a defendant to second-guess counsel's
> assistance after conviction or adverse sentence, and it is all too easy for
> a court, examining counsel's defense after it has proved unsuccessful,
> to conclude that a particular act or omission of counsel was
> unreasonable.  A fair assessment of attorney performance requires that
> every effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and to
> evaluate the conduct from counsel's perspective at the time.  Because of
> the difficulties inherent in making the evaluation, a court must indulge
> a strong presumption that counsel's conduct falls within the wide range
> of reasonable professional assistance; *that is, the defendant must
> overcome the presumption that, under the circumstances, the challenged
> action might be considered sound trial strategy*.  There are countless
> ways to provide effective assistance in any given case.  Even the best
> criminal defense attorneys would not defend a particular client in the
> same way.

*Strickland*, 466 U.S. at 689 (emphasis supplied) (citations and internal quotation

marks omitted); *see also*, *e.g.*, *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)

("When reviewing whether an attorney is ineffective, courts should always presume

strongly that counsel's performance was reasonable and adequate.") (internal quotation marks omitted).

"Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: '*petitioner must establish that no competent counsel would have taken the action that his counsel did take.*'" *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1315) (emphasis supplied). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds *unless it is shown that no reasonable lawyer, in the circumstances, would have done so.*" *Rogers*, 13 F.3d at 386 (emphasis supplied).

2.   *The prejudice prong*

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002). *See also*, *e.g.*, *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (holding that a *habeas* petitioner "must affirmatively prove prejudice, because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'") (quoting *Strickland*, 466 U.S. at 693)) (alteration in original). "It is not enough for the [*habeas* petitioner] to show that the errors had some conceivable effect on the outcome of the

proceeding." *Strickland*, 466 U.S. at 693 (alteration supplied); *see also Harrington*, 562 U.S. at 112 (citing *Strickland*, 466 at 693) ("The likelihood of a different result must be *substantial*, not just conceivable.")) (emphasis supplied).

Instead, to prove prejudice, the *habeas* petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Williams*, 529 U.S. at 391 (same).   When that standard is applied in the context of the death sentence itself, "'the question is whether there is a reasonable probability that, absent the errors, the sentencer [*i.e.*, in Alabama, the trial court judge] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695) (alteration supplied).

That is a high standard, and in order to satisfy it a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones*, 255 F.3d 1273, 1278 (11th Cir. 2001) (quoting *Strickland*, 466 U.S. at 687).   In other words, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson*, 256 F.3d at 1177 (quoting *Eddmonds v.*

53

*Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996) (in turn quoting *Kimmelman v. Morrison*,

477 U.S. 365, 374 (1986))) (internal quotation marks omitted) (alteration supplied).

> 3.  *Deference accorded state court findings of historical fact, when evaluating ineffective assistance of counsel claims*

State court findings of historical fact made in the course of evaluating a claim

of ineffective assistance of counsel are subject to a presumption of correctness under

28 U.S.C. §§ 2254(d)(2) and (e)(1).  *See, e.g.*, *Thompson v. Haley*, 255 F.3d 1292,

1297 (11th Cir. 2001).  To overcome a state-court finding of fact, the petitioner bears

a burden of proving contrary facts by "clear and convincing evidence."

Additionally, under the AEDPA, a federal *habeas* court may grant relief on a

claim of ineffective assistance of counsel *only if* the state-court determination

involved an "unreasonable application" of the *Strickland* standards to the facts of the

case.  *Strickland* itself, of course, also requires an assessment of whether counsel's

conduct was professionally unreasonable.   Those two assessments cannot be

conflated into one.  *See Harrington,* 562 U.S. at 101-12.  Thus, *habea*s relief on a

claim of ineffective assistance of counsel can be granted with respect to a claim

actually decided by the state courts *only if* the *habeas* court determines that it was

"objectively unreasonable" for the state courts to find that counsel's conduct was not

"professionally unreasonable." The *Harrington* Court explained:

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; see also *Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *Id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S. [111, 125], 129 S. Ct. at 1420 [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at [123], 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question

55

is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105 (alterations supplied); *see also Premo v. Moore*, 562 U.S. 115, 121-22 (2011).

## V.  DAVIS'S CLAIMS

### A.    Ineffective Assistance of Counsel During Guilt Phase of Trial

Davis contends that, by abdicating their "Constitutionally mandated responsibility to subject the State's case to meaningful adversarial testing," and by committing errors so serious that they deprived him of a fair trial, trial counsel provided ineffective assistance under the framework established by *Strickland v. Washington*, 466 U.S. 668 (1984).[45]  Davis divides this claim into five subclaims of ineffective assistance based on his trial counsel's alleged: (1) failure to conduct an adequate investigation; (2) failure to present alibi witnesses; (3) failure to challenge the State's investigation and presentation of the case; (4) failure to present, argue adequately, and seek favorable rulings on numerous pre-trial motions; and (5) failure to present additional substantive evidence in his defense.[46]   He raises numerous

---

[45] Doc. no. 33, at 7.

[46] *Id*. at 7-23.

factual allegations in support of each subclaim. Even so, the majority of those factual allegations were raised and rejected in state court.[47]

The trial court found that Davis had not met his burden of establishing ineffective assistance of counsel,[48] and the Alabama Court of Criminal Appeals affirmed that finding. *Davis v. State*, 9 So. 3d 539, 546-52 (Ala. Crim. App. 2008). Davis now argues that the Court of Criminal Appeals failed to properly apply the *Strickland* test and its progeny, including *Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Williams v. Taylor,* 529 U.S. 362 (2000).[49] Each of Davis's five subclaims will be addressed, in turn.

1.     *Failure to adequately investigate the capital murder charge*

Davis asserts that his trial counsel failed to undertake a timely and substantive investigation prior to trial, and he argues that, had they done so, they would have discovered relevant evidence that would have aided his defense. He challenges the amount of time counsel spent on his case, the scope of counsel's investigation, and counsel's failure to transcribe the preliminary hearing.

a.     *Time spent in preparation for trial*

---

[47] Any claim that was not raised in state court will be identified below. Otherwise, the claims were raised in Davis's Second Amended Rule 32 Petition. Rule 32 C.R. Vol. 14, Tab 52.

[48] Rule 32 C.R. Vol. 62, Tab 80, at 5-26.

[49] However, the court notes that many of Davis's claims were not presented to the Alabama Court of Criminal Appeals.

Davis contends that the amount of time counsel spent preparing for trial and investigating was grossly inadequate for a capital case.[50]  He complains that he first met attorney Steven Giddens on April 9, 1993, and then only for a few minutes prior to the preliminary hearing.[51]   Thereafter, neither Giddens nor co-counsel Jonathan Adams performed any meaningful work to prepare for trial until just two weeks before the trial at the end of November.  Davis asserts that Giddens' time sheets reflect that Giddens met with him only twice after their initial meeting, on June 11, 1993, and November 12, 1993, and for only an hour each time.[52]

The generalized assertion that counsel did not spend adequate time preparing for trial, standing alone, does not entitle Davis to relief.  First,  it should be noted that this "claim" was not specifically raised in state court.  Instead, within the section of his Rule 32 petition entitled "Statement of the Case," Davis complained that the time records submitted to the court by one of his trial lawyers showed that he did not begin working on the case until November 24, 1993, just eleven days before trial commenced.[53]   At the conclusion of the evidentiary hearing, Davis argued that counsel should have spent more than two hours with him,[54] but conceded: "the case

---

[50]  Doc. no. 33, at 8-13.

[51]  *Id*. at 8-9.

[52]  *Id*.

[53]  Rule 32 C.R. Vol. 14, Tab. R-52, at 3.

[54]  He complained that Giddens first met with him in June, 1993, three months after the crime

law requires me to point to specific errors that were made by defense attorneys and not just say, well, they only spent two weeks investigating this case and so that's not enough."[55]  The alleged lack of sufficient time spent investigating, standing alone, does not warrant further discussion[56] as the claim was effectively waived by counsel in state court.  The amount of time involved in preparation is, however, discussed below in conjunction with specific alleged deficiencies.

        b.    *Scope of investigation*

Davis complains that counsel failed to take the following actions during the months prior to trial: request a continuance of the preliminary hearing because he had conducted no pre-hearing interviews; request funds to obtain an investigator; file motions to obtain mental health or social history evaluations, and subpoenas for police, school, DHR, or other family public assistance records; conduct an investigation into drug or alcohol use by Davis or members of his family; elicit exculpatory or mitigating information from Davis; interview Davis's mother until one week before trial; interview any other family members or friends of Davis; interview key witnesses closer in time to the event; interview or investigate the backgrounds of

---

was committed, and noted that the time sheets reflect that Adams met with Davis only one time and that nothing was done on the case until November.  Rule 32 R. Vol. 24, at 1153.

    [55] *Id.* at 1155.

    [56] To the extent that the Respondent argues that Davis has added new factual support for this claim, the state court record reveals that essentially the same arguments were made.  *Id.* at 1153-1155.

Shannon Hardy Wilson or the Phillips cousins, the centerpieces of the State's case against Davis; pursue an alibi defense; take notes of important interviews; conduct meaningful interviews of the co-defendants or Willie Smith; investigate the burglary of the firearm that was used in the offense; attempt to identify and interview the informant; and prepare a coherent defense.[57]

Davis has not, however, described how or why he was prejudiced by counsel's alleged deficiencies. Accordingly, he has failed to satisfy the heightened pleading requirements for *habeas* cases. *See McFarland*, 512 U.S. at 856. To the extent that certain allegations are repeated elsewhere within this claim or petition, with fully-developed arguments regarding prejudice, the assertions will be addressed there. To the extent that they are not, the allegations are due to be dismissed as conclusory.

### c.    *Failure to transcribe preliminary hearing*

Davis argues that his trial counsel were ineffective for failing to take notes during the preliminary hearing, or request that the hearing be recorded.[58]   The Alabama Court of Criminal Appeals addressed this claim in its opinion affirming the denial of Davis's Rule 32 petition:

> Davis argues that counsel was ineffective for failing to ensure that the record of the proceedings in the lower court was fully recorded.

---

[57] Doc. no. 33, at 8-13.

[58] *Id*. at 9.

Specifically, he asserts that counsel erred in failing to have his preliminary hearing recorded and for not ensuring that sidebar conferences were recorded.

The circuit court made the following findings on this claim:

In paragraph 38, Davis alleges [ineffective assistance of counsel] based on trial counsel's failure to move for full recordation of all proceedings in his capital murder trial. Davis failed to prove that he was prejudiced by the lack of transcription of certain sidebars during the course of trial. Although Giddens testified, the subject of whether any controversial rulings or prejudicial comments were made during these sidebars was not addressed. This Court, which presided over Davis's capital murder trial, cannot recall anything discussed during sidebars that would have prejudiced Davis due to their lack of transcription. Because Davis did not put forth evidence to support this claim, it is denied.

(R. 1151-52.)

At the Rule 32 hearing, Davis asked Giddens why he did not move to have the preliminary hearing transcribed. The following occurred:

[Rule 32 counsel]: Do you make a strategy decision not to make that motion or have you just never thought about making that motion?

[Giddens]: When the only witness really is going to be the investigating officer, you find out what you need to know, I mean, he's charged with killing a man at a gas station, Direct Oil here in Anniston. And that was pretty much the testimony. And I believe the officer testified what the codefendants had told him.

(R. 31-32.)  Davis made no attempt to show how he was prejudiced by
counsel's failure to have the preliminary hearing or certain sidebar
conferences recorded.   There are no allegations that the officer's
testimony at the preliminary hearing was inconsistent with his trial
testimony or that the sidebar conferences contained omitted information
that prejudiced Davis.  "It is incumbent upon [petitioner] to show some
prejudice from the failure to transcribe the preliminary hearing
testimony before it may be claimed to be ineffective assistance of
counsel.  *Spilman v. State,* 633 P.2d 183 (Wyo. 1981)." *Jennings v.
State,* 806 P.2d 1299, 1307 (Wyo. 1991).  The circuit court correctly
denied relief on this claim.

*Davis v. State*, 9 So. 3d 539, 551 (Ala. Crim. App. 2008) (alterations in original).

Davis has not shown that the state court's rejection of this claim was contrary

to, or an unreasonable application of, clearly established federal law.  Although Davis

argues that a transcript of the preliminary hearing *could* have been important because

it *might* have contained testimony that conflicted with trial testimony,[59] he has not

demonstrated that the trial testimony actually conflicted with the testimony at the

preliminary hearing, or that he was prejudiced because the police officer's testimony

was not transcribed.  Finally, although he claims that the state court unreasonably

required him to allege prejudice with greater specificity, he offers no legal support for

that contention.[60]

2.   *Failure to locate, interview, and present exculpatory
     witnesses*

---

[59] *Id.*

[60] *Id.* at 22.

Davis complains that his trial counsel's inadequate investigation prevented them from locating, interviewing, and presenting additional exculpatory witnesses, including alibi witnesses.[61]  Davis faults counsel for interviewing only one potential exculpatory witness, his proffered alibi witness, Tonya Heard.[62]  He argues that counsel should have sought out and interviewed other "people in Davis's extended family and social network,"[63] and contends that a sufficient investigation would have uncovered many other exculpatory witnesses, such as his "aunt" Betty Jacobs and her daughter Cynthia Denise Jacobs, both of whom could have provided a different, more persuasive alibi than that of Tonya Heard.[64]

Review of the underlying state court record reveals that the facts in support of this claim were presented to the state court.  While Davis did not name Betty Jacobs or Cynthia Denise Jacobs in his Rule 32 petition, or assert that counsel should have

---

[61] *Id*. at 13-16.

[62] In his Rule 32 petition, Davis alleged counsel was ineffective for failing to call Tonya Heard as an alibi witness. Rule 32 C.R. Vol. 14, Tab 52, at 10.  This is not the claim he raises in this court.  However, it is worth noting that at the evidentiary hearing, Giddens testified that he decided not to call Ms. Heard as a witness because he felt her testimony would be damaging.  Rule 32 R. Vol. 18, Tab 58, at 68-70.  This was based on her statement to Giddens that Davis had been at her house on the night of the murder, but left, then later returned, acted nervous, and instructed her to tell people that he had been with her all night.  *Id*.  The Alabama Court of Criminal Appeals found that counsel made a sound strategic decision and was not ineffective for failing to call her as an alibi witness. *Davis v. State*, 9 So. 3d at 548-549.

[63] Doc. no. 33, at 16.

[64] *Id*. at 14-15.  Giddens testified at the Rule 32 hearing that Davis told him Ms. Heard could provide him with an alibi, but he did not mention Betty Jacobs or Cynthia Denise Jacobs.  Rule 32 R. Vol. 19, at 149.

presented their testimony at trial, he did call them as witnesses during the Rule 32 evidentiary hearing.[65]  They testified that, on the night of the murder, Davis was at their home in Anniston, a thirty-minute walk, or an eight-to-ten-minute drive, from Direct Oil, between 7:00 and 8:00, the time the murder was committed.[66]  They also testified that they had not previously informed anyone that Davis was with them because no one had asked.[67]  Meanwhile, Giddens testified that Davis had never informed him that Betty or Cynthia Denise Jacobs might be able to offer testimony on his behalf.[68]

The Alabama Court of Criminal Appeals affirmed the trial court's denial of this claim. That court noted that "[t]rial counsel's performance cannot be deemed ineffective for failing to locate alibi witnesses whose existence was not brought to his attention," *Davis v. State*, 9 So. 3d 539, 548 (Ala. Crim. App. 2008) (quoting *Adkins v. State*, 632 S.E. 2d 650, 653 (Ga. 2006) (in turn quoting *Escobar v. State*, 620 S.E. 2d 812 (2005)) (alteration supplied), and held that "counsel was not ineffective for failing to conduct further investigation into Davis's alibi defense and to locate Cynthia Jacobs, a witness whose testimony was inconsistent with Davis's own

---

[65] Rule 32 R. Vol.  19, at 241-324.

[66] *Id*. at 242-244, 260-261, 264-265, 281-282, 295-297, 309, 315-316.

[67] *Id*. at 245, 256, 295-299.

[68] *Id*. at 148-149.

statements to his attorneys." *Davis v. State*, 9 So. 3d 539, 548 (Ala. Crim. App. 2008).  Davis argues that he should not be blamed for failing to bring this information to counsels' attention, given the paucity of time counsel actually spent with him.  It is not reasonable to believe, however, that a criminal defendant facing a capital murder charge would not inform his attorneys of a legitimate alibi defense, if one existed, regardless of how much or how little time he spent meeting with those attorneys.  Moreover, the Court of Appeals made the factual determination that the testimony of Davis's aunt and her daughter was inconsistent with that of Davis's other alleged alibi witness, as well as with Davis's own statements to trial counsel. That determination is reasonable.  Counsels' failure to search for multiple, inconsistent potential alibis in the hope of finding one that might stick cannot be deemed deficient performance.  Davis is entitled to no relief.

3.    *Failure to challenge the state's investigation and presentation of its case-in-chief*

Davis asserts that his trial counsels' failure to investigate compromised his ability to challenge the State's case during the trial.[69]  He argues that counsel failed to adequately cross-examine State witnesses, and object to "irrelevant and prejudicial" evidence introduced by the State.[70]  Specifically, he contends that counsel

---

[69] Doc. no. 33, at 16-19.

[70] *Id*. at 16.

65

should have: (1) argued that the Phillips cousins were not credible because they received reduced sentences for their testimony, and gave their statements only after they were threatened with capital punishment if they refused to do so; (2) challenged Shannon Wilson's testimony because she failed to establish it was actually Davis she heard boasting about committing the crime; (3) taken adequate steps to ensure no gang-related references or innuendo were made during the trial; (4) objected to the admission of a note found in the pocket of a pair of shorts alleged to have been worn by Davis;[71] (5) argued that the clothing descriptions given by the disinterested witnesses matched clothing worn by the Phillips cousins, not Davis; (6) emphasized to the jury that Davis was taller than 6 feet, whereas Dewey Waites' identification of the shooter included an estimation that he was approximately 5 feet, 8 inches.[72]

Davis unsuccessfully raised these allegations in his Rule 32 petition,[73] and the Alabama Court of Criminal Appeals affirmed the trial court's denial of relief:

> Second, Davis argues that counsel was ineffective for failing to challenge the State's case against him. The circuit court made the following findings of fact on this claim:

---

[71] This allegation is one basis of Claim G, that Davis's first, fifth, sixth, eighth and fourteenth amendment rights were violated by the admission into evidence of a note allegedly found in the pocket of Davis's clothing, and will be discussed in greater detail in Section V.G., *infra*.

[72] Doc. no. 33, at 16-19.

[73] Rule 32 C.R. Vol. 14, Tab 52, at 11-14.

Davis failed to carry his burden of proof as to this allegation in his second amended petition. The record shows that trial counsel challenged the State's investigation and preparation of this case, including reviewing witness statements, discovery, visiting the crime scene, and speaking with Davis. In fact, this preparation paid off at trial when defense counsel prepared a defense that attempted to cast doubt on the veracity of the Phillips brothers [*sic*] [his codefendants] and on Willie Smith. That this defense was not successful does not lessen its validity. The closing arguments of defense counsel at the guilt phase demonstrate how effective they were in preparing a defense. The use of Alphonso Phillips's allocution against him — suggesting he was the triggerman — is the stuff good defenses are made of. (R. 1210-1211.) Trial counsel also used the State's evidence of the descriptions of the participants in the Direct Oil shooting in an attempt to establish a reasonable doubt as to Davis's innocence. This defense strategy included calling a police officer to the stand to recount a physical description given immediately after the crime that was someone different from Davis's description. This testimony, combined with the efforts to discredit the Phillips brothers [*sic*], allowed defense counsel to argue that Willie Smith and the Phillips brothers [*sic*] were conspiring to frame Davis.

As to paragraphs 24-29 in the second amended petition, Davis offered no evidence or argument that would be sufficient to meet his burden of proof in this case. As Davis has not established deficient performance or prejudice in this regard, this claim is denied.

(C.R. 1147-48.) The circuit court's findings are supported by the record.

We have reviewed the record of Davis's trial. Davis's codefendants Alphonso Phillips and Terrance Phillips testified that the

three made plans to rob the Direct Oil gasoline station in Anniston and that Davis was carrying a .25 caliber semiautomatic pistol.  FN.

> FN. In exchange for their testimony at Davis's trial, Alphonso and Terrance Phillips pleaded guilty to conspiracy to commit robbery. Alphonso was sentenced to 20 years' imprisonment, and Terrance was sentenced to 10 years' imprisonment.

Alphonso testified that when they went into the gasoline station Davis pointed the gun at Johnny Hazle and fired two shots at him.  Terrance said that he was supposed to be the lookout but that he walked away before they got to the gas station.  He testified that he heard gunshots as he was walking away.  Willie Smith testified that Davis told him that he had robbed and shot someone at the Direct Oil station.   Still other witnesses testified that Davis had made statements to them concerning his involvement in the robbery/murder.  The evidence against Davis was overwhelming.

> Giddens testified at the Rule 32 hearing that "our strategy was [to] discredit the people who were there, show the jury the discrepancies in the height, weight, and actually try to establish a reasonable doubt that perhaps a co-defendant who had a motive to lie did it, not Mr. Davis." (R. 150.)   The record shows that counsel did an admirable job of attempting to discredit  the State's witnesses.  As this Court stated on direct appeal:

> > The appellant's defense strategy consisted mainly of trying to discredit or to cast doubt upon the testimony of the state's witnesses through cross-examination and arguments to the jury and to the trial court.  By these means, he attempted to exploit differences as to some details in their testimony, attempted to persuade the jury that under the facts it was more likely that Alphonso did the shooting, argued to the jury and to the trial court that the facts surrounding the commission of the crime better fit the elements of the lesser included offense of felony-murder

rather than with the offense of capital murder, and attempted to cast doubt upon the veracity of Alphonso, Terrance, and Smith (who was involved with the authorities in an unrelated case) by emphasizing the deals they had made with the state for lenient treatment in return for their testimony.

*Davis v. State,* 718 So.2d at 1156.  The record also shows that counsel made numerous objections and was able to secure a ruling excluding any reference to "gang activity."  Counsel vigorously attacked the State's overwhelming evidence against Davis.  That counsel was unsuccessful in failing to obtain an acquittal is not sufficient to find that counsel's performance was ineffective.

> The fact that a particular defense was unsuccessful does not prove ineffective assistance of counsel.  *Chandler v. United States,* 218 F.3d [1305] at 1314 [(11th Cir. 2000)].  "[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.'"  *Chandler,* 218 F.3d at 1314 (quoting *Darden v. Wainwright,* 477 U.S. 168, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)).

*Brown v. Crosby,* 249 F. Supp. 2d 1285, 1321 (S.D. Fla. 2003).  The circuit court did not abuse its discretion in denying relief on this claim.

Third, Davis argues that his attorneys were ineffective for failing to object to what Davis says was irrelevant and prejudicial evidence.  He argues that counsel should have objected to the admission of a letter found in Davis's pocket that referred to gang activity and to Shannon Wilson's testimony.  Wilson testified that she overheard a conversation between Davis and Willie Smith in which Davis said that he shot and killed Hazle.

The circuit court found that Davis failed to meet his burden of proof on this claim because no evidence was introduced at the

69

evidentiary hearing concerning this issue. We agree. Counsel was not questioned concerning this evidence.

> This court has held that "[o]bjections are a matter of trial strategy, and an appellant must overcome the presumption that 'conduct falls within the wide range of reasonable professional assistance,' that is, the presumption that the challenged action 'might be considered sound trial strategy.'" *Moore v. State,* 659 So.2d 205, 209 (Ala.Cr.App. 1994), citing *Strickland* [*v. Washington*], 466 U.S. [668] at 687-88, 104 S.Ct. [2052] at 2064-65 [(1984)].

*Lane v. State,* 708 So.2d 206, 209 (Ala. Crim. App. 1997). As we stated in *Brooks v. State,* 456 So.2d 1142, 1145 (Ala. Crim. App. 1984), "effectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made. Effectiveness of counsel is not measured by whether counsel objected to every question and moved to strike every answer." Davis failed to meet his burden of proof on this claim; therefore, the trial court correctly denied him relief.

*Davis v. State*, 9 So. 3d 539, 549-551 (Ala. Crim. App. 2008) (alterations in original) (footnote omitted).

Davis now argues that the state court's "refusal to find ineffective assistance in trial counsels' complete failure to conduct an independent investigation sufficient to enable them to effectively challenge the State's factual and legal theories resulted in a decision that was contrary to and involved an unreasonable application of

*Strickland* and its progeny."[74]   However, because Davis has not established that the state court's denial of the claim was unreasonable, the claim itself is without merit.

Further, review of the trial transcript reveals that counsel actually made many of the arguments Davis faults him for not making.  Counsel argued that the Phillips cousins were not credible witnesses because of their own self interests,[75] secured a ruling prohibiting the admission of any gang related references,[76] and emphasized the discrepancies in height and clothing descriptions of Davis and that of the shooter as reported by the witness.[77]   Moreover, Davis cannot establish that he was actually prejudiced as a result of counsel's failure to make the other arguments he complains were not made.  There is no reasonable likelihood that counsel would have succeeded had he challenged Shannon Wilson's testimony on the grounds that she failed to establish it was actually Davis she heard boasting about committing the crime.  There were no gang-related references or innuendo during the trial that prejudiced Davis and should have prompted an objection.  Finally, as discussed in Section V.G., *infra*, Davis was not prejudiced by the admission of the redacted letter.  This claim is due to be denied.

---

[74] Doc. no. 33, at 19.

[75] R. Vol. 7, Tab 13, at 1177-78.

[76] R. Vol. 1, Tab 4, at 17.

[77] R. Vol. 1, Tab 10, at 625, 627-28, 630, 632-33.

4.   *Failure to present, argue adequately, and seek favorable rulings on pre-trial motions*

Davis asserts that counsel failed to file pretrial motions that were necessary to his receipt of a constitutionally effective defense.[78]   Specifically, he claims that counsel: (a) failed to timely file four pre-trial motions that would have challenged the validity of his arrest;[79] (b) failed to file motions that would have helped to achieve a non-biased and fair panel of jurors;[80] (c) failed to file a motion for full recordation of all proceedings, including sidebar communications;[81] and (d) failed to object to him being shackled before the jury.[82]

---

[78] Doc. no. 33, at 20-22.

[79] Davis claims that the following motions should have been filed: (1)  an "Ex Parte Application for Investigative Expenses"; (2) a "Motion for Discovery of State and Local Health, School, Medical, Custodial, Institutional and Related Documents Involving Davis's Family Members"; (3) a "Motion to Reveal the Identity of Informants and Reveal Deals, Promises or Inducements Relating to Testimony and Information"; and (4) an "Ex Parte Application for a Forensic Psychologist, a Social Worker and for a Neuropsychologist to Address Mitigation Factors in Sentencing." *Id.* at 20.

[80] Davis claims that counsel should have filed: (1) a "Motion for Order for Access to, Inspection of, and Copying of All Jury System Records"; (2) "Motions for Funds for Expert Assistance to Investigate Petit Jury Venires"; (3) a "Motion for a Jury Questionnaire"; and (4) a "Motion for Disqualification from the Jury Venire of All Potential Jurors who Would Automatically Vote for the Death Penalty if They Found Davis Guilty of Capital Murder." *Id.*  He further claims that counsel failed to seek a fully sequestered *voir dire*; failed to make an adequate showing of why individual *voir dire* was necessary; and failed to adequately litigate Davis's right to a juror questionnaire. *Id.* at 21.

[81] *Id.* at 21-22.

[82] *Id.* at 22.

Davis raised each of these claims in his Rule 32 petition,[83] but he did not raise parts (a), (b), and (d) on appeal from the denial of that petition.[84]   Therefore, the motions referenced in parts (a), (b), and (d) are procedurally defaulted, and Davis has offered nothing to excuse the procedural default of the claims.

Additionally, the Rule 32 court denied these claims on the merits, and Davis has not established that the state court's determination on parts (a), (b), or (d) of this claim was unreasonable.   In part (a) of his claim, Davis claims that his defense would have been significantly improved if his trial counsel had filed motions to challenge the validity of his arrest, specifically:   (1) an "Ex Parte Application for Investigative Expenses"; (2) a "Motion for Discovery of State and Local Health, School, Medical, Custodial, Institutional and Related Documents involving Davis's Family Members"; (3) a "Motion to Reveal the Identity of Informants and Reveal Deals, Promises or Inducements Relating to Testimony and Information"; and (4) an "Ex Parte Application for a Forensic Psychologist, a Social Worker and for a Neuropsychologist to Address Mitigation Factors in Sentencing."[85]

---

[83] Rule 32 C.R. Vol. 14, Tab 52, at 17-20.   The court notes that page 20 of the Second Amended Rule 32 petition is missing from this record.   However, in its opinion denying the petition, the trial court noted that part (c) of this claim was raised in paragraph 38 of the petition, and part (d) of the claim was raised in paragraph 40 of the petition.   Rule 32 C.R. Vol. 62, Tab 80, at 18-19. Paragraphs 38 and 40 would have been on page 20.

[84] Rule 32 C.R. Vol. 57, Tab 60, at 39-40.

[85] Doc. no. 33, at 20.

The trial court held that, to the extent the motions pertained to the guilt phase of the trial,[86] Davis had failed to establish prejudice.[87]

> The first such motion asserted in support of this [ineffective assistance of counsel] claim is styled by Davis as an *Ex Parte* Application For Investigative Expenses. As for the guilt phase, Petitioner failed to offer any new evidence that resulted from his employment of at least two private investigators and a number of attorneys working on his behalf. Thus, Davis did not establish prejudice as to this claim. Davis's extensive investigation for his evidentiary hearing produced no new evidence that would have impacted his guilt phase. FN.

>> FN. Further, this Court heard no testimony from any investigator as to work performed investigating guilt phase issues. This Court cannot even be certain that the multiple investigators employed by Davis in this proceeding did *any* investigation of guilt-phase claims, with the exception of portions of testimony by the Jacobs and Sharon Christopher. Davis has not proved prejudice as to this guilt-phase claim.

> Further, the few witnesses called by Petitioner on guilt phase issues (Sharon Christopher, Betty Jacobs, and Cynthia Jacobs) all had the same problems with their testimony as that of Tonya Heard, who was interviewed by Giddens prior to Davis's trial. These witnesses did not provide an alibi, and provided stories inconsistent with the story given by Davis to his trial counsel. For this reason, Davis cannot establish prejudice in this regard. Competent trial counsel could have wisely chosen to stay away from these witnesses — one of whom trial counsel

---

[86] The trial court noted that the second and fourth of these motions deal "primarily with the penalty phase of Davis's trial," and denied claims related to those motions later in its opinion. Rule 32 C.R. Vol. 62, Tab 80, at 17, 27-58. Similarly, this court will address the portions of this claim relating to the penalty phase of Davis's trial in Claim B.

[87] Rule 32 C.R. Vol. 62, Tab 80, at 16-18.

located without the assistance of an investigator — due to the harm that their inconsistent stories could have caused.  FN.

> FN.  Further, the Court notes that Betty and Cynthia Jacobs — who gave alibi stories vastly different than those ascribed to Heard and Christopher — were not even names as alibi witnesses in the Davis's petition.
>
> . . . .

Thus, the only remaining motion to be resolved . . . is the Motion to Reveal the Identity of Informants and Reveal Deals, Promises or Inducements Relating to Testimony and Information.  Davis has again failed to establish prejudice as to this claim.  First, Davis has not shown that any deals, promises or inducements were made to any witnesses in this matter other than those revealed by the State prior to Davis's capital murder trial.  Second, Davis failed to prevail on the issue of the State's assertion of privilege as to its confidential informant in this Rule 32 proceeding.  Thus, Davis failed to prove prejudice as to that issue.  FN.

> FN.  In addition, because the identity of the confidential informant has not been linked to any relevant issue in this case, competent trial counsel could have chosen not to waste their time chasing this issue down a rabbit hole.  For all the time and court hearings collateral counsel spent on litigating this issue, Petitioner has not been able to articulate any impact the identity of this CI would have had on Davis's case.

Rule 32 C.R. Vol. 62, Tab 80, at 16-18 (alteration and ellipses supplied, emphasis in original).

In part (b) of this claim, Davis argues that counsel should have filed, and obtained favorable rulings on:  (1) a "Motion for Order for Access to, Inspection of,

and Copying of All Jury System Records"; (2) "Motions for Funds for Expert Assistance to Investigate Petit Jury Venires"; (3) a "Motion for a Jury Questionnaire"; and (4) a "Motion for Disqualification from the Jury Venire of All Potential Jurors who Would Automatically Vote for the Death Penalty if They Found Davis Guilty of Capital Murder."[88]  He also argues that counsel failed to seek a fully sequestered *voir dire*, and failed to make an adequate showing of why individual *voir dire* was necessary.[89]  Davis maintains that these steps would have ensured an impartial jury.[90]

The trial court found Davis had failed to carry his burden of proof as to these claims:

> Davis asserts [ineffective assistance of counsel] based on trial counsel's failure to file motions on issues concerning the jury selection in this case.  Davis failed to carry his burden of proof as to these claims.  The Court cannot remember hearing any evidence at the evidentiary hearing that would support a finding of prejudice or deficient performance in regard to these claims.
>
> Likewise, Davis did not carry his burden of proof in regard to his argument that trial counsel failed to argue for fully sequestered voir dire.  The trial court in Alabama is given great discretion as to how to conduct voir dire, even in capital cases.  This Court is very reluctant to employ the time consuming method of individual, sequestered voir dire, and would have denied such a motion in this case.  Davis did not prove or establish any evidence that would have led this Court to conclude that

---

[88] Doc. no. 33, at 20.

[89] *Id.* at 21.

[90] *Id.*

individual voir dire was required in order to ensure a fair trial in this
case.  Further, Davis did not prove prejudice in this regard.

Rule 32 C.R. Vol. 62, Tab 80, at 18 (alteration supplied).

In part (d) of this claim, Davis contends that counsel should have objected to
Davis being shackled in front of the jury.[91]  The trial court denied the claim, finding
that Davis had offered no evidence to support a finding that he was shackled in view
of the jury, and noting that it had no recollection of Davis being shackled in view of
the jury.[92]

Davis has not established that the denial of parts (a), (b), and (d) of this claim
resulted in a decision that was contrary to, or involved an unreasonable application
of, clearly established federal law as determined by the Supreme Court of the United
States, or a decision that was based on an unreasonable determination of the facts in
light of the evidence presented in the state court proceeding.

In part (c) of this claim, Davis asserts that counsel should have moved for full
recordation of all proceedings, including sidebar communications and the preliminary
hearing.[93]  The trial court denied the claim,[94] and — as previously discussed in

---

[91] Doc. no. 33, at 22.

[92] Rule 32 C.R. Vol. 62, Tab 80, at 19.

[93] Doc. no. 33, at 21-22.

[94] Rule 32 C.R. Vol. 62, Tab. 80, at 18-19.

Section V.A.1.c. of this Opinion, *supra* — the Alabama Court of Criminal Appeals

affirmed the denial.[95]

---

[95]Specifically, the intermediate state appellate court held:

Davis argues that counsel was ineffective for failing to ensure that the record of the proceedings in the lower court was fully recorded. Specifically, he asserts that counsel erred in failing to have his preliminary hearing recorded and for not ensuring that sidebar conferences were recorded.

The circuit court made the following findings on this claim:

In paragraph 38, Davis alleges [ineffective assistance of counsel] based on trial counsel's failure to move for full recordation of all proceedings in his capital murder trial. Davis failed to prove that he was prejudiced by the lack of transcription of certain sidebars during the course of trial. Although Giddens testified, the subject of whether any controversial rulings or prejudicial comments were made during these sidebars was not addressed. This Court, which presided over Davis's capital murder trial, cannot recall anything discussed during sidebars that would have prejudiced Davis due to their lack of transcription. Because Davis did not put forth evidence to support this claim, it is denied.

(R. 1151-52.)

At the Rule 32 hearing, Davis asked Giddens why he did not move to have the preliminary hearing transcribed. The following occurred:

[Rule 32 counsel]: Do you make a strategy decision not to make that motion or have you just never thought about making that motion?

[Giddens]: When the only witness really is going to be the investigating officer, you find out what you need to know, I mean, he's charged with killing a man at a gas station, Direct Oil here in Anniston. And that was pretty much the testimony. And I believe the officer testified what the codefendants had told him.

(R. 31-32.) Davis made no attempt to show how he was prejudiced by counsel's failure to have the preliminary hearing or certain sidebar conferences recorded. There are no allegations that the officer's testimony at the preliminary hearing was inconsistent with his trial testimony or that the sidebar conferences contained omitted

Davis makes only a very general argument that the intermediate state appellate court failed to properly apply *Strickland* and its progeny to this claim, and that the decision was contrary to or an unreasonable application of clearly established federal law.[96]  His only specific assertion is that the appellate court "created a classic catch-22" by "unreasonably" requiring him to "challenge with greater specificity the prejudicial content contained in the unrecorded proceedings," when he was "deprived of any record or transcript" from which to glean the allegedly prejudicial content.[97]  However, Davis has not demonstrated that he suffered any prejudice as a result of this failure, so this claim cannot succeed.

5.      *Failure to present additional substantive evidence*

Davis contends that counsel should have obtained evidence about his alleged low IQ and psychological profile in a more timely manner.[98]  He maintains that, if counsel had done so, they could have argued that he did not "fit the

_____

information that prejudiced Davis.  "It is incumbent upon [petitioner] to show some prejudice from the failure to transcribe the preliminary hearing testimony before it may be claimed to be ineffective assistance of counsel.  *Spilman v. State*, 633 P.2d 183 (Wyo. 1981)."  *Jennings v. State*, 806 P.2d 1299, 1307 (Wyo. 1991).  The circuit court correctly denied relief on this claim.

*Davis v. State*, 9 So. 3d 539, 551 (Ala. Crim. App. 2008) (alterations in original).

[96] Doc. no. 33, at 7-8; doc. no. 39, at 15-17.

[97] Doc. no. 33, at 22.

[98] *Id.*

79

mental/psychological model of a young criminal conspiracy leader as alleged by the State."[99]   Davis also asserts that counsel should have introduced his mother's testimony that she and Davis both knew and were on friendly terms with the victim, to support an argument that Davis had no motive to shoot him.[100]

Both of these claims were raised by Davis in his Rule 32 petition[101] and denied by the trial court.  With respect to the claim that Davis's low IQ was inconsistent with his being the leader of a conspiracy, the trial court found:

> Davis alleges [ineffective assistance of counsel] based on defense counsel's failure to argue that Davis's IQ and psychological makeup were inconsistent with him being the leader of any criminal conspiracy. Once again, Davis failed to carry his burden of proof in this regard. While Davis offered expert and layperson testimony on his mental status and personality, this testimony did not exclude the potential for Davis to be the leader of the criminal enterprise which led to the death of Hazle.
>
> The evidence at the hearing indicates that Davis had participated in a previous robbery involving numerous participants. Thus, Davis had prior experiences which may have led him to believe it was worth trying again with different collaborators. Certainly, the fact that the crime was performed in such a haphazard fashion may have something to do with Davis's poor leadership and planning abilities, but it does not offer any reasonable basis on which to question the State's theory. In any event, Davis failed to prove his claim . . . .

---

[99] *Id.* at 23.

[100] *Id.*

[101] Rule 32 C.R. Vol. 14, Tab 52, at 23-24.

Rule 32 C.R. Vol. 62, Tab 80, at 25-26 (alteration and ellipsis supplied).  Although Davis presented this claim on appeal from the denial of the Rule 32 petition,[102] the Alabama Court of Criminal Appeals did not address it.  Even so, Davis has not met his burden of establishing that the trial court's decision was either contrary to or an unreasonable application of clearly established federal law.

With respect to the claim pertaining to Davis's alleged lack of motive to rob or shoot the victim because he and his mother had known the victim for years, the trial court found:

> Davis alleges [ineffective assistance of counsel] because trial counsel did not call Davis's mother to testify that Davis had no motive to shoot the victim.  Because Davis did not call his mother to testify [at the Rule 32 evidentiary hearing], no evidence was offered in support of this contention.  As such, Davis failed to carry his burden of proof as to this claim.  This claim, then, is denied.
>
> Further, because the State alleged a murder during the course of a robbery, evidence that Davis had no personal reason to kill Hazle would be of little or no benefit to the Petitioner.  The motive, according to the State's theory, was a robbery attempt.  Davis, apparently offended by Hazle's laughter or failure to comply with demands to produce money from the register, shot Hazle before the robbery could be completed.  Thus, Davis's motive was connected to the robbery attempt.  Further, testimony that Davis was personally known by the victim would *increase* his motive to kill, as he would have to eliminate the witness.  This claim lacks merit despite Davis's failure to put forth evidence on this issue.

---

[102] Rule 32 C.R. Vol. 57, Tab 60 at 40-41.

Rule 32 C.R. Vol. 62, Tab 80, at 25 (alterations supplied, emphasis in original). Despite Davis's contrary assertion,[103] he did not raise this claim in his brief on collateral appeal.[104] Thus, this claim is procedurally defaulted, and Davis has offered nothing to excuse the procedural default of the claim. Furthermore, Davis offers nothing to establish that the trial court's denial of this claim was contrary to, or an unreasonable application of, clearly established federal law.

## B.    Ineffective Assistance of Counsel During the Penalty Stage

Davis argues that his trial counsel were ineffective in the investigation, preparation and presentation of mitigation evidence during the penalty phase of trial.[105] He contends that he was entitled to have all aspects of his background, family life, medical history, environment, school records, and any other life experience that may be considered mitigating evidence presented to the jury and, but that such evidence was not presented because counsel relied only on the information provided by him and his mother.[106] He argues that trial counsel unreasonably and inexplicably failed to obtain school, social service agency, health, employment, correctional, and

---

[103] Doc. no. 39, at 8.  Davis contends that he raised the claim on pages 40-41 of his appellate brief (Rule 32 C.R. Vol. 57, Tab 60).  Doc. no. 39-1, at 2.

[104] Rule 32 C.R. Vol. 57, Tab 60.

[105] Doc. no. 33, at 23-42.

[106] *Id.* at 23.

religious records and, thus, failed to discover and present compelling mitigating evidence.[107]

As with all ineffective assistance of counsel claims, Davis must show both deficient performance and resultant prejudice. To satisfy the deficient performance prong, counsels' representation must have fallen below "an objective standard of reasonableness," which is measured against the "prevailing professional norms" at the time. *Strickland,* 466 U.S. at 688. "That standard is necessarily a general one," as "'[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.'" *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (quoting *Strickland,* 466 U.S. at 688-689) (finding the Court of Appeals erred by treating the ABA's guidelines "not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel 'must fully comply'") (alteration supplied).

When evaluating trial counsels' investigation and preparation for the penalty phase of a capital trial, there is no checklist of tasks counsel must complete in order to perform in a constitutionally effective manner. It is, nonetheless, well-settled that trial counsel has an "'obligation to conduct a thorough investigation of the

---

[107] *Id.* at 24.

defendant's background'" when preparing for a capital sentencing. *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (holding that counsel's obligation was "unquestioned" under prevailing professional norms at the time of trial) (quoting *Williams*, 529 U.S. at 396); *Wiggins,* 539 U.S. 510; *Strickland,* 466 U.S. at 691 (counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary). *See also Sears v. Upton*, 561 U.S. 945, 1032 (2010) (noting that it was "unsurprising" that the state postconviction court found that "the cursory nature of counsel's investigation into mitigation evidence — 'limited to one day or less, talking to witnesses selected by [the defendant's] mother' — was 'on its face . . . constitutionally inadequate'") (alteration provided); *Williams v. Allen*, 542 F.3d 1326, 1339-40 (11th Cir. 2008) (investigation of mitigating evidence in capital defendant's background fell short of prevailing professional norms); *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001) (noting that a "failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history").

Even so, the court must consider "'counsel's perspective at the time' investigative decisions are made," and a "'heavy measure of deference'" must be afforded to counsel's judgments. *DeYoung v. Schofield,* 609 F.3d 1260, 1284 (11th

Cir. 2010) (quoting *Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005)).  Thus, even when, in hindsight, an investigation might be viewed as less than adequate, counsel's performance will not always be deemed constitutionally deficient, especially when the defendant contributed in some way to counsel's perspective.  *See, e.g., Bobby v. Van Hook*, 558 U.S. 4, 12-13 (2009) (because counsel had uncovered significant mitigating evidence from the defendant's background, the decision not to seek more fell well within the range of professionally reasonable judgments); *Strickland,* 466 U.S. at 691 ("When a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."); *Johnson v. Upton*, 615 F.3d 1318, 1331-33 (11th Cir. 2010) (an attorney does not perform deficiently by not discovering mitigating evidence that his client did not mention to him); *Reed v. Secretary, Florida Dept. of Corrections*, 593 F.3d 1217, 1240 (11th Cir. 2010) ("The defendant's own words and deeds play a role in assessing the reasonableness of counsel's conduct."); *Cummings v. Secretary for Dept. of Corrections*, 588 F.3d 1331, 1357-58 (11th Cir. 2009) (although counsel may not "blindly follow" his client's instructions not to look for or use mitigation evidence, a mentally competent defendant's instruction not to investigate or not to present mitigation evidence may make counsel's decision not to do so reasonable); *McClain*

*v. Hall*, 552 F.3d 1245, 1251-52 (11th Cir. 2008) (whether defendant informed his trial counsel about his abusive childhood is "'extremely important'" to determining reasonableness of counsel's performance); *Newland v. Hall*, 527 F.3d 1162, 1202-09 (11th Cir. 2008) (defense attorney's investigation prior to penalty phase of the trial was reasonable due to the information provided by the defendant); *Stewart*, 476 F.3d at 1210-14 (counsel's failure to present evidence of defendant's alleged abuse was not deficient because defendant did not inform counsel of this abuse); *Henyard v. McDonough*, 459 F.3d 1217, 1245-46 (11th Cir. 2006) (counsel's failure to discover evidence of sexual abuse was not deficient given defendant's repeated denials of abuse).

To satisfy the prejudice prong, a petitioner must show that, "but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." *Porter*, 558 U.S. at 41. When evaluating a claim of ineffective assistance in the context of a penalty phase mitigation investigation, courts must undertake a "probing and fact-specific analysis" that considers the totality of the available mitigation evidence, both that adduced at trial and in any postconviction proceedings, in order to assess whether there is a reasonable probability that defendant would have received a different sentence after a constitutionally sufficient

mitigation investigation. *Sears*, 561 U.S. at 955-56; *Porter*, 558 U.S. at 41; *Wong v. Belmontes*, 558 U.S. 15, 20 (2009).

This analysis includes an assessment of whether the newly unearthed mitigating evidence is merely cumulative or simply additional details about a defendant's background that would have "barely altered the sentencing profile presented to the sentencing judge," or whether it would have been the only evidence that could have "humanized" the defendant, allowing the jury or the sentencing judge to "accurately gauge his moral culpability." *Porter*, 558 U.S. at 41. The court also should consider whether the missing mitigation evidence might have been viewed unfavorably, or opened doors for the prosecution to bring in damaging rebuttal evidence, *Cook v. Upton*, No. 5:09-CV-25 (CAR), 2010 WL 1050404, at *11 (M.D. Ga. Mar. 18, 2010) (counsel's failure to introduce evidence concerning the petitioner's mental health did not prejudice the petitioner since the records contained many details that were potentially harmful to the petitioner), or whether the aggravating circumstances of the crime are such that they would outweigh any prejudice caused by the failure to present mitigating evidence, *Dobbs v. Turpin,* 142 F.3d 1383, 1390-91 (11th Cir.1998).

Davis faults counsel for failing to investigate and present four types of mitigating evidence: *i.e.,* (1) evidence relating to childhood trauma and depravity; (2)

87

testimony regarding his mental health; (3) evidence relating to his mental/psychological dysfunction and brain damage; and (4) mitigation evidence about the prior felony conviction.[108]   These claims were raised in Davis's Rule 32 petition,[109] and denied on the merits by the trial court.[110]   The Alabama Court of Criminal Appeals affirmed the denial, but based its decision on a procedural bar. *Davis v. State*, 9 So. 3d 514, 521-22 (Ala. Crim. App. 2006).  The court nonetheless discussed the claim in significant detail, and commented in *dicta* that, if not for the procedural bar, it would have been compelled to grant relief and order a new sentencing hearing.  *Id*. at 522-26.  Even so, when the Court of Criminal Appeals re-examined the claim after remand from the Alabama Supreme Court, it concluded that Davis was *not* entitled to relief.  *Davis v. State*, 9 So. 3d 539 (Ala. Crim. App. 2008).  Davis asserts that the denial of this claim was contrary to and an unreasonable application of clearly established federal law, and based on an unreasonable determination of the facts in light of the evidence presented.

1.     *Failure to obtain mitigation evidence relating to childhood trauma and depravity*

---

[108] Davis also raises a fifth subclaim, that counsel was ineffective for failing to object to the submission of the penalty phase case to the jury on a Friday at 4:30 p.m.  That claim will be addressed at the conclusion of the discussion of the claims regarding mitigating evidence.

[109] Rule 32 C.R. Vol. 14, Tab 52, at 26-35.

[110] Rule 32 C.R. Vol. 62, Tab 80, at 27-58.

Davis asserts that he endured horrific physical and emotional abuse throughout his childhood, and argues that his attorneys could have uncovered this abuse and presented it as mitigating evidence if they had conducted an adequate investigation by speaking with potential witnesses and consulting with qualified experts.[111] Specifically, he asserts that,

> had trial counsel consulted with qualified experts on a timely basis, counsel could have established that Davis had been exposed to in utero trauma and abuse; extensive physical, psychological and sexual abuse; domestic violence; rejection and abandonment by mother and father; poverty and neglect; mentally and emotionally unstable care-givers; and an unstable, unsafe, and unpredictable home life.

Doc. no. 33, at 25.  He contends that his lawyers should have asked him and his mother more probing questions, spoken to other family members, and obtained and reviewed DHS, school, medical, and judicial records.[112]

Because of the unusual procedural posture of this claim, and in order to conduct a "probing and fact-specific analysis," this court will:  (1) identify the relevant factual determinations and rulings made by the trial court; (2) quote what the Alabama Court of Criminal Appeals stated in *dicta*; (3) provide the final analysis of the merits by the Alabama Court of Criminal Appeals when it ultimately denied the claims; and (4) review the reasonableness of the state court's decision and identify

---

[111] Doc. no. 33, at 25-34.

[112] *Id*. at 25-34.

the arguments made by Davis in support of his contention that the state court misapplied the controlling federal law on both the performance and prejudice prongs of the *Strickland* analysis.

a. *Conclusions of the trial court*

In its 63-page order denying this claim in Davis's Rule 32 petition, the trial court essentially found that the failure of Davis and his family to be forthcoming about his childhood abuse absolved counsel for failing to dig deeper in order to uncover it.[113]   The court also found that Davis had not been prejudiced by the omission of the additional evidence during the sentencing hearing.[114]   The trial judge reasoned as follows:

> In this claim, Davis has alleged that his trial counsel were ineffective in regard to the penalty phase of his trial.  Quite simply, this claim can only be described as bizarre, based on the fact that [Davis's] own family seems to have concealed important information from trial counsel.  Having considered the petition, having carefully reviewed the evidence presented at this hearing, as well as at the trial, and following the law governing Sixth Amendment claims — including the recent decision in *Wiggins v. Smith* , 123 S. Ct. 2527 (2003) — the court finds that this claim is due to be denied.

> This finding is not meant to imply that the Court did not find compelling some of the mitigation evidence presented by Petitioner during the [Rule 32] evidentiary hearing.  Much of the evidence presented at the Rule 32 hearing focused on abuse inflicted on Davis by

---

[113] Rule 32 C.R. Vol. 62, Tab 80, at 27-48.

[114] *Id.*

his mother, Lillie Bell Davis.  The Court finds that Davis was abused by his mother to an extent that would have rendered it relevant to the issue of the appropriate penalty determination in this case under existing law, though the Court, as explained below, finds that this evidence is insufficient to establish prejudice.

The Court's major concern, however, is that if this Court used this evidence to find the existence of deficient performance the Court would be engaging in the inappropriate activity of judging the performance of trial counsel through the use of hindsight.  Further, the Court would be passing judgment on Attorney Adams without the benefit of his testimony.  Even worse, this Court would be inappropriately shifting the blame for the inexcusable actions of Davis'[s] family, particularly his mother, to his trial counsel.  This Court must judge trial counsel's performance through their perspective at the time.  That being the case, the Court does not find that trial counsel's performance was deficient.

To the contrary, Jimmy Davis'[s] family — and to a very large extent his mother — bears a heavy burden in this case for their role in this matter.  Because Adams did not testify, this Court does not know what Adams did or did not do in preparation for this case.  The Court presumes, however, that Adams acted reasonably in the questions he asked his client and his client's mother and in preparing for the penalty phase.  Further, the testimony of Giddens establishes that **at no time** did Davis ever mention to his attorneys the abuse suffered at the hands of his mother or the intervention of DHR in the Davis home.

. . . .

Further, the record establishes, by the Petitioner's own admission, that trial counsel did talk to two of Davis'[s] siblings.  (RR. 863.)  Further, even in the time frame immediately before the evidentiary hearing, Davis did not speak in detail of the abuse inflicted on him as a child, instead generalizing that his background "wasn't rosy" and that he didn't have any privileges, only "every day survival."  (RR. 863.)  When specifically questioned about abuse, Davis only acknowledged that he was disciplined with a switch, in stark contrast to the evidence

91

that Davis was, in fact, hit with belts, electrical cords, and with an open hand. (RR. 863-864.)  As noted by Dr. King, "he was not – he was not too forthcoming.  I had to ask a number of questions about that."  (RR. 863-864.)  Thus, the record supports a finding that even Davis continued to participate in the family's conspiracy of silence, even on the eve of his evidentiary hearing.

The Court also takes notice of the Petitioner's request, via motion to the Court, to keep the documents and evidence concerning Petitioner's abuse sealed.  As noted by counsel for the Petitioner, this was done out of the family's concern for their privacy.  (RR. 161-163) It was this desire by the family to keep this matter private — in addition to their fear of Lillie Bell Davis — that the witnesses before this Court during the evidentiary hearing noted was the reason behind their years of silence.  Although the Petitioner's motion to keep these records private is not "evidence" in the formal sense of the word, it does allow this Court to once again view the family machinery that trial counsel were up against in this case, machinery that even collateral counsel had to deal with in this matter.

Further, this Court noted during the evidentiary hearing that Lillie Bell Davis failed to make an appearance during the entire week this matter was heard. Although Lillie Bell Davis attended Davis'[s] capital murder trial, she was noticeably absent as a witness or a spectator during the entire week of the evidentiary hearing.  Although the Court can infer why Ms. Davis would choose not to come into court once this secret was made public, it certainly sheds light on the type of person Ms. Davis is and the type of person trial counsel were misled by.  In any event, it is difficult for this Court to view the preparation of trial counsel through their eyes when the very people (Lillie Bell and the two, unnamed siblings) who were giving trial counsel information — apparently misleading information — were not called to recount their conversations with Giddens and Adams.

Giddens testified that he felt that he had a family history from talking to the mother.  The Court assumes that additional information was obtained from the two siblings interviewed by trial counsel.

Counsel learned where Davis had gone to school, that he received his GED from Tuskegee, how he grew up, that Davis'[s] father had died, the parents had been divorced. (RR. 97)  Davis'[s] friends, that trial counsel were aware of, were the same people who testified against Davis at his capital murder trial: Alphonso Phillips, Terrance Phillips, and Willie Smith.  Other acquaintances included Tonya Heard, who was not a good witness due to the fact that Davis had attempted to manufacture an alibi story with her, something she refused to participate in.

Looking at the witnesses who testified at the evidentiary hearing, namely Cynthia and Betty Jacobs and Geneva Davis, there is nothing to suggest that the above-named individuals were not Davis'[s] friends at the time of his arrest.  The others in Davis's life, including his sisters Mary Nell and Hortense, had been out of Davis'[s] life for some time before this murder and would not be considered close friends or acquaintances in the sense of people who spent a good deal of time with Davis on a day-to-day basis in the year or so leading up to Hazle's murder.  Thus, trial counsel had a distinct disadvantage in that Davis'[s] friends made up the potential witnesses against him.

Further, as noted above, these friends do not appear to have had knowledge of Davis'[s] upbringing.  Instead, the abuse information was a closely held secret kept within the family by a manipulative Lillie Bell Davis.  Thus, not only was trial counsel's decision not to call Davis'[s] friends a reasonable one under the circumstances, Davis has not been prejudiced in regards to this abuse information by counsel's failure to call them on his behalf.

According to *Wiggins v. Smith*, 123 S. Ct. 2527, 2536 (2003), this Court has to make a determination of whether the background investigation — which includes "a context-dependent consideration of the challenged conduct . . . from counsel's perspective at the time" — was reasonable.  Based on the factors facing trial counsel, most notably Lillie Bell Davis, this Court finds that trial counsel acted reasonably, and were misled by the Petitioner's own family.

Trial counsel felt they had a reasonable idea of Davis'[s] background from their interaction with the Petitioner's mother. Generally speaking, mothers are the best advocates a son could have in difficult times.  If you want to phrase it as judicial notice, this Court takes judicial notice that ordinarily there are few bonds stronger than a mother's love for her child.  There has been nothing presented to this Court that suggests that  Sigler, Davis'[s] siblings, or Davis himself ever alerted trial counsel to the fact that Lillie Bell Davis was not a typical loving mother.

Davis did not help his counsel, either.   As the United States Supreme Court noted in *Strickland*:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably altogether diminished or eliminated.

*Id*., 466 U.S. at 691.  *See also*, [*sic*] *Chandler*, 218 F.3d at 1319 n. 24 ("when the circumstances of a claim make these conversations relevant, the petitioner can rarely (if ever) satisfy his burden to disprove the presumption of effective assistance without disclosing the substance of these attorney-client conversations.").  Giddens'[s] testimony was that Davis did not speak of any sexual abuse.  Petitioner did not question Giddens about what Davis precisely told his trial counsel concerning his background, but there is no evidence that Davis, his mother, or his siblings in Anniston, Alabama, did anything to put his attorneys on notice of the existence of any abuse.  *See,* [*sic*] *Williams v. Head*, 185 F.3d 1223, 1235 (11th Cir. 1999) ("Given the lack of clarity of the record, we presume that [Attorney] Allen talked with [Client] Williams

94

as part of his effort to ascertain whether there was any mitigating circumstance evidence that Collins had failed to present.  We are comfortable with doing so because Allen is an experienced criminal defense attorney . . . .  There is no reasonable possibility that Allen . . . would have neglected to talk with his client about mitigating circumstances.").

Looking at Giddens'[s] testimony and the trial testimony of Lillie Bell Davis, much of the background information given by Davis's family was true, but given with Ms. Davis'[s] personal "spin" on it, omitting the important portions of Davis's life in which he was beaten by a belt or switch.  The information concerning Davis'[s] participation in the job corps, obtaining his GED at Tuskegee, the death of his father, his parents' marital difficulties, are all items that Lillie Bell told counsel about and was willing to testify about.  Thus, trial counsel did obtain much of this information through the most obvious source: Davis'[s] mother.

Although Davis faults trial counsel for not subpoenaing his DHR records, **there is absolutely no evidence before this Court that reasonably competent counsel would have been on notice that such records existed**.  There are no constitutionally required checklists for mitigation investigations.  Trial counsel are faced with the realities of limited time and limited resources.  Those resources have to be managed in an efficient manner.  Thus, this Court does not find that attorneys are expected to subpoena agency records 'just in case.'  Had Lillie Bell Davis, Davis'[s] siblings, or Davis himself told his trial counsel that this issue needed to be investigated — that DHR had been involved in the Davis home — this Court would absolutely find ineffective assistance of counsel for failure to investigate, discover and/or develop this evidence, depending on the strategic decisions made by counsel following their investigation.  But that is not what happened here.

Davis is asking this Court to declare two competent trial lawyers incompetent due to the fact that they were manipulated by Lillie Bell Davis, the Davis family, and Davis himself due to the family's conspiracy of silence.  Quite simply, it is not trial counsel's fault, it is

the fault of Petitioner, of his mother, of Andre Sigler, and of the Davis family as a whole; a family that apparently sought collateral counsel's assistance in keeping these facts private, even during the time leading up to the evidentiary hearing in this matter.

> . . . .

Finally, this Court finds that the substantive evidence presented at the evidentiary hearing does not establish prejudice under *Strickland*. Although it is clear that Davis suffered some abuse as a child, he was never hospitalized, DHR did not remove him from the home, and the abuse by Lillie Bell was remote in time to the murder of Hazle. This evidence, when considered with the facts of this crime, do not rise to the level necessary to establish prejudice.

This Court found the existence of two aggravating circumstances: prior conviction of a crime involving use or threat of force against the person and murder committed during the course of a robbery. In mitigation, this Court found the existence of only one statutory mitigating circumstance: the age of the defendant at the time of the crime. Having reviewed the evidence presented at the evidentiary hearing, this Court does not find that the substantive evidence from the evidentiary hearing, if presented at Davis'[s] sentencing[,] would have altered these statutory findings.

The substantive mitigation evidence presented during the evidentiary hearing in support of the [ineffective assistance of counsel] claims was of the non-statutory type. The Court does not find that this evidence changes the original finding that Davis had the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law and that he did not act under the influence of extreme mental or emotional disturbances during the commission of the crime.

Not only does the evidence offered at the evidentiary hearing fail to support a finding of either of these statutory mitigating circumstances, the evidence presented at the trial disproves the existence of these

circumstances.  The evidence shows that this crime was planned in advance and not the product of behavioral aberration.  Further, the evidence supports a finding that Davis'[s] motive was to seek money from the Direct Oil station, and not the result of a mental or emotional breakdown or disturbance.  Further, the evidence shows that the victim was shot when he failed to hand over the money fast enough and instead smiled at the Petitioner.  Petitioner has not shown a direct link between the proffered mitigating evidence and the commission of this offense.

Instead, this evidence is of the sort consisting of "any aspect of a defendant's character or record  . . . that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death."  Ala. Code § 13A-5-52 (1975).  Had Davis'[s] family revealed this information to trial counsel, rather than concealing it, this information would have been properly introduced as non-statutory mitigation.  Further, it would have been entitled to some weight in the consideration of the proper sentence in this case.

It's [*sic*] weight, however, would not be sufficient to create a reasonable probability as to the outcome of Petitioner's sentence.  The abuse suffered by Davis was remote in time, about five or six years, to the commission of this offense.  (RR. 512)  Further, this offense was committed after Davis had just previously committed a robbery in the third degree.  The abuse was of the sort that Davis'[s] family hid it from the outside world for years, even going so far as to hide it from Davis'[s] counsel.  The petitioner himself participated in the family's silence.  Even immediately before the evidentiary hearing, Davis had to be prodded for information about the prior abuse.  (RR. 863-864)  The extent of Davis'[s] commentary on this abuse was "he felt that sometimes . . . he was disciplined too much."  (RR. 864)

Another aspect of these facts that decreases the weight this mitigation evidence would have is the fact that the abuse DID NOT lead any of Davis'[s] family members to report Lillie Bell's actions to authorities, to tell people outside of the family, or otherwise remedy the situation.  Further, in the one formally documented case of abuse before the Court, DHR made a decision to leave Davis in the home.  Regardless

97

of the hindsight and speculation offered by various DHR employees at the evidentiary hearing, the fact remains that as of 1993 the evidence would have been that DHR never actually took measures to have Davis removed from the home due to abuse. This decision has a direct impact on the weight to be afforded this evidence.

When combined with the fact that Davis'[s] family members were comfortable with keeping this information secret, this abuse becomes much less powerful as evidence. Davis'[s] family must not have thought his life was in danger during his adolescence, as they did nothing to protect him from further abuse. Instead, they let family pride, fear of Lillie Bell, or other factors preclude them from coming forward. Even at the hearing, these witnesses were *still* hesitant to come forward and discuss these issues. The abuse of Davis obviously did not impact Davis'[s] own family to a degree great enough where they were motivated to seek assistance from authorities in dealing with the issue. This Court, as well as a jury, would have to consider such factors in determining the weight to be given this evidence.

Based on the testimony of Storey at the original sentencing hearing, this Court considered the difficulty of Davis'[s] upbringing and his below-average intellect. While this new evidence puts this information in a new perspective, it does not change the fact that the facts of this crime and the two aggravating circumstances proven by the State far outweighed the one statutory mitigating factor and these non-statutory mitigating factors.

Likewise, some of the evidence presented by the Petitioner falls into the category of "double-edged sword" type evidence referenced by Giddens. (RR. 156, 158) For example, some of the evidence indicated that Davis had good role models in his life. One of Davis'[s] own witnesses noted that his violent behavior did not begin until the commission of the Robbery III offense prior to the Direct Oil murder. (RR. 994-995, 1006) This information leads to an inference that Davis'[s] violence was a product of some factor other than his upbringing, considering the testimony that throughout Davis'[s] childhood (when the abuse occurred) he was not a violent person.

Instead, he became violent when he committed the Robbery III of a Domino's Pizza employee and began fighting in jail and became aggressive and disrespectful. (RR. 1006) Such testimony does not suggest that the abuse suffered by Davis was of any great mitigation significance as his violent criminal behavior does not begin until years later after he is away from his mother and her influence.

This Court does not accept that the behavior of Lillie Bell Davis in abusing the Petitioner or misleading his trial counsel was appropriate. The Court's finding of no [ineffective assistance of counsel] is not an approval of such behavior. Instead, it is a recognition that no matter how wrong her behavior was, trial counsel were not responsible for the family's (and Davis'[s]) silence on this issue and the abuse inflicted by Lillie Bell — while wrong — does not serve as mitigation evidence that would have created a reasonable probability that the outcome of Davis's penalty phase would have been different. Accordingly, in addition to finding that counsel's performance was reasonable under the circumstances, the Court further finds that Davis did not prove prejudice in any event.

        . . . .

For the foregoing reasons, the Court denies this claim. Although the Court acknowledges that this abuse evidence should have been brought out at Davis'[s] trial, the fault for it not coming out rests with Davis and his family, and not his counsel. It would pervert Sixth Amendment jurisprudence to punish lawyers for deliberate misdeeds by their client and client's families. The record before the Court establishes a family that is coming to terms with their past. The problem is that they chose to do so only after the Petitioner was sentenced to death. That this secret was more valuable to them than the potential risk of their silence to Davis at his capital murder trial is disturbing, but it is not the result of ineffective assistance of counsel. This claim, in its entirety, is denied."

Rule 32 C.R. Vol. 62, Tab. 80 at 27-29, 33-40, 51-57 (emphasis in original; footnotes omitted; seventeenth and eighteenth alterations in original, other alterations supplied; first, fifth, and eighth ellipses supplied, other ellipses in original).

  b.  *Alabama Court of Criminal Appeals' initial opinion* (dicta)

  The Alabama Court of Criminal Appeals described the "powerful" mitigation evidence and the actions of counsel, whom it believed "failed to conduct the type of investigation sanctioned by the guidelines developed by the American Bar Association for attorneys representing defendants in death-penalty cases as endorsed by the United States Supreme Court in *Wiggins v. Smith*[, 532 U.S. 510 (2003)]":

> At the Rule 32 hearing, Davis presented the testimony of two sisters, an aunt, and several social workers. Davis's sisters testified that their mother regularly beat Davis with switches, extension cords, and brooms. Mary Nell Davis testified that she remembered one instance when Davis was in the second grade and their mother beat Davis so badly with a broom that his head swelled up and his ear was almost "severed." She also said that when her mother was beating Davis he [*sic*] would call him a "black bastard."
>
> Beverly Boggs, a social worker with the Calhoun County Department of Human Resources ("DHR"), testified that her first contact with Davis was when he was about 10 years old. A report had been filed with DHR that Davis was being abused and neglected. Davis's mother admitted to Boggs that she beat Davis because he was a bed wetter. The social worker recommended counseling for the child and mother.
>
> Another social worker, Theresa Peebles, testified that she investigated a complaint that alleged that Davis was being abused when

Davis was about 10 years old.  Davis admitted to her that his mother beat him because he was a bed wetter.  Peebles said that she observed the extent of Davis's injuries on this occasion and that Davis had between 25 and 30 marks on his back.  She said, "I've never seen a back that looked worse than Jimmy's did."  Peebles made photographs of his injuries, and those photographs were introduced at the Rule 32 hearing.

> . . . .

> Giddens testified to the following concerning mitigation evidence:

> Q [Davis's attorney]:  But in your practice of defending capital cases, would you agree that an individual's educational background, family situation and employment status are some of the few things that should be taken into consideration at the mitigation phase?

> A [Giddens]:  I think you need to take into consideration whatever evidence you can offer to a jury.  Mitigation is simply that, to mitigate the sentence down to life [imprisonment] without parole and a lot of things to go into it.   Educational background.   I mean, lack of significant criminal history is one that you can offer.  Many things are taken into mitigation.  But simply asking for life without parole is asking to spare the death penalty, spare the defendant's life.  And that's ultimately for the jury to make a recommendation.  But I mean, you can offer, under the nonstatutory mitigation in Alabama, you can offer virtually anything.

> Q:  And prior to becoming the District Attorney, when you're defending these cases, how would you go about investigating that "virtually anything" that you could put before a jury?

> A:  Well, the "virtually anything" is putting family members on, "Please spare my son's life"; "Please spare

my brother's life"; "Please spare my mother's life." "He was a good child.  He played ball, he did this."  And showing a picture of the defendant that maybe they didn't get to see. And that's — that's what I'm talking about, the non-statutory mitigation is anything.  Anything that they have ever done.

. . . .

Q: Have you ever offered evidence of physical child abuse?

A: No.

Q: If you found evidence of physical child abuse in a defendant's life, would you offer that in a mitigation stage?

A: If it was somehow related to the crime or if it — I mean, under nonstatutory mitigation, I'm sure it's admissible.  I'm sure you can get it in, but I personally did not ever do that.  FN.

> FN.  Evidence that a defendant was a victim of child abuse is a classic example of mitigating evidence; its admittance is not affected by whether the abuse directly related to the crime.

(R. 75-76.)  Giddens further testified that he spoke only with Davis's mother and that he did not speak with any of Davis's siblings.  He did not attempt to get any of Davis's school records or any records from DHR.  Giddens was never questioned about Adams's preparation for the penalty phase.  Indeed, the State's cross-examination of Giddens failed to elicit any information that would bolster the State's position that a reasonable investigation was conducted in this case.  Moreover, the

102

record shows that most of the preparation was conducted two weeks before Davis's trial.

We have also reviewed the transcript of the penalty phase. Counsel called Lillie Davis, Davis's mother, to testify at the penalty phase. She told the jury that Davis's father had left them when Davis was approximately one year old, that Davis did not have a father figure in his life, that Davis started giving her trouble when he was around 9, that Davis went to live with his father in New York when he was 15 years old, that Davis moved back after about two months because his father had died, and that Davis dropped out of school when he was 16 years old. She also said that Davis ran with a bad crowd, that he had never been involved in any violent behavior — just stealing — and that when he reached the age of 17 she asked him to leave her house because she could not control him. Last, she asked the jury to spare her son's life.

Andrew Lamont Sigler, Davis's first cousin, also testified at the penalty phase. FN.

FN.  Sigler testified at the Rule 32 hearing that Davis's attorneys had not contacted him before Davis's trial but that on the day of sentencing he was in the courthouse and one of the attorneys asked him to testify.

Sigler testified: "I think Jimmy was missing a lot as he was coming up. People to rely on, people to talk to, people who could understand him and try and help him out. A lot of things that we all have had, more successful people have had." (Trial record at p. 1322.)  Sigler also asked the jury to spare Davis's life.

. . . .

After the penalty-phase jury deliberated for 40 minutes, it returned with a question. The question was whether the trial court could accept a recommendation of death if seven jurors voted for death and five for

life.   The trial court sent the jury back to deliberate and gave the following instruction:

> The Court has heard the responses both by the State and by the defendant to this question.   Appears I have unanimity from each side of the case and no objections to the Court answering this question in the negative that no, the Court cannot accept the numbers as they state them. And further state there must be 10 votes for recommendation of death or there must be at least 7 votes for a recommendation of life without parole.

(Record of trial, p. 1375-76.)   After this instruction, the jury returned with a recommendation of 11 for death and 1 for life imprisonment without parole.   Certainly, it is reasonable to conclude that the evidence of Davis's child abuse could very well have tipped the scales in the other direction**.**

. . . .

. . . In this case counsel failed to conduct the type of investigation sanctioned by the guidelines developed by the American Bar Association for attorneys representing defendants in death-penalty cases as endorsed by the United States Supreme Court in *Wiggins v. Smith.*

*Davis v. State*, 9 So. 3d 514, 522-525 (Ala. Crim. App. 2006) (alterations in original; first ellipses in original, other ellipses supplied; footnote omitted).

        c.    *Opinion of Alabama Court of Criminal Appeals on remand*

Upon reexamining the claim on remand, the Alabama Court of Criminal Appeals rejected its previous comments, and concluded that Davis was not entitled to relief:

We stated in our previous opinion affirming the circuit court's denial of Davis's Rule 32 petition that if this issue had been properly before us we would direct that a new sentencing hearing be conducted. *Davis v. State,* 9 So. 3d at 526. However, upon further research and review of the record we have reconsidered our comments in dicta in our previous opinion, and we now conclude that the circuit court did not abuse its discretion in denying Davis relief on his claims of ineffective assistance of trial counsel at the penalty phase.

*Davis v. State*, 9 So. 3d 539, 553 (Ala. Crim. App. 2008).

The Court held that the findings of the circuit court, as set out above, were supported by the record, adopted them as part of its opinion, and affirmed the trial court's denial of this claim:

First, Davis argues that counsel should have discovered and presented evidence from family members and the Department of Human Resources ("DHR") records to show that he had been abused as a child.

At the penalty phase, counsel called Davis's mother, his first cousin, and a counselor who had evaluated Davis's IQ. On direct appeal we stated the following about the mitigating evidence that was presented:

[Davis] called three witnesses: his mother, Lillie Bell Davis; his first cousin, Andre Lamont Sigler; and a counselor, Annie M. Storey. His mother testified generally about [Davis's] background and family life. She stated that she and her husband, who was [Davis's] father, separated when [Davis] was one year old, and that [Davis] never had the benefit of a father in the home when he was growing up. She stated that [Davis] went to Detroit to live with his father when he was 15 years of age, but that his father died shortly thereafter and that his death was devastating to [Davis]. She further testified that she began to have

105

trouble with [Davis] when he was about 9 years old; that he would misbehave at school and at home; that he dropped out of school when he was 16; that he would not work, would stay out at night, and was frequently in trouble; that after he turned 17, she could not handle him; and that he left home when he was 19. She asked the jury to spare her son's life. Sigler also testified about [Davis's] background and home life. He stated that [Davis] missed not having a father in the home; that because of his circumstances he "missed a lot" when he was growing up; that when he was growing up he had no one to rely on, to talk to, or to help him; that when his father died he was noticeably affected and his appearance and attitude changed; and that he had not had the advantages that Sigler had had. Sigler also asked the jury to recommend a sentence of life imprisonment without parole. Storey, a counselor employed by the Calhoun-Cleburne Mental Health Center and the Oxford city school system, testified that she administered intelligence and diagnostic educational tests to [Davis] before his trial; that he had a full-scale IQ of 77, which placed him at the 6th percentile, i.e., 94% of the people in his age group scored higher; that an IQ of 77 is considered within the borderline range of intelligence; that he is functioning "between where we would consider an individual who is mentally retarded and one who is low average"; and that he functions at the 5th grade level academically. [Davis] called only one witness at the second sentencing hearing before the trial court, his mother, who testified again about her son's general background and family life, and asked the court for mercy.

*Davis v. State,* 718 So.2d at 1156.

Giddens testified at the Rule 32 hearing that Davis did not tell him that he had been abused as a child. Cocounsel Adams did not testify concerning his dealings with Davis or the extent of his investigation into Davis's upbringing. We have reviewed the record of Davis's trial and

find that Adams's involvement in the case was not minor. Adams conducted opening and closing statements and cross-examined the majority of the state witnesses. Also, Adams spoke with two of Davis's siblings – though we do not know the identity of those siblings. We are troubled that Adams was not called to testify at the Rule 32 hearing when it is clear that he had a significant role in preparing for Davis's trial. FN.

> FN. As we stated above: "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation]. Therefore, 'where the record is incomplete or unclear about [counsel's] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.'" *Chandler v. United States*, 218 F.3d 1305, 1314 n. 15 (11th Cir. 2000) (en banc) (quoting *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999))." *Grayson v. Thompson*, 257 F.3d 1194, 1218 (11th Cir. 2001).

However, Giddens testified at the Rule 32 hearing as follows:

> There was a lot of preparation. Mr. Adams and I — I had asked Judge Street if he would appoint me cocounsel since it was a capital murder case and that involved a lot of work. And I asked him to appoint a cocounsel. And he appointed Mr. Adams at my request. And Mr. Adams and I did a lot of preparation.
>
> We came into Anniston, interviewed a lot of witnesses, did a lot of research.

(R. 36-37.) In preparing mitigation evidence, Giddens stated:

> [Giddens]: As I said, at the same time as you begin to assess the evidence. You begin to think about in the event that he's convicted or she's convicted of capital

107

murder, what are you going to do in the sentence hearing. You have to be prepared for all of its [sic].

Q [Rule 32 counsel]: So when you started to prepare the guilt/innocence part of Mr. Davis's case in November of 1993, that's about the same time you began to prepare the mitigation case?

[Giddens]: Well, I mean, we had spoken with his mother sometime during that time and knew that she was going to be a witness in that event. And also got an order signed for a mental evaluation to use as mitigation if, you know, it if [sic] came out favorable or something you would want to offer mitigation for the defendant. I mean, during the time frame of preparing for the case, you have to prepare for the sentence hearing as well because it will be immediately after the trial.

(R. 72-73.) Giddens said that Davis provided him with little information except that he was with Heard at the time of the robbery/murder.

Counsel have a duty to investigate but this duty is confined to reasonable investigation. See *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. In *Funchess v. Wainwright*, 772 F.2d 683, 689 (11th Cir. 1985), this Court found counsel reasonably investigated despite the fact that he had not investigated his client's psychological problems because the client never told him of any problems and the competency evaluation did not suggest any problems existed. The client also acted competently while assisting counsel in preparing his case. *See id*. Thus the court held that counsel was not put on notice of any problems and could not be faulted for not pursuing the matter. See *id*.; cf. *Collins v. Francis*, 728 F.2d 1322, 1349 (11th Cir. 1984) (determining that counsel who failed to investigate witnesses that the defendant did not tell him about was not ineffective).

Reliance upon some family members statements [*sic*] that other mitigation witnesses did not exist was considered permissible in *Singleton v. Thigpen*, 847 F.2d 668, 670 (11th Cir. 1988). Rejecting a per se rule of ineffective assistance where counsel does not consult family members, we held in *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999), that counsel's investigation was reasonable when he did not interview the defendant's sister or father, the latter because the defendant had not lived with him for very long. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Strickland* [*v. Washington*,] 466 U.S. [668] at 690-91, 104 S.Ct. [2052] at 2066 [(1984)].

The conduct of the counsel here did not fall below the professionally competent standard. While the Warrens did not discover the records from Holladay's stay at Central State Hospital in Milledgeville, Georgia or records from other psychiatrists who treated Holladay, there is no evidence in the record, nor does Holladay allege, that he told them of his prior treatment. As in *Funchess*, the report of the lunacy commission that Holladay was sane and competent combined with counsel's impression of Holladay as cooperative, articulate, and affable did not put Mrs. Warren on notice that there were or might be psychiatric records that she needed to find.

*Holladay v. Haley,* 209 F.3d 1243, 1251-52 (11th Cir. 2000). Based on the unusual circumstances presented in this case and the fact that we not [*sic*] know the extent of cocounsel's investigation because Adams was not called to testify, we cannot say that counsel was ineffective for failing to discredit the statements of Davis, his mother, and two of his siblings, and to conduct yet more investigations. Thus, we conclude that

the circuit court did not abuse its discretion in finding that the investigation conducted by Davis's attorneys was reasonable. "Clearly this is not a case where counsel failed to investigate, a case where counsel was ignorant of what evidence could be presented in mitigation, or a case where counsel presented no mitigation evidence." *Waldrop v. State*, 987 So.2d 1186, 1202 (Ala. Crim. App. 2007).

Moreover,

"[a] defense attorney is not required to investigate all leads, however, and "there is no per se rule that evidence of a criminal defendant's troubled childhood must always be presented as mitigating evidence in the penalty phase of a capital case." *Bolender* [*v. Singletary*], 16 F.3d [1547,] at 1557 [(11th Cir. 1994)] (footnote omitted) (quoting *Devier v. Zant*, 3 F.3d 1445, 1453 (11th Cir.1993), *cert. denied*, [513] U.S. [1161], 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995)). "Indeed, '[c]ounsel has no absolute duty to present mitigating character evidence at all, and trial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel.'" *Bolender*, 16 F.3d at 1557 (citations omitted)."

*Marek v. Singletary*, 62 F.3d 1295, 1300 (11th Cir. 1995). Evidence of childhood abuse has been described as a double-edged sword. *See Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (evidence of brain injury, abusive childhood, and drug and alcohol abuse was "double edged" because it would support a finding of future dangerousness). *See also Miniel v. Cockrell*, 339 F.3d 331 (5th Cir. 2003); *Harris v. Cockrell*, 313 F.3d 238 (5th Cir. 2002). The circuit court did not abuse its discretion in denying relief on this claim.

. . . .

Last, even if we were to find that counsel's performance was deficient in the penalty phase of Davis's trial, we would find no

prejudice.  As the United States Supreme Court stated in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003):

> In *Strickland* [*v. Washington*, 466 U.S. 668 (1984)], we made clear that, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 694, 104 S.Ct. 2052.  In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.

539 U.S. at 534, 123 S.Ct. 2527.

The circuit court noted in its order denying relief that the evidence of Davis's childhood abuse was not of "any great mitigation significance as his violent criminal behavior does not begin until years later after he is away from his mother and her influence."  The circuit court found in mitigation that Davis was only 23 years old at the time of the robbery/murder and the court also "considered all testimony and evidence presented to the jury and to the Court in regard to the defendant's background, character, [and] education achievement level."  The court found that the failure to present evidence of Davis's childhood abuse would not have prejudiced him.

We have reweighed the alleged omitted mitigation evidence against the aggravating circumstances that existed in this case.  We agree with the circuit court that death was the appropriate sentence in this case and that the fact that certain potential mitigation evidence was not presented would have had no affect [*sic*] on the outcome.

*Davis v. State*, 9 So. 3d 539, 563-566, 569-570 (Ala. Crim. App. 2008) (alterations

in original).

      d.    *Analysis*

For claims that counsel was ineffective at the penalty phase of trial, the issue is "whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court." *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006). To establish ineffective assistance of counsel, and rebut the strong presumption that counsels' performance was reasonable, the petitioner has the burden of establishing that no competent counsel would have taken the action his counsel took.

Davis's reply challenges the reasonableness of the state court's decision, asserting that the failure to grant him relief on the merits of his ineffective assistance of counsel claims was contrary to, and involved an unreasonable application of, clearly established Federal law, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[115] He argues that the presumption of correctness owed to state court fact findings is rebutted by the clear and convincing evidence presented during the Rule 32 hearing.[116] In support, Davis directs this court to the "Petitioner's Proposed Findings of Fact and Conclusions of Law, submitted to the Rule 32 Circuit

---

[115] Doc. no. 39.

[116] *Id*. at 13.

Court."[117]  Davis also contends that the Alabama Court of Criminal Appeals failed to properly apply the *Strickland* test because it "ignored United States Supreme Court law pertaining to the professional standards and norms of representation in capital cases."[118]

### i.    *Performance*

Davis first argues that the Alabama Court of Criminal Appeals unreasonably blamed counsels' failure to uncover evidence of his childhood abuse on his and his family's silence about the abuse, without faulting trial counsel for failing to investigate school, medical, and social service records, or for failing to ask probing questions of the Davis family.[119]  He cites *Rompilla*, 545 U.S. at 381, for the proposition that the Sixth Amendment requires counsel to make a reasonable effort to obtain information, even when the defendant and his family are "uninterested in helping" and inform counsel that no mitigating evidence is available.[120]  He also cites *Williams v. Taylor*, 529 U.S. 362, 396 (2000), for the proposition that counsel's

---

[117] *Id.*  The Petitioner's Proposed Findings of Fact and Conclusions of Law are located in Rule 32 C.R. Vol. 17, at 1034-1113.

[118] Doc. no. 39, at 15.

[119] *Id*. at 18-19.

[120] *Id*. at 19.

failure to conduct a "thorough investigation of the defendant's background" could not be excused as within counsel's discretion to make a "tactical decision."[121]

It is apparent from a review of the state court record that counsel did not conduct an extensive investigation for the penalty phase of this capital trial. It is troubling that: counsel's notes reflect only two visits with Davis prior to trial; counsel spoke with Davis's mother only once, and then only days before the trial; much of the preparation, including the evaluation that was performed the weekend prior to the Monday morning trial, was conducted at the last minute; and, counsel did not meet with the penalty phase witnesses prior to the day they were scheduled to testify. It also is troubling that relevant mitigation evidence existed, but was not discovered.

Even so, counsel did not have many leads to pursue mitigating evidence. The record is clear that neither Davis nor his mother informed Giddens of the abuse Davis suffered.[122] Any suggestion that Davis might have opened up to counsel if they had spent more time with him, earning his trust, or perhaps explaining the importance of being completely truthful and forthright, is mere conjecture, and unsupported by any evidence. Although it undoubtedly would have been far better if counsel had gathered more background information prior to the capital sentencing proceeding,

---

[121] *Id.*

[122] Because Davis did not call Adams to testify at the Rule 32 hearing, the court has no way of knowing if Adams was informed of the abuse or the role Adams played in preparing for the sentencing phase of the trial.

they were not constitutionally required to complete any set checklist of tasks, especially when counsel had received no information to indicate that potential mitigating evidence existed.

Ultimately, this court must confront the fact that the Eleventh Circuit has "repeatedly held that '[a]n attorney does not render ineffective assistance by failing to discover and develop childhood abuse that his client does not mention to him.'" *Puiatti v. Secretary, Florida Department of Corrections,* 732 F.3d 1255 (11th Cir. 2013) (quoting *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999)) (alteration in original).

Thus, it cannot be said that the determination of the Alabama Court of Criminal Appeals — *i.e.*, that counsel's investigation was not constitutionally deficient — was objectively unreasonable.

The Alabama court painstakingly considered the evidence presented, applied the controlling Supreme Court precedent, and found that,

> [b]ased on the unusual circumstances presented in this case and the fact that we do not know the extent of cocounsel's investigation because Adams was not called to testify, we cannot say that counsel was ineffective for failing to discredit the statements of Davis, his mother, and two of his siblings, and to conduct yet more investigations.

*Davis v. State*, 9 So. 3d 539, 566 (Ala. 2008) (alteration supplied). Davis has not

shown that no reasonable factfinder would have arrived at the same conclusion.

ii.   <em>Prejudice</em>

In any event, Davis has not demonstrated that he suffered prejudice as a result

of his attorneys' failure to more thoroughly investigate potential sources of mitigating

evidence. Davis argues that he was prejudiced by counsels' failure to present to the

jury the "compelling mitigating evidence of the serious abuse [he] suffered as a child,

the chaotic and dysfunctional household in which he grew up, and the gross neglect

of his parents."[123] He asserts:

> The compelling mitigation evidence trial counsel failed to
> investigate and uncover was at least as severe as evidence that the
> United States Supreme Court has found to be prejudicial when excluded.
> *See, e.g., Wiggins*, 539 U.S. at 516, 524-25 (holding that petitioner was
> denied Constitutionally effective assistance of counsel when counsel
> chose not to expand their investigation of his life history for mitigating
> evidence beyond the pre-sentence investigation report and department
> of social services records, and thereby failed to uncover evidence of
> "severe physical and sexual abuse petitioner suffered"); *Williams*, 529
> U.S. at 395-98 (holding that petitioner was denied Constitutionally
> effective assistance when counsel failed to investigate and present
> during the sentencing phase a "voluminous amount" of evidence of his
> "nightmarish childhood"); *Williams v. Allen*, 542 F.3d 1326, 1339 (11th
> Cir. 2008) (holding that counsel's failure to conduct an adequate
> investigation precluded jury from weighing evidence of childhood
> history of abuse and cruelty).

---

[123] Doc. no. 39, at 18 (alteration provided).

116

Doc. no. 39, at 18.

According to Davis, the Alabama Court of Criminal Appeals failed to properly weigh the additional mitigating evidence presented during the Rule 32 proceeding under the standards set forth in *Strickland* and its progeny.[124] He argues that the court improperly based its determination on his failure to "show a direct link between the proffered mitigating evidence and the commission of [the] offense."[125]  Additionally, he asserts:

> As this Court held in *Boyd v. Haley*, the "fail[ure] to recognize that [petitioner's] background evidence had any mitigating value due to the lack of its causal nexus to the crimes" results in a "legal conclusion contrary to clearly established federal law regarding the purposes of the penalty and sentencing phases of trial."  Order at 31-33, Case no. CV-00-S-2919-E (Sept. 28, 2001) (holding that the CCA erroneously failed to properly consider and weigh petitioner's mitigating background evidence because of his failure to demonstrate a causative linkage between that evidence and his crimes) (citing *Hardwick v. Crosby*, 320 F.3d 1127, 1162-63 (11th Cir. 2003)).  In short, the question is simply whether the evidence is of such a character that it might serve as basis for a sentence less than death.  *Tennard v. Dretke*, 542 U.S. 274, 287 (2004).   Accordingly, the CCA's decision is contrary to and an unreasonable application of clearly established federal law.[126]

Doc. no. 39, at 20 (alterations in original).

---

[124] *Id.* at 19.

[125] *Id.* at 20 (quoting *Davis v. State*, 9 So. 3d 539, 561 (Ala. Crim. App. 2008)) (alteration in original).

[126] *Id.* at 20 (alterations in original).

Upon review of the record in this case, it is apparent that the trial court did not base its finding of no prejudice solely on the absence of a causal link between the abuse Davis suffered as a child and the crime he committed. The trial court held that the evidence *could* have been introduced as non-statutory mitigation and entitled to *some* weight in determining the proper sentence. Even so, the trial court found, for multiple reasons, that the evidence would not have been sufficient to create a reasonable probability that the sentence would have been different. Moreover, the Alabama Court of Criminal Appeals based its implicit determination that Davis was not prejudiced on the nature of evidence of childhood abuse as mitigation, noting that it is often described as a "double-edged sword," because it could also support a finding of future dangerousness. *Davis v. State*, 9 So. 3d 539, 566 (Ala. Crim. App. 208).

Davis also argues that the Alabama Court of Criminal Appeals improperly weighed the mitigation evidence when it "completely shifted course from its 2006 opinion where it stated that '[i]t is reasonable to conclude that the *evidence of Davis's child abuse could very well have tipped the scales* in the . . . direction [of life imprisonment without parole],'" and "improperly agreed with the Circuit Court's assessment that the evidence was not of 'any great significance as his violent criminal

behavior does not begin until years later after he is away from his mother and her influence.'"[127] Davis argues:

> This Court has noted that "the Supreme Court has long recognized that a defendant's troubled background is relevant mitigating evidence in the quest to determine his moral culpability." *Boyd*, Order at 32, Case no. CV-00-S-2919-E (Sept. 28, 2001) (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)); *Eddings v. Oklahoma*, 455 U.S. 104, 112 [(1982)]; *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)). Thus, the CCA's failure to give appropriate weight to the evidence of Davis's childhood abuse because it occurred years earlier than the crime constitutes a decision both contrary to, and an unreasonable application of, clearly established federal law.

Doc. no. 39, at 21 (alteration supplied).

The trial court's determination that Davis had not established prejudice was not based entirely on the length of time that had elapsed between the abuse and the offense. Moreover, the appellate court, which devoted most of its discussion to the performance prong of *Strickland*, based its prejudice determination primarily on the risks of presenting evidence of childhood abuse as mitigation evidence. The state court considered the totality of the available mitigation evidence, including that adduced at trial and in the postconviction proceedings, and determined that there was no reasonable probability that the introduction of that evidence would have resulted in a different sentence. That determination was not patently unreasonable.

---

[127] *Id.* at 20-21 (quoting *Davis v. State*, 9 So. 3d 514, 524 and *Davis v. State*, 9 So. 3d 539, 563) (alterations and emphasis in original).

2.     *Failure to obtain or present any testimony regarding Davis's mental health*

— and —

3.     *Failure to obtain mental health evidence relating to mental/psychological dysfunction and brain damage*

Davis asserts that his trial counsel did not adequately discover, prepare, and present evidence regarding his mental health and brain damage.[128]   He complains that counsel did not obtain information regarding his mental competency and health until the week before trial, when they filed a motion seeking "to determine [Davis's] *intelligence level, educational level, any behavioral problems, or any condition relative to his behavior in a normal social environment*."[129]   Because counsel did not specify that Davis was facing capital murder charges, the evaluation was performed by a psychometrist whose licensing, training, and experience were in the administration of I.Q. tests, primarily to school students.[130]   The psychometrist administered IQ and MMPI (Minnesota Multiphasic Personality Inventory) tests on December 4, 1993, just two days before trial, and counsel did not speak with or meet her until just before she testified.[131]   Davis also contends that counsel should have

---

[128] Doc. no. 33, at 34-39.

[129] *Id*. at 34 (alteration supplied) (emphasis in original).

[130] *Id*. at 34-35.

[131] *Id*. at 35.

sought the services of other qualified experts, such as a forensic psychologist, a social worker, and a neuropsychologist.[132]   Finally, Davis faults counsel for failing to discover and present evidence that he had sustained a frontal lobe brain injury — a defect that he contends manifested in poor performance in school and delayed maturation.[133]

a.   <em>Evidence presented in state court</em>

Davis called Anne M. Storey, the psychometrist who had administered IQ and MMPI tests, during the penalty phase of trial.  Ms. Storey testified that Davis had a full-scale IQ of 77, which placed him in the borderline range of intellectual functioning.[134]   Storey stated that Davis's IQ would make it difficult for him to perform ordinary tasks.[135]   Counsel presented no evidence that Davis had brain damage or other mental deficiencies.

During the Rule 32 hearing, Davis produced several of his school records and report cards.  His eighth grade report card shows that he made four B's and one C.[136] He also was administered the Wechsler Intelligence Scale ("WISC-R") IQ test in

---

[132] *Id.* at 37.

[133] *Id*. at 39.

[134] R. Vol. 8, Tab 20, at 1332-33.

[135] *Id*. at 1334-35.

[136] Rule 32 C.R. Vol. 34, Tab 58, at 1848.

121

eighth grade, which revealed a full-scale IQ of 74.[137]   The WISC-R evaluation form

contained the handwritten comment: "all areas are above grade level expectancy."[138]

During the hearing, Davis presented the testimony of Dr. Kimberly Svec

Ackerson, an Alabama-licensed clinical psychologist specializing in forensic

psychology, who testified that she would have referred Davis to a neuropsychologist

for further investigation of possible brain injury or damage.[139]   Dr. Charles J. Golden,

a professor of psychology at Nova Southeastern University and Director of the

Neuropsychological Assessment Center, testified, based on his assessment of Davis's

IQ scores, that Davis had frontal-lobe brain damage.[140]

The State presented the testimony of Dr. Glen D. King, a clinical psychologist

who testified, after evaluating Davis and his IQ scores, that Davis merely had

borderline intellectual functioning, not brain damage, and that he would not have

referred Davis to a neuropsychologist.[141]   Dr. King also testified that a CAT scan, an

MRI, or a PET scan is traditionally used to diagnose brain damage, but none of those

---

[137] *Id.* at 1853.

[138] *Id.*

[139] Rule 32 R. Vols. 21-22, Tab 58, at 694-98.

[140] Rule 32 R. Vol. 22, Tab 58, at 795-804.

[141] *Id.* at 869-73.

tests had been administered to Davis at any time — either prior to trial or during the postconviction proceedings.[142]

        b.     *Rule 32 court's order of denial*

Following the evidentiary hearing, the trial court rejected Davis's claims, saying:

> Next, Davis alleges [ineffective assistance of counsel] based on trial counsel's failure to get a psychologist to conduct a mental evaluation, rather than having him tested by a psychometrist. This claim, too, fails.
>
> First, trial counsel did not request that the evaluation be conducted by a psychometrist, nor did this Court's order state that the evaluation should have been done by a psychometrist. Instead, due to an administrative error at the mental health center, Davis was assigned to Annie Storey, a psychometrist, for evaluation. (RR. 129) Although trial counsel did not request this procedure, Giddens testified that Storey, "did exactly what I asked her to do." (RR. 93) Namely, Giddens testified that he was concerned mostly with Davis'[s] IQ and achievement level.
>
> Under the circumstances of this case, defense counsel's concern about IQ and achievement level testing was reasonable. As Giddens recounted, there was no special plea in Davis'[s] case and nothing had struck either Giddens or Adams as peculiar about Davis'[s] mental state. Giddens did not believe that Davis was incapable of assisting in his defense, and did not believe that Davis had any mental problems. Davis did not provide any evidence at the evidentiary hearing that would suggest otherwise. Accordingly, there is no basis for this Court to conclude that reasonably competent trial counsel would have been

---

[142] *Id.* at 873.

concerned about Davis'[s] mental health, other than information that might be useful for mitigation.

Trial counsel was not looking to prove the statutory mitigating circumstances of "extreme mental or emotional disturbance" or "substantial impairment of his ability to conform his conduct to the requirements of the law," just as Davis did not do so in the evidentiary hearing. Further, had Davis'[s] IQ been lower (or had the United States Supreme Court made *Atkins* [*v. Virginia,* 536 U.S. 304 (2002),] applicable to individuals in the borderline range of intelligence), trial counsel's strategy would be celebrated as genius by collateral counsel today. There was nothing unreasonable about getting Davis'[s] IQ and achievement levels before the jury.

In addition, even though trial counsel were not responsible for the assignment of a psychometrist to this case, trial counsel were under the impression that Storey's report had been reviewed and approved by Dr. Clarence McDanal, a licensed psychiatrist. Although McDanal testified at the evidentiary hearing that his review was merely an "administrative sign-off," there is nothing to impute this knowledge to trial counsel. Reasonable trial counsel could have trusted that a clinic of mental health professionals would be run with more efficiency than the picture painted by Dr. McDanal. Because Storey did exactly what trial counsel wanted her to do, it was reasonable for trial counsel to accept her work and accept the representations of the clinic that her work had been reviewed by a licensed psychiatrist.

Finally, Davis was not prejudiced by Storey's work in this case. First, Dr. King — an experienced forensic psychologist with a great deal of experience testifying in Alabama criminal cases — testified that he would not have referred Davis for any further testing or evaluation. In addition, the law allowed Storey to refer Davis for further evaluation or testing if she felt it was necessary. Ala. Code § 34-26-1(c)(1)(b). That she did not do so corroborates the findings of Dr. King.

The Court notes that, notwithstanding Dr. King's testimony, Petitioner could argue that Storey was not trained to know when referral

to a neuropsychologist was necessary or indicated.  This argument, however, is not persuasive.  Although Dr. Ackerson, the psychologist who testified for Davis, stated that she would have referred Davis to a neuropsychologist for further evaluation, she also indicated that the results of the testing were not enough for her to reach that conclusion.  (RR. 716)  To reach the conclusion that a referral to a neuropsychologist was necessary, Ackerson stated that she would have needed a social history.

Thus, Ackerson's testimony that she would have referred Davis to a neuropsychologist is based on the premise that she would have had an accurate social history.  As noted above, Davis'[s] family was not in the mood or habit of giving accurate social histories in 1993.  Even Davis himself gave a watered down version of his social history to Dr. King in the months prior to his *evidentiary hearing*.  He did not cooperate with his trial counsel or in the preparation of the [pre-sentence investigation] report.  Thus, the social history that would have been given to a psychologist in 1993 is the same social history that was spoon fed to trial counsel by Davis'[s] family, intent on concealing their history of abuse.  Accordingly, this Court cannot find that Davis would have been referred to a neuropsychologist had his evaluation been completed by a psychologist rather than a psychometrist.

. . . .

Based on the testimony of Storey at the original sentencing hearing, this Court considered the difficulty of Davis'[s] upbringing and his below-average intellect.  While this new evidence puts this information in a new perspective, it does not change the fact that the facts of this crime and the two aggravating circumstances proven by the State far outweighed the one statutory mitigating factor and these non-statutory mitigating factors.

Rule 32 C.R. Vol. 62, Tab. 80, at 48-51, 55 (alterations supplied) (footnote omitted) (emphasis in original).

c.     *Decision of the Alabama Court of Criminal Appeals*

The Alabama Court of Criminal Appeals made the following findings:

Davis argues that counsel was ineffective for failing to present evidence that he suffered from damage to the frontal lobe of his brain.  At the Rule 32 hearing, Giddens testified that he moved that Davis be mentally evaluated to determine his IQ and his academic performance.  He said that he and Adams planned to use this information in mitigation if Davis was convicted.  Giddens further testified that Davis gave him no reason to believe that he was mentally impaired or that he could not assist in his defense.

Dr. Kimberly Ackerson, a clinical psychologist, testified at the Rule 32 hearing that after examining Davis she would have referred him to a neuropsychologist for further evaluation.  Dr. Charles Golden, a professor of psychology at Nova Southeastern University and Director of the Neuropsychological Assessment Center, testified that based on Davis's IQ scores it was his opinion that Davis had frontal-lobe damage.

The State countered Davis's experts by calling Dr. Glenn King, a clinical psychologist. Dr. King testified that he had examined Davis and that it was his opinion that Davis "merely had borderline intellectual functioning" and that he would not refer Davis for further testing by a neuropsychologist.

Whether Davis suffered from brain damage was disputed by the medical experts.   "[The defendant's] presentation of conflicting expert opinion would have further undermined the defense's credibility.  Trial counsel 'cannot be deemed ineffective' for not presenting . . . conflicting opinions."  *Philmore v. State,* 937 So.2d 578, 587 (Fla. 2006). Therefore, counsel was not ineffective for failing to discover and present this disputed evidence.

*Davis v. State*, 9 So. 3d 539, 566-567 (Ala. Civ. App. 2008) (alteration in original).

d.     *Analysis*

126

To the extent Davis now claims he suffers from organic brain damage, the state court concluded that Davis had failed to prove the assertion during the Rule 32 evidentiary hearing. That determination is amply supported by the record. The state court's determination that counsel was not ineffective for failing to discover and present such evidence was not contrary to or an unreasonable application of clearly established federal law.

Davis also has not shown that he was prejudiced by any delay in conducting the evaluation, or by the manner in which the evaluation was conducted. It is true that, as a result of the delay, counsel never learned that the examination had been performed by a school psychometrist instead of a forensic psychologist, and the evaluator never learned that Davis was facing capital charges. Even so, there is no indication that those deficiencies affected the outcome of Davis's sentencing. Even though Davis's own expert witness testified that she would have referred Davis to a neuropsychologist for further evaluation, she conceded that she would have needed an accurate social history before making that determination. There is nothing to suggest that a different examiner performing the tests on an earlier date would have recorded an accurate social history, given the persistent reluctance of Davis and his family members to be forthcoming about the family's history of abuse. Moreover, Giddens testified that there were no signs that Davis had mental deficiencies or

defects, and there has been no conclusive evidence to establish that Davis suffered from anything more than a low I.Q., which was identified by the psychometrist and placed into evidence during the penalty phase of the trial.

The state court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination in light of the evidence presented.

4.    *Failure to discover and present mitigation evidence about prior felony conviction*

Davis asserts that counsel was ineffective for failing to investigate the facts of his prior felony conviction for robbery, which was his sole prior felony aggravator.[143] He argues that, while the prior offense technically was classified as a robbery, it really was more of a "minor offense involving the theft of a few pizzas."[144]  According to Davis's petition, he

> was one of a group of four involved in what was a minor offense: someone called and ordered pizzas for delivery to a certain address, and when the pizza deliveryman arrived, the group robbed approximately $35 and six pizzas, then fled.  R.202/4-204/7; 206/22-25.  The police quickly apprehended everyone.  No weapon was involved.  R.205/3-6.

Doc. no. 33, at 39.  Davis asserts that Jadie Boozer, the court-appointed lawyer who had represented him on the earlier "pizza case" and testified at the Rule 32

---

[143] Doc. no. 33, at 39-41.

[144] *Id.* at 39.

evidentiary hearing, would have been willing to testify at trial to the foregoing facts,

if trial counsel had only contacted him.[145]

This claim was considered and rejected by the Alabama Court of Criminal

Appeals.  The relevant portions of the opinion read as follows:

> Davis argues that counsel was ineffective for failing to investigate and
> to present evidence concerning the facts of Davis's prior conviction for
> robbery.  He asserts that the facts surrounding that offense were relevant
> to alleviate the impact of the aggravating circumstance that Davis had
> previously been convicted of a crime of violence.  He cites *Rompilla v.
> Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), for the
> proposition that he is entitled to a new sentencing hearing on that basis.
>
> In *Rompilla v. Beard*, the United States Supreme Court held that
> counsel's performance at the penalty phase of a capital-murder trial was
> ineffective because counsel failed to examine the court file of a prior
> conviction that the Commonwealth of Pennsylvania intended to use at
> sentencing.  The Supreme Court noted that its holding was due, in part,
> to the fact that counsel was aware that the Commonwealth intended to
> seek the death penalty by relying solely on the aggravating circumstance
> that the defendant had a significant history of felony convictions
> involving the use of violence, that the Commonwealth intended to rely
> on a prior conviction for rape and assault, and that the Commonwealth
> intended to introduce the transcript of the victim's testimony to show the
> defendant's violent nature.  The United States Supreme Court stated:
>
> > Without making reasonable efforts to review the file,
> > defense counsel could have no hope of knowing whether
> > the prosecution was quoting selectively from the transcript,
> > or whether there were circumstances extenuating the

---

[145] *Id.* at 41.  Davis also contends that two of the other individuals who were involved in the robbery, "Carlos Hughley and Vishon Sigler[,] would have been ready, willing, and able to testify at the penalty phase of Davis'[s] trial that Davis was a minor participant and was apprehended in possession of a single pizza as he fled the scene."  *Id.* at 40 (alterations supplied).

behavior described by the victim. The obligation to get the file was particularly pressing here owing to the similarity of the violent prior offense to the crime charged and Rompilla's sentencing strategy stressing residual doubt. Without making efforts to learn the details and rebut the relevance of the earlier crime, a convincing argument for residual doubt was certainly beyond any hope.

> . . . .

> If the defense lawyers had looked in the file on Rompilla's prior conviction, it is uncontested they would have found a range of mitigation leads that no other source had opened up. In the same file with the transcript of the prior trial were the records of Rompilla's imprisonment on the earlier conviction, . . . , which defense counsel testified she had never seen, *id*., at 508. The prison files pictured Rompilla's childhood and mental health very differently from anything defense counsel had seen or heard. An evaluation by a corrections counselor states that Rompilla was 'reared in the slum environment of Allentown, Pa, vicinity. He early came to the attention of juvenile authorities, quit school at 16, [and] started a series of incarcerations in and out Penna. [*sic*] often of assaultive nature and commonly related to over-indulgence in alcoholic beverages.' Lodging [to App. 111-120] 40. The same file discloses test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling.

> The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts.

545 U.S. at 386-91, 125 S.Ct. 2456.  In responding to a dissent to its opinion, the Supreme Court in *Rompilla* stressed that it was not creating a per se rule that counsel was automatically ineffective for failing to conduct a "complete review of the file on any prior conviction." 545 U.S. at 388, 125 S.Ct. 2456.

In this case there is no allegation that the file of Davis's prior conviction contained a plethora of mitigating evidence.  In fact, the record shows that Davis pleaded guilty to robbery in the third degree and that he was sentenced to one year and one day.  At the sentencing phase of Davis's trial[,] counsel argued that he had been convicted and sentenced for the lowest degree of robbery recognized in Alabama.  At the Rule 32 hearing Giddens testified as follows:

> [Rule 32 counsel]: Did you make an attempt to talk to any other person within the criminal justice system that had had any dealings with Jimmy?
>
> [Giddens]: Criminal justice systems being I believe he had a robbery conviction that was offered against him.  And I was aware of that.  I mean, I had gotten those records so I was aware of that through the criminal justice system.
>
> [Rule 32 counsel]: Did you speak to anyone involved in that case?
>
> [Giddens]: No.  I reviewed the record on that and saw what he was convicted of it.  And I think he actually served time on it.
>
> . . . .
>
> [Rule 32 counsel]: And you didn't do any investigation to find out what the circumstances of that robbery was; did you?

[Giddens]: Well, the only thing that is admissible is the conviction itself, not the facts of it.

[Rule 32 counsel]: Even at a sentence hearing in mitigation?

[Giddens]: The state offered simply a certified copy of the conviction. Which we don't object to, because you didn't want them to have to put on a witness to bring out the facts.

(R. 100-01.)

Davis presented testimony at the Rule 32 hearing that his prior robbery in the third degree conviction was the result of Davis and several other individuals robbing a pizza delivery person of six pizzas. Davis was caught by police running away with a pizza.

This case is distinguishable from *Rompilla*. In *Rompilla* the sole aggravating circumstance that the Commonwealth was relying on to seek the death penalty was related to Rompilla's prior conviction for violence. In this case, the State relied on two aggravating circumstances: that the murder was committed during a robbery and that Davis previously had been committed of a "felony involving the use or threat of violence." Also, in *Rompilla* the attorney testified that she had not looked at the file of Rompilla's prior rape conviction. Here, Giddens testified that he did examine the file on Davis's prior conviction but had not spoken to anyone about the prior case. More importantly, the jury in this case was aware that Davis had previously been convicted of the *lowest* degree of robbery. Counsel tried to minimize the prior conviction. Thus, we do not believe that *Rompilla* mandates that we reverse Davis's sentence on this issue. As the Florida Supreme Court stated in *Davis v. State*, 928 So.2d 1089 (Fla. 2005):

"The facts of the instant matter are entirely distinguishable from those present in *Rompilla*. As noted above, defense counsel in the present case reviewed all of the materials that were in his possession in preparation for

Davis's penalty phase trial. Moreover, unlike *Rompilla*, there is no indication that there was material here that trial counsel was aware the State was going to use in aggravation that was not obtained and reviewed by trial counsel prior to the penalty phase trial. Moreover, unlike defense counsel in *Rompilla*, there is no indication that there was material here that trial counsel was aware the State was going to use in aggravation that was not obtained and reviewed by trial counsel prior to the penalty phase trial. Moreover, unlike defense counsel in *Rompilla*, Davis's trial counsel reviewed records in the public defender's file transmitted to him regarding Davis's medical history, educational background, and other general background information surrounding his life. A thorough reading of the United States Supreme Court's decision in *Rompilla* reveals that it is inapplicable to the facts of the instant matter. Unlike defense counsel's deficient performance in *Rompilla*, trial counsel's investigation in the instant matter was within the level of reasonable performance that is required by *Strickland* [*v. Washington*, 466 U.S. 668 (1984) ] and *Wiggins* [*v. Smith* , 539 U.S. 510 (2003) ]. *See Rompilla*, 125 S.Ct. at 2463 ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste.") (citing *Wiggins*, 539 U.S. at 525, 123 S.Ct. 2527; *Strickland,* 466 U.S. at 699, 104 S.Ct. 2052).

928 So.2d at 1108. *See also Miller v. State*, 926 So.2d 1243, 1252-53 (Fla. 2006). Thus, we cannot say that counsel was ineffective for failing to conduct a more detailed investigation into Davis's prior conviction for robbery in the third degree.

*Davis v. State*, 9 So. 3d 539, 567-569 (Ala. Crim. App. 2008) (third alteration supplied; other alterations, ellipses, and emphasis in original).

133

Davis argues that the Alabama Court of Criminal Appeals's decision was contrary to, and an unreasonable application of, *Rompilla*.  He also challenges the state court's findings of fact, asserting that "the [Court of Criminal Appeals] stated, without any explanation or citation to evidence, that 'counsel tried to minimize the prior conviction,'" and contending that the record is "void of any evidence of diligence by counsel to support this judicial conclusion."[146]

This court does not agree with Davis's contentions, and finds that the Alabama Court of Criminal Appeals correctly construed *Rompilla*, and reasonably applied that decision to the facts of this case.  *Rompilla* established a reasonableness test for assessing the duty of counsel to conduct an adequate investigation.  In *Rompilla,* defense counsel attempted to research the defendant's background by talking to him and his family, and even consulted mental health experts in preparing the defendant's mitigation case.  *Rompilla*, 545 U.S. at 381.  However, counsel failed to review prior conviction records, despite his knowledge that the government intended to rely on the records in arguing aggravating circumstances.  The Supreme Court found that counsel's conduct was both unreasonable and prejudicial because the records revealed "a range of mitigation leads that no other source had opened up."  *Id.* at 390.

---

[146] Doc. no 39, at 21-22 (alteration supplied).

The Alabama Court of Criminal Appeals found that *Rompilla* did not require the reversal of Davis's sentence. *Davis v. State*, 9 So. 3d538, 569 (Ala. Crim. App. 2008). It relied upon two Florida cases, both of which are factually distinguishable from the instant case. In *Davis v. State*, 928 So.2d 1089 (Fla. 2005), the petitioner did not make a specific claim about failure to investigate the facts of a prior conviction, but instead challenged trial counsel's overall investigation and preparation for the penalty phase.[147]   The state court denied the claim, finding that counsel had adequately prepared and noting that trial counsel not only obtained the old criminal file, but also "reviewed records . . . regarding [the petitioner's] medical history, educational background, and other general background information surrounding his life." *Id.* at 1108 (alteration supplied).

In *Miller v. State*, 926 So.2d 1243 (Fla. 2006), the state court rejected a claim that counsel was ineffective for failing to mitigate the prior violent felony aggravator by articulating the underlying circumstances of his second degree murder conviction. The court held that *Rompilla* was inapplicable because an "informed attorney" had made an "informed and strategic decision" not to present evidence of the facts of the underlying conviction. *Id.* at 1253. The record supported a conclusion that counsel

---

[147] The petitioner in the 2005 Florida *Davis* case faulted counsel for waiting until after the jury found him guilty to begin preparing for the penalty phase, for spending only eleven hours in preparation, and for presenting only the petitioner's testimony during that phase of the trial. *Davis v. State*, 928 So. 2d 1089 (Fla. 2005).

had "researched all reasonable areas of mitigation, including the work and research of prior defense counsel"; was aware of the defendant's childhood, substance abuse problems, and mental health issues; and, most relevantly, had "all relevant information regarding Miller's 1986 second-degree murder conviction." *Id.* at 1250, 1253. The court concluded, based on counsel's testimony at the postconviction evidentiary hearing, that he had made a strategic decision to minimize the impact of Miller's prior conviction by "gloss[ing] over it" and "not allowing [the state] to present more evidence on it." *Id.* at 1252 (alterations provided).

In this case, the state court's determination that counsel's performance was not constitutionally deficient was based upon the following findings of fact: (1) Giddens's testimony that he examined "the file on Davis's prior conviction, but had not spoken to anyone about the prior case"; (2) the jury's awareness that Davis had previously been convicted of the lowest degree of robbery; and (3) counsel's attempt to minimize the prior conviction. *Davis v. State*, 9 So. 3d 539, 569 (Ala. Crim. App. 2008). Two of these findings are not clearly supported by the record. First, Giddens did not testify that he reviewed "the file on Davis's prior conviction"; rather, he testified that he "reviewed the record and saw what he was convicted of."[148] That testimony suggests that Giddens was referring to the actual charge, third degree

---

[148] Rule 32 C.R. Vol. 18, Tab 58, at 100.

robbery, and not the underlying circumstances of the crime.  Second, the court's

conclusion that counsel attempted to minimize the prior conviction is tenuous.  After

a thorough review of the record, it is apparent that counsel did not testify that he

made an informed and strategic decision[149] not to present the facts of the conviction

to the jury, or to "gloss over" the prior conviction in order to minimize its impact.

During the hearing, Giddens testified in a general sense that he did not object to the

State offering a certified copy of the conviction into evidence, "because you don't

want them to have to put on a witness to bring out the facts."[150]  But he did not

explain how testimony regarding the facts of the prior offense would have been

anything other than helpful.  Moreover, the state court did not find, and the record

does not support a finding, that counsel was in fact familiar with the underlying facts

of Davis's prior offense.

   *Rompilla* does not mandate that defense counsel obtain the complete court files

of all prior convictions of a capital defendant that will be used by the State at trial, or

suggest that counsel must comb through the old files of prior defense counsel in order

to obtain buried, but possibly relevant social and mitigating history.  Here, however,

the relevant mitigating evidence could have been discovered through a simple review

---

[149] The state court never made the explicit determination that counsel had made the strategic decision to ignore the underlying facts of the robbery conviction, nor did it discuss whether any such strategic decision was reasonable.

[150] Rule 32 C.R. Vol. 18, Tab 58, at 101.

of the arrest affidavit.   Counsel's failure to conduct that simple inquiry is questionable at best.

Even if counsel's performance could be considered constitutionally deficient, however, Davis still must show that he suffered prejudice as a result.  Davis's failure to prove prejudice appears to have formed the primary basis of the decision of the Alabama Court of Criminal Appeals to deny relief.  That court noted that, unlike in *Rompilla*, "there is no allegation that the file of Davis's prior conviction contained a plethora of mitigating evidence."  *Davis v. State*, 9 So. 3d 539, 568 (Ala. Crim. App. 2008).  The court also relied heavily on the fact that the jury knew that Davis was convicted of the lowest degree of robbery, and that one other aggravating circumstance was present.

Davis argues that, if the jury had learned the "underlying facts of [his] tagalong involvement in the group robbery of a few pizzas, the outcome of the penalty phase might have been different."[151]  Common sense does suggest that testimony that Davis went along with a group of boys who ordered and then stole several pizzas and $35 from a delivery person, where no gun or weapon was involved and no one was injured, could have been more compelling to a jury than an argument by defense counsel that his prior conviction and sentence were for the lowest degree of robbery

---

[151] Doc. no. 39, at 22.

in Alabama.  Whether this would have been sufficient to sway the jury, and the court, to impose a sentence of life without parole is another matter.  In Davis's case, unlike in *Rompilla,* the State was not relying *solely* on the prior conviction of a violent offense.  It also relied upon the fact that the murder was committed during a robbery as an aggravating circumstance.  Importantly, the fact of the robbery was undisputed once Davis was convicted as charged.

Moreover, a review of the Rule 32 testimony of Jadie Boozer, the attorney who represented Davis in his prior robbery case, reveals that the facts surrounding the robbery actually could have been more damaging to Davis than he claims.[152] Although Boozer testified that no weapon was used or recovered, he also testified on cross-examination that the victim's narrative in the police report stated that "[o]ne black male wearing a jacket and some dark cloth over his face confronted [the victim] and said, '[g]ive it up, man,'" that a "[b]lack male had his hand – right hand in the jacket pocket as if he, black male, *had a gun*," and that the victim "gave up the money."[153]  The events as recorded in the police report mirror the facts of the instant case, and both sets of facts suggest an escalating pattern of violence by Davis. Because there was evidence of the threatened use of a firearm, the prior robbery,

---

[152] Rule 32 R. Vol. 19, Tab 58, at 201-210.

[153] *Id*. at 205, 209 (alteration provided) (emphasis provided).

which Boozer also testified had originally been charged as a first degree offense, might not have been viewed by the jury as a mere "prank," as Davis now suggests. The state court's denial of this claim was not an unreasonable application of clearly established federal law, or based on an unreasonable determination of clearly established federal law.

This claim is due to be denied.

5.   *Failure to object to the submission of the penalty phase case to the jury on a Friday at 4:30 p.m.*

Davis contends that trial counsel were ineffective for failing to object to the submission of the penalty phase case to the jury on a Friday at 4:30 p.m. Davis offers the following in support of this claim:

> Submitting the case to the jury this late in the day before the weekend, and shortly before Christmas, placed pressure on the jurors to try to "wind up" deliberations to avoid being sequestered over the weekend. The consequence of submitting the case to Davis'[s] jury at such a late hour on a Friday created a climate for a hurried, unconsidered sentence. The facts bear this out: by 7:00 p.m. that Friday evening, the jury reached a decision of 7 to 5 in favor of execution. Tr. 1374. Trial counsel posed no objection to the jury continuing to deliberate after such an exhausting and demanding day. Only twenty minutes later, they voted 11 to 1 in favor of execution. Tr. 1377. Trial counsel erred in not objecting to the jury's deliberating Davis'[s] fate while under such time pressure.

Doc. no. 33, at 42 (alterations supplied).[154]

---

[154] This is the entirety of Davis's claim.

Respondent maintains that this claim is unexhausted, pointing out that, even though Davis raised the claim in his second amended Rule 32 petition,[155] he did not raise it on collateral appeal.[156]  Davis argues that this claim was "in fact raised on collateral appeal,"[157] but a review of his appellate brief does not reveal any mention of the claim.[158]  The claim, therefore, is procedurally defaulted, and Davis has offered nothing to excuse the default.

Respondent argues, in the alternative, that *habeas* relief cannot be granted on this claim because the Rule 32 court denied the claim on the merits, and

> Davis has not alleged, and cannot show, that the denial of relief on his claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."

Doc. no. 35, at 26.[159]  Contrary to Respondent's argument, however, it does not appear that the trial court addressed this claim at all.  As a result — *i.e.,* because the trial court made no findings on this claim — there is nothing for this court to review.

---

[155] Rule 32 C.R. Vol. 12, Tab 47, at 29.

[156] Doc. no. 35, at 25.

[157] Doc. no. 39, at 8.

[158] *See* Rule 32 C.R. Vol. 57, Tab 60.

[159] Respondent cites "C.R2. 1190-1191" as the pages of the trial court's opinion on which it denied this claim on the merits.  The trial court's opinion denying Davis's Second Amended Rule 32 petition is located in Rule 32 C.R. Vol. 62, Tab 80.  The pages cited by the respondent correspond to  Rule 32 C.R. Vol. 62, Tab 80, at 57-58.  However, the trial court did not address this claim on the pages cited by the respondent.

141

Furthermore, even assuming the claim were properly before this court, it would be due to be denied on the merits.  Davis has offered nothing beyond a conclusory assertion that counsel "erred in not objecting to the jury's deliberating Davis's fate while under such time pressure."  Similarly, he has offered nothing to indicate that he was prejudiced by counsel's failure to object to the jury's deliberations beginning on a Friday night.

## C.    Counsel Was Ineffective for Not Objecting to Prosecutorial Misconduct

Davis asserts that repeated instances of prosecutorial misconduct violated his rights to a fair trial, due process, and a reliable sentence.[160]  He also contends that trial counsel were ineffective for failing to object to the alleged instances of prosecutorial misconduct.

The relevant question on *habeas* review of claims of prosecutorial misconduct is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).  The Eleventh Circuit explicated that standard in *Spivey v. Head,* 207 F.3d 1263 (11th Cir. 2000), *cert. denied*, 531 U.S. 1053 (2000):

---

[160] Doc. no. 33, at 42-50.

Improper prosecutorial arguments, especially misstatements of law, must be considered carefully because "while wrapped in the cloak of state authority [they] have a heightened impact on the jury." *Drake v. Kemp*, 762 F.2d 1449, 1459 (11th Cir. 1985). When assessing this type of claim, this Court examines the entire context of the judicial proceeding to determine if it was fundamentally unfair. *See Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated*, 478 U.S. 1016, 106 S. Ct. 3325, 92 L. Ed. 2d 732 (1986), *reinstated*, 809 F.2d 700 (1987). Not every improper prosecutorial remark, therefore, renders the trial unfair. *See id*. Improper arguments do, however, render the capital sentencing hearing fundamentally unfair and require reversal when there is a reasonable probability that they changed the outcome of the case. *See id.* at 1402. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id*. at 1401 (quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Proper arguments, regardless of their impact on the outcome of the case, do not render a trial unfair.

*Spivey*, 207 F.3d at 1275-76 (alteration in original). Moreover, "improper statements during argument can be cured by clear and accurate jury instructions." *Johnson v. Alabama,* 256 F.3d 1156, 1185 (11th Cir. 2001).

Davis raises nine distinct examples of prosecutorial misconduct as separate claims in his federal petition. All of those claims were raised for the first time in Davis's petition for writ of *certiorari* to the Supreme Court of Alabama on direct appeal.[161] Although the Alabama Supreme Court did not specifically address all of those claims in its opinion, it did note that it had thoroughly reviewed the petitioner's arguments and found no reversible error. *Ex Parte Davis*, 718 So.2d 1166 (Ala.

---

[161] C.R. Vol. 10, Tab 35, at 49-65.

143

1998).  That decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  As will be seen, the record establishes that the comments did not "so infect the trial with an unfairness" as to deprive Davis of constitutional due process.  When considered in light of the weight of the evidence, the arguments made by defense counsel, and the trial court's instructions to the jury, it is not likely that the prosecutor's comments influenced the jury's decision.  *See Darden*, 477 U.S. at 182 (citing *United States v. Young*, 470 U.S. 1 (1985)).

1.     *Implying that Davis had been involved in a gang prior to his arrest*

Davis asserts that the prosecutor violated his right to a fair trial by repeatedly implying during his closing argument that Davis was a gang member and, therefore, should be convicted and sentenced to death.[162]  In support of this assertion, Davis contends that the prosecutor "referred to Davis'[s] use of bandanas on previous occasions, and he also called Davis a 'hoodlum' who 'conned' a state witness."[163]

The relevant portions of the opinion of the Alabama Supreme Court on direct appeal read as follows:

---

[162] Doc. no. 33, at 43.

[163] *Id*. (alteration supplied).  Davis adds that the "pre-sentence investigative report also contained damaging hearsay about Davis's alleged gang involvement." *Id*. (alteration supplied).  This claim was raised separately in Claim H and will be addressed as part of Claim H.

144

Davis next argues that in his closing argument the prosecutor made comments insinuating that Davis had been involved in a gang before he was arrested for this crime. Davis points out that the evidence in this case did not suggest that Hazle's murder was connected to gang activity, and he argues that the prosecutor nevertheless used his closing argument to inject irrelevant implications of gang activity into the trial, in violation of the trial court's ruling on a motion in limine to exclude any evidence of alleged gang activity on Davis's part.

. . . .

No evidence at trial established, or even implied, that Davis had any involvement in gangs.   However, Davis argues that the prosecutor circumvented the motion in limine by making remarks during closing argument that, he says, were tantamount to accusations that Davis was a gang member and that were so highly prejudicial as to mandate the reversal of his conviction.

During closing arguments, defense counsel argued primarily that the testimony of Willie Smith, Alphonso Phillips, Terrance Phillips, and others was not reliable. In response to these arguments, the prosecutor stated, in pertinent part:

> [The State]: Ladies and gentlemen, if I brought – if I could – if I could bring somebody that was the pillar of the community down here to say, "Yes, I saw Jimmy Davis kill Johnny Hazle at Direct Oil," then don't you think I'd do it?
>
> But that's not what you get.  You get the people that were there.  The people that are involved in the crime . . . . I don't have anybody from Parker Memorial or from St. Michael's [apparent references to Baptist and Episcopal churches in Anniston].  And you have to understand that.
>
> We've got people that this is the streets [sic].  This is the streets where young men these days make their bones and *they carry the badge of honor with bandannas* –

145

[Defense counsel]: Judge, I object to that line of argument.

[The State]: Judge, I can appeal for law enforcement all day long.  And we would ask the court to allow me to do so.

The Court: Overrule the objection.

[The State]: They have guns, just like this gun that was acquired.  And in this situation, the guns and the bandannas led to a man's death.  These were teenagers from good homes.  I think you could see that.

Davis concedes that in its closing argument the State did not explicitly accuse him of being a gang member; however, he argues that it is "common knowledge" that bandannas may be used as gang paraphernalia and that the prosecution's reference to a bandanna as a "badge of honor" so strongly invoked the imagery of gang membership as to amount to an outright accusation that the defendant was a gang member.

Davis relies upon *Haralson v. State*, 227 Ga. App. 118, 488 S.E. 2d 497 (1997), wherein the Georgia Court of Appeals affirmed the granting of a mistrial on the ground that the prosecutor had impermissibly placed the defendant's character into issue by eliciting testimony that the defendant was a gang member. . . .

        . . . .

Davis argues that here, as in *Haralson*, the prosecutor's mention of "bandannas" during his closing remarks was synonymous with reference to gang involvement.  Davis points out that Alabama courts have considered evidence of a defendant's association with a "gang" as functionally equivalent to evidence of a "collateral criminal act," so that such evidence "is presumptively prejudicial and . . . is admissible only when [it is] probative and [only] under certain limited exceptions."

146

*Thomas v. State*, 625 So.2d 1149, 1153 (Ala. Cr. App. 1992), *reversed on other grounds, Ex parte Thomas*, 625 So.2d 1156 (Ala. 1993). . . .

. . . .

We recognize that admitting evidence of a defendant's association with an ill-received organization or group may constitute reversible error, *Dawson v. Delaware*, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), and that mentioning gang activity — in particular the prosecutor's mentioning it in the trial of a case that is itself not gang-related, and to which gang-related activity has no connection — may invite a reversal. *Walker v. State*, 631 So. 2d 294 (Ala. Cr. App.1993). However, we do not agree with Davis that the prosecutor's mention of "bandannas" as a "badge of honor" was equivalent to an improper reference to gang activity, such as was present in both *Haralson* and *Thomas*. In *Haralson*, the detailed evidence as to the defendant's wearing a bandanna and the significance of its color unequivocally linked the defendant with gang involvement. Likewise, in *Thomas*, the evidence directly established that the defendant was associated with a gang and it was particularly prejudicial because the crime in question was of a type commonly associated with gang activity.

In contrast, in this present case, the prosecutor's reference to "bandannas" was not even made in regard to Davis; it certainly did not directly link him to gang involvement. The prosecutor made this reference in the context of responding to defense counsel's argument that the State's witnesses were "liars"; the prosecutor admitted that the State's witnesses were not "pillar [s] of the community" but were instead from "the streets where young men . . . carry the badge of honor with bandannas." Even in view of "the massive media coverage of gang violence in contemporary society," *Ex parte Thomas*, 625 So. 2d at 1157, we find no basis for holding that the prosecutor's reference to bandannas was an overt, or even a veiled, reference to a gang affiliation. Moreover, if the reference to bandannas carries any generally negative connotation, it necessarily reflects upon the State's own witnesses, not upon the defendant. We therefore hold that the prosecutor's remarks do not warrant a reversal of Davis's conviction.

147

*Ex parte Davis*, 718 So.2d 1166, 1174-77 (Ala. 1998) (emphasis and alterations in original).

Review of the closing arguments confirms that it was not unreasonable for the Alabama Supreme Court to conclude that any potentially negative connotation from the prosecutor's reference to "bandannas" reflected on the State's own witnesses. There was no overt or veiled reference to Davis's alleged gang membership. As such, Davis has not shown that the state court's determination that the prosecutor's remarks did not warrant a reversal was contrary to, or an unreasonable application of, clearly established federal law, or that the decision was based upon an unreasonable determination of the facts in light of the evidence presented in the state courts.

Davis argues that counsel were ineffective for failing to object when the prosecutor improperly implied that he had been involved in a gang prior to his arrest. Davis did not raise this claim in state court.[164] Thus, it is has not been exhausted, and

---

[164] Davis alleged in Claim F of his Rule 32 petition that "Trial Counsel Failed to Prevent or Otherwise Object to Important Instances of Prosecutorial Misconduct." Rule 32 C.R. Vol. 14, Tab. 52, at 21. He argued, *inter alia*, that counsel were ineffective for failing to object to the prosecution improperly drawing attention to the fact that he did not testify in his own defense and attempting to improperly bolster the credibility of Alphonso Phillips by painting him as a "good kid" led astray by Davis. *Id*. at 21-22. Davis did not argue, as a part of Claim F, that counsel were ineffective for failing to object when the prosecutor improperly implied that he had been involved in a gang prior to his arrest. *Id*. at 21-23. However, in Claim C of his Rule 32 petition, in which Davis alleged counsel were ineffective for failing to challenge the State's investigation and presentation of the case, he argued that counsel were ineffective for failing to "ensure the pretrial ruling [that the prosecution was barred from introducing any evidence that in any way implied that the murder was gang-related or that Davis or the co-defendants were involved in a gang] was enforced and that gang-related references and innuendo did not make their way into the trial." Rule 32 C.R. Vol. 14, Tab. 52, at 11-

this court cannot review it.  Even if the claim were properly before this court, it would be due to be dismissed, because the underlying claim of prosecutorial misconduct upon which the ineffective assistance of counsel claim is based is without merit. Counsel cannot be found deficient for failing to make an objection that was not warranted.

> ### 2.    *Improperly telling the jury that one purpose of convicting Davis was to decrease crime in general*

Davis complains that the prosecutor made the following closing argument: "That doesn't mean that if you believe beyond a reasonable doubt this defendant is guilty and you convict him that it's not going to have an effect [on crime in general]. It doesn't mean that whatsoever."[165]  Davis contends that the prosecutor's argument was irrelevant, prejudicial, and violated the principles established in *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976) (holding that capital cases require consideration of "the character and record of the individual offender" and "the circumstances of the particular offense") and *Copeland v. Washington*, 232 F.3d 969, 975 (8th Cir. 2000) (prosecutor unlawfully referenced "the other murders in all of Missouri's history" and, thereby, improperly evoked the jury's fear of crime).

---

12.  Davis raised this claim as Claim A(3) of his federal petition, and it is addressed in that section of this memorandum opinion.  It does not appear that Davis intended for that claim of ineffectiveness to be a part of the current claim, Claim C(1).  However, even if he did, it would be due to be denied for the same reasons discussed in Claim A(3).

[165] Doc. no. 33, at 44 (alteration in original).

The Alabama Supreme Court summarily denied relief, *Ex Parte Davis*, 718 So.2d 1166 (Ala. 1998), and Davis merely reasserts the arguments made in state court. Davis does not explain how the denial of this claim was an unreasonable determination of clearly established federal law. Moreover, the trial transcript reveals that the portion of the argument quoted by Davis was taken out of context. The entirety of the comment is as follows:

> Your job, Ladies and Gentlemen, is to decide guilt or innocence of Jimmy Davis. And you're [*sic*] job is not to decide, as Mr. Giddens and Mr. Adams said before, that there's too much violence in the street. That doesn't mean that if you believe beyond a reasonable doubt this defendant is guilty and you convict him that it's not going to have an affect [*sic*]. It doesn't mean that whatsoever.

R. Vol. 7, Tab 14, at 1232. Although the prosecutor admitted that convicting Davis might have an impact on street violence in general, he clearly advised the jurors that their only purpose was to decide if Davis was guilty or innocent, regardless of the possible effect their decision might have. The comment is not comparable to the outrageously objectionable arguments made in *Copeland*; and there is no reasonable likelihood that the comment rendered Davis's trial unfair. Davis is entitled to no relief on this claim.

Davis also argues that counsel were ineffective for failing to object when the prosecutor improperly told the jury that one purpose of convicting him was to

decrease crime in general.  Davis did not raise this claim in state court.  Thus, it has not been exhausted, and this court cannot review it.  Even if the claim were properly before this court, it would be due to be dismissed, because the underlying claim of prosecutorial misconduct upon which the ineffective assistance of counsel claim is based is without merit.  Counsel cannot be found deficient for failing to make an objection that was not warranted.

3.    *Misstating the law and arguing facts not in evidence*

Davis argues that the prosecutor impermissibly argued "facts" that were not in evidence, and manipulated other facts to induce the jury to convict and sentence him to death.[166]  He cites *Copeland v. Washington*, 232 F.3d 969, 975 (8th Cir. 2000) for the general proposition that it is unreasonable, in light of Supreme Court precedent, for a state court to find harmless a prosecutor's reference to facts not in evidence during a penalty stage argument.[167]  He provides no further elaboration.  In the one sentence Davis devotes to this claim, he fails to identify the facts — either not in evidence or allegedly manipulated — that were improperly and impermissibly argued by the prosecutor.[168]

---

[166] Doc. no. 33, at 44.

[167] *Id.*

[168] Likewise, Davis failed identify these facts when he raised this claim in his *certiorari* petition on direct appeal.  *See* C.R. Vol. 10, Tab 35, at 53.

This claim was summarily denied by the Alabama Supreme Court. By merely asserting this ground for relief, without more, Davis has failed to satisfy his burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts*. *See*, *e.g.*, *McFarland v. Scott*, 512 U.S. 849, 856 (1994). The absence of a fully-developed argument necessarily leads this court to conclude that Davis has failed to show that the state court's denial of this claim was contrary to, or an unreasonable application of, clearly established federal law. *See Davis v. State*, 9 So. 3d 514 (Ala. Crim. App. 2006).

Davis also argues that counsel were ineffective for failing to object when the prosecutor repeatedly and impermissibly argued "facts" that were not in evidence and manipulated other facts to prejudice him and induce the jury to convict him. Davis did not raise this claim in state court. Thus, it has not been exhausted, and this court cannot review it. Even if the claim were properly before this court, it would be due to be dismissed, because the underlying claim of prosecutorial misconduct upon which the ineffective assistance of counsel claim is based is clearly without merit. Counsel cannot be found deficient for failing to make an objection that was not warranted.

4.     *Improperly vouching for the veracity and quality of state witnesses*

Davis contends that "the prosecutor repeatedly attempted to bolster the credibility of the State's witnesses, in clear violation of federal law. *Berger v. United States*, 295 U.S. 78, 88 (1935) ('[I]mproper suggestions, insinuations, and especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none')."[169]  Davis adds that his attorneys' failure to adequately investigate the circumstances of his case made it impossible for them to know that the prosecutor's characterizations were false.[170]

Davis first complains that the prosecutor improperly vouched for the credibility of Shannon Hardy Wilson, who testified, among other things, that she heard Davis confess to committing the murder.[171] Davis points to the following argument by the prosecutor:  "Shannon Hardy, what is her axe to grind in this thing?  Really, I doubt very seriously — well, you Ladies and Gentleman saw her testify.  I don't think she was trying to cover — didn't appear like she was trying to cover for her cousin in the situation."[172]

This claim was rejected without discussion by the Alabama Supreme Court. *Ex Parte Davis*, 718 So.2d 1166 (Ala. 1998).  A review of the record indicates that,

---

[169] Doc. no. 33, at 44 (alteration supplied).

[170] *Id*.

[171] *Id*. at 45.  Ms. Wilson's testimony is located at R. Vol. 6, at 991-1034.

[172] Doc. no. 33, at 45.

during closing arguments, defense counsel attacked Wilson's credibility, arguing that she had lied to protect her cousins, Alphonso and Terrance Phillips.[173]   The prosecutor's argument was made in response to that attack upon Hardy's credibility, and was a legitimate inference from the evidence.   The state court's implicit determination that the prosecutor's argument did not constitute plain error was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence.

Davis next claims that the prosecutor improperly attempted to portray co-defendant Alphonso Phillips as a "good kid" who had been led astray by Davis.[174] Specifically, Davis points to the prosecutor asking Alphonso if he had "ever been involved in anything like this before in your life," to which Alphonso answered, "No, sir."[175]   Davis contends that, at the time of trial, the District Attorney's Office had a list compiled by the Anniston Police Department, confirming that Alphonso was known to be a gang member,[176] and the department was aware that Alphonso had previously been arrested for disorderly conduct, a weapons violation, trespass, and

---

[173] R. Vol. 7, Tab 13, at 1178, 1184, 1196-1205.

[174] Doc. no. 33, at 45.

[175] R. Vol. 7, at 1135.

[176] Doc. no. 33, at 45.  Davis points out that, during his testimony at the Rule 32 hearing, Assistant District Attorney Ron Wood stated that he did not know if this information was disclosed to Davis's attorneys during the course of the trial.  *Id.* (citing Rule 32 R. Vol. 23, at 1086).

violation of a liquor law.[177]   Davis further contends that the prosecutor made repeated

attempts to improperly bolster the credibility of Terrance Phillips, despite knowing

that Terrance had "entered into a consent decree in connection with a third-degree

assault charge in 1992."[178]

Davis argues that although the prosecution knew that both Alphonso and

Terrance Phillips had criminal records relating to guns and assaults, District Attorney

Joe Hubbard made the following statements during his closing argument:

> Terrance Phillips did a terrible thing.  He got involved in something he
> shouldn't get involved in.  He did a terrible thing and he knows that.
> But he was not a hard core criminal.  He was going to school.  Never
> been in trouble before.  Terrance Phillips, 16 years old, no trouble
> whatsoever, a good boy, on the edge of going bad if something didn't
> happen.  And something did happen.  And Alphonso Phillips, a boy that
> hadn't crossed the edge was looking for something, looking for
> whatever.  Crossed the edge and got into some trouble.  Because they
> were looking for somebody to help him, looked to somebody to be their
> big brother, and the father or whatever.  And they picked him.  They
> picked Jimmy Davis.  And they picked the wrong one.

---

[177] *Id.*  Davis points out that, during his Rule 32 testimony, Mr. Wood stated that he did not know if this information was disclosed to Davis's attorneys during the course of the trial.  *Id.* (citing Rule 32 R. Vol. 23, at 1089).

[178] *Id.*  Davis points out that in his Rule 32 testimony, Mr. Wood stated that he did not know if this information was made available to trial counsel.  *Id.* (citing Rule 32 R. Vol. 23, at 1088).

Further, Davis does not explain what a "consent decree" is.  At the time of his trial, it was defined by § 12-15-1(6), Ala. Code 1975, as "[a]n order, entered after the filing of a delinquency petition and before the entry of an adjudication order, suspending the proceedings and continuing the case of the child under supervision in the child's own home, under terms and conditions agreed to by all parties concerned."  *See D.D.A. v. State*, 650 So.2d 571, 573 (Ala. Crim. App. 1994) (alteration in original).

Doc. no. 33, at 46 (quoting R. Vol. 7, Tab 14, at 1231). Davis argues that, because the prosecution did not disclose the information it had regarding Alphonso's gang involvement, his attorneys were unable to challenge the prosecutor's improper vouching for the credibility of Alphonso and Terrance, and were unable to use the information for cross-examination purposes.[179]

Many of the arguments and facts presented here were not raised in the state court. When Davis first raised this claim in his petition for a writ *certiorari* on direct appeal, he objected to the following instances of alleged improper bolstering:

> The next witness for whose veracity the prosecutor testified was Terrance Phillips: "Terrance Phillips, 16 years old, no trouble whatsoever, a good boy. . . ." R. 1231) The prosecutor continued through his list of crucial witnesses: "And Alphonso Phillips, a boy that hadn't crossed the edge, was looking for something, looking for whatever." R. 1231) Later, the prosecutor again vouched for the credibility of the witnesses, the very witnesses who received "deals" from the prosecutor in exchange for their favorable testimony: "It's rare, Ladies and Gentlemen, to see people cooperate against their friend in situations like this. And that's the reason you can't just discount what they've done here today, yesterday. It takes some guts, particularly when you as young as though (sic) two fellows were." R. 1235).

C.R. Vol. 10, Tab. 35, at 54 (alteration in original). Davis argued that the "prosecutor made a concerted effort to attest to the credibility of each witness, cumulatively bolstering the state's otherwise weak case."[180] His argument was based on the

---

[179] Doc. no. 33, at 46 (quoting R. Vol. 7, Tab 14, at 1231).

[180] C.R. Vol. 10, Tab. 35, at 54.

premise that it is "grossly improper" for a prosecutor, as a public official, to personally vouch for the credibility of his witnesses, especially when that testimony constitutes the bulk of the State's case against the defendant.[181]   That claim was rejected by the Alabama Supreme Court without discussion.  *Ex Parte Davis*, 718 So.2d 1166 (Ala. 1998).

The denial of that claim was not contrary to, or an unreasonable application of, clearly established federal law, including *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), nor was the decision based upon an unreasonable determination of the facts in light of the evidence presented in the state courts.  Defense counsel had previously attacked the credibility and character of the Phillips cousins, and argued that they had conspired to tell lies in order to place all of the blame on Davis.[182]  The argument that Davis makes here — *i.e.,* that the prosecutor's portrayal of the Phillips cousins as "good kids" was misleading and improper, because he knew or should have known about their contacts with the juvenile system — was not raised in the petition for writ of *certiorari* on direct appeal.  The state court did not have the opportunity to address the claim in light of these belatedly offered "facts" and argument.  Thus, the claim has not been exhausted, and this court cannot review it.[183]

---

[181]  *Id.* at 55.

[182]  R. Vol. 7, Tab 13, at 1178-1181, 1183-84, 1187-1211.

[183]  To the extent Davis argues that the facts and argument were not raised on appeal because

Davis also contends that counsel were ineffective for failing to object to the allegedly improper arguments about Shannon Wilson and the Phillips cousins referenced above.   He adds that counsels' unreasonable failure to adequately investigate the circumstances of his case made it impossible for them to know that the prosecutor's characterizations were false.   In his Rule 32 petition, Davis raised only the portion of this claim relating to Alphonso Phillips.   Specifically, Davis alleged that:

> The prosecutor made repeated attempts to improperly bolster the credibility of Alphonso Phillips by painting him as a "good kid" led astray by Davis.   The prosecutor asked this elder Phillips cousin if he had ever been involved with anything like the Hazel robbery and murder.   Alphonso Phillips replied "no." (Tr. 1135).   In closing, the prosecutor refers to Alphonso as "a boy that hadn't crossed the edge, was looking for something, for whatever." (Tr. 1231).   If trial counsel had spent any time whatsoever investigating Alphonso Phillips' past, they would have learned that he had been in trouble on multiple occasions including conduct involving a firearm.   Because defense counsel failed to conduct an investigation, however, they could not challenge the prosecutor's portrayal of Alphonso Phillips and consequently failed to challenge Alphonso Phillips' credibility.

Rule 32 C.R. Vol. 14, Tab. 52, at 22.[184]   The trial court denied the claim, saying that

> the Court finds that the State did not "improperly bolster" the testimony of Alphonso Phillips.   The State argued legitimate, reasonable inferences from the record.   This type of argument is well within the State's right.

---

of the alleged *Brady* violations by the State, the *Brady* claim will be addressed separately.

[184] Davis raised the identical issue on appeal from the denial of his Rule 32 petition.   Rule 32 C.R., Vol. 57, Tab 60, at 41-42.   However, the Alabama Court of Criminal Appeals did not address the claim in its opinion.   *See Davis v. State*, 9 So. 3d 539 (Ala. Crim. App. 2008).

> Davis certainly did not establish prejudice as to this claim. Further, having read the closing argument of the State, this Court cannot find that no reasonable attorney would have failed to object to this line of argument.

Rule 32 C.R. Vol. 62, Tab 80, at 20. Davis has not established that the state court unreasonably determined that he failed to prove either deficient performance by counsel or prejudice from counsel's failure to object to the prosecutor's statements about Alphonso Phillips.

Davis did not raise his claims that counsel were ineffective for failing to object to allegedly improper arguments about Shannon Wilson and Terrance Phillips in state court. Thus, the portion of this claim pertaining to Shannon Wilson and Terrance Phillips has not been exhausted, and this court cannot review it.

5.   *Improperly commenting on Davis's failure to testify*

Davis contends that his constitutional rights were violated by the prosecutor's comments about his silence throughout the trial. He argues that:

> During his guilt-phase closing argument, the prosecutor drew the jury's attention to the fact that Davis had not testified. Tr. 1234. After emphasizing to the jury that each of the accomplices and other witnesses had admitted to minor roles in the crime, the prosecutor implied that the only person who could have told a different story was Davis. By rhetorically asking who could contradict each witnesses' [*sic*] testimony, Davis contends that the prosecutor focused the jury's attention on the fact that Davis had not denied the accomplices' allegations. Tr. 1230-32.

Doc. no. 33, at 47.   The Supreme Court of Alabama addressed this claim as follows:

Davis next argues that during closing arguments the prosecution made improper remarks that violated his rights to a fair trial, due process, and a reliable verdict.  Davis first contends that the prosecution improperly commented upon his decision not to testify at trial and that, under Alabama law, this error, taken alone, mandates a reversal of his conviction.  Davis points out that "[i]t is a basic principle of law that once a defendant chooses not to testify at his trial the exercise of that choice is not subject to comment by the prosecution." *Wherry v. State*, 402 So.2d 1130, 1133 (Ala. Cr. App. 1981).  "In determining if a prosecutorial remark impairs the integrity of the defendant's right not to testify the test is whether the defense can show that the remark[, given the context in which it was made,] was intended to comment on the defendant's silence or was of such character that a jury would naturally and necessarily construe it as a comment on the defendant's silence." *United States v. LeQuire*, 943 F.2d 1554, 1565 (11th Cir. 1991), *cert. denied*, 505 U.S. 1223, 112 S. Ct. 3037, 120 L. Ed. 2d 906 (1992). Additionally, we note that at trial Davis did not object to the comments he complains of here, and, therefore, that his argument must be reviewed for plain error; that is, for "those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *Kuenzel v. State*, 577 So.2d 474 (Ala. Cr. App. 1990), *affirmed*, *Ex parte Kuenzel*, 577 So.2d 531, *cert. denied*, *Kuenzel v. Alabama*, 502 U.S. 886, 112 S. Ct. 242, 116 L. Ed. 2d 197 (1991) (quoting *United States v. Young*, 470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)).

Davis argues that during closing argument the prosecutor repeatedly drew the jury's attention to the fact that Davis did not testify. According to Davis, the prosecutor reminded the jury that each of the other persons who participated in the crime had testified and that only Davis could "tell a different story." To support this argument, Davis points to the following excerpt from the prosecutor's argument:

What do we have to show that Alphonso and Terrance are telling the truth?  I submit to you, ladies and gentlemen, if you're going to get together and concoct a

160

story about somebody else doing a crime, first thing you're going to do is exonerate yourself. You're going to get yourself out of it.

Now, what would keep Shannon, Alphonso and Terrance from getting together and putting Alphonso as a lookout that just walked off, didn't do anything? Why did Alphonso change his story now? . . . Who was going to say different? . . .

. . . .

Why didn't they say Jimmy hid the gun in the back yard? *Who was going to say different than that?*

. . . .

Why did Alphonso – why didn't he just say Jimmy had the gun all day? Why didn't he say that? *Who was going to dispute that?* . . . Why didn't he just say Jimmy had it? *Who was there to dispute it?* Why didn't he? Because it wasn't the truth.

. . . .

It's rare, ladies and gentlemen, to see people cooperate against their friends in situations like this. And that's the reason you can't just discount what they've done here today, yesterday. It takes some guts, particularly when you're as young as though [*sic*] fellows were.

. . . .

Because, ladies and gentlemen, I wanted them to testify. And they did testify. . . . And I submit to you, ladies and gentlemen, you know who it was that did this

161

>killing.   It's Jimmy Davis.   The man's been sitting over
>there with his attorneys.  (Emphasis added.)
>
>Davis argues that these comments served only to focus the jury's
>attention on the fact that he did not personally refute the testimony of the
>other witnesses, and that they implied to the jury that he would have
>done so if he was innocent.
>
>In closing argument, Davis's counsel attacked the credibility and
>character of the witnesses who knew Davis, suggesting that Alphonso
>Phillips and the other witnesses against Davis could gain from lying on
>the stand, and thus conspired against Davis by testifying against him.
>The State points out that, in its rebuttal argument, it repeatedly offered
>examples of how, if the witnesses were indeed conspiring to falsely
>testify against Davis, they could have done so to their own greater
>benefit by telling a different story.   After reviewing the State's
>comments in their full context, we cannot hold that they would naturally
>and necessarily be construed as an attack on Davis's decision not to
>testify on his own behalf; rather, they could well be construed as a form
>of cohesive rebuttal to defense counsel's theory that the witnesses
>against Davis were lying in order to rid themselves of involvement in
>the crime.

*Ex Parte Davis*, 718 So.2d 1166, 1173-74 (Ala. 1998) (alterations and emphasis in

original).

The Supreme Court has held that direct comments by the prosecution about a

defendant's silence violate the Fifth Amendment. *Griffin v. California*, 380 U.S. 609,

615 (1965).  When determining whether a prosecutor has made an impermissible

comment, federal courts must consider the totality of the circumstances and evaluate

"whether the remark is 'manifestly intended' by the prosecutor or 'would naturally

and necessarily be understood by the jury' as a comment on the defendant's silence."

*Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987) (citing *United States v. Vera*, 701 F.2d 1349 (11th Cir. 1983)).

The Eleventh Circuit described the proper manner in which to evaluate a *Griffin* claim in *Isaacs v. Head*, 300 F.3d 1232 (11th Cir. 2002), saying:

> The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify.   A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.   The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so.   The defendant bears the burden of establishing the existence of one of the two criteria.   The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement . . . .
>
> *United States v. Knowles*, 66 F.3d 1146 (11th Cir. 1995) (citations, quotations, and footnotes omitted).   *See also United States v. LeQuire*, 943 F.2d 1554, 1565 (11th Cir. 1991) (same); *Solomon v. Kemp*, 735 F.2d 395, 401 (11th Cir. 1984).
>
> In applying *Griffin*, we have strictly enforced the requirement that a defendant show that the allegedly offensive comment was either manifestly intended to be a comment on the defendant's silence or that the comment naturally and necessarily related to the defendant's silence.

*Isaacs*, 300 F.3d at1270 (ellipses supplied).

Davis has failed to explain how the Alabama Supreme Court's decision with respect to the prosecutor's alleged comments about his failure to testify was contrary to or an objectively unreasonable application of *Griffin*. He is entitled to no relief.

Davis also claims that his attorneys were ineffective for failing to object to the allegedly improper argument. That claim was raised in Davis's Rule 32 petition, and on appeal from the denial of that petition. The Alabama Court of Criminal Appeals affirmed the trial court's denial of this claim, holding:

> The circuit court made the following findings on this claim:
>
> > In paragraph 43, Davis alleges [ineffective assistance of counsel] because the prosecutor allegedly drew attention to the fact that Davis did not testify, without objection from defense counsel. The contention that the prosecutor improperly commented on Davis's failure to testify was reviewed and rejected by the Supreme Court of Alabama. *Ex parte Davis*, 718 So.2d 1166, 1174 (Ala. 1998). Having failed on the underlying issue on direct appeal, Davis cannot succeed by relitigating this issue in the guise of [ineffective assistance of counsel]. *See, Williams* [*v. State*], 783 So.2d 108, 133 (Ala. Crim. App. 2000) ("Because we determined that the remarks did not constitute plain error even if objectionable, appellant cannot relitigate the issue under the guise of ineffective assistance of counsel in a post-conviction proceeding. A finding of no manifest injustice under the 'plain error' standard on a direct appeal serves to establish a finding of no prejudice under the test for ineffective assistance of counsel provided in *Strickland v. Washington* [, 466 U.S. 668 (1984) ]."). Because the underlying issue lacks merit, counsel could not have been ineffective in this regard. *See Card v. Dugger*, 911 F.2d

1494, 1520 (11th Cir. 1990) ("Counsel cannot be labeled ineffective for failing to raise issues which have no merit.").

R. 1152-53.)

Initially we note that the circuit court erroneously relied on a decision by this Court, *Williams v. State*, 783 So.2d 108 (Ala. Crim. App. 2000), that was later reversed by the Alabama Supreme Court. However, the circuit court issued its order before the Supreme Court released *Ex parte Taylor*, 10 So.3d 1075 (Ala. 2005). The *Taylor* court held:

> Although it may be the rare case in which the application of the plain-error test and the prejudice prong of the *Strickland* [*v. Washington*, 466 U.S. 668 (1984)] test will result in different outcomes, a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under *Strickland* to sustain a claim of ineffective assistance of counsel."

*Taylor*, 10 So. 3d at 1078.

On direct appeal the Supreme Court stated the following concerning the prosecutor's argument in closing:

> After reviewing the State's comments in their full context, we cannot hold that they would naturally and necessarily be construed as an attack on Davis's decision not to testify on his own behalf; rather, they could well be construed as a form of cohesive rebuttal to defense counsel's theory that the witnesses against Davis were lying in order to rid themselves of involvement in the crime.

*Ex parte Davis*, 718 So.2d 1166, 1174 (Ala. 1998). The Alabama Supreme Court specifically found that the prosecutor's comments were

not improper.  "The sixth amendment right to effective assistance of
counsel does not require counsel to raise every objection without regard
to its merit."  *Palmes v. Wainwright,* 725 F.2d 1511, 1523 (11th Cir.
1984).  *See also Thomas v. Jones,* 891 F.2d 1500 (11th Cir. 1989)
(counsel not ineffective for failing to object to admissible evidence).
Therefore, counsel was not ineffective for failing to object to a
prosecutor's proper argument.

Moreover, whether to object is a matter of trial strategy.
"[C]ounsel's failure to object to the prosecutor's summation represents
his tactical decision to avoid underscoring the prosecutor's statements
so as to draw the jury's attention to them."  *Gatto v. Hoke,* 809 F. Supp.
1030, 1039 (E.D.N.Y. 1992).  Relief was correctly denied on this claim.

*Davis v. State*, 9 So. 3d 539, 551-552 (Ala. Crim. App. 2008) (alterations in original).

That determination was neither contrary to clearly established federal law, nor

an unreasonable determination of the facts in light of the evidence.  Davis offers no

evidence to refute the court's conclusion that he failed to establish deficient

performance. Moreover, because he has not established that the allegedly offensive

comment was manifestly intended to be a comment on his silence or naturally and

necessarily related to his silence, he cannot establish that the state court unreasonably

determined that he was not prejudiced by counsels' failure to object to the comment.

6.   *Improperly arguing that the jury could not consider mercy in reaching
     a verdict*

Davis contends that, during closing arguments, the prosecutor "instructed the

jury to set aside their prerogative to consider mercy and convict Davis of capital

166

murder and sentence him to death," when he argued:  "It's emotional, isn't it?  Really

emotional . . . .  But you Ladies and Gentleman have no place for tears for you right

now"; and when the prosecutor later "urged the jury to disregard feelings for Davis's

family and impose a death sentence."[185]  In its full context, the prosecutor made the

following argument to the jury:

> It's emotional, isn't it?  Really emotional.  But, you know, if you believe
> – if we can see a 17-year-old boy look at a picture of a man that he was
> involved in killing and shed a tear, and then maybe there's some hope.
> Because maybe he is sorry for what happened, for his involvement in it.
>
> But you Ladies and Gentleman have no place for tears for you
> right now.  You shed them all for Johnny Hazle when this is over with.
> But right now you've got to do your duty and if you find this defendant
> — we've shown you beyond a reasonable doubt that he's guilty, then
> don't let a murderer walk away.  And don't just put it on and say I've
> done a good job because little Terrance and 17-year-old Alphonso have
> bit the bullet, and they're going to prison.
>
> I ask you, Ladies and Gentlemen, to search your consciences and
> be realistic.  Understand, Ladies and Gentlemen, that you're dealing
> with people who are not used to testifying, would not take this stand for
> a million dollars if they could.  But they're consistent in one thing.  And
> that is that Jimmy Davis was the one who killed Johnny Hazle and tried
> to rob him out there on that occasion.
>
> I ask you, Ladies and Gentlemen, to do what you have to do, as
> unpleasant as it is, and convict him — Jimmy Davis — of capital
> murder.

---

[185] Doc. no 33, at 47-48 (alteration supplied).

R. Vol. 7, Tab 14, at 1235-37.  Citing *Nelson v. Nagle*, 995 F.2d 1549, 1555-57 (11th Cir. 1993), Davis asserts that the Eleventh Circuit has explicitly found that "mercy is a proper consideration" in capital cases.  He contends that the prosecutor improperly argued that the jury should not consider mercy or sympathy during its deliberations.[186]

Davis has not established that the Alabama Supreme Court's summary denial of this claim was unreasonable or contrary to clearly established law.  He correctly argues that the jury may show mercy in rejecting a death sentence.  Here, however, the prosecutor's argument acknowledged the tragedy of the victim's death, then appropriately urged the jurors not to be emotional during their deliberations.  Further, the arguments made by the prosecutor in this case, even if they could be viewed as improper, did not so prejudicially affect Davis's substantial rights as to deprive him of a fair trial.

Davis also argues that counsel were ineffective for failing to object to the prosecution's argument that the jury should not consider mercy or sympathy during its deliberations.  Davis did not raise this claim in state court.  Thus, it has not been exhausted, and this court cannot review it.  Even if the claim were properly before this court, it would be due to be dismissed, because the underlying claim of

---

[186] Doc. no. 33, at 47-48.

prosecutorial misconduct upon which the ineffective assistance of counsel claim is based is clearly without merit.  Counsel cannot be found deficient for failing to make an objection that was not warranted.

      7.     *Improperly instructing the jury that it was their duty to impose death*

Davis asserts that, during the State's closing argument in the guilt phase, and again during the penalty phase, the prosecutor improperly argued that the jury had a duty to impose death.[187]  He claims that:

> The prosecutor unmistakably instructed the jury that they had an obligation to convict Davis: "[b]ut right now you've got to do your duty and if you find this defendant – we've shown you beyond a reasonable doubt that he's guilty, then don't let a murderer walk away," and later, "I ask you, ladies and gentlemen, to do what you have to do."  Tr. 1236.

> During the penalty phase, the prosecutor continued to emphasize that the jury had a duty: "You're part of society that sometimes gets drug (sic) down here by subpoena.  And sometimes jurors do what they're supposed to do.  And sometimes jurors don't do what they're supposed to do."  And later: "I just want you to do the right thing . . . .  Because I know you've done your job already and you're going to do your job again."  The prosecutor concluded his [argument] by exhorting the jury to do "what is best for the community." Tr. 1354-55.

Doc. no. 33, at 48-49 (ellipses and first alteration in original, other alteration supplied).

---

[187] Doc. no. 33, at 48.

The Alabama Supreme Court's summary denial of this claim is entitled to deference. Davis has not established that its determination was contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence presented. Although Davis argues that the prosecutor "instructed the jury that they had an obligation to convict Davis," it is clear that the prosecutor was arguing that the State had met its burden of proof, and was asking the jury to follow the law and return a conviction. Review of the prosecution's arguments in their entirety, reveals that these arguments did not render the trial fundamentally unfair:

> But you Ladies and Gentleman have no place for tears for you right now. You shed them all for Johnny Hazle when this is over with. But right now you've got to do your duty and if you find this defendant — we've shown you beyond a reasonable doubt that he's guilty, then don't let a murderer walk away. And don't just put it on and say I've done a good job because little Terrance and 17-year-old Alphonso have bit the bullet, and they're going to prison.

> I ask you, Ladies and Gentlemen, to search your consciences and be realistic. Understand, Ladies and Gentlemen, that you're dealing with people who are not used to testifying, would not take this stand for a million dollars if they could. But they're consistent in one thing. And that is that Jimmy Davis was the one who killed Johnny Hazle and tried to rob him out there on that occasion.

I ask you, Ladies and Gentlemen, to do what you have to do, as unpleasant as it is, and convict him — Jimmy Davis — of capital murder.[188]

    . . . .

 Ladies and Gentlemen, I know you had rather do anything in the world than look at my face one more time. But this will be the last time, I can assure you.

Because it is the last time, I want to thank you. Because I think you've done something that maybe some of you didn't think you would ever be able to do either. You came into a terrible situation and you performed admirably.

You took a situation where you could have copped out, to be honest with you. And I don't mean cop-out about finding this defendant not guilty. I don't think there's any question in your mind that this defendant is guilty. But you could have avoided what you're doing here right now.

You could have avoided it by finding the defendant guilty of a lesser charge on the felony murder. And you didn't do that. Which tells me that you were willing to bear up under what you're bearing up under now. Don't ever let anybody tell you it's not a serious, serious thing that you're doing.

And as the District Attorney in this county, I want you to know that I appreciate the seriousness of this as well. Because not only are you making the decision with this recommendation, but I as the District Attorney, a human being, am asking you to do something that's not pleasurable to me at all.

You have borne up under the circumstances and you performed your civic duty because you are a part of society. You're part of society

---

[188] R. Vol. 7, Tab 14, at 1236-37.

that sometimes gets drug down here by subpoena.   And sometimes jurors do what they're supposed to do.  And sometimes jurors don't do what they're supposed to do.  They're still part of society.

And our society says you don't take a life when you don't have to take a life.  Johnny Hazle's life didn't have to be taken.

Now, did it have anything to do with the fact, did it really, that Ms. Davis was not a good mother?  Of course not.  Had nothing to do with that.

Did it have anything to do with the fact that he had a lower intelligence than some other people?  Do you think that?

Did it have anything to do with the fact that it might be that Jimmy Davis is mean?  And that when he took that pistol in his hand he wasn't thinking, "I've got a low IQ," or, "Is this going to hurt my mama when I do this," or, "Is it going to hurt my cousin," Mr. Sigler?  He was thinking of one thing: "I want some money and if I don't get it, I'm going to kill this man."

Society, of which we're all a part, has a right to exact a just punishment.   I'm going to submit to you, Ladies and Gentlemen, that a just punishment as the death penalty need not require you go into McDonald's and shoot five or six or ten people.   It's the person that we're looking at.

The aggravating circumstances in this case far outweigh the mitigating circumstances.  And I'm as sorry as I can be for this mother.  And I'm as sorry as I can be for Mr. Sigler.  And the whole family.  And I'm not blaming them one iota.  Because do you know how many people grow up in families without fathers?   Families without mothers?  Families where both parents work?  They never ever kill.

Jimmy Davis knew he shouldn't be doing what he did and he did it anyway.  And he took a man's life.  He will never be back.

I don't want to preach to you.  I just want you to do the right thing.  And I, like these defense lawyers, whatever you decide to do, I'll be satisfied with that.  Because I know you've done your job already and you're going to do your job again.

I'm just asking you to look at the options.  And if you feel like these aggravating circumstances outweigh the mitigating ones, then I ask you to return a recommendation to Judge Street.  And I don't know whether he will follow it, but it will carry a great weight for him.  And I don't want to mislead you.  It will carry great weight whatever you do.

I appreciate your work this week.  And I think it's appropriate that we end on late Friday afternoon since we started early one Monday morning.  And you'll never forget this week.  I know you won't.  And you may be on other juries later on down the road.  But you'll never forget this week and I know I won't.

As many of these cases as I handle, and my assistants handle, and that these gentlemen over here handle, we never forget these kind of cases.  So we'll be satisfied with what you Ladies and Gentlemen do.  And I will just ask you to do in your conscience what you feel is best for society.  Do what's best for the community.

R. Vol. 8, Tab. 23, at 1352-56.

The state court reasonably determined that the prosecutor had not made an improper argument.  Davis is entitled to no relief.

Davis also argues that counsel were ineffective for failing to object when the prosecutor improperly argued that the jury had a duty to impose death.  Davis did not raise this claim in state court.  Thus, it has not been exhausted, and this court cannot review it.  Even if the claim were properly before this court, it would be due to be

dismissed, because the underlying claim of prosecutorial misconduct upon which the ineffective assistance of counsel claim is based is clearly without merit.   Counsel cannot be found deficient for failing to make an objection that was not warranted.

8.     *Improperly arguing nonstatutory aggravating circumstances in support of conviction and sentence*

Davis asserts that the prosecutor put forth numerous irrelevant and prejudicial "reasons" for convicting and sentencing him to death.[189]   He lists the following examples of improper arguments: (1) the importance of a guilty verdict to the victim; (2) the ordeal suffered by the victim's brother in identifying the victim's body; (3) Davis killed the victim for smiling at him; (4) Davis was the principal in the crime, rather than an accomplice; and (5) the pain inflicted on Davis's mother.[190]   Davis argues that none of those considerations was relevant, yet each encouraged an improper conviction and sentence of death, based on nonstatutory aggravating circumstances.

In support of this claim, Davis cites pages 1173 and 1234 of the trial transcript.[191]   On page 1173, the prosecution argued at the conclusion of the guilt phase that the testimony at trial was that the victim "looked over, looked back at

---

[189] Doc. no. 33, at 49.

[190] *Id*.

[191] *Id*.

Jimmy Davis and smiled, and Jimmy Davis shot him."[192]   In fact, the prosecution

made the following comments on page 1234 of the guilt-phase rebuttal closing

argument:

> And I submit to you, Ladies and Gentlemen, you know who it was that did this killing.  It's Jimmy Davis.  The man's been sitting over there with his attorneys.  I wish I could bring the one that really ought to be here to testify as to what kind of clothing he was wearing — this man who robbed him was wearing.  And how tall he was.  And what the gun looked like.  And how long he was there.
>
> The one that laughed.  The one that smiled.  Maybe he was nervous.  Maybe he was scared.  Maybe he just didn't believe it was happening.  When he looked at his old friend and smiled and looked back at Jimmy Davis and smiled, and couldn't believe it when that bullet penetrated his chest and he grabbed his chest.
>
> I would like to present the man to you that grabbed his chest and obviously turned and was shot in the back a second time.  I would love to have him testify.  But that man was shot and was in excruciating pain, according to Dr. Warner, when those shots pierced his liver.  And yet that tough man tried to get to that telephone and call in his own emergency.
>
> But I don't have him.  We'll just have to go by what the other witnesses said. . . .

R. Vol. 7, Tab 14, at 1234-1235.  These comments were proper comments on the

evidence and inferences to be drawn from the evidence.

---

[192] R. Vol. 7, Tab 12, at 1173.

Davis's federal petition does not identify the portions of the transcript where

the prosecution allegedly made other improper arguments.  However, Davis did cite

to specific pages of the trial transcript when he raised this claim in state court:

> For example, the prosecutor improperly argued at the guilt phase that
> their decision was important to the deceased victim, R. 1185); that the
> victim's brother['s] ordeal in identifying the victim's body requires a
> guilty verdict R. 1186); . . . that he was the principal instead of an
> accomplice and therefore deserved the death penalty R. 1409); and that
> the pain inflicted on Mr. Davis's mother made the death penalty
> appropriate. R. 1409-1410).

C.R. Vol. 10, Tab 35, at 61 (alteration supplied).  The arguments made on pages 1185

and 1186 of the transcript do, in fact, involve references to the importance of the

verdict to the victim, and to the victim's brother's ordeal in identifying the body, *but*

*those arguments were made by defense counsel*, and not by the prosecution.[193]

The arguments made on pages 1409 and 1410 were made by the prosecution

during the State's final argument to the trial judge at the March 4, 1994 sentencing

hearing.[194]  Earlier in the sentencing hearing, the defense called Davis's mother, Lillie

Bell Davis, to testify on his behalf, pleading for his life.[195]  The prosecutor stated

during his final argument that Lillie Bell Davis "deserves all of our sympathy and

---

[193] R. Vol. 7, Tab 13, at 1185-1186.

[194] R. Vol. 8, Tab 27, at 1409-10.

[195] *Id*. at 1395-1401.

condolences."[196]  However, there was no argument that the pain inflicted on Davis's mother made a death sentence appropriate.

Furthermore, the prosecution's argument that Davis deserved the death penalty because he was the principal in the murder was made in comparing Davis's participation in the crime with the participation of the Phillips cousins.[197]

> I want to comment on the defendant's participation in this matter as compared to Alphonso Phillips and Terrance Phillips'[s] participation.  It was known at the time of trial that Terrance Phillips had, in fact, pled guilty to conspiracy to commit robbery.  He had done so prior to trial.
>
> It was also known at the time of trial that Alphonso Phillips would, in fact, plead guilty to robbery and receive a 20-year sentence.
>
> And those considerations were placed before a jury of Mr. Davis'[s] peers and they understood that when they went to deliberate in this particular case.  But they also understood from the evidence, Judge, and I think it was very clear that their participation in this crime was nowhere near the participation that Mr. Davis had in this crime.
>
> The evidence was overwhelming that Terrance Phillips basically backed out in this particular robbery offense after conspiring to rob.  Alphonso Phillips did, in fact, participate in the robbery, even though nothing was taken.  But his participation was not nearly so great as the defendant's in one respect, in that he was not armed.  And that the defendant chose to take another person's life.  And that he was in fact, the shooter.

---

[196] *Id*. at 1410.

[197] *Id*. at 1408.

> We did not charge Jimmy Davis with complicity in this matter, as Mr. Adams indicated.  He is the principal without question.  And that's the reason we ask for a sentence commensurate with his actions as compared to those of Alphonso and Terrance Phillips.

R. Vol. 8, Tab 27, at 1408-09 (alterations supplied).  This was a proper argument based on the evidence presented at trial.  Thus, the state court's summary denial of this claim was not unreasonable or inconsistent with clearly established law.  Moreover, Davis has not established that the alleged errors rendered his trial fundamentally unfair.

Davis also argues that counsel were ineffective for failing to object when the prosecutor argued nonstatutory aggravating circumstances in support of a conviction and death sentence.  Davis did not raise this claim in state court.  Thus, it has not been exhausted, and this court cannot review it.  Even if the claim were properly before this court, it would be due to be dismissed, because the underlying claim of prosecutorial misconduct upon which the ineffective assistance of counsel claim is based is clearly without merit.  Counsel cannot be found deficient for failing to make an objection that was not warranted.

9.   *Improperly denigrating Davis's right to an attorney*

Davis contends that the prosecutor denigrated his right to an attorney, and encouraged the jury to convict him because he relied on counsel throughout the

178

trial.[198]  Specifically, Davis argues that "[d]uring closing arguments of the guilt phase, the State argued that the jury 'know[s] who it was that did this killing. It's Jimmy Davis. The man's been sitting over there with his attorneys.'"[199]  According to Davis, this was an impermissible argument in favor of guilt or punishment based on his assertion of a constitutional right in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976).[200]

In *Doyle*, the Supreme Court held that a prosecutor's use of the petitioner's silence at the time of his arrest for impeachment purposes violates due process. *Id.* at 619. "The Court later extended this protection to post-*Miranda* invocations of the right to counsel." *Fugate v. Head*, 261 F.3d 1206, 1222 (11th Cir. 2001) (citing *Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986)).

The comment in question here was made during the State's rebuttal closing argument, in response to Davis's closing argument that someone other than Davis committed the murder.[201]  In full context, the prosecution argued:

> It's rare, Ladies and Gentlemen, to see people cooperate against their friends in situations like this.  And that's the reason you can't just discount what they've done here today, yesterday.  It takes some guts, particularly when you're as young as though [*sic*] fellows were.

---

[198] Doc. no. 33, at 49-50.

[199] *Id.* (first alteration supplied, second alteration in original)

[200] *Id.* at 49.

[201] R. Vol. 7, Tab 13, at 1175-1214.

And I'm not saying anything about them — I'm not putting a halo on any of them.  Alphonso and Terrance need to have — get some time. And if you Ladies and Gentlemen don't like what happened, to them, if you're upset about what happened to them, then you have to look to me, because I make those decisions as far as what kind of plea agreement they enter into.  And don't hold that against them.  You can hold that against me, if you want to.

Because, Ladies and Gentlemen, I wanted them to testify.   And they did testify.  And I submit to you, Ladies and Gentlemen, you know who it was that did this killing.  It's Jimmy Davis.  The man's been sitting over there with his attorneys.  I wish I could bring the one that really ought to be here to testify as to what kind of clothing he was wearing – this man who robbed him was wearing.  And how tall he was. And what the gun looked like.  And how long he was there.

R. Vol. 7, Tab 14, at 1233-34.  Clearly, this argument was not a comment on Davis's

assertion of his right to counsel.  Rather, it was an appropriate response to Davis's

prior argument that someone else  committed the crime.  Davis cannot show that the

state court's summary denial of this claim was an unreasonable application of clearly

established federal law.  This claim is due to be dismissed.

Davis also argues that counsel were ineffective for failing to object when the

prosecutor encouraged the jury to convict him because of his reliance on counsel

throughout the trial.  Davis did not raise this claim in state court.  Thus, it has not

been exhausted, and this court cannot review it.  Even if the claim were properly

before this court, it would be due to be dismissed, because the underlying claim of

prosecutorial misconduct upon which the ineffective assistance of counsel claim is

180

based is clearly without merit.  Counsel cannot be found deficient for failing to make

an objection that was not warranted.

## D.   Counsel Were Ineffective for Failing to Preserve Investigation Records and Files for Review

Davis complains that trial counsel failed to adequately preserve the record for

review.[202]  Specifically, he claims that:

> Giddens did not maintain any meaningful files associated with Davis'[s]
> defense.   No records, notes, or memoranda of interviews or
> investigations or preliminary hearing testimony was in the file.  R.47/8-
> 9.
>        Throughout the pretrial proceedings and trial, bench conferences
> were held that were not transcribed.  These gaps in the record prevented
> appellate counsel from identifying and addressing all claims on appeal,
> foreclosed a full and fair review on direct appeal, and resulted in a trial
> record missing crucial portions of the proceedings against Davis.

Doc. no. 33, at 50 (alteration supplied, paragraph numbers omitted).  Davis alleges

that his lawyers "took no steps to preserve or retain reasonably competent client files

or to return Davis'[s] files to him after they were discharged by Davis," when, "[a]t

a minimum, the files could have been sent to Davis or his successor counsel as trial

counsel knew of Davis'[s] whereabouts —   Holman Prison — and successor

counsel's identity was readily available from published decisions."[203]  Davis contends

that his trial counsels' failures prejudiced him in his post-conviction proceedings, and

---

[202] Doc. no. 33, at 50-51.

[203] Doc. no. 33, at 50-51 (alterations supplied).

that this problem was "further aggravated because trial counsel were uncooperative in the Rule 32 investigation into the effectiveness of their representation."[204]

Davis raised this claim in his Rule 32 petition as two separate claims.[205]   In denying the claims on the merits, the trial court found:

> In paragraph 46, Davis alleges [ineffective assistance of counsel] based on defense counsel's failure to adequately preserve the record. Davis failed to carry his burden of proof in regard to this claim. Davis did not establish that he was prejudiced by the failure to transcribe all bench conferences.  This Court, which sat over Davis's capital murder trial, has no personal knowledge of any issues discussed during such bench conferences that supports a finding of prejudice.  Accordingly, this claim is denied.
>
> . . . .
>
> In this claim, Davis alleged [ineffective assistance of counsel] based on trial counsel's failure to maintain Davis'[s] client files. Giddens testified at the evidentiary hearing that he turned over everything relating to Davis that he had in his possession.  (RR. 28) Giddens also testified that he gave Davis'[s] direct appeal lawyers a copy of his file after his representation of Davis terminated.  (RR. 29) Although Giddens offered the hearsay statement of Adams that Adams did not have any files relating to Davis, Adams did not testify to the circumstances surrounding the absence of these files.  Again, Davis did not carry his burden of proving [ineffective assistance of counsel] in this regard.
>
> For example, the record is silent as to whether Adams destroyed this file, whether the file was lost during a move between law offices, or whether the file was destroyed by a fire or flood.  There are numerous

---

[204] *Id.* at 51.

[205] R. 32 C.R. Vol. 14, Tab 52, at 22-25.

events or reasons that Adams'[s] files could have been missing, many of which would not necessarily reflect on Adams'[s] reasonableness or diligence in attempting to maintain client files.  Davis appears to attempt to capitalize on a silent record to infer deficient performance, which he cannot do.

It should also be noted that if Giddens provided his file to both Davis's direct appeal lawyers and collateral counsel, Davis has not established prejudice under *Strickland*, even if this Court considers the hearsay statement of Adams offered through Giddens.  If Davis received items that would have been duplicated in Adam's case file, then he suffered no prejudice.  There was no testimony or evidence presented at the evidentiary hearing that would allow this Court to find the existence of prejudice in regard to this claim.  As such, this claim is denied.  *A.R. Cr.P.*, 32.2.

Rule 32 C.R. Vol. 62, Tab. 80, at 23, 26-27 (alterations supplied).  Although Davis presented the claims to the Alabama Court of Criminal Appeals on collateral appeal,[206] that court did not address the claims.[207]

Davis argues that the state courts' failure to grant relief on the merits of this "compelling Constitutional claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established Federal law," and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[208]  Davis does not explicate that argument any further.

---

[206] Rule 32 C.R. Vol. 57, Tab 60, at 13; 39-40; 60; 72-73.

[207] *See Davis v. State*, 9 So. 3d 539 (Ala. Crim. App. 2008).

[208] Doc. no. 33, at 51.

The trial court found that Davis failed to establish that he was prejudiced by counsel's failure to have all bench conferences transcribed, and that he failed to establish that counsel were unreasonable in failing to maintain his client files, or that he was prejudiced as a result. Davis makes the conclusory argument that counsels' shortcomings denied him effective assistance of counsel because, but for counsels' deficient performance, the outcome of his trial *could* have been different.[209] He adds that the failures prejudiced him in his post-conviction proceedings.[210] However, Davis offers nothing to support a finding that the state court's denial of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented.

**E.    *Brady* Claims**

Davis argues that the State withheld exculpatory information, and that deprived him of his rights to due process, a fair trial, and a reliable sentencing proceeding in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.[211]   Specifically, he complains that: (1) the State failed to reveal Alphonso Phillips's known gang involvement, as well as the disposition of juvenile delinquency charges against both

---

[209] *Id.*

[210] *Id.*

[211] *Id.* at 51-55.

Phillips cousins; (2) the State suppressed and/or mishandled material evidence recovered by the police; and (3) the State failed to disclose threats made against Davis and his mother, and the existence of a confidential informant who feared for his life.

The Supreme Court held in *Brady v. Maryland*, 373 U.S. 83 (1963), that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87 (ellipses supplied). A *Brady* violation has three components: "[(1) t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (alterations supplied). The prejudice requirement (which is also sometimes referred to in the case law as a "materiality" requirement) is satisfied if "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Bagley*, 473 U.S. 667, 682 (1985) (quoting *Strickland*, 466 U.S. at 695); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Stated differently, prejudice (or "materiality") is determined by asking whether the evidence suppressed by the government, viewed cumulatively, would undermine confidence in the guilty verdict. *See Kyles*, 514 U.S. at 434, 436-37 & n. 10.

Davis first raised a *Brady* Claim in his Rule 32 petition. He listed nineteen items that, he alleged, were not produced to defense counsel,[212] but he offered only a conclusory assertion his constitutional rights were violated as a result of the alleged suppression of those items.   The claim was denied by the trial court.[213]   Davis appealed the denial, focusing on the same alleged violations that he raises here.[214]

The Alabama Court of Criminal Appeals held as follows:

> Davis next argues that the State suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, Davis argues that the State failed to provide footprint evidence, failed to preserve his codefendant's clothes, failed to disclose threats made against Davis and his family, failed to reveal his codefendant's gang involvement, and failed to reveal the identity of the informants. FN.

> > FN.  In Davis's second amended petition he merely recites 19 different evidentiary items that he alleged the State suppressed.

> The circuit court made the following findings of fact on this claim:

> > The petitioner failed to carry his burden of proof in establishing the existence of a valid *Brady* claim. The United States Supreme Court definitively held, in *Brady v. Maryland*, that "the government's failure to disclose evidence favorable to the defendant who specifically requested it violates the defendant's due process rights

---

[212] Rule 32 C.R. Vol. 14, Tab. 52, at 36-37.

[213] Rule 32 C.R. Vol. 62, Tab 80, at 58-59.

[214] Rule 32 C.R. Vol. 57, Tab. 60, at 64-70.

when the evidence is material to the guilt or punishment."
*Smith v. State*, 698 So.2d 189, 207 (Ala. Crim. App. 1996);
*Brady v. Maryland*, 373 U.S. at 87.  To properly establish
a *Brady* violation, the defendant must make a showing that
(1) the prosecution suppressed evidence, (2) the evidence
suppressed was favorable to the defendant or was
exculpatory, and (3) the evidence suppressed was material
to the issues at trial. *Ex parte Kennedy*, 472 So.2d 1106
(Ala.1985), *cert. denied*, 474 U.S. 975 (1985).
"'Materiality' requires a finding that, had the evidence
been disclosed to the defense, a reasonable probability
exists that the outcome of the proceedings would have been
different." *Coral v. State*, 628 So.2d 954, 979 (Ala. Crim.
App. 1992), *aff'd on return to remand*, 628 So.2d 988 (Ala.
Crim. App. 1992), *aff'd*, 628 So.2d 1004 (Ala. 1993), *cert.
denied*, 114 S.Ct. 1387 (1994).  "A 'reasonable probability'
is one sufficient to undermine confidence in the result."
*Coral v. State*, 628 So.2d at 979; *Pennsylvania v. Ritchie*,
480 U.S. 39 (1987); *United States v. Bagley*, 473 U.S. 667
(1985); *Rogers v. United States*, 485 U.S. 969 (1988).

Thus, in order for Davis to make a proper *Brady*
claim, he must clearly show a suppression of evidence and
that there was a reasonable probability, one sufficient to
undermine confidence in the proper resolution of the case
at trial, that the jury would have resolved his case
differently had the prosecution disclosed the evidence in a
timely manner. *Id*. There has been no such evidence
established by the petitioner in this case, certainly nothing
enumerated in items (a) through (s) of paragraph 67 in the
second amended petition.

Davis absolutely failed in this regard.  Many of the
items alleged in the petition were never mentioned during
the Rule 32 hearing.  One of the items mentioned, an
alleged footprint at the scene, was referred to in a report
handed over to the defense, never used at trial, and never

explained at the hearing.   Thus, Davis did not prove suppression as the defense was put on notice that this evidence may have existed, did not prove materiality (it is unclear if this item even exists, where it was located, how it was found, how it was documented, whether it was casted or photographed, etc.), and he did not prove that it was exculpatory.

Based on the record before this Court, this claim is denied.

(C.R. 1191-92.)  The record of the Rule 32 proceedings supports the circuit court's findings.  Davis made no effort at the Rule 32 hearing to satisfy the requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  Davis thoroughly failed to meet his burden of proof under Rule 32.3, Ala. R. Crim. P.

Moreover, this claim is procedurally barred for the reasons discussed by this Court in *Williams v. State*, 782 So.2d 811, 818 (Ala. Crim. App. 2000):

The appellant's first argument is that the State withheld exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, he contends that the State suppressed evidence that a potential witness had seen the appellant and the victim together in Mobile before the murder and evidence that a white Porsche automobile had been seen at the scene of the crime at about 3:30 p.m. on the day of the murder.  The appellant did not assert that this claim was based on newly discovered evidence.  Therefore, it is procedurally barred because he could have raised it at trial and on direct appeal, but did not.  *See* Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P.; *Boyd v. State*, 746 So. 2d 364 (Ala. Cr. App.1999); *Matthews v. State*, 654 So. 2d 66 (Ala. Cr. App.1994); *Lundy v. State*, 568 So. 2d 399 (Ala. Cr. App.1990).

188

*Davis v. State*, 9 So. 3d 514, 526-528 (Ala. Crim. App. 2006).

Thus, the claim was found to be procedurally barred by the Alabama courts.

Davis contends that the claim is not procedurally defaulted, arguing:

> Courts have declined to procedurally bar such claims, noting that such a ruling would "reward the wrongdoer because he was not timely found out." *Julius v. Jones*, 875 F.2d 1520, 1525 (11th Cir. 1989) (declining to impose procedural bar as to *Brady* claim and unwilling to hold that "if the prosecutor failed to produce evidence which was required to be produced under *Brady* and which failure was unknown to defendant's counsel, the claim is procedurally barred because defense counsel did not ferret out the violation").

> Here, the *Brady* evidence was not disclosed to Davis'[s] trial counsel. Moreover, a second informant's existence did not come to light until post-conviction proceedings were underway. Thus, this claim simply could not have been raised at trial or on direct appeal. Neither Davis nor his counsel had reason to know of the *Brady* material at an earlier stage. Subsequent to the discovery of the withheld evidence, this claim was timely raised on direct appeal as well as in Davis's Second Amended Rule 32 Petition and on collateral appeal in the CCA. See Exhibit A ("Chart of Davis's Responses to the State's Answer"). Thus, there can be no default.

Doc. no. 39, at 6-7 (alteration supplied).

Alternatively, Davis argues that the State's suppression of this evidence constitutes cause for any default, and asserts that he suffered actual and substantial prejudice because evidence pointing to a different perpetrator likely would have resulted in a different outcome at the guilt/innocence phase. He contends that "given the strong likelihood that such evidence could have reasonably implicated another

189

perpetrator or could have been tested to in fact prove Davis's innocence, the failure to consider Davis's claim results in a fundamental miscarriage of justice" and should be excused.[215]

As discussed in Section IV.B.1., *supra*, federal courts "will not review judgments of state courts that rest on adequate and independent state grounds." *Michigan v. Long*, 463 U.S. 1032, 1041 (1983). Thus, "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto.'" *Harris v. Reed*, 489 U.S. 255, 262 (1989) (quoting *Murray v. Carrier*, 477 U.S. 478, 485 (1986)).  In the context of a defaulted *Brady* claim, the Supreme Court explained in *Banks v. Dretke*, 540 U.S. 668 (2004), that the cause and prejudice standard tracks the last two elements of a *Brady* claim: suppression by the government and materiality. *Id.* at 691 (citing *Strickler*, 527 U.S. at 282).  As will be seen from the discussion of each of Davis's allegations of error, in turn, he cannot establish both cause for the default and actual prejudice from the alleged errors, as required to excuse the procedural default.

1.      *The state failed to disclose Alphonso Phillips's known gang involvement and prior adjudications of delinquency charges against both Phillips's cousins*

---

[215] Doc. no. 39, at 7 (alterations supplied).

Davis alleges that the following information was not disclosed to counsel: (1) a 1993 "compilation of persons reported to be in gangs by the Anniston Police Department" that was maintained by the prosecutor, confirming that Alphonso Phillips was a known gang member; (2) the previous arrests of Alphonso Phillips for disorderly conduct, a weapons violation, violation of a liquor law, and trespass; and (3) the entry of Terrance Phillips into a consent decree in connection with a third-degree assault charge in 1992.[216]  He argues that the State's failure to disclose that information hindered trial counsels' ability to effectively cross-examine the

---

[216] Doc. no 33, at 45.

Phillips cousins and challenge the prosecutor's improper closing arguments.[217]

According to Davis:

> Evidence about the Phillips cousins' pasts, coupled with inconsistencies in their testimony, would likely have caused the jury to consider whether the Phillips cousins acted alone and then later conspired to blame Davis for the Direct Oil robbery and shooting. It also might have undermined that State's theory that the Phillips cousins were "good boys" led astray by Davis, and caused a jury to conclude that Davis was, at best, a follower. There is a reasonable probability that the result of the guilt/innocence phase would have been different.

Doc. no. 33, at 52.

---

[217] The prosecutor argued:

> Terrance Phillips did a terrible thing. He got involved in something he shouldn't get involved in. He did a terrible thing and he knows that. But he was not a hard core criminal. He was going to school. Never been in trouble before. And now he's got a ten-year conspiracy to commit robbery. He's ruined his life.

> . . . .

> Terrance Phillips, 16 years old, no trouble whatsoever, a good boy, on the edge of going bad if something didn't happen. And something did happen.

> And Alphonso Phillips, a boy that hadn't crossed the edge was looking for something, looking for whatever. Crossed the edge and got into some trouble. Because they were looking for somebody to help him, looked to somebody to be their big brother, and the father or whatever. And they picked him. They picked Jimmy Davis. And they picked the wrong one.

R. Vol. 7, Tab 14, at 1226-1231.

Sufficient prejudice exists to excuse a procedurally defaulted *Brady* claim only when "'the favorable evidence could reasonably be taken to put the case in such a different light as to undermine the confidence of the verdict.'" *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435). The "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 289-290 (quoting *Kyles*, 514 U.S. at 435).

A review of the state court record reveals that Davis has not met this standard. First, not only is it highly unlikely that the "compilation of suspected gang members" would have been admissible at trial in any event, but the record reveals that *the list included Davis as a suspected gang member as well*,[218] thereby negating any benefit Davis might have gained by opening the door to that inquiry.[219]  Second, even making

---

[218] Rule 32 C.R. Vol. 32, at 1905.

[219] In its reply brief on appeal from the denial of Davis's Rule 32 petition, the State argued:

> Davis conveniently fails to note that his name was also included on this "gang list" he (presumably) claims would have altered the outcome of his case in his favor. (R. 1085)  In the previous argument, Davis attacks his attorneys for not taking more measures to prevent the mention of gangs at his trial, but now he blames the State for not allowing him to interject the gang issue into the trial.  Davis cannot expect to argue it both ways and receive relief.

> If Davis had used these gang records against the Phillips brothers [*sic*], it would have opened the door to proving Davis's similar gang-related activities – thereby shattering all of Davis's previous attempts to keep this information away from the jury.  If

the unlikely assumption that the juvenile records of the Phillips cousins would have been admissible at trial to show bias pursuant to *Davis v. Alaska*, 415 U.S. 308 (1974),[220] their omission does not undermine confidence in the verdict.  Although the prosecutor did argue that Terrance Phillips had "never been in trouble before,"[221] that was just a portion of his argument, and the statement was in response to the arguments of defense counsel. The prosecutor did not paint the State witnesses as innocent bystanders, or upstanding citizens.  Rather, he acknowledged that he did not have pastors, clergy, and nuns to present as witnesses, but only the people who were at the crime scene, on the streets, and involved in the crime.[222]  While he tried to paint the Phillips cousins, who were ages 16 and 17 at the time of the offense, as less culpable than Davis, he specifically told the jury he was not "putting a halo on any of them," and that they needed to "get some time" for their involvement in the case.[223] Finally, the prosecutor's argument that the Phillips cousins were credible witnesses

---

anything, this information would have been more prejudicial to Davis's defense.

R. 32 C.R. Vol. 57, Tab. 61, at 40-41.

[220] Under Alabama law, the use of juvenile records for purposes of general impeachment is not allowed.  Alabama Rule of Evidence 609(d) states that "[e]vidence of juvenile or youthful offender adjudications is not admissible under this rule" (alteration supplied).   Section 12-15-72(a)(b) of the Alabama Code provides that a juvenile adjudication is not a conviction and is not admissible against a juvenile in any court.

[221] R. Vol. 7, Tab 14, at 1226.

[222] *Id*. at 1225.

[223] *Id*. at 1233.

was not based on the assertion that they were "good boys," but on the fact that, despite their involvement in the crime, they had the fortitude to testify against a friend, and in so doing, did not try to completely exonerate themselves of culpability.[224]  Thus, even if the Phillips's prior arrests had been admitted, the State's argument and theory of the case would not have been significantly weakened. There is no reasonable likelihood that the verdict would have been different, nor is confidence in the verdict undermined.

2.      *The state suppressed and/or mishandled material evidence recovered by police*

Davis asserts that (1) footprints were retrieved from the crime scene, but not logged into evidence or produced for examination by his attorneys; (2) a pair of white tennis shoes was recovered, but not put in evidence or provided to counsel; (3) the officers failed to retrieve clothing worn by the Phillips cousins; and (4) an officer provided false testimony regarding how he learned of the gun's location — first claiming that he received the information from another officer, but later saying he received a tip as to the gun's location from a second confidential source.[225]  Davis contends that all of this evidence *could have* substantiated the theory that someone else shot the victim.

---

[224] *Id.*

[225] Doc. no. 33, at 52-54.

Davis's bare suppositions are not sufficient to establish that any of the alleged evidence would have been exculpatory, impeaching, or otherwise favorable to his defense.  Without any proof of materiality, the *Brady* inquiry must end.  *See*, *Allen v. Secretary, Florida Dept. of Corrections*, 611 F.3d 740, 746-47 (11th Cir. 2010).

> 3.   *The state failed to disclose death threats against Davis and his mother and the existence of a confidential informant who feared for his life*

Davis argues that during the trial, death threats were made against him and his mother, but neither he nor defense counsel was informed.[226]  According to Davis, the failure to disclose this information deprived his defense team of the opportunity to investigate whether the person responsible for the threats was connected to the Direct Oil robbery and murder, and whether the threats were made as a means of intimidating him.[227]  As an initial matter, Davis has offered no evidence to support his conclusory assertion that defense counsel were not informed about the alleged threats.  During the Rule 32 evidentiary hearing, Davis called prosecutor Ron Wood as a witness.[228]  Wood testified that he had no idea that such a threat was made, and that he did not know whether Davis's lawyers had been informed of the threat.[229]  Thus,

---

[226] *Id*. at 54-55.

[227] *Id*.

[228] Rule 32 R. Vol. 23, at 1066-1119.

[229] *Id*. at 1104-05.

there is no evidence to support Davis's contention that the evidence was suppressed. There also is no indication that the evidence was material.

Davis further argues that, throughout both the trial and the Rule 32 proceedings, the State refused to "disclose the identity of a confidential informant identified in a supplemental report who allegedly feared for his life if his identity were disclosed."[230]  Davis reasons that "if the confidential informant still fears for his life nearly ten years after the crime was committed, and Davis has been incarcerated since the day after the shooting at Direct Oil, it is likely that Davis was <u>not</u> the perpetrator."[231]

Mr. Wood was also questioned about the confidential informant during the Rule 32 evidentiary hearing,[232] but he denied any awareness:

> Q:   Now, Mr. Wood, are you aware that the AG's office has taken the position that the identity of a confidential informant used in this case cannot be revealed because the confidential informant feared his life would be in danger if his ID. was revealed?
>
> A:   No, ma'am.
>
> . . . .
>
> Q:   Have there been times where the District Attorney's office has refused to turn over the identity of an informant because that

---

[230] Doc. no 33, at 55.

[231] *Id.*  (emphasis in original).

[232] R. 32 R. Vol. 23, at 1105-1108.

informant was fearful that if his identity was revealed his life would be in danger?

A:     I don't have any personal knowledge of it.

. . . .

Q:     And could you read that paragraph into the record?

A:     "Officer Tim Whatley introduced me to a black male that did not want his ID. known.  This person told me that he had reason to believe that the following four people did the murder: Jimmy Davis, Alphonso Phillips, Terrance Phillips and Willie Smith."

Q:     And does that paragraph in the report here refresh your recollection as to whether or not there was a confidential informant in this matter?

A:     No, ma'am.

Q:     Did you ever speak to a confidential informant in this matter?

A:     I don't recall speaking to one, no, ma'am.

Q:     Now, if I told you that the Attorney General's office has made argument to this Court and the Court has accepted that there was a confidential informant in this matter, and that person's identity could not be revealed because he felt his life would be threatened, would you take issue with that?

A:     No, ma'am.

Q:     And would you agree that if that's the position that the Attorney General's office took, that there must have been persons in the Anniston community in 1993 that would threaten a witness to keep him from testifying?

A:      Ma'am, I have no knowledge of your procedures, what you've been doing this week, or whether that's – I don't know.  I don't know what the game plan is here.

Q.      Do you think the Attorney General's office would state that the confidential informant feared for his life if he didn't fear for his life?

A:      No, ma'am.

R. 32 R. Vol. 23, at 1105-08 (ellipses supplied).  Davis has provided no evidence to support his contentions that the identity of a confidential informant was suppressed, or that the identity of any confidential informant was material.

## F.      The Admission of Highly Prejudicial Hearsay Testimony

Davis contends that his Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by the admission of the damaging hearsay testimony of Willie Smith and Shannon Hardy Wilson.[233]  This claim was raised for the first time in Davis's petition for writ of *certiorari* on direct appeal.[234]  The State correctly noted in its response to the claim that no objections to the testimony were made during trial, and argued that there was no plain error.[235]  The Alabama Supreme Court denied the claim

---

[233] Doc. no. 33, at 55-58.

[234] C.R. Vol. 10, Tab 35, at 33-36.

[235] C.R. Vol. 10, Tab 36, at 35-38.  The State argued that Willie Smith's testimony about what Alphonso said to him was admissible under the excited utterance exception to the hearsay rule, and that Shannon Hardy's testimony was admissible because the conversations she testified about were either not offered for the truth of the statement or were admissible under the excited utterance exception to the hearsay rule.  *Id.*

without discussion. *Ex parte Davis*, 718 So. 2d 1166, 1169, 1178 (Ala. 1998). That decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

1.   *Willie Smith*

Willie Smith, who was not charged in the offense, testified that, on the night of the shooting, Davis told him that he had shot someone while he robbed Direct Oil with Alphonso and Terrance Phillips.[236]   Smith also testified that he met up with Alphonso Phillips and Davis at Alphonso's home the next morning, and the conversation turned to the events of the previous evening.[237]   Smith testified that, during that conversation, Alphonso said to him: "'Willie, you ought to seen [*sic*] how Jimmy was shooting that man.'"[238]

Davis argues that Smith's testimony about Alphonso's statement was hearsay, and that it should have been excluded because it did not fall within any exception.[239] He contends that admission of the testimony violated his right to due process and a fair trial because it corroborated Alphonso's trial testimony identifying him as the shooter, and it bolstered Alphonso's credibility.[240]

---

[236]  R. Vol. 6, at 951.

[237]  *Id.* at 953-54.

[238]  Doc. no. 33, at 56 (quoting R. Vol. 6, at 954-55).

[239]  *Id.*

[240]  *Id.* at 57.

There were no objections to the testimony during trial.  Consequently, the claim could only have been reviewed on direct appeal for plain error.  Without regard to the propriety or the admissibility of the challenged statement, it is well settled that, even when evidence is improperly admitted, a conviction will not be reversed for plain error unless the error affected the substantial rights of the defendant.  *See United States v. Arbolaez*, 450 F.3d 1283, 1291 (11th Cir. 2006).  In other words, the "error must have been prejudicial," and it must have affected the outcome of the court proceedings.  *Id.*

There was no such showing in this case, due to the more damaging nature of Smith's testimony that Davis himself admitted to the shooting, as well as the other substantial evidence against Davis.  The Alabama Supreme Court's implicit finding that the admission of the allegedly improper testimony did not constitute plain error or seriously impact the fairness of the trial was not unreasonable.

2.    *Shannon Hardy Wilson*

Davis also complains about portions of the testimony given by Shannon Hardy Wilson, a cousin of Alphonso and Terrance Phillips.[241]   Wilson lived at her grandmother's home with her husband, her two young children, and Alphonso.[242]

---

[241] *Id.* at 57-58.
[242] R. Vol. 6, at 992-93.

201

Wilson testified that, on the night of the murder, Davis and Alphonso entered the house around 8:00 p.m., changed their clothes, and then sat down and watched television for a couple of hours.[243]

Wilson overheard a conversation between Davis and Alphonso.   Wilson testified as follows:

> A:   I was in my grandmother's room, sitting on the bed.  And they were talking about what they had — you know, what was going on and who did what.  Basically they were saying, you know, that it didn't work out right.
>
> Q:   Did you know what they were talking about?
>
> A:   No.
>
> Q:   – at that time?
>
> A:   I just heard Alphonso say that it was — it was fucked up, that it didn't go right.

R. Vol. 6, at 1011.  Before Wilson left the house to go to work at 10:45 p.m., Davis left her grandmother's home, and Wilson asked Alphonso why he was changing clothes.  In response, Alphonso replied that he was going to bed and was not going back out that night.[244]  The next day, Davis returned to the house with Willie Smith.[245]

---

[243] *Id.* at 1000-1001.   Wilson testified that she knew "Alphonso put on his night clothes," "some short pajamas and a T-shirt because he didn't go back out," and that Davis "changed into some street clothes," maybe "a pair of jeans and a shirt."  *Id.*

[244] *Id.* at 1002-1003.

[245] *Id.* at 1004.

They went into the den with Alphonso and were "just hanging out."[246]   According to

Wilson's testimony, the three of them then discussed the events of the previous night:

Q:     Who do you remember speaking first?

A:     It was Willie.

Q:     What did Willie say, if you remember?

A:     Just asked them what they had been up to.

. . . .

Q:     Did either one of them respond?

A:     Jimmy did.

Q:     What did Jimmy say?

A:     He went in to tell them about what had happened the night before
       in full detail.  He explained it to Willie.

Q:      What did he say happened, Ms. Wilson ?

A:     He said, "My nigger, let me tell you what happened last night."

. . . .

Q:     All right.  And no question in your mind he said that.

A:     (Nodding head up and down.)

Q:     What did he say next?

---

[246] *Id.* at 1005.

A:      Told him about how they planned to rob Direct.

Q:      Had anybody spoken about that except Jimmy at this time?

A:      No.  I had heard a little bit of conversation, just a little bit the night before while I was curling my hair in the bathroom.

Q:      Okay.  Who was in that conversation?

A:      Alphonso and Jimmy, but Jimmy was doing the talking.

Q:      All right.  Let's — I'll go back to that in just a minute.

        After he said what he said, "Let me tell you what happened last night," and he began telling him about the plan, tell us exactly what he said as best you remember.

A:      That him and Terrance and Snook — I mean Alphonso were walking.  And Jimmy and Alphonso decided that they had a little job that they needed to do.  The job being that they were going to rob Direct.

Q:      And Jimmy – was Jimmy saying this?

A:      Yes, sir, he was.

Q:      Was Alphonso saying anything –

A:      No.

Q:      – at that time?

A:      No, sir, he wasn't.

Q:      But Jimmy said that Jimmy and Alphonso had decided that they had a little job to do?

204

A:      Yeah.  And then Alphonso told him that he hadn't done nothing.

Q:      Alphonso told him that he hadn't done nothing?

A:      Yeah.

Q:      Who was he talking to?

A:      He was speaking to Willie.

Q:      All right.  And then what's the next thing your heard?

. . . .

A:      [Davis] said, "Damn right, you punk ass nigger.  You ran off and left me."

Q:      Okay.  He said, "Damn right, you punk ass nigger.  You ran off and left me?"  Now, am I correct?

A:      Yes.

Q:      Now, what was said then?

A:      Then he went on to tell what happened.

Q:      All right.  What did he say happened?

A:      That Terrance was — Scooter was on the corner looking out for the police.  And that him and Snook went on to the Direct parking lot and into the building.  Before they got in there, he said they pulled up their bandanas and they went in there.  And when he got to the door he said, "Give it up."  And that Mr. Hazle laughed at him and that Alphonso ran.

        And then he said he told him to give it up again.  And he said Mr. Hazle laughed at him and then he shot him.

Q:     And was that Jimmy that was saying that?

A:     Yes, sir.

Q:     What did Alphonso say, if anything, while Jimmy was saying that?

A:     He just kind of sat there.

Q:     What happened next, Ms. Wilson?

. . . .

A:     Then he raised his hand up and he said that gun went "pow pow pow." (Indicating.)

Q:     All right.  Who are you saying said that?

A:     Jimmy said it.

Q:     And were you able to see anything at that time as he was saying that?

A:     I saw him with his hand up (indicating).

. . . .

Q:     After you saw him raise his hand and "pow pow pow," what's the next thing you saw or heard?

A:     Willie asks him, "Man, what did you – "

Q:     Speak up now?

A:     Willie asked him what did he – Willie said, "Man, you didn't have to do that, you didn't have to shoot him."

Q:      What else was said?

A:      Then he said that he wasn't going to let no cracker laugh at him.

Q:      Wasn't going to let no cracker laugh at him?

A:      (Nodding head up and down.)

Q:      Do you remember anything else that was said?

A:      Yeah.  When they went on to talk about, they were talking about the gun.  Jimmy said that the last shot felt better than the first.

R. Vol. 6, at 1005-10 (alteration supplied).

Davis challenges the admissibility of Wilson's testimony that: (1) on the night of the murder, Alphonso told her that he was changing into his night clothes because he was not going out again; (2) the next morning, she heard Alphonso tell Willie Smith that Alphonso had not done anything wrong; (3) she overheard Smith telling Davis that Mr. Hazle did not have to be shot; and (4) the night before, she had heard Alphonso say the crime was "fucked up" and "didn't go right."[247]   Davis argues that the hearsay testimony was damaging to his case because Wilson was the only non-accomplice who testified to these statements, and the statements bolstered the credibility of Alphonso, Terrance, and Smith.[248]

---

[247] Doc. no 33, at 57.

[248] *Id.* at 57-58.

Given the strength of the other evidence against Davis, it is highly unlikely that the admission of Wilson's testimony had any material effect on the outcome of the trial. Thus, there was no plain error. The Alabama Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

### G. Admission of Note Allegedly Found in the Pocket of Davis's Clothing

Davis challenges the admission of a note with his name on it, found in the pocket of a pair of black shorts taken from a laundry hamper in Alphonso Phillips's home[249] the day after the homicide.[250] During the trial, Alphonso and Terrance testified that Davis wore and discarded the shorts on the day of the murder.[251] To corroborate this testimony, the State sought the admission of the note found in the pocket of the shorts. The trial court reviewed the note, and admitted the following redacted version without objection from defense counsel[252]:

Dear My Little African Queen,

---

[249] At the time of the Direct Oil shooting, Alphonso resided with his grandmother, Martha Jean Phillips, at 1711 Moore Avenue in Anniston. R. Vol. 6, at 1048.

[250] Doc. no. 33, at 58-59. Officer Roy Nunnelly testified that he found the note in the pocket of a pair of shorts he retrieved from Alphonso's home on March 19. R. Vol. 5, at 875-880. The note was admitted in its redacted form at R. Vol. 5, at 893-94.

[251] R. Vol. 5, at 802-803, 820, 826 (Terrance); R. Vol. 6, at 1067, 1074, 1080-1082 and R. Vol. 7 at 1107-1108, 1123 (Alphonso).

[252] R. Vol. 5, at 893-94.

How's life?  Mines are doing fine.  I got your letter.  I feel the same as you do.  Here's all the things about me.

1.    My Name: Jimmy Davis Jr:
2.    My Birthday: Oct. 6, 1970
3.    My Hobbies: Being Pro black each and every day.
4.    My Birth place: Queens, New York
5.    My type of women: Honest, true, and Loving.
6.    My Age: 22

I wish we could of stayed a little longer, but my mommy were ready to go.  I would love to get to know you better. So we would get a chance to really get to know each other in the furture [sic] soon.  So that's all for now but never my loving thoughts for you.

Your furture [sic]
Lover

When you come
back to Anniston
again call this
number  236-5912

Tell me [sic] sister
I said I love her.

C.R. Vol. 1, Tab 1, at 83.

Davis argues that, even in redacted form, the note contained references and innuendo from which a juror might infer an association with a gang, or a suggestion that the victim's death was race-related.[253]  Davis posits that the phrase "pro-black each and every day" could have suggested to the jury that his daily actions were

_____

[253] Doc. no. 33, at 58.

motivated by racial hatred, and that the salutation to his "little African queen" furthered this prejudicial view by calling to mind black separatism and militance.[254] Davis contends that the admission of the note likely motivated a conviction based on fear rather than on proof beyond a reasonable doubt.[255]  He further argues that the note was not relevant because it said nothing about the crime, and was useless as identification evidence.[256]

This claim was raised for the first time in Davis's petition for writ of *certiorari* on direct appeal.[257]  In its reply brief, the State argued that the note was relevant because its presence in the pocket helped establish that Davis had worn the shorts found in Alphonso Phillips's home, and thus, supported the testimony of Alphonso and Terrance Phillips describing what Davis wore during the commission of the crime.[258]  The State also asserted that the prejudicial nature of the note had been minimized by the redactions, and that any prejudice was outweighed by the probative value of the note.[259]

---

[254]  *Id.*

[255]  *Id.* at 58-59.

[256]  *Id.* at 59.

[257]  R. Vol. 10, Tab 35, at 20-26.

[258]  R. Vol. 10,  Tab 36, at 25-30.

[259]  *Id.*

210

Without discussing the claim, the Supreme Court of Alabama found no reversible error. *Ex Parte Davis*, 718 So. 2d 1166, 1169, 1178 (Ala. 1998).  Davis has not established that the denial of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.  The content of the note admitted into evidence was not inflammatory or obviously gang-related, and it would not have caused the conviction to be based on fear and racial bias.

Davis also asserts that trial counsel were constitutionally ineffective because, instead of objecting to the admission of the note altogether, they stipulated to its admission in a redacted form.  According to Davis, even the redacted note contained phrases that the jury was likely to associate with racism or gang activity.[260]   That claim was denied by the Rule 32 trial and appellate courts upon remand:

> He argues that counsel should have objected to the admission of a letter found in Davis's pocket that referred to gang activity. . . .
>
> The circuit court found that Davis failed to meet his burden of proof on this claim because no evidence was introduced at the evidentiary hearing concerning this issue.  We agree.  Counsel was not questioned concerning this evidence.

---

[260] Doc. no. 33, at 17-18, 59.

This court has held that "[o]bjections are a matter of trial strategy, and an appellant must overcome the presumption that 'conduct falls within the wide range of reasonable professional assistance,' that is, the presumption that the challenged action 'might be considered sound trial strategy.' *Moore v. State*, 659 So.2d 205, 209 (Ala. Cr. App. 1994), citing *Strickland* [*v. Washington*], 466 U.S. [668] at 687-88, 104 S.Ct. [2052] at 2064-65 [(1984)]."

*Lane v. State*, 708 So.2d 206, 209 (Ala. Crim. App. 1997). As we stated in *Brooks v. State*, 456 So.2d 1142, 1145 (Ala. Crim. App. 1984), "effectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made. Effectiveness of counsel is not measured by whether counsel objected to every question and moved to strike every answer." Davis failed to meet his burden of proof on this claim; therefore, the trial court correctly denied him relief.

*Davis v. State*, 9 So. 3d 539, 550-551 (Ala. Crim. App. 2008) (alterations in original).

Thereafter, however, Davis failed to raise this claim in his petition for writ of certiorari.[261] As such, it is both unexhausted and procedurally barred because a return to state court would be futile. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Collier v. Jones*, 910 F.2d 770 (11th Cir. 1990).

Moreover, it should be noted that the Alabama Court of Criminal Appeals' denial of this claim on the merits was neither contrary to, nor an unreasonable application of, clearly established federal law. The state court's implicit

---

[261] Rule 32 C.R. Vol. 61, Tab 72.

determination that the note was not overly prejudicial was not unreasonable, and its conclusion that counsel was not ineffective for failing to object to its admission was consistent with clearly established federal law.

## H.   Improper Consideration Through the Pre-Sentencing Report of Davis's Juvenile Record and Allegations of Gang Involvement

Davis contends that the trial court violated his Eighth and Fourteenth Amendment rights by considering "allegations set forth in the pre-sentence investigation report, which consisted of inflammatory and erroneous allegations, [and] included assertions of vulgar and reckless conduct at the referenced interview, assertions based on hearsay about gang involvement or leadership, and implications that Davis had a criminal record that included gun charges."[262]  This claim was raised by Davis in his *certiorari* petition on direct appeal,[263] and rejected by the Alabama Supreme Court:

> Davis next argues that during the sentencing phase of the trial the court improperly considered evidence of his prior juvenile offenses in determining whether he should receive the death penalty.  Davis also argues that a separate reference to gang affiliation, made in the presentencing report rather than in the prosecutor's closing arguments, was highly prejudicial and was improperly considered by the trial court in its sentencing order.

---

[262] Doc. no. 33, at 60 (alteration supplied).

[263] C.R. Vol. 10, Tab 35, at 26-30.

Before the sentencing hearing, defense counsel objected to a portion of the presentencing report that refers to allegations that Davis was a member of a gang.  That objection was as follows:

> [Defense counsel]: And then, Judge . . . it is stated that it's not only reported by a codefendant and other witnesses, but also other witnesses in prior cases, that Mr. Davis was a ringleader of the 'Folks' gang and then it's got a branch of 'Disciples' in West Anniston.  And the defendant disputes that."

Davis argues that this portion of the presentencing report was irrelevant on the question of the existence of the aggravating circumstances allowed into evidence under Ala. Code 1975, § 13A-5-49, and that it did not serve to rebut any evidence offered in mitigation.  He also argues that the trial court's considering his juvenile adjudications was, in itself, reversible error, even if the court did not consider the allegations of Davis's gang involvement to be part of his history of juvenile delinquency.

Davis points out that "juvenile adjudications are not convictions and are not criminal in nature" and thus cannot be considered as prior criminal activity under the Alabama capital sentencing scheme. *Freeman v. State*, 555 So.2d 196, 212 (Ala. Cr. App. 1988), *affirmed*, *Ex parte Freeman*, 555 So.2d 215 (Ala.1989), *cert. denied*, *Freeman v. Alabama*, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990).  He theorizes that is it "highly likely" that the trial court considered his prior juvenile adjudications as proof of gang involvement, thereby exacerbating the error, and concludes that the trial court's sentencing order was thus based upon inadmissible and highly prejudicial evidence, which mandates that we reverse his sentence and order a new sentencing hearing.

We find nothing in the record to support Davis's contention that the trial court considered the allegations of his gang involvement when it determined his sentence and drafted its sentencing order.   The presentencing report contained evidence of Davis's prior adjudications of delinquency based on theft, receiving stolen property, and trespass.

214

However, the report also showed that, since 1987, when he became an adult, Davis had been convicted on misdemeanor counts alleging assault, trespass, theft, and resisting arrest and also on one felony count alleging robbery in the third degree.

In its order sentencing Davis to death, the trial court cited only two aggravating circumstances: (1) that Davis murdered Johnny Hazle during a robbery attempt and (2) that Davis had a prior felony conviction for third-degree robbery.   In considering the "mitigating circumstance" set out in § 13A-5-51(1) — that "[t]he defendant has no significant history of prior criminal activity" — the trial court specifically cited Davis's prior juvenile adjudications in negation of that factor.

While we find no merit in Davis's argument that in determining his sentence the trial court considered the suggestion that he had been involved in gang activity, we agree that the trial court erred in considering Davis's juvenile adjudications.  The juvenile adjudications could not properly be used to negate the mitigating circumstance of "no significant history of prior criminal activity."  However, it is clear that, without regard to Davis's juvenile adjudications, the evidence of Davis's convictions of various misdemeanors and, most important, his conviction of robbery, would preclude the trial court from finding that he had "no significant [criminal] history."   Because the properly considered evidence of Davis's criminal convictions would negate this mitigating factor, we conclude that the trial court's error in considering Davis's juvenile adjudications was harmless.

*Ex parte Davis*, 718 So.2d 1166, 1177-78 (Ala. 1998) (alterations in original).

It is undisputed that the presentencing report did make some references to alleged gang activity.   However, the Alabama Supreme Court's determination that there was "nothing in the record to support Davis's contention that the trial court considered the allegations of his gang involvement when it determined his sentence

and drafted its sentencing order" is entitled to deference on review.  Moreover, that determination is supported by an independent review of the record.

It also is undisputed that the trial court, without objection, improperly considered Davis's juvenile convictions in determining that he was not entitled to the statutory mitigating circumstance of having "no significant criminal history." However, the Alabama Supreme Court determined that the error was harmless since Davis's adult convictions would also negate the mitigating factor.  That decision is neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  Davis's criminal convictions as an adult supported the state court's finding that he did not qualify for the mitigating circumstance at issue.

Finally, it is fundamental that federal courts may not grant *habeas* relief for errors of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Davis is entitled to no relief on this claim.

Under the heading of this claim, Davis also challenges trial counsel's failure to object to the procedures used to prepare the presentence report in this case.[264] Davis argues that, pursuant to *Estelle v. Smith*, 451 U.S. 454, 469-70 (1981), the Sixth Amendment right to counsel is implicated at presentence interviews, and Davis

---

[264] Doc. no. 33, at 60.

should not have been interviewed outside the presence of his attorneys.[265] Specifically, Davis claims that counsel were ineffective for failing to object to the presentence report because he was interviewed outside the presence of previous counsel; the report contained inflammatory and condemning conclusions about Davis's refusal to communicate with the author of the report; the report allegedly contained false statements; and the judge could have drawn adverse inferences from Davis's refusal to communicate with the report's author.[266]

It does not appear that this claim was raised in state court; therefore, it is unexhausted and procedurally defaulted. Moreover, Davis has offered nothing to indicate that he was prejudiced by counsel's failure to object to the presentence report on these grounds. Thus, he is entitled to no relief.

## I.     Conviction and Sentence Obtained Through the Use of Uncorroborated Accomplice Testimony

Davis asserts that the non-accomplice testimony was insufficient to convict him of capital murder.[267] He contends that, even though the trial court found as a matter of law that only Alphonso Phillips was an accomplice, both Terrance Phillips and

---

[265] *Id.*

[266] *Id.*

[267] *Id.* at 63-65.

Willie James Smith were accomplices.[268]   He argues that no other witness was able

to connect him with the commission of the offense.[269]

Davis unsuccessfully argued this claim in the Alabama Supreme Court on

direct appeal:

> Davis argues that the *only* evidence directly linking him with the
> robbery and murder of Hazle was the testimony of Alphonso Phillips,
> Terrance Phillips, and Willie Smith.  Based upon the evidence of
> Alphonso Phillips's participation in the robbery that ended in the murder
> of Jimmy Hazle, the trial court held that, as a matter of law, Alphonso
> Phillips was an accomplice to the crimes that Davis was charged with.
> Davis relies on § 12-21-222, Ala. Code 1975:
>
> > A conviction of felony cannot be had on the
> > testimony of an accomplice unless corroborated by other
> > evidence tending to connect the defendant with the
> > commission of the offense, and such corroborative
> > evidence, if it merely shows the commission of the offense
> > or the circumstances thereof, is not sufficient.
>
> Davis argues that Terrance Phillips and Willie Smith were
> accomplices to the crimes he was charged with, just as Alphonso
> Phillips was, and that their testimony, therefore, could not properly be
> used to corroborate Alphonso Phillips's testimony. *Knowles v. State*, 44
> Ala. App. 163, 204 So. 2d 506 (1967).  He contends that, beyond the
> "accomplice" testimony of Terrance Phillips and Willie Smith, there was
> no evidence to link him with the robbery and murder of Johnny Hazle;
> thus, he concludes, his sentence and conviction should be overturned.
>
> Before § 12-21-222 is invoked, it must clearly appear that the
> witness is an accomplice, and it is the defendant's burden to prove that

---

[268] *Id.* at 63.

[269] *Id.* at 64.

a witness is an accomplice, unless the evidence shows without dispute that the witness is an accomplice.  *Steele v. State*, 512 So. 2d 142 (Ala. Cr. App. 1987).  The evidence clearly established that Alphonso Phillips acted as Davis's accomplice in the robbery that ended in the murder of Johnny Hazle, and the trial court thus properly held that, as a matter of law, Alphonso Phillips was Davis's accomplice.  Davis contends that the trial court should likewise have held that, as a matter of law, Terrance Phillips and Willie Smith were also Davis's accomplices, so that their testimony against him would have to be corroborated.

Davis emphasizes that Terrance Phillips was indicted for the same offense as Davis was; however, the mere fact that a witness is indicted for the same crime as the defendant does not alone mark the witness as an accomplice with the defendant in the commission of the crime.  *Steele v. State, supra*.  The evidence shows that, on the day of the crime, Terrance Phillips went to a nearby community center after school, that Davis and Alphonso Phillips were already there, and that they already had a plan to rob Direct Oil.  The evidence shows that the two informed Terrance Phillips of the plan, and that he walked with them in the direction of Direct Oil.  There is no evidence that Terrance Phillips participated in the formulation of the plan, or that he helped execute it; rather, it is clear that Terrance Phillips separated himself from Davis and Alphonso Phillips before the commission of the crime.  These facts are sufficient to present a jury question as to whether Terrance Phillips was an accomplice in Davis's crime, and to support a finding by the jury that Terrance Phillips was not an accomplice.

As to Willie Smith, the evidence merely shows that on the morning of March 17, 1993, Davis came to the motel room where Smith and a friend were lodging and that Smith "handled" the gun that Davis used later that day in the murder of Johnny Hazle.  No evidence indicates that Smith had any prior knowledge that Davis planned to used the gun in the commission of a crime, or that Smith otherwise participated in the robbery-murder.  The only evidence of any complicity on Smith's part was that, after Davis had robbed Direct Oil and murdered Johnny Hazle, Davis discussed this crime with Smith.  We agree that this was not a sufficient basis upon which the trial court could

219

have determined, as a matter of law, that Smith was Davis's accomplice in the crime; on the contrary, the evidence would support a jury's finding of fact that Smith was not Davis's accomplice.

"The test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense." *Ex parte Scott*, 460 So.2d 1371 (Ala. 1984) (quoting *Ware v. State*, 409 So.2d 886, 891 (Ala.Cr.App. 1981)). "Such corroborative evidence does not have to be very strong, or even sufficient to support a conviction, but merely must logically tend to link the accused with the offense." *Scott*, at 1373. There was abundant evidence, through the testimony of Terrance Phillips and Willie Smith, to connect Davis with the robbery of Direct Oil and the murder of Johnny Hazle. Moreover, even if the jury considered Terrance Phillips and Willie Smith to be Davis's accomplices, and thus followed the trial court's instructions that their testimony would likewise require corroboration, the record provides such corroboration. We therefore find no merit in Davis's argument as to this issue.

*Ex Parte Davis*, 718 So.2d 1166, 1170-71 (Ala. 1998) (emphasis in original).

Although Davis contends that the denial of this claim was contrary to, and involved an unreasonable application of, clearly established Federal law, and was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, he does nothing but repeat the arguments he made in state court.[270] The state court's factual determinations were amply supported by the

---

[270] Doc. no. 33, at 63-65.

record, and its legal conclusions were neither contrary to, nor an unreasonable application of, clearly established federal law.  Davis is entitled to no relief.

## J.   The State Court Violated Davis's Constitutional Rights by Applying a Blanket Rule that Hearsay Evidence is Inadmissible in Rule 32 Proceedings

Davis argues that the Alabama courts deprived him of fair sentencing under the Eighth and Fourteenth Amendments when they applied a blanket rule that hearsay evidence is inadmissible in Rule 32 proceedings.[271]

This claim was raised and rejected on appeal from the denial of Davis's Rule 32 petition:

> Davis also argues that the circuit court erred in excluding other evidence related to Davis's family environment.  Davis's brief on this issue consists of two paragraphs.  Davis states only that the circuit court erroneously excluded hearsay and that hearsay evidence is admissible at the sentencing stage of a capital-murder trial.  However, Davis does not identify what hearsay was excluded.
>
> What Davis fails to consider is that this evidence was offered in a Rule 32 proceeding and not at the sentencing phase of a capital-murder trial.  The Alabama Rules of Evidence do not apply to sentencing hearings, but do apply to Rule 32 proceedings.  *See* Rule 101, Ala. R. Evid., and Rule 1101(a), Ala. R. Evid. Rule 804, Ala. R. Evid., specifically forbids the admittance of hearsay evidence.  It appears that the circuit court correctly applied the law.  We find no error here.

*Davis v. State,* 9 So. 3d 514, 530 (Ala. Crim. App. 2006).

---

[271] *Id.* at 65-66.

Davis contends that during the Rule 32 evidentiary hearing, he offered the testimony of his family, friends, and others familiar with his childhood, as well as social history testimony from Janet Vogelsang, a licensed clinical social worker, in support of his ineffective assistance of trial counsel claims.[272]  Davis complains that portions of these witnesses' testimony were excluded by the trial court based on the State's hearsay objection, even though such testimony would have been admissible during the penalty phase.[273]  Davis asserts that it is unconstitutional to exclude mitigation evidence on the basis of hearsay during sentencing, and argues that post-conviction counsel could not have established prejudice in support of Davis's ineffective assistance of counsel claims without presenting the readily available evidence that trial counsel could and should have presented during the penalty phase hearing.[274]

It does not appear that this claim was raised in Davis's petition for writ of *certiorari* on appeal from the denial of his Rule 32 petition.[275]  As such, it is both unexhausted and procedurally barred because a return to state court would be futile.

---

[272] *Id.* at 65.

[273] *Id.*

[274] *Id.*

[275]  Rule 32 C.R. Vol. 61, Tab 72.

222

*See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Collier v. Jones*, 910 F.2d 770, 773 (11th Cir. 1990).

Moreover, "state courts are the final arbiters of state law." *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997). Alabama state courts have held that hearsay is not admissible in a Rule 32 hearing. *See, e.g., Hunt v. State*, 940 So.2d 1041, 1051 (Ala. Crim. App. 2005).

Even though this claim is based primarily on state evidentiary law, and has not been exhausted, it is due to fail on the merits. Davis does not identify what "portions" of the witnesses' testimony were excluded based on the State's hearsay objection, nor does he demonstrate how their omission caused him prejudice.

Finally, review of the record reveals that the state court's evidentiary rulings did not strip Davis of the opportunity to present his claim during the Rule 32 proceedings. Davis is not entitled to relief on this claim.

## K. The State Court Violated Davis's Constitutional Rights When it Excluded the Testifying Expert's Social History Exhibit as Cumulative

Davis explains that during the Rule 32 hearing, "Ms. Vogelsang testified to Davis's social history with reference to a testifying exhibit, Petitioner's Exhibit 114,[276] which was duly marked and prominently displayed to the court and all

---

[276] Petitioner's Exhibit 114 is located at Rule 32 C.R. Vol. 55, at 6102.

223

counsel."[277]  However, when Exhibit 114 was offered into evidence, the State's objections were sustained.[278]  The Alabama Court of Criminal Appeals found that, although the social history binder was otherwise admissible, there was no error in excluding the exhibit since it was cumulative of other admitted evidence.  *Davis v. State*, 9 So. 3d 514, 530 (Ala. Crim. App. 2006).  Davis concedes that the exhibit "may to some extent have tracked Ms. Vogelsang's testimony," but argues that such evidence was not merely cumulative of other lay testimony, but rather, "assigned the expert's analysis of and conclusions regarding significant, relevant facts in an organized way found nowhere else in the record."[279]  Davis further contends that the exhibit included matters about which Ms. Vogelsang did not testify.[280]

The Alabama Court of Criminal Appeals found the following:

> Davis argues that the Rule 32 court erred in excluding clinical social worker Jan Vogelsang's entire binder of notes that consisted of a compilation of her findings regarding Davis's social history.

> Initially, we note that Davis's social history was introduced for the purpose of showing that mitigating evidence existed and that his trial counsel was ineffective for failing to introduce that evidence.  However, in Part I of this opinion we held that Davis's claims of ineffective assistance of trial counsel were procedurally barred because when *Ex*

---

[277]  Doc. no. 33, at 66.

[278]  Rule 32 R. Vol. 23, at 1134-36.

[279]  Doc. no. 33, at 66.

[280]  *Id.*

*parte Jackson* was in effect, Davis was tried.  Accordingly, if any error did occur, it was rendered harmless by our holding in Part I.

Moreover, in his brief to this Court Davis argues that "[t]his issue merits this Court's close attention because such an expert's exhibit is indeed the very sort of exhibit that belongs in the jury room in the penalty phase deliberations of a capital murder case along with whatever supporting and discrediting evidence accompanies it." (Davis's brief at pp. 75-75.)  The National Association of Social Workers ("NASW") argues that social histories are reliable and important evidence and are widely used in capital-murder cases to show mitigation.

At the Rule 32 proceeding a plethora of other evidence was offered and admitted to show that mitigation evidence did exist.  Indeed, the evidence introduced and admitted at the hearing was similar to the evidence contained in Vogelsang's social history binder.

When addressing a similar claim in *Williams v. Anderson*, 174 F. Supp. 2d 843 (N.D. Ind. 2001), *aff'd*, *Williams v. Davis*, 301 F.3d 625 (7th Cir. 2002), a federal court when denying relief, likewise noted:

> Williams argues that the post-conviction court's decision denied him due process by precluding the court from considering additional mitigating evidence, as mandated by *Hitchcock v. Dugger*, 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987), *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), and *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978).  In *Skipper v. South Carolina*, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986), the Supreme Court held that excluding mitigating evidence as cumulative may be implausible under the facts of a case if the court cannot conclude that the excluded evidence would have had no impact on the jury's deliberations.  476 U.S. at 8, 106 S. Ct. 1669.  Thus, Williams argues that the Indiana Supreme Court's determination that the evidence was cumulative impeded the court's ability to consider all relevant facets of

his character in determining his sentence, and thus violated *Skipper*.

This court first notes that the evidence was excluded during post-conviction proceedings, and not during the actual trial. Thus, it is unclear whether the protection of *Hitchcock, Eddings, Lockett*, and *Skipper* apply at all.

174 F. Supp. 2d at 872-73.

The social history binder was admissible. The circuit court erred in not allowing this binder to be received into evidence; however, in this case, it is clear that the material in the binder was cumulative to Vogelsang's thorough and lengthy Rule 32 testimony and to testimony offered by other witnesses at the Rule 32 hearing. "The exclusion of admissible evidence does not constitute reversible error where the evidence 'would have been merely cumulative of other evidence of the same nature, which was admitted.'" *Houston v. State*, 565 So. 2d 277, 281 (Ala. Crim. App. 1990) (quoting *Ex parte Lawson*, 476 So. 2d 122, 122 (Ala. 1985)). Accordingly, for the reasons stated above we find no reversible error.

*Davis v. State,* 9 So. 3d 514, 529-530 (Ala. Crim. App. 2006) (alteration in original).

The denial of this claim was based on the court's factual finding that the material in the binder was cumulative to Vogelsang's testimony and the testimony of other witnesses. While Davis disputes this finding, and argues that it was an unreasonable factual determination, he does not cite to any portions of the record to demonstrate which evidence was not cumulative, and improperly and prejudicially excluded. His conclusory assertion that the exhibit "assigned the expert's analysis

226

of and conclusions regarding significant, relevant facts in an organized way found nowhere else in the record" is insufficient factual support for this claim.

Davis has not established that the decision of the Court of Criminal Appeals was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Davis is not entitled to relief on this claim.

## L. The State Court Violated Davis's Constitutional Rights By Adopting Verbatim the State's Proposed Factual Findings and Legal Conclusions

Davis complains that the Rule 32 court abdicated its responsibility to provide an independent review of the issues by adopting *verbatim* the State's proposed findings of fact and conclusions of law, without adopting anything from his own submission.[281]  Davis argues that the court should have made a fair and independent judicial review of the evidence and law, and rendered its own order adopting portions from each party's submission as it deemed appropriate, incorporating any necessary text to explain its independent legal analysis and judgment.[282]  He asserts that by adopting the State's proposed order *verbatim*, the court violated Supreme Court

---

[281] Doc. no. 33, at 67-69.

[282] *Id.* at 68.

227

precedent established in *Anderson v. Bessemer City*, 470 U.S. 564, 572-73 (1985), and *United States v. El Paso Natural Gas*, 376 U.S. 651, 656-57 (1964).

In response, the State first argues that, because this claim raises only an issue of state law, it is not subject to review by this court pursuant to 28 U.S.C. § 2241(c)(3), 28 U.S.C. § 2254(a), and *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). In the alternative, the State contends that the claim is procedurally barred because Davis did not raise it in his Rule 32 petition or on appeal from the denial of that petition.

This claim was raised on appeal from the denial of Davis's Rule 32 petition,[283] in his application for rehearing,[284] and in his *certiorari* petition.[285]   While the merits of the claim were not addressed by the Rule 32 court, and the claim itself was not identified by either appellate court, the failure of a state appellate court to mention a claim does not mean the claim was not presented.  *Dye v. Hofbauer*, 546 U.S. 1, 2-4 (2005).  Because the Alabama Court of Criminal Appeals did not find that this claim was procedurally defaulted, there is no procedural bar stemming from any state procedural default.

---

[283] Rule 32 C.R. Vol. 57, Tab 60, at 4, 53-55.

[284] Rule 32 C.R. Vol. 58, Tab 64, at 27.

[285] Rule 32 C.R. Vol. 59, Tab 67, at 7-9, 93-105.

Moreover, the respondent's argument that the claim is one of pure state law is not persuasive. Davis raised the issue of whether the Rule 32 court's *verbatim* adoption of the Rule 32 Proposed Order submitted by the State in the circumstances of this case was a violation of Davis's rights under "the Due Process Clause of the Alabama Constitution of 1901 (Article 1, Section 6) *and/or the Due Process Clause of the United States Constitution*."[286] Davis elaborated by arguing that the appellate court should not employ the clear error standard on review because the Rule 32 court had essentially "rubber stamped" the State's proposed order, which was "replete with error," and based its conclusions in part on information outside the Rule 32 record.[287] Although not presented as a separate and delineated claim for relief, Davis arguably alerted the state courts to the federal constitutional issue.

In any event, Davis's claim is without merit. Although in *Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985), and *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656-657 (1964), the Supreme Court criticized trial courts' *verbatim* adoption of findings of fact prepared by prevailing parties, it ultimately held "that even when the trial judge adopts proposed findings verbatim, the findings are those

---

[286]   Rule 32 C.R. Vol. 57, Tab 60, at 4; Rule 32 C.R. Vol. 59, Tab 67, at 8-9 (emphasis supplied).

[287]   Rule 32 C.R. Vol. 57, Tab 60, at 53-55.

of the court and may be reversed only if clearly erroneous." *Anderson*, 470 U.S. at 572.

Davis identifies two portions of the trial court's order he alleges constitute clear error.  First, he alleges that the order erroneously stated that "[t]here are no constitutionally required checklists for mitigation investigations."[288]  He argues that "this conclusion is wholly contrary to" *Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003), in which the Court noted "that a 'checklist' can be found in the standards for capital defense work articulated by the American Bar Association and that the Court has 'long referred [to the ABA Standards] as "guides in determining what is reasonable.""[289]

In its order denying Davis's Rule 32 petition, the trial court stated:

> Although Davis faults trial counsel for not subpoenaing his DHR records, **there is absolutely no evidence before this Court that reasonably competent counsel would have been on notice that such records existed**. *There are no constitutionally required checklists for mitigation investigations.*  Trial counsel are faced with the realities of limited time and limited resources.  Those resources have to be managed in an efficient manner.  Thus, this Court does not find that attorneys are expected to subpoena agency records "just in case."  Had Lillie Bell Davis, Davis's siblings, or Davis himself told his trial counsel that this issue needed to be investigated — that DHR had been involved in the Davis home — this Court would absolutely find ineffective assistance of counsel for failure to investigate, discover and/ or develop this

---

[288] Doc. no. 33, at 68 (alteration in original).

[289] *Id.* (alteration in original).

> evidence, depending on the strategic decisions made by counsel following their investigation. But that is not what happened here.

Rule 32 C.R. Vol. 62, Tab. 80, at 39-40 (boldface emphasis in original, italicized

emphasis supplied).

The Court in *Wiggins* did not indicate that there are "constitutionally required

checklists for mitigation investigations." In fact, *Wiggins* did not mention a checklist

at all. Rather, *Wiggins* stated:

> Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) — standards to which we long have referred as "guides to determining what is reasonable." *Strickland, supra*, at 688, 104 S.Ct. 2052; *Williams v. Taylor, supra*, at 396, 120 S.Ct. 1495. The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(c), p. 93 (1989) (emphasis added). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. *Cf. Id.*, 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences (emphasis added)); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1982) ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing . . . . Investigation is essential to fulfillment of these functions").

*Wiggins*, 539 U.S. at 524-25 (emphasis in original).  The American Bar Association guidelines regarding the performance of counsel in death penalty cases are not constitutionally required.  Thus, the trial court's statement was not contrary to *Wiggins*.  Further, the court notes that the trial court followed *Wiggins* in adjudicating Davis's claim that counsel were ineffective during the sentencing phase.[290]

Second, Davis questions the Rule 32 court's conclusion that "this Court does not know what [defense counsel] Adams did or did not do in preparation for this case."[291]   Davis argues that this statement is factually false because it is "uncontroverted that trial counsel did not subpoena key documents or make any attempt to secure DHR, school, or other available records."[292]   Davis has taken this quote out of context.  In denying Davis's claim that counsel were ineffective during the penalty phase, the Rule 32 court stated:

> Jimmy Davis's family – and to a very large extent his mother – bears a heavy burden in this case for their role in this matter.  *Because Adams did not testify, this Court does not know what Adams did or did not do in preparation for this case.  The Court presumes, however, that Adams acted reasonably in the questions he asked his client and his client's mother and in preparing for the penalty phase.*  FN.
>
> > FN.  Further, based on Davis's statement that his attorneys only spoke with his mother and two siblings, this Court

---

[290] Rule 32 C.R. Vol. 62, Tab 80, at 27-44.

[291] Doc. no. 33, at 68 (alteration in original).

[292] *Id.*

232

> presumes Adams spoke with at least two of Davis's
> siblings. (RR. 863)
>
> Further, the testimony of Giddens establishes that **at no time** did Davis
> ever mention to his attorneys the abuse suffered at the hands of his
> mother or the intervention of DHR in the Davis home.

Rule 32 C.R. Vol. 62, Tab 80, at 29 (boldface emphasis in original, italicized

emphasis supplied).  The court's statement was intended to emphasize that because

Davis did not call Adams to testify at the Rule 32 hearing, the court did not have the

benefit of Adams' testimony concerning his preparation for the penalty phase.  The

footnote indicates that the court did not pretend to have no knowledge of anything

Adams did or did not do.

Davis has pointed to no clear error in the trial court's order denying the Rule

32 petition.  Thus, his claim must fail.

## M.    The State Failed to Meet its Burden of Proving Capital Murder During the Course of a Robbery

Davis asserts that his conviction should have been vacated because the State

failed to prove its case of capital murder committed during a robbery.[293]  He argues

that no physical evidence linked him with the robbery of Direct Oil or the murder of

Mr. Hazle, no eyewitness could identify him as the man who shot the victim, and no

---

[293] Doc. no. 33, at 69-70.

233

reliable evidence to corroborated the testimony of the Phillips cousins, who were given plea agreements in exchange for their testimony against him.[294]

Davis further argues that, even if the evidence was sufficient to prove that he shot Mr. Hazle, the State did not carry its burden of proof on robbery because no money was taken from the scene, and the only evidence to support the robbery element of capital murder was the Phillips cousins' uncorroborated testimony.[295]  He adds that, without the robbery, the most serious charge for which any of the participants could have been convicted was intentional murder.[296]

Although the claim was not raised in Davis's brief on direct appeal, the Alabama Court of Criminal Appeals nonetheless considered the sufficiency of the evidence:

> He does not question the sufficiency of the evidence to support his conviction.  Even though he does not raise this issue on appeal, we have reviewed the evidence presented and find it was sufficient for the jury to find the appellant guilty beyond a reasonable doubt of the capital offense charged in the indictment.  In fact, the evidence of his guilt is strong and convincing.

*Davis v. State*, 718 So. 2d 1148, 1156-57 (Ala. Crim. App. 1997).

---

[294] *Id.* at 69.

[295] *Id.*

[296] *Id.*

The Alabama Supreme Court affirmed that decision, and in connection with Davis's claim in his petition for writ of *certiorari* that there was insufficient corroborating evidence to convict him, found that:

> "The test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense." *Ex parte Scott*, 460 So. 2d 1371 (Ala. 1984) (quoting *Ware v. State*, 409 So. 2d 886, 891 (Ala. Cr. App. 1981)). "Such corroborative evidence does not have to be very strong, or even sufficient to support a conviction, but merely must logically tend to link the accused with the offense." *Scott*, at 1373. There was abundant evidence, through the testimony of Terrance Phillips and Willie Smith, to connect Davis with the robbery of Direct Oil and the murder of Johnny Hazle. Moreover, even if the jury considered Terrance Phillips and Willie Smith to be Davis's accomplices, and thus followed the trial court's instructions that their testimony would likewise require corroboration, the record provides such corroboration.

*Ex parte Davis*, 718 So. 2d 1166, 1171 (Ala. 1998).

The denial of this claim by the state court was neither contrary to, nor an unreasonable application of, clearly established federal law. The evidence, taken in the light most favorable to the State, amply established that the murder was committed during the course of a robbery attempt, and that Davis was indeed the man who shot and killed the victim.

**N.     Double Counting of Robbery as an Element of the Underlying Offense and as an Aggravating Circumstance at Sentencing Violated the Fifth, Sixth, Eighth, and Fourteenth Amendments**

Davis argues that one of the aggravating circumstances presented by the State during the penalty phase of the trial was the fact that the murder was committed during the course of a first degree robbery: a fact that also was necessary to prove the offense of capital murder.[297]   Davis argues that the "double counting" of robbery "both as an elevator in the guilt phase and as an aggravator in the penalty phase" violated his right to a reliable and rational sentence, and failed to narrow the class of cases eligible for the death penalty as required by federal law.[298]

This claim was first raised in Davis's amended petition for writ of *certiorari* on direct appeal, and it was denied without discussion by the Supreme Court of Alabama.  *Ex parte Davis*, 718 So. 2d 1166, 1169, 1178 (Ala. 1998).  The Alabama Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

"To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found

---

[297] Doc. no. 33, at 70-71.

[298] *Id.*

236

guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)). The requirement that a jury in the sentencing phase find an aggravating circumstance before it can impose a death sentence, narrows the class of persons eligible for the death penalty. *Id*. The use of an aggravating circumstance is only one means of narrowing the class of death-penalty-eligible defendants. *Id*. The narrowing function may be performed by jury findings at the guilt or sentencing phases of a trial. *Id*. at 245. In Davis's case, the "narrowing function" was performed by the jury at the guilt phase of his trial when it found him guilty of committing an intentional murder during the course of a first degree robbery. "The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." *Lowenfield*, 484 U.S. at 246. *See also Johnson v. Singletary*, 991 F.2d 663, 669 (11th Cir. 1993) (finding no constitutional infirmity in a Florida statute permitting a defendant to be eligible for the death penalty based upon a felony murder conviction, and to be sentenced to death based upon an aggravating circumstance that duplicates an element of the underlying conviction).

Davis is not entitled to relief on this claim.

237

**O.    The Trial Court's Failure to Conduct Individual Sequestered *Voir Dire* Deprived Davis of His Rights to Due Process and a Fair Trial by an Impartial Jury**

Davis asserts that, because he is an African-American who was charged with capital murder of a white man who was well known in the community, his case had racial overtones, and that individual *voir dire* was necessary to ensure that he obtained a fair and impartial jury.[299]  Specifically, Davis contends that, during *voir dire*, one potential juror, Nicholas Deljudice, made blatant references to race.[300] Davis speculates that many other jurors likely held similar racially-biased attitudes, but were uncomfortable expressing them in front of the group.[301]   Davis also

---

[299] Doc. no. 33, at 71-73.

[300] *Id*. at 72.  The trial transcript reveals that the "blatant references to race" made by Deljudice were made at a sidebar, outside of the presence of the rest of the potential jurors.  When asked at sidebar what he had heard about the case, Deljudice explained:

> Was strictly in the community and strictly scuttlebutt.  It's never really accurate, not the intellectual community.
>
> Anyway, the scuttlebutt is in the community amongst the blacks that it was a hit.  They didn't mention names of who did.  I don't know that guy from anybody else.  The scuttlebutt was that it was a hit, that he, Hazle, was informing on some of the narcotics, informing, and that they hit him.  And this is what was said.  I don't know if it's any truth in it or not.
>
> . . .
>
> That's right, that's all I heard.  And I know – like I said, I know his brother and his brother said nothing of this nature.  Just was strictly scuttlebutt amongst the gang kids.

R. Vol. 2, at 109-110.

[301] Doc. no. 33, at 72.

238

complains that the venire was exposed to the beliefs of other potential jurors about the victim, the defendant, and the nature of the crime which may have caused him prejudice.[302]

This claim was first raised in Davis's second petition for writ of *certiorari* on direct appeal,[303] and it was summarily denied by the Alabama Supreme Court. *Ex parte Davis*, 718 So. 2d 1166, 1169, 1178 (Ala. 1998).

It is well established that trial courts are granted wide discretion in conducting *voir dire*. The Supreme Court has never held that individual, sequestered *voir dire* is constitutionally required, but has left that determination to the discretion of the trial court. *Mu'Min v. Virginia*, 500 U.S. 415, 431-32 (1991). As in *Mu'Min*, the *voir dire* proceedings in Davis's case were "by no means perfunctory." *Id.* at 431. The record reflects that the trial court allowed 127 potential jurors to be questioned in groups of fourteen.[304] Defense counsel did not object to that process, nor did they request

---

[302] *Id.* at 72-73.  Davis asserts that:

> Specifically, several potential jurors stated in the presence of their panels that Mr. Hazel [*sic*] had worked hard, was polite, was a church-going man, had a brother who was well-known in the community and had left other family behind, and was friendly to most people.  Moreover, one of the potential jurors stated his opinion in open court that "this case is violent, very violent case."  Tr. 301.  One panel also heard that Davis had been suspended from school several times, and that he attended school sporadically.  Tr. 413-14.

*Id.*

[303] C.R. Vol. 10, Tab 35, at 70-75.

[304] R. Vol. 1, Tab 4, at 21-23.

individual sequestered *voir dire*.   The *voir dire* of each fourteen-member panel was

extensive and thorough.[305]   Review of the transcript reveals no comments made by

prospective jurors in the presence of other panel members that would have caused

bias or prejudice.[306]  Furthermore, individual questioning was allowed if needed.

The trial court's examination of prospective jurors was within "the wide

discretion granted to the trial court in conducting voir dire." *Mu'Min*, 500 U.S. at

427.  There is no indication that the petitioner was prejudiced by the trial court's

decision to conduct *voir dire* examination of prospective jurors in panels, rather than

individually.   In sum, the Supreme Court of Alabama's denial of this claim was

neither contrary to, nor an unreasonable application of, clearly established federal

law. This claim is due to be dismissed.

**P.    Davis's Rights to Due Process, a Fair Trial, and a Reliable Verdict from a Fair and Impartial Jury Were Violated When the Trial Court Failed to "Life Qualify" the Veniremembers in Accordance with *Morgan v. Illinois***

Davis argues that he was denied an adequate *voir dire* because the trial court

failed to "life qualify" the venire by asking whether any juror would automatically

impose the death penalty, in accordance with *Morgan v. Illinois*, 504 U.S. 719, 729

(1992).[307]  He argues that several potential jurors were struck for cause because they

---

[305] R. Vol. 1, Tab 5, at 29-95; R. Vol. 2, at 96-296; R. Vol. 3, at 297-492.

[306] *Id.*

[307] Doc. no. 33, at 74.

had fixed opinions *against* the death penalty, but complains that he was not afforded the opportunity to determine whether any potential jurors had fixed opinions *in favor of* it.[308]  This claim was raised in Davis's second petition for writ of *certiorari* on direct appeal,[309] and it was summarily denied by the Alabama Supreme Court.  *Ex Parte Davis*, 718 So. 2d 1166, 1172, 1179 (Ala. 1998).

The Sixth Amendment guarantees criminal defendants the right to a fair trial by an impartial jury.  *Skilling v. United States*, 561 U.S. 358, 438 (2010) (citing *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).  The purpose of *voir dire* is to determine whether prospective jurors can render an impartial verdict based solely on the evidence and the court's instructions.  *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981).

> The voir dire inquiry used to determine whether there are jurors who would vote automatically to impose the death penalty if a defendant were found guilty of a capital crime is referred to as the "reverse-*Witherspoon*" inquiry, because it arose from a line of death penalty voir dire cases exemplified by *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

*Brown v. Jones*, 255 F.3d 1273, 1279 n.6 (11th Cir. 2001).

The Supreme Court has held that defendants have a *right* to conduct that inquiry at *voir dire*.  *Morgan*, 504 U.S. at 736 (holding that the defendant "was

---

[308] *Id*.

[309] C.R. Vol. 10, Tab 35, at 79-81.

241

Case 1:07-cv-00518-CLS   Document 50   Filed 05/26/16   Page 242 of 300

entitled, *upon his request*, to inquiry discerning those jurors who, even prior to the state's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty") (emphasis supplied).   That right can be waived, however.  There is no clearly established federal law requiring a court to ask life-qualifying questions *sua sponte* during *voir dire*, when a defendant has requested that line of questioning himself.

Moreover, to the extent Davis may be attempting to assert that counsel was ineffective for failing to life-qualify the jury,[310] he has failed to satisfy both prongs of the *Strickland* analysis.  *See Hightower v. Schofield*, 365 F.3d 1008, 103-538 (11th Cir. 2004), *abrogated on other grounds*, 545 U.S. 1124 (2005) (to succeed on a reverse-*Witherspoon*-based claim of ineffective assistance, defendant must show that counsel's errors resulted in the seating of jurors who were unconstitutionally biased in favor of death); *Stamper v. Muncie*, 944 F.2d 170, 177 (4th Cir. 1991) (petitioner alleging ineffective assistance based on counsel's failure to explore with certain members of the venire the "reverse-*Witherspoon*" inquiry must demonstrate how any shortcoming on trial counsel's part constituted prejudice sufficient to satisfy the

---

[310] Within this claim, Davis makes the assertion: "Neither the court nor trial counsel attempted to "life qualify" the jury by asking whether any veniremember would automatically impose the death penalty.  Davis was denied a fair trial because the jury was weighted in favor of death."  Doc. no. 33 at 74.  He elaborates no further.

second prong of the *Strickland* test).  Davis has not produced any evidence that any of the seated jurors were unconstitutionally biased in favor of death.

The state court's denial of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.

**Q.    The Trial Court Erred By Granting the State's Motions to Strike for Cause Potential Jurors Elaine Thomas and Sandra Tilley**

Davis asserts that in capital cases, the right to a fair and impartial jury requires that veniremembers not be struck for cause merely because they express reservations about the death penalty.[311]  He argues that potential jurors Elaine Thomas and Sandra Tilley should not have been struck for cause for expressing their reservations about the death penalty, because their opinions did not affect their ability to perform their duties as jurors.[312]  According to Davis, the trial court used the wrong standard when it granted the State's cause challenge on the grounds that Ms. Thomas "clearly stated she has a fixed opinion against the death penalty."[313]  He also contends that the trial court erroneously stated that Ms. Tilley "continued to be adamant in her beliefs that she would require proof beyond *all* doubt in order to either convict or to impose a

---

[311] Doc. no. 33, at 75.

[312] *Id*. at 75-77.

[313] *Id*. at 76 (quoting R. Vol. 3, at 314).

243

death penalty," and incorrectly characterized Ms. Tilley's answers to *voir dire* questions as an indication that she was unable to convict under the reasonable doubt standard.[314]

This claim first was raised in Davis's second petition for writ of *certiorari* on direct appeal,[315] and it was summarily denied by the Supreme Court of Alabama. *Ex Parte Davis*, 718 So. 2d 1166, 1169, 1178 (Ala. 1998). That decision was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed it was chosen by excluding potential jurors for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522. This standard was later clarified in *Wainwright v. Witt*, 469 U.S. 412 (1985), when the Supreme Court held that a prospective juror may be excluded for cause because of his views on capital punishment when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror

---

[314] *Id*. (quoting R. Vol. 3, at 314-15) (emphasis supplied).
[315] C.R. Vol. 10, Tab 35, at 82-89.

244

in accordance with his instructions and his oath.'" *Id.* at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).   The Court further held that, because the determination of juror bias involves "credibility findings whose basis cannot be easily discerned from an appellate record," the trial court's factual findings are entitled to deference on *habeas* review and are presumed correct under § 2254(d).   *Wainwright*, 469 U.S. at 429.

During *voir dire*, the following exchanges took place with potential juror Elaine Thomas:

> MR. HUBBARD:   Okay.   With that in mind, we move into an area now for a few questions on something very heavy, if you will.   And if you find this defendant guilty, as I told you before, you will then be asked to render or recommend a sentence to Judge Street, if you find him guilty of this capital murder offense.   These two recommendations can only be life without parole or the death penalty.
>
> Be candid and honest with us if you will at this time.   Do any of you have a fixed opinion against the imposition of the death penalty?
>
> You may have read about it a million times, may have seen about it on television a million times, and you never thought that it might come down to you sitting in a jury box possibly having a part in rendering a verdict in that way.   But I'm telling you and the Judge will tell you that that's a very real possibility in this situation, that you may have that

decision; that decision to make a recommendation as to that.

So what I want to ask you is, do any of you have a fixed opinion against the death penalty, whether it be religious, moral grounds, or any other type grounds that we can think of?

Yes, ma'am.

PJ THOMAS:      Elaine Thomas.  I don't like the death penalty.

MR. HUBBARD:    Okay.  Let me ask you just a couple of questions, Ms. Thomas, and I appreciate your candor there with us.

And you said you don't like the death penalty. Is there any set of circumstances that you can imagine in your mind for which you would vote for the death penalty to be imposed?  Or would you always say, "I don't care what the circumstances are, I'm going to vote against the death penalty"?

PJ THOMAS:      I just wouldn't want to be in a case where I would have to decide that someone should die.  I wouldn't — I wouldn't want that for me.

MR. HUBBARD:    And again, I understand what you're saying and I don't want to press you too much, because I know that lawyers tend to do that at times.  But I have to try to get a yes or no answer for the record here.

PJ THOMAS:      But if I had to vote for a death penalty, I would probably vote no.  If I was on the jury and I was asked, I would probably say life without parole instead of death penalty.  To be honest.

246

MR. HUBBARD:     Can you imagine anytime you're sitting in a jury, regardless, not necessarily this defendant or not necessarily this case, but any case, can you ever imagine yourself sitting in a jury and voting for the death penalty?

PJ THOMAS:       No.

MR. HUBBARD:     All right.  So I assume then you would have a fixed opinion against the imposition of the death penalty.

PJ THOMAS:       Uh-huh (affirmative).

MR. HUBBARD:     Am I correct?

PJ THOMAS:       Yeah.  I wouldn't vote for the death penalty.

MR. HUBBARD:     That's fine.   Thank you, ma'am.   This is a very weighty decision.  Everybody has to make up their own mind and I appreciate your candor.

    . . . .

MR. GIDDENS:     Okay.  This question is to Ms. Thomas, Ms. Elaine Thomas.  You have indicated earlier that you said, I believe, you don't like the death penalty and you would not want to be in the case.  And I believe you said you would probably vote "no" in that event on the death penalty.

PJ THOMAS:       Uh-huh (affirmative).

MR. GIDDENS:     Do you understand that this case has two phases?  You have a guilt, to determine the — the jury determines the guilty or not guilty of the defendant.  And then you have the penalty phase to decide the

247

punishment.   And you believe you would probably vote "no."

Could you sit on the part whereby you determined the guilt or not guilty?  I mean, would your feeling on the death penalty, do you think would prevent you from sitting in another one?

PJ THOMAS:          I probably could sit there, but I wouldn't vote for it.

MR. GIDDENS:       Well, my question is, could you decide on the guilt or innocence from the evidence presented to you from the witness stand —

PJ THOMAS:          Yeah.

R. Vol. 2, at 285-286; R. Vol. 3, at 305-306.

The following took place with potential juror Sandra Tilley:

PJ TILLEY:            My name is Sandra Tilley.  And before I can impose the penalty, it would have to be beyond any doubt, you know.

MR. HUBBARD:    Okay.  And perhaps – Okay.  Well, I understand.  In other words, if the Judge charged you that if you were convinced beyond a reasonable doubt then you would still require beyond all doubt or to 100 percent?

PJ TILLEY:            Yeah.  I wouldn't want to sentence somebody to that, you know, if I had any doubt —

MR. HUBBARD:    I understand.

PJ TILLEY:            — that he was guilty.

248

MR. HUBBARD:   What I'm saying is though, if the Judge charged you of one thing that only required beyond a reasonable doubt, you would still hold us to a higher burden of proof; that is, beyond all doubt?

PJ TILLEY:   Yeah.

MR. HUBBARD:   Is that correct?

PJ TILLEY:   Yeah.  I would want to be sure that he did it, you know.

MR. HUBBARD:   Well, I don't want to mislead you.  I know this is a difficult concept.  But we're talking about two different phases of a trial here.  The first phase would be for us to prove to you beyond a reasonable doubt that this defendant is guilty.  Okay.

And then the next phase is to decide what recommendation would be made for that.  So that you could actually make a finding that the defendant was guilty of capital murder and then still recommend life without parole or the death penalty, whichever, you know, you preferred.  Do you understand what I'm saying there?

PJ TILLEY:   Yeah.

MR. HUBBARD:   But what you're saying is, as I understand it, is regardless of what the Judge said about beyond a reasonable doubt, that you had to be satisfied beyond a reasonable doubt and only that level of proof was necessary, you would still require proof beyond all doubt or to 100 percent; is that correct?

PJ TILLEY:   Yes, you know.  I would.

. . . .

MR. GIDDENS:        Okay.  And, Ms. Tilley, I believe you stated that you
                    would not impose a death penalty unless it
                    convinced to you beyond any doubt; is that correct?

PJ TILLEY:          Yes.  Before I would want to take someone's life I
                    would want to be sure that he did it.  I wouldn't —
                    I wouldn't want to have any doubt he was guilty.

MR. GIDDENS:        Would that be relative to imposing the death
                    penalty?  My question again would be to —

PJ TILLEY:          After I heard the evidence, if I felt sure that he was
                    guilty, then I would have no problem with, you
                    know, with capital punishment.  But if I had any
                    doubt that he was guilty, no, I couldn't.

MR. GIDDENS:        Okay.   Again, we go back to beyond a reasonable
                    doubt.  And we have again, we have two parts.  We
                    have a guilt or what we call the guilt phase, that
                    decides guilty and not guilty of capital murder.

                           My question is, can you sit on that part and
                    could you decide his guilt or innocence, so to speak,
                    and are you saying you would impose the burden
                    they must prove it beyond all doubt at that point?

PJ TILLEY:          Well, I would want to feel sure that he was guilty.

MR. GIDDENS:        Okay.  Beyond all doubt?

PJ TILLEY:          I wouldn't want to have any doubt he was guilty to
                    take his life.

MR. GIDDENS:        Okay.

250

R. Vol. 2, at 290-291; R. Vol. 3, at 306-307.

When the State challenged Ms. Thomas and Ms. Tilley, the following transpired:

MR. HUBBARD:    Judge, the state would make two challenges at this time. One, Ms. Elaine Thomas, and I believe the record reflects that she could not vote for the death penalty under any circumstances.

    We would also move to strike Sandra Tilley, who indicated, as I understand it, that she could not follow the Judge's instructions in that she would require the state of Alabama to prove beyond all doubt its case, and beyond all doubt in order to have the defendant sentenced to the death penalty, as opposed to what the law would be with regard to beyond a reasonable doubt.

    We would ask both of those to be struck by challenge.

THE COURT:    Any challenges by the defense?

MR. ADAMS:    No challenges. Are we allowed to make a response?

THE COURT:    All right.

MR. ADAMS:    Our response on the challenge on Juror Thomas goes exactly back to the motion we filed prior to voir dire about the defendant being entitled to a jury of his peers. This would be a classic example where a black member is wanting to be excluded by the state on the premise that she has now been death qualified. When she told the Court in response to one of Mr. Giddens' questions that she would

251

probably render a verdict based on guilt or innocence, that her problem would be returning a verdict for capital punishment in the penalty phase.

So we would renew our motion that we filed that it would infringe his right to a jury of his peers if she's excluded.

And on Ms. Tilley, I believe Ms. Tilley said she wanted just to be sure and have no doubt in her mind before she would impose the death penalty. I don't think that she has a problem with the death penalty and I don't think she has a problem with the presumption of reasonable doubt, what your instructions might be. She just wants to be satisfied completely in her mind.

So we would oppose the challenge of Ms. Tilley.

THE COURT:       Response by the state?

MR. HUBBARD:     In the first instance, Judge, with Elaine Thomas, I don't care whether she's black, white, green or purple. The law is clear in that the state can challenge any individual who says that they basically are conscientiously objecting to the imposition of the death penalty. Whether she could serve as a fair juror on the trial part and an unfair juror on the death penalty part has already been decided — and we feel like decided correctly — that she is not a juror that is qualified to serve on this particular jury under the *Whitt* decision.

As far as Ms. Tilley is concerned, I understood and I tried to be as thorough as I could be with her in explaining to her what beyond a

252

reasonable doubt and beyond all doubt meant. And each time she brought it to my attention that she could not do anything unless she was satisfied 100 percent beyond all doubt. And I think that's certainly a reason to be able to challenge her in that regard.

THE COURT: Anything further?

MR. ADAMS: No, sir.

THE COURT: The Court has heard the arguments made to the state's challenge of juror Elaine Thomas and Sandra Tilley. The Court finds from their responses that challenges are well made in that Ms. Thomas has clearly stated she has a fixed opinion against the death penalty. And Ms. Tilley, despite attempts to say otherwise, continued to be adamant in her beliefs that she would require proof beyond all doubt in order either to convict or to impose a death penalty after conviction at the guilt phase.

Both challenges are granted.

R. Vol. 3, at 312-315.

The transcript amply supports the determination that the views of both Thomas and Tilley would have prevented, or substantially impaired, the performance of their duties as jurors in accordance with their instructions and oath. Although Ms. Thomas indicated that she could decide on the guilt or innocence from the evidence presented on the witness stand, she never contradicted her repeated declarations that she would not vote to impose the death penalty. Ms. Tilley consistently maintained that she

253

would not impose the death penalty unless she was convinced beyond *all doubt*, rather than beyond *a reasonable doubt*. The trial court's findings are "credibility findings whose basis cannot be easily discerned from an appellate record," and they are entitled to deference from this court. *See Wainwright*, 469 U.S. at 429. Davis has failed to demonstrate that, when the state court rejected this claim, it relied on erroneous facts, applied law contrary to established United States Supreme Court precedent, or construed the applicable law in an objectively unreasonable manner. He is, therefore, not entitled to *habeas* relief on this ground.

**R.    The Trial Court's Failure to Strike for Cause Jurors Who Demonstrated Bias Against Davis Deprived Him of His Rights to Due Process and a Fair Trial by an Impartial Jury**

Davis asserts that the trial court erroneously failed to *sua sponte* remove for cause potential jurors Mary Deese and Robert Tate.[316] Although defense counsel did

---

[316] Doc. no. 33, at 77-78. Davis asserts that:

> Veniremember Mary Deese stated that she knew the victim's family from church and expressed that her knowledge of the family would cause problems for her if she were selected to sit on the jury. Although Ms. Deese acknowledged that she would try to set her feelings aside, she was so uncomfortable with her knowledge of the Hazel [sic] family that she again brought it to the court's attention in response to a question about pretrial publicity. Ms. Deese stated, "I knew too many of the family. I've known them for years, the family." Tr. 112. The trial court acknowledged that Ms. Deese probably had contact with the victim's family and talked about the crime with them.

*Id.* at 77 (alteration provided). With regard to Robert Tate, Davis complains that:

> Potential Juror Robert Tate answered during voir dire that he had heard Mr.

not challenge either potential juror for cause,[317] Davis nonetheless argues that the court's failure to remove them *sua sponte* forced him to use valuable peremptory challenges.[318]

Davis raised this claim in his second petition for writ of *certiorari* on direct appeal.[319]   The Alabama Supreme Court found that the trial court did not abuse its discretion or commit plain error in failing to strike the jurors:

> Davis next argues that, during voir dire examination of the venire, the trial court erred to reversal in failing to strike for cause certain members of the venire who, according to Davis, gave responses indicating a bias against him.  As Davis points out, it is fundamental that jurors who display prejudice or bias against a defendant should be removed for cause from the petit jury panel.  *Ross v. Oklahoma*, 487 U.S. 81, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988); *State v. Freeman*, 605 So. 2d 1258 (Ala. Cr. App. 1992).  He argues that the trial court should have struck these jurors for cause from the venire, and that its failure to do so forced his defense counsel to use valuable peremptory strikes to remove them from the venire.  Davis concludes that this amounts to a denial of his right to a fair and impartial jury and that he is therefore entitled to a new trial.

---

> Hazel [*sic*] was killed in a gang hit.  Tr. 310.  The trial court, which had previously granted a motion in limine to prevent any mention of gangs or gang-related activity because of the inherent prejudice involved, failed to remove Mr. Tate for cause.  Tr. 310-11.  The fact that a veniremember who possessed such presumptively prejudicial information remained on the panel violated Davis'[s] right to be tried by a fair and impartial jury.  The defense was forced to use a peremptory strike to remove Mr. Tate from the jury.

*Id.* at 77-78 (alteration supplied).

[317]  R. Vol. 3, at 312; R. Vol. 2, at 138-141.

[318]  Doc. no. 33, at 78.

[319]  C.R. Vol. 10, Tab 35, at 65-70.

To justify a challenge for cause, there must be a proper statutory ground or "'some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.'" *Clark v. State*, 621 So. 2d 309, 321 (Ala. Cr. App. 1992) (quoting *Nettles v. State*, 435 So. 2d 146, 149 (Ala. Cr. App. 1983)). This Court has held that "once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions" about a case, the juror should be removed for cause. *Knop v. McCain*, 561 So. 2d 229, 234 (Ala. 1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. *Ex parte Taylor*, 666 So. 2d 73, 82 (Ala. 1995). A juror "need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it." *Kinder v. State*, 515 So. 2d 55, 61 (Ala. Cr. App. 1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. *Kinder*, at 60-61. In order to justify disqualification, a juror "'must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused'"; "'[s]uch opinion must be so fixed . . . that it would bias the verdict a juror would be required to render.'" *Oryang v. State*, 642 So. 2d 979, 987 (Ala. Cr. App. 1993) (quoting *Siebert v. State*, 562 So. 2d 586, 595 (Ala. Cr. App. 1989)).

*Ex Parte Davis*, 718 So. 2d at 1171-72 (alterations and ellipses in original). With respect to potential juror Mary Deese, the Alabama Supreme Court found:

Davis next argues that, during voir dire, juror no. 24 indicated a strong affiliation with the victim's family and that she therefore should have been struck for cause. Davis did not challenge this juror for cause; thus, we need only determine whether the trial court committed plain error in failing to strike juror no. 24 sua sponte. "'Plain error' arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." *Ex parte Bankhead*, 585 So.2d 112, 117 (Ala. 1991).

During voir dire, juror no. 24 told the trial court that she knew the victim's family from church and that she did not want to sit on the jury because she knew too many of the victim's family members. Juror no. 24 stated, in pertinent part:

| [Defense counsel]: | Yes ma'am, you knew Mr. Hazle? |
|---|---|
| [Juror 24]: | Yes, I knew his family. They're members of the church where I attend. |
| . . . . | |
| [Defense counsel]: | All right, . . . would the fact that you knew all these people, would that cause you any problems if you were selected on this jury? |
| [Juror 24]: | I'm afraid it would. |
| [Defense counsel]: | All right.  Let me put it to you another way then.  If you were selected on this jury, would you be able to set aside the fact that you knew Johnny Hazle or his family and reach a decision based solely on the evidence in the case? |
| [Juror 24]: | I would try. |
| [Defense counsel]: | Okay.  That's a pretty good answer, but are you saying you're not sure? |
| [Juror 24]: | Yes, sir. |

257

[Defense counsel]:          Do you think it might influence
                            you in some way?

[Juror 24]:                 I'm afraid so.

However, the trial court questioned juror no. 24 further, as
follows:

[The Court]:                . . . [L]et me ask you a question.
                            Is your answer one really that
                            you would be uncomfortable in
                            sitting as a member of the jury
                            and would rather not?

[Juror 24]:                 Yes, sir.

[The Court]:                I understand that.  The legal
                            question, however, is if in fact
                            you were selected could you sit
                            as a fair and impartial juror, put
                            out of your mind whatever you
                            have heard from any family
                            members of the Hazle family, or
                            anything you've heard on any
                            news reports of any kind, listen
                            just to the evidence in this case,
                            and if you had to from that
                            evidence strictly determine what
                            the facts are and apply the law?

[Juror 24]:                 Yes, I think I could, yes.

[The Court]:                But your answer is you had
                            rather not; is that it?

[Juror 24]:                 I have never been in court. I
                            don't know anything about it.

258

> [The Court]:          I understand.
>
> [Juror 24]:           *But I could.*
>
> (Emphasis added.)

> We agree with the State that the voir dire of juror no. 24 does not
> reveal an absolute bias or favor on her part; on the contrary, she was
> forthright in expressing both her reservations about serving on the jury
> and her belief that she could overcome those reservations and properly
> render a decision in the case, based upon the evidence and the law.  In
> view of this, we find no plain error in the trial court's failure to strike
> this juror sua sponte.

*Ex Parte Davis*, 718 So. 2d 1166, 1172-73 (Ala. 1998) (alterations and emphasis in

original).

With respect to potential juror Robert Tate, the following exchange took place,

at side bar, during *voir dire*:

> THE COURT:        Mr. Tate, I believe earlier when questions were
> asked about do you know anything about what
> happened at the Direct Oil or had you heard
> anything, I believe your answer was that you just
> heard what the other people were saying?
>
> PJ TATE:          That was what I heard, just hearsay, you know.
>
> THE COURT:        Right.  As quietly as you can, can you tell us what it
> is that you heard said?
>
> PJ TATE:          Well, what I heard was this was a gang member and
> he had —
>
> THE COURT:        Keep quiet as you can.

259

PJ TATE:        Had to kill a white man to join that gang.  Now, I
                heard that.  I don't know if it's so or not.

THE COURT:      I believe you told us you could — any of that that
                you heard you could put out of your mind and not
                give any consideration in the deliberation; is that
                correct:

PJ TATE:        I think I probably could.

THE COURT:      Just listen to the evidence that's presented?

PJ TATE:        The evidence that's presented over there is what I
                want to go by.

THE COURT:      All right.  Any other questions?

MR. ADAMS:      Who told you that it had something to do with a
                gang?

PJ TATE:        I don't even remember.  It's just friends.  There's
                several people talking about it.  I don't remember
                who it was.  Said that's what it was all about, that
                they had to go out and kill a white man to join a
                gang.  You know, whether it's so or whether it's not,
                I don't know.

R. Vol. 3, at 309-311.  In its opinion on direct appeal, the Alabama Supreme Court

did not discuss the trial court's failure to *sua sponte* strike juror Tate, but implicitly

found no plain error had occurred.  *Ex Parte Davis*, 718 So. 2d 1166, 1169, 1178

(Ala. 1998).

Davis offers no Supreme Court precedent to support his inchoate claim that it is the trial court's responsibility to *sua sponte* dismiss prospective jurors for cause. Instead, the issue in the case cited by the petitioner, *Ross v. Oklahoma*, 487 U.S. 81 (1988), was whether the trial court had committed reversible error by *failing to grant the defendant's motion* to excuse a potential juror for cause. In that case, the Supreme Court expressly held that the an erroneous denial of a for-cause challenge of a juror does not amount to a constitutional infirmity, *unless* the challenged juror is actually seated on the defendant's jury. *Id.* at 89-91; *see also United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000). Thus, the relevant Supreme Court precedent does not impose a duty on the trial court to *sua sponte* strike jurors for cause as a result of bias, and it only allows a *habeas* petitioner to complain of a trial court's denial of his challenges for cause when the challenged veniremembers actually end up sitting on the jury. *Heath v. Jones*, 941 F.2d 1126, 1132-33 (11th Cir.1991) *cert. denied*, 502 U.S. 1077 (1992).

In this case, even though Davis failed to raise a cause challenge against either of the potential jurors about whom he now complains, he was able to remove them by exercising peremptory challenges. Neither Deese nor Tate was seated on the jury. Thus, even setting aside the fact that the trial court was not required to *sua sponte* exclude potential jurors Deese and Tate for cause, Davis did not suffer a

261

constitutional injury because neither of those challenged jurors actually sat on his jury.

Moreover, Davis may not assert a constitutional violation based on an alleged loss of peremptory challenges, as the Supreme Court has "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to a impartial jury." *Ross,* 487 U.S. at 88 (alteration supplied).   The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

**S.     The Use of Improper Jury Instructions Deprived Davis of His Fifth, Sixth, Eighth, and Fourteenth Amendment Rights**

Davis contends that the court read erroneous instructions to the jury, and in so doing, decreased the burden of proof in violation of Supreme Court precedent and his rights to due process and a fair trial.[320]

1.     *Reasonable doubt*

Davis asserts that the trial court's reasonable doubt instruction erroneously afforded the jurors the alternative of convicting based on moral certainty.  He claims that the court used the terms "moral certainty" and "reasonable doubt" interchangeably, thereby decreasing the burden of proof and implying that acquittal

---

[320] Doc. no. 33, at 78-79.

was not mandatory if the State failed to carry its burden of proof beyond a reasonable doubt.[321]

Davis raised this claim in his second petition for *certiorari* on direct appeal.[322] The Alabama Supreme Court summarily denied the claim. *Ex Parte Davis*, 718 So. 2d 1166, 1169, 1178 (Ala. 1998). That denial was neither contrary to, nor an unreasonable application of, clearly established federal law.

The record reflects that the trial court gave the following instructions to the jury:

> Now, in coming before you, a jury of his peers, upon his plea of not guilty the defendant is presumed to be innocent of the charge or charges against him. The presumption of innocence remains with a defendant through every stage of the trial and during your deliberations on the verdict and is not overcome unless from all of the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.

> The presumption of innocence with which the defendant enters into the trial is a fact in the case which must be considered with all of the evidence and is not to be disregarded by you.

> To state that principle another way, a defendant, although accused of crime, begins a trial with a clean slate, with no evidence against him. The law then permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused. The presumption of innocence follows a defendant as a matter of evidence until his guilt is established by the evidence beyond a reasonable doubt.

---

[321] *Id.*

[322] C.R. Vol. 10, Tab 35, at 77-78.

The presumption of innocence alone is sufficient to acquit a defendant — that is, to find a defendant not guilty — unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt from all of the evidence in the case.

Now, Ladies and Gentlemen, the burden is upon the state of Alabama to convince you members of the jury from the evidence and from all reasonable and proper inferences that can be drawn therefrom beyond a reasonable doubt *and to a moral certainty* that the defendant is guilty as charged in the indictment before you can convict him of that charge. And this burden remains on the state throughout the case. The defendant is not required to prove his innocence.

Now, the terms "reasonable doubt" and "moral certainty" are interchangeable terms, and actually are legal equivalents. That means that if the jury is convinced beyond a reasonable doubt of the guilt of the defendant, or if the jury is convinced to a moral certainty of the guilt of the defendant, in either event you should then convict the defendant of the appropriate charge.

On the other hand, if the jury is not so convinced, then the defendant should be acquitted.

Now, the term "reasonable doubt" means just what it says. The law tells us that a reasonable doubt is a fair doubt based upon reason and common sense and arising from the state of the evidence. While it's rarely possible to prove anything to an absolute certainty, a defendant is never to be convicted on mere suspicion, conjecture, guess or surmise.

A reasonable doubt may arise not only from the evidence in the case that is produced, but also from a lack of evidence in the case. The burden is upon the state to prove the defendant guilty beyond a reasonable doubt of every essential element of the crime that is charged. A defendant has the right to rely upon failure of the prosecution to establish such proof.

A defendant may also rely upon evidence brought out on cross examination of witnesses for the prosecution and upon evidence presented on behalf of the defendant. But the law never imposes upon a defendant in a criminal case the burden or the duty of producing any evidence whatsoever.

We can say, Ladies and Gentlemen, that before a conviction can be had in this case the state must satisfy each and every member of the jury of the defendant's guilt beyond a reasonable doubt. Even if the state demonstrates a probability of guilt, if it does not establish guilt beyond a reasonable doubt you must acquit the defendant.

The term "reasonable doubt" is basically self-explanatory. And efforts to define it don't always clarify the term. It may help you to know that reasonable doubt is not a mere possible doubt. Everything relating to human affairs is open to some possible or imaginary doubt.

A reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all of the evidence in the case. It's a doubt based upon reason and common sense. It does not mean a vague or arbitrary notion, but it is an actual doubt based upon the evidence, the lack of evidence, a conflict in the evidence, or a combination thereof.

It is a doubt that remains after going over in your minds the entire case and giving consideration to all of the testimony and evidence. It is distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

If after considering all of the evidence you are convinced of the defendant's guilt beyond a reasonable doubt then it would be your duty to convict the defendant. However, if you still have a reasonable doubt then the defendant is entitled to the benefit of it and you should acquit the defendant.

So then, Ladies and Gentlemen, we can say that a reasonable doubt exists in any case when after careful and impartial consideration

of all of the evidence the jurors do not feel convinced to a moral certainty that a defendant is guilty of the charge, then there is reasonable doubt and the jury should acquit the defendant on that charge.

Upon considering all of the evidence in the case, if you have a reasonable doubt of the defendant's guilt of the charge arising out of any part of the evidence or lack of evidence in the case, then you should find the defendant not guilty.

Now, Ladies and Gentlemen of the jury, it may well be that portions of testimony or evidence in this case that's been presented to you would be of the type that we call circumstantial evidence. The test of the sufficiency of circumstantial evidence is whether the circumstances as proved produce a moral conviction to the exclusion of all reasonable doubt of the guilt of the defendant.

There should not be a conviction based upon circumstantial evidence unless to a moral certainty it excludes every other reasonable hypothesis than that of the guilt of the accused.

No matter how strong may be the circumstances, if they can be reconciled with the theory that the defendant is innocent then the guilt of the accused is not shown by that full measure of proof which the law requires and the defendant should be acquitted.

R. Vol. 7, Tab 15, at 1243-49 (emphasis supplied).

An identical claim was rejected in *Johnson v. Alabama*, 256 F.3d 1156 (11th

Cir. 2001), in which the Eleventh Circuit set out the clearly established federal law

as follows:

In a criminal case, the government must prove each element of a charged offense beyond a reasonable doubt. *See, e.g.*, *In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 1072, 25 L. Ed. 2d 368 (1970). Although a court must instruct the jury that a defendant's guilt has to be

266

proven beyond a reasonable doubt, the Supreme Court has stated that
"the Constitution neither prohibits trial courts from defining reasonable
doubt nor requires them to do so as a matter of course." *Victor v.
Nebraska*, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243, 127 L. Ed. 2d 583
(1994). If a trial court does attempt to define reasonable doubt, it must
explain the standard correctly, although "the Constitution does not
require that any particular form of words be used in advising the jury of
the government's burden of proof." *Id*.

> When reviewing the correctness of reasonable-doubt charges, the
Supreme Court has phrased the proper constitutional inquiry as
"'whether there is a reasonable likelihood that the jury understood the
instructions to allow conviction based on proof insufficient to meet the
*Winship* standard.'" *Harvell v. Nagle*, 58 F.3d 1541, 1542-43 (11th Cir.
1995) (quoting *Victor*, 511 U.S. at 6, 114 S. Ct. at 1243). We consider
the instruction as a whole to determine if the instruction misleads the
jury as to the government's burden of proof. *See id.; see also Victor*,
511 U.S. at 5-6, 114 S. Ct. at 1243 (instructions must be "taken as a
whole"); *Cage*, 498 U.S. at 41, 111 S.Ct. at 329 (explaining that "[i]n
construing the instruction, we consider how reasonable jurors could
have understood the charge as a whole").

*Johnson*, 256 F.3d at 1190-91 (alteration in original)

The Eleventh Circuit then examined the petitioner's claim, explaining:

> At the close of the evidence at Johnson's trial, the judge gave the
jury a lengthy instruction on reasonable doubt. Johnson contends that
the instruction was flawed because, in the course of the instruction, the
trial judge (1) equated "beyond reasonable doubt" with "moral
certainty"; (2) referred to a reasonable doubt as an "actual and
substantial one," or a "a doubt for which a good reason can be given or
assigned"; and (3) said that in "the final analysis" each juror would have
to look into his "own heart and mind" for the answer. Johnson asserts
that these comments effectively lowered the burden of proof below the
reasonable doubt standard.

. . . .

Here, the trial judge employed "beyond a reasonable doubt" and "to a moral certainty" interchangeably and even informed the jury that the two terms were synonymous.  But other portions of the instruction ensured that the "moral certainty" language would not reasonably be understood to lower the State's burden.   We have specifically recognized that the use of the term "moral certainty" in a reasonable doubt instruction is not fatal.  *See Felker v. Turpin*, 83 F.3d 1303, 1309 (11th Cir. 1996) (trial court's definition of reasonable doubt as "'doubt which is based on the evidence, a lack of evidence or a conflict in the evidence'" and "'doubt which is reasonably entertained as opposed to vague or fanciful or farfetched doubt,' served to erase any taint created by the term 'moral certainty' and to thus place it beyond the potential for constitutional harm"); *Harvell*, 58 F.3d at 1543 (trial court's statements that reasonable doubt had to be derived from the evidence and that reasonable doubt could not be "fanciful, vague, whimsical, capricious, conjectural or speculative" cured any potential constitutional harm associated with the term "moral certainty").

The instruction in this case included substantial language echoing the key phrases in *Felker* and *Harvell*.  Specifically, the trial judge in this case repeatedly informed the jury that it could not convict Johnson unless the evidence presented to it was inconsistent with any reasonable theory of innocence; the judge also repeatedly instructed the jury not to go beyond the evidence and engage in speculation in order to find Johnson guilty.  The instruction as a whole, which emphasized the jury's obligation to focus on the evidence presented in court and made abundantly clear that a conviction could not be based on speculation, convinces us that it was not reasonably likely that the jury understood the instructions to allow conviction based on proof insufficient to satisfy *Winship*.

*Johnson*, 256 F.3d at 1192-93 (ellipses supplied).

A review of the entire charge in this case reflects that, as in *Johnson,* the trial court correctly conveyed to the jury that Davis was presumed innocent, that the presumption of innocence remained with him throughout his trial, and that the jury must be convinced from the evidence of his guilt beyond a reasonable doubt. Thus, the trial court's instructions did not violate Davis's rights to due process and a fair trial, despite the trial judge's interchangeable use of the phrases "moral certainty" and "reasonable doubt." *Cf. Victor v. Nebraska*, 511 U.S. 1, 8-22 (1994) (trial courts' instructions on reasonable doubt, which contained references to "a moral certainty" and "an actual and substantial doubt," when taken as a whole, correctly conveyed the concept of reasonable doubt to the jury). Davis is entitled to no relief on this claim.

2.    *Aggravating circumstances*

Davis claims the trial court improperly instructed the jury that it could consider two aggravating circumstances if it found them beyond a reasonable doubt.[323] This claim was raised in Davis's second petition for writ of *certiorari* on direct appeal,[324] and it was rejected without discussion by the Supreme Court of Alabama. *Ex Parte Davis*, 718 So. 2d 1166, 1169, 1178 (Ala. 1998).

---

[323] Doc. no. 33, at 79.

[324] C.R. Vol. 10, Tab 35, at 78-79.

The trial judge gave the following jury instruction on aggravating circumstances:

> The aggravating circumstances, which you may consider in this case, if you find from the evidence that they have been proved beyond a reasonable doubt are as follows: First, that the defendant was previously convicted of a felony involving the use or threat of violence to the person; secondly, that the capital offense was committed while the defendant was engaged in or was an accomplice in the commission of or an attempt to commit or flight from committing a robbery.

R. Vol. 8, Tab 24, at 1360-1361. Davis complains that the court failed to instruct the jury on the elements of the aggravating circumstances, so the jury "received no guidance on how to determine whether Davis had previously been convicted of a crime involving violence against a person."[325] Davis concedes that the State offered a certified copy of a prior conviction for robbery in the third degree, but argues that the court never defined third degree robbery for the jury.[326]

Davis has not explained how the court's failure to define third degree robbery or to offer the jury any additional guidance in determining whether Davis had previously been convicted of a crime involving violence against a person violated his constitutional rights. During the sentencing phase of the trial, the State introduced certified copies of the case action summary and bench sheets from Davis's 1992

---

[325] Doc. no. 33, at 79.

[326] *Id.*

270

conviction for third degree robbery in *State of Alabama v. Davis*, CC-92-979.[327]  The

defense stipulated that  "in CC 92-979, Circuit Court of Calhoun County, Alabama,

that Jimmy Davis is the same Jimmy Davis that pled guilty to robbery in the third

degree, received a sentence of one year and one day, on December 21, 1992," and that

he was represented by an attorney.[328]  Alabama law provides that:

> (a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:
>
>> (1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
>>
>> (2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property.
>
> (b) Robbery in the third degree is a Class C felony.

Ala. Code § 13A-8-43 (1975).  By pleading guilty to third degree robbery, Davis

admitted to committing a crime involving the use, or threat, of force or violence

against a person.  The defense stipulated to the authenticity and validity of the prior

conviction.   Thus, the "previous conviction of a violent felony" aggravator was

unquestionably satisfied.

---

[327] R. Vol. 7, Tab 19, at 1295-98.  The exhibits themselves are located at C.R. Vol. 1, Tab 1, at 87-89.

[328] R. Vol. 7, Tab 19, at 1298-99.

Furthermore, even if the jury had not found the existence of a previous conviction of a violent felony, it clearly found that the "murder during the commission of a robbery" aggravator had been satisfied. Davis's conviction was for that very offense. Thus, the robbery served as both the underlying offense and an aggravating circumstance. Under Alabama law, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." Ala. Code § 13A-5-45(e) (1975). As such, the fact that Davis had been convicted of murder during the commission of a robbery necessarily meant that the jury had unanimously determined that the robbery aggravator had been satisfied. Davis is entitled to no relief on this claim.

## T.     The Trial Court's Instructions on Accomplices and Corroboration Constituted Reversible Error

Davis complains that the trial court instructed the jury that Alphonso Phillips was an accomplice, but it did not mention whether Terrance Phillips or Willie Smith could be considered an accomplice.[329] Davis contends that Terrance Phillips should have been considered an accomplice as a matter of law, and the jury should have been

---

[329] Doc. no. 33, at 79-82.

so informed.[330]   He also asserts that the court gave confusing instructions about whether anyone else could be considered an accomplice.[331]

Specifically, Davis complains that the court committed reversible error when it failed to instruct the jury: (1) that it had the duty to determine which witnesses were accomplices; and (2) that accomplices could not corroborate each other.

The trial court gave the jury the following instructions on accomplices:

Ladies and gentlemen of the jury, a term utilized in the law that you may have heard previously is that of "accomplice."  An accomplice is defined as an associate in crime or a partner or a partaker in guilt.  An accomplice is one who is in some way connected with the commission of a crime. *And whether a witness is an accomplice or not is a question of fact to be determined by a jury where there is conflict in the evidence on that question.*

*A conviction for a felony offense cannot be had on the testimony of an accomplice or of numerous accomplices unless such testimony be corroborated or be supported by other evidence* tending to connect the defendant with the commission of the offense.

The rule is that such other evidence[,] to be sufficient, to be believed by the jury beyond a reasonable doubt, if such evidence merely shows the commission of the offense or the circumstances of the offense thereof, without connecting the defendant with the commission of the offense, then such other evidence is not sufficient and the defendant could not be convicted as to that charge.

If the jury is not satisfied beyond a reasonable doubt of the truth of some of the evidence in this case tending to prove the defendant's

---

[330] *Id*. at 80.

[331] *Id*.

guilty connection with the charged offense, other than the testimony of Alphonso Phillips, then the jury cannot find the defendant guilty.

The Criminal Code of the state of Alabama at Section 12-21-222 reads:  A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of such offense, and such corroborative evidence if it merely shows commission or circumstances thereof is not sufficient.

So it's the law of this state that no person can be convicted on the uncorroborated testimony of an accomplice.  Corroborating testimony that would be sufficient in order to support a conviction for an offense charged, if a jury is so satisfied from the evidence beyond a reasonable doubt, need not necessarily refer to any facts testified to by an accomplice, if any there be, but may include proof of circumstances tending to prove the truth of the material features of the testimony of the alleged accomplice.

The corroborating testimony is not sufficient if it merely shows the commission of an offense or the circumstances thereof.  As a matter of law in this case the defendant Alphonso [Phillips] is an accomplice of the defendant in this case.

R. Vol. 7, Tab 15, at 1261-64 (emphasis and alteration provided).

In his petition, Davis contends that the trial court's instruction was not only

confusing,

it also misled the jury by telling it that only Alphonso Phillips could be considered an accomplice in determining the sufficiency of the evidence. The trial court did not tell the jury that others could be accomplices, even though Terrance Phillips was also an accomplice as a matter of law.  The trial court also did not explain that although other witnesses' status as accomplices was not so clear as to warrant a directed verdict on this issue, they might still be found to be accomplices on the facts as

274

presented at trial.  This ambiguity was crucial in this case, because the State relied so heavily on the testimony of Terrance Phillips and Willie Smith.[332]

Davis further alleges that:

> The trial court failed to instruct the jury that if Terrance Phillips and Willie Smith were found to be accomplices, their testimony could not be used to corroborate the testimony of Alphonso Phillips.

> As a result, the jury may well have found that the testimony of Alphonso Phillips was corroborated by the testimony of accomplices Terrance Phillips and Willie Smith.  The jury could also have found that Alphonso Phillips corroborated Terrance Phillips, that Terrance Phillips corroborated Willie Smith, and that Willie Smith corroborated Alphonso Phillips.

> The proper instruction would have required the jury to subtract all three witnesses' testimony, and then to decide whether the remaining evidence was sufficient to convict Davis of capital murder. . . .

> At the very least, the jury should have been required to assess the sufficiency of the evidence without considering the testimony of Terrance and Alphonso Phillips.  Whether to also subtract Willie Smith's testimony should have been left to the jury to decide.  The insufficient instructions did not give guidance to the jury about the critical issue in this case and rendered Davis['s ]conviction unreliable.[333]

Doc. no. 33, at 82 (alteration and ellipses supplied, paragraph numbers omitted).

Both claims were raised in Davis's second petition for writ of *certiorari* on direct appeal,[334] and both were summarily denied by the Alabama Supreme Court.  *Ex*

---

[332] *Id.* at 81-82.

[333] *Id*. at 82.

[334] C.R. Vol. 10, Tab 35, at 7-11.

275

*Parte Davis*, 718 So.2d 1166, 1169, 1178 (Ala. 1998). Davis has not shown that the state court's denial of these claims was either contrary to, or an unreasonable application of, clearly established federal law, nor that it was based on an unreasonable determination of the facts in light of the evidence presented.

Davis's contention that the court failed to instruct the jury of its duty to determine which witnesses were accomplices is belied by the record. The court instructed the jury that the question of "whether a witness is an accomplice or not is a question of fact to be determined by a jury where there is conflict in the evidence on that question." The jury was clearly instructed that it was their job to determine whether any witness was an accomplice.[335] Further, the court never indicated that Alphonso Phillips was the only accomplice.

Davis's contention that the trial court failed to instruct the jury that accomplices could not corroborate each other is similarly unavailing. The court instructed the jury that a "conviction for a felony offense cannot be had on the testimony of an accomplice or of *numerous accomplices* unless such testimony be corroborated or be supported by other evidence tending to connect the defendant with the commission of the offense."[336] Although the court did not identify by name the

---

[335] R. Vol. 7, Tab 15, at 1261-62.

[336] *Id.* at 1262 (emphasis provided).

witnesses who might have been considered accomplices, it adequately informed the

jury of the appropriate law.

Moreover, the United States Supreme Court has made it clear that, in the

context of jury instructions,

> [t]he only question for [the habeas court] is "whether the ailing
> instruction by itself so infected the entire trial that the resulting
> conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147,
> 94 S. Ct. 396, 400-01, 38 L. Ed. 2d 368 (1973); *see also Henderson v.
> Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730, 1736-37, 52 L. Ed.2d 203
> (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868,
> 1871, 40 L. Ed. 2d 431 (1974) ("'[I]t must be established not merely that
> the instruction is undesirable, erroneous, or even "universally
> condemned," but that it violated some [constitutional right]'"). It is well
> established that the instruction "may not be judged in artificial
> isolation," but must be considered in the context of the instructions as
> a whole and the trial record. *Cupp v. Naughten*, *supra*, 414 U.S., at 147,
> 94 S. Ct., at 400-01. In addition, in reviewing an ambiguous instruction
> . . . we inquire "whether there is a reasonable likelihood that the jury has
> applied the challenged instruction in a way" that violates the
> Constitution. *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190,
> 1198, 108 L. Ed. 2d 316 (1990). And we also bear in mind our previous
> admonition that we "have defined the category of infractions that violate
> 'fundamental fairness' very narrowly." *Dowling v. United States*, 493
> U.S. 342, 352, 110 S. Ct. 668, 674, 107 L. Ed. 2d 708 (1990). "Beyond
> the specific guarantees enumerated in the Bill of Rights, the Due Process
> Clause has limited operation." *Ibid*.

*Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991) (ellipses and first two alterations

supplied, other alterations in original) (footnote omitted). *See also Jones v. United

States*, 527 U.S. 373, 389-390 (1999).

In his previous Claim V.I., Davis argued that he was convicted due to the admission of uncorroborated accomplice testimony.  When faced with the same claim, the Alabama Supreme Court found that "even if the jury considered Terrance Phillips and Willie Smith to be Davis's accomplices, and thus followed the trial court's instructions that their testimony would likewise require corroboration, the record provides such corroboration." *Ex Parte Davis*, 718 So.2d 1166, 1170-71 (Ala. 1998). Davis has not established that this finding was contrary to, or involved an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts in light of the evidence presented in state court.  Because there was sufficient corroboration of the testimony of Terrance Phillips and Willie Smith, any "confusion" caused by what Davis alleges to be a "lack of guidance" did not render his trial fundamentally unfair.  These claims are due to be denied.

**U.    The Penalty Phase Jury Instructions Implied That Aggravating Circumstances Did Not Have to Be Found Unanimously**

Davis complains that the trial court erroneously instructed the jury on aggravating circumstances.[337]  The trial judge gave the following instruction at the conclusion of the penalty phase of trial:

---

[337] Doc. no. 33, at 83.

Now, as I've stated to you before, the burden of proof is on the state to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance or circumstances considered by you in determining what punishment is to be recommended in this case.

This means before you can even consider recommending that the defendant's punishment be death, each and every one of you must be convinced beyond a reasonable doubt based on the evidence that at least one or more of the aggravating circumstances exists.

In deciding whether the state has proven beyond a reasonable doubt the existence of any given aggravating circumstance, you should bear in mind the definitions which I have given you as to reasonable doubt.

R. Vol. 8, Tab 24, at 1361.

According to Davis, this instruction implied that the jurors had permission to find either one or the other aggravating circumstance, without the State having to prove either of them beyond a reasonable doubt as required by *Ala. Code* § 13A-5-45(e) (1981).[338]   In other words, he contends, some jurors could have found the aggravating circumstance of homicide during a robbery, while others found the circumstance of a prior violent felony conviction.[339]   He argues that this instruction

---

[338] Doc. no. 33, at 83-84.  *Ala. Code* § 13A-5-45(e) states:

At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances.  Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing.

[339] Doc. no. 33, at 83.

ran directly contrary to the concept that aggravating circumstances must be unanimously found beyond a reasonable doubt, and substantially increased the likelihood that the jury's sentence recommendation would be arbitrary and capricious, rendering his sentence unreliable.[340]

There was no objection at trial to this instruction. This claim was raised for the first time in Davis's amended petition for writ of *certiorari* on direct appeal,[341] and it was denied without discussion by the Supreme Court of Alabama. *Ex parte Davis*, 718 So. 2d 1166, 1169, 1178 (Ala. 1998).

These instructions present no constitutional violation. Taken as a whole, the instruction adequately informed the jury that each aggravating circumstance had to be found unanimously. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974) ("In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.") (citations and internal quotation marks omitted). The Alabama Supreme Court's implicit determination that no plain error had been committed was not unreasonable.

---

[340] *Id.*

[341] C.R. Vol. 10, Tab 35, at 47-48.

Moreover, even if the instructions could be considered ambiguous, given the facts of this case, there is no possibility that the jurors did not unanimously find the existence of one aggravating factor. Davis was convicted of murder during the commission of a robbery. The robbery served as both the underlying offense and an aggravating circumstance. Under Alabama law, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." Ala. Code § 13A-5-45(e). Thus, the fact that Davis had been convicted of murder during the commission of a robbery necessarily meant that the jury had unanimously determined that the robbery aggravator had been satisfied. Davis is entitled to no relief on this claim.

## V.  Misconduct by Jurors Deprived Davis of His Constitutional Right to Be Tried by an Impartial Jury

Davis complains that three instances of juror misconduct deprived him of his right to be tried by an impartial jury.[342] This claim was raised in Davis's Rule 32 petition.[343] The Rule 32 court dismissed the claim, finding it was procedurally barred:

> This claim is dismissed as Petitioner never established that the information pleaded or established that the information contained in this claim could not have been discovered in time to be included in a motion

---

[342] Doc. no. 33, at 84-85.

[343] Rule 32 C.R. Vol. 14, Tab 52, at 45-46.

for a new trial. Further, the Petitioner did not offer any facts that would rebut the presumption created by the State's pleading of a procedural bar. Because this was the Petitioner's burden under Rule 32.3, the Court accepted the application of the procedural bar in this case. *Accord, Debruce v. State*, CR-99-1619, 2003 WL 22846752 (Ala. Crim. App. Dec. 2, 2003). Accordingly, this claim is procedurally barred.

Further, paragraph 84 appears to violate Rule 606(b) of the Alabama Rules of Evidence,[344] and no facts pleaded in the petition brought this claim within any exception to that rule. Thus, this paragraph would have been rightfully dismissed under Rule 32.7(d). *See, Ex parte Neal*, 731 So. 2d 621 (Ala. 1999).

---

[344] The petitioner alleged in paragraph 84 that:

During the penalty phase of the trial, the jurors were divided on the capital punishment issue such that seven jurors were in favor of a sentence of death and five were against it. At that point, one of the group of seven jurors took four of the five jurors who had voted against the death penalty around the corner and out of ear shot of the remaining jurors, and discussed their refusal to vote for the death penalty. Thereafter, the vote in favor of the death penalty changed to 11-to-1.

Rule 32 C.R. Vol. 14, Tab 52, at 45. Alabama Rule of Evidence 606(b) provided that:

(b) *Inquiry into validity of verdict or indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes. Nothing herein precludes a juror from testifying in support of a verdict or indictment.

Ala. R. Evid. 606(b).

Rule 32 C.R. Vol. 62, Tab 80, at 62-63.  Davis did not appeal the Rule 32 court's denial of this claim.  As no cause or prejudice has been alleged or demonstrated, this claim is due to be dismissed as procedurally barred.

Moreover, even if Davis's juror misconduct claims were not procedurally barred, he would be entitled to no relief.  Davis asserts that juror Brian Pike "improperly failed to disclose during *voir dire* when questioned that his brother-in-law was a law enforcement officer who escorted the Phillips cousins and/or Davis to and from the courtroom during Davis'[s] trial."[345]  Davis maintains that Pike's failure to disclose this crucial information deprived him of a trial by an impartial jury, and denied his right to have questions answered truthfully by prospective jurors so that his counsel could exercise discretion wisely in making peremptory strikes.[346]

During *voir dire* of Mr. Pike's panel, defense counsel asked, "How many in here . . . have law enforcement in their family background, whether their father, mother, brother, sister were in law enforcement?"[347]  Mr. Pike did not respond to the question.  Davis contends that Mr. Pike "improperly failed to disclose . . . that his brother-in-law was a law enforcement officer who escorted the Phillips cousins

---

[345] Doc. no 33, at 84-85 (alteration supplied).

[346] *Id*. at 85.

[347] R. Vol. 3, at 434-35.

and/or Davis to and from the courtroom" during the trial.[348]  However, the question asked was limited to having an immediate family member — "father, mother, brother [or] sister" — involved in law enforcement.   The panel was never asked about in-laws.

Further, Davis alleges only that Mr. Pike's brother-in-law "escorted the Phillips cousins and/or Davis to and from the courtroom during Davis'[s] *trial*."[349]   Davis makes no claim that Mr. Pike's brother-in-law was ever present in the courtroom during *voir dire*, or that Mr. Pike had any reason to believe, during *voir dire,* that his brother-in-law might be involved with the trial in any capacity.   Finally, there is no allegation that Mr. Pike ever became aware of his brother-in-law's alleged participation in the trial, thus triggering a need to notify the court of his potential conflict after he was seated on the jury.  This claim is without merit.

Davis further argues that:

> During the penalty phase of the trial, the jurors were divided on the capital punishment:  seven jurors were in favor of a sentence of death and five were against.  At that point, one of the group of seven jurors took four of the five jurors who had voted against the death penalty around the corner out of ear shot of the remaining jurors, and discussed their refusal to vote for the death penalty.  Thereafter, the vote in favor of the death penalty changed to 11-to-1.

---

[348] Doc. no. 33, at 84-85.  The court notes that Davis does not identify Mr. Pike's brother-in-law by name, nor does he reveal who the brother-in-law allegedly worked for, or the exact nature of his employment.

[349] *Id*. (alteration and emphasis supplied).

Doc. no. 33, at 84.  Presumably, Davis is arguing that it was reversible error in his trial for several jurors to go around the corner from the other jurors to talk.  In support of this argument, Davis cites *Kimoktoak v. State*, 578 P.2d 594 (Alaska 1978), in which the Alaska Supreme Court held it was *per se* reversible error for the court to allow the sequestered jury to separate from each other for three days during deliberations.

The holding in *Kimoktoak* was based upon Rule 27 of the Alaska Rules of Criminal Procedure, which "requires that once a jury has begun its deliberations it must remain under the charge of the court until a verdict is agreed upon, unless the parties agree to allow the jurors to return to their homes for reasonable periods of rest." *Kimoktoak*, 578 P.2d at 595.  The court noted that the case was distinguishable from "situations in which the court required sequestration but separation occurred by the inadvertence or carelessness of the jurors or the officer of the court, or both." *Id*. at 596 n.4.

The Alaska Rules of Criminal Procedure do not apply to Davis, and Alabama does not have a similar rule.  Even if such a rule did apply, it would not have been violated in Davis's case because the "separation" alleged by Davis did not involve the jurors being allowed to return to their homes for a period of time during deliberation.

Finally, Davis alleges that Mr. Pike stated that "during the trial, the jurors observed persons in cars circling the hotel where the jurors were sequestered," and

> discussed amongst themselves their belief that the persons in the cars were gang members and were watching the jurors.  Because no juror stated this fear or belief to the court, trial counsel and the court were unable to evaluate and/or determine whether the jurors' belief of gang involvement affected the deliberations and verdict.

Doc. no. 33, at 85.  There is nothing in the record to support even an inference that the jurors engaged in any misconduct with regard to observing cars circling their hotel, or that their deliberations were impacted in any way by their observations.[350]

## W.   Alabama's Fee Cap Foreclosed Effective Representation

Davis asserts that Alabama Code §15-12-21, which capped the compensation for court-appointed attorneys in capital cases at $1,000 for out-of-court work conducted in connection with each phase of the trial,[351] "inevitably discouraged" counsel from conducting the preparation necessary to provide effective assistance of counsel.[352]  He further asserts that the State of Alabama failed to authorize ancillary

---

[350]   The court notes, however, that if the jurors' deliberations had been affected by their fear that gang members were watching them, it seems more likely that their verdict would have been in favor of Davis rather than against him.

[351]   Section 15-12-21 was amended in 1999 to remove the cap on the total fee an attorney representing an indigent defendant could recover.  However, the cap was in effect at the time of Davis's trial.

[352]   Doc. no. 33, at 85-87.

costs that were necessary to investigate, prepare, and properly defend him at both phases of his trial.[353]

Davis raised both parts of this claim in his Rule 32 petition.[354]  The respondents contend that this claim is procedurally barred because it was not raised at trial or on appeal, and it was subsequently found to be barred by the Rule 32 court.[355]  The Rule 32 court pointed out that, because the same claim had been rejected numerous times by Alabama's appellate courts, the claim was frivolous and failed "to state a material issue of law."[356]

On appeal, the Alabama Court of Criminal Appeals found that the claim was procedurally barred by Alabama Rules of Criminal Procedure 32.3(a)(3) and (a)(5) because it could have been, but was not, raised at trial or on appeal.  *Davis v. State*, 9 So. 3d 514, 530 (Ala. Crim. App. 2006).  Although Davis raised the claim in his *certiorari* petition,[357] the Alabama Supreme Court "decline[d] to address issues not previously considered on the merits by the Court of Criminal Appeals," then reversed the Court of Criminal Appeals' judgment and remanded the case for the appeals court to "consider all Davis's ineffective-assistance-of-counsel claims on their merits." *Ex*

---

[353] *Id*. at 86.

[354] Rule 32 C.R. Vol. 14, Tab 52, at 7-9.

[355] *See* Rule 32 C.R. Vol. 62, Tab 80, at 9.

[356] *Id*. at 10.

[357] Rule 32 C.R. Vol. 59, Tab 67, at 65-67.

*parte Davis,* 9 So. 3d 537, 539 (Ala. 2007) (alteration supplied).  The Alabama Court of Criminal Appeals did not mention Davis's fee cap claim in its opinion following remand.  *Davis v. State*, 9 So. 2d 539 (Ala. Crim. App. 2008).  Davis raised the claim in his next *certiorari* petition,[358] but the Alabama Supreme Court denied the petition. *Ex parte Davis*, 9 So. 3d 571 (Ala. 2008).

The Alabama Court of Criminal Appeals was the last state court to address this issue.  That court found the claim to be procedurally barred.  *Davis v. State*,  9 So. 3d 514, 530 (Ala. Crim. App. 2006).  Thus, the claim is procedurally barred from review in this court.  *See Harris v. Reed*, 489 U.S. 255, 262 (1989).

Moreover, even if this claim were not barred, it is apparent that it cannot succeed on the merits.  Inadequate funding of counsel appointed to represent capital defendants does not itself amount to ineffective assistance of counsel unless it contributes to actual errors or shortcomings in the performance of counsel.  *See Strickland*, 466 U.S. at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.").

Davis asserts that Alabama's compensation scheme provides an inherent economic disincentive to conduct effective representation.  He makes the general

---

[358] Rule 32 C.R. Vol. 61, Tab 72, at 125-126.

assertion that due to this "inherent economic disincentive," counsel were unable to interview "20 or 30 people," unable to obtain and review hundreds of pages of "valuable mitigation documents," unable to prepare and argue motions, and unable to spend "countless hours" working with "experts and investigators."[359]   However, he fails to explain the actual errors or shortcomings that resulted from those deficiencies. Similarly, despite his general assertion that "[m]eaningful legal assistance and due process requires the State to ensure defendants are not deprived of crucial expert testimony simply because they are indigent,"[360] Davis fails to identify any alleged crucial expert testimony that was not obtained in his case as a result of cost constraints.

## X.   Davis's Death Sentence Was Improperly Sought and Imposed Pursuant to a Pattern of Racial Bias

Davis asserts that the death penalty was sought and imposed in his case due to a pattern of racial bias, and that his attorneys were ineffective for failing to make this argument at trial and on appeal.[361]   He argues:

> In Calhoun County and the State of Alabama, the death penalty is sought in an arbitrary and capricious fashion and pursuant to a racially discriminatory pattern in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and the Alabama Constitution.  *See McClesky*

---

[359] Doc. no. 33, at 86.

[360] *Id.* at 86.

[361] *Id.* at 87-88.

> *v. Kemp*, 481 U.S. 279 (1987).  Ineffective assistance of counsel under
> the standards of *Strickland* arose through failure of trial counsel to raise
> these issues during the trial and appeal.

Doc. no. 33, at 87.

In support of this argument, Davis points to the testimony of Assistant District Attorney Ron Wood, who testified during the Rule 32 hearing that he had noted in the case screening summary that the "[d]efendant refuses to talk and is said to hate whites."[362]  Davis contends that the notation evinced racial bias because, as Mr. Wood acknowledged during his testimony, murder motivated by racial prejudice is not an aggravating factor for purposes of determining whether a crime should be charged as a capital crime under Alabama law.[363]  Davis also contends Mr. Wood's testimony that "he was unaware of any case where he had prosecuted the murder of an African-American victim by a white defendant as a capital murder case" is evidence of racial bias.[364]

This claim was raised in Davis's Rule 32 petition,[365] and on appeal from the denial of that petition.[366]  The Alabama Court of Criminal Appeals held that the claim was procedurally barred pursuant to Rules 32.3(a)(3) and (a)(5), Ala. R. Crim. P.,

---

[362] *Id*. (quoting Rule 32 R. Vol. 23, at 1068-69).

[363] *Id*. at 88 (citing Rule 32 R. Vol. 23, at 1077-79).

[364] *Id*. (citing Rule 32 R. Vol. 23, at 1109).

[365] Rule 32 C.R. Vol. 14, Tab 52, at 38.

[366] Rule 32 C.R. Vol. 57, Tab 60, at 71-72.

290

because it could have been, but was not, raised at trial or on appeal. *Davis v. State*, 9 So. 3d 514, 530 (Ala. Crim. App. 2006). That finding rests upon firmly established and regularly followed state procedural rules. Thus, the default precludes federal review of the claim.

It should be noted that included within this claim is the assertion that "[i]neffective assistance of counsel under the standards of *Strickland* arose through failure of trial counsel to raise these issues during the trial and appeal."[367] Davis does not elaborate that assertion. Thus is unclear whether he is attempting to excuse his procedural default of this claim, or raise a separate claim of ineffective assistance of counsel.

An allegation of ineffective assistance of counsel can constitute cause for a procedural default, but only if the petitioner can prevail on an independent ineffective assistance of counsel claim, and has raised, and thus exhausted, that particular claim of ineffective assistance of counsel in state court. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Hill v. Jones*, 81 F.3d 1015, 1029-31 (11th Cir. 1997). While Davis arguably exhausted his claim of ineffective assistance of *trial* counsel in state court,[368]

---

[367] Doc. no. 33, at 87 (alteration supplied).

[368] On appeal from the denial of his Rule 32 petition, Davis alleged that "trial counsels' failure to address the role Davis'[s] race and the victim's race played in the decision by the District Attorney to seek the death penalty constituted ineffective assistance of counsel." Rule 32 C.R. Vol. 57, Tab 60, at 72 (alteration supplied).

he did not exhaust a claim of ineffective assistance of *appellate* counsel. Regardless, it is clear that Davis's conclusory claim of ineffective assistance of counsel entitles him to no relief.

## Y.   The Manner of Execution Used by the State of Alabama Constitutes Cruel and Unusual Punishment

Davis asserts that execution using either lethal injection or electrocution constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.[369]   He argues that a "growing number of courts have held that the protocol employed for administering lethal injection lacks 'both reliability and transparency' and has 'resulted in an undue and unnecessary risk of an Eighth Amendment violation.'"[370]   Alternatively, he argues that electrocution constitutes cruel and unusual punishment under evolving standards of decency, because

> [e]lectrocutions as carried out by the State of Alabama are qualitatively more cruel and unusual than a civilized society should tolerate. The State would utilize primitive equipment and procedures in executing Davis, which can result in grotesque, barbaric torture, including body charring, organ and tissue explosion, and mutilation.

---

[369] Doc. no. 33, at 88-90.

[370] *Id.* at 89 (citing *Morales v. Tilton*, 465 F. Supp. 2d 972, 974 (N.D. Cal. 2006); *Taylor v. Crawford*, No. 05-4173-CV-C-FJG, 2006 WL 1779035, at *8 (W.D. Mo. June 26, 2006), *aff'd* 457 F.3d 902, 904 (8th Cir. 2006)).

Doc. no. 33, at 89 (alteration supplied).  Davis further contends that counsel was ineffective for failing to raise this issue at trial.[371]

At the outset, it should be noted that, to the extent this claim pertains to execution by electrocution, the claim is moot.  *Alabama Code* § 15-18-82(a) (1975) provides that:

> Where the sentence of death is pronounced against a convict, the sentence shall be executed at any hour on the day set for the execution, not less than 30 nor more than 100 days from the date of sentence, as the court may adjudge, by lethal injection unless the convict elects execution by electrocution as provided by law.  If electrocution is held unconstitutional, the method of execution shall be lethal injection.

Because Davis has not stated that he has affirmatively chosen electrocution as the means of his execution, he will be executed by lethal injection.  Therefore, to the extent that he challenges the constitutionality of death by electrocution, the claim is due to be dismissed as moot.

To the extent Davis asserts that lethal injection constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, the respondent correctly argues that review of the claim is procedurally foreclosed under the authority of *Hill v. McDonough*, 547 U.S. 573 (2006).  In *Hill*, the Supreme Court held that claims challenging the execution process should be brought in a suit

---

[371] *Id*.

pursuant to 42 U.S.C. § 1983. *Id.* at 580. *See also Thompkins v. Secretary, Dept. of Corrections*, 557 F. 3d 1257, 1261 (11th Cir. 2009) (citing *Hill*, 547 U.S. at 579-83). Accordingly, this court is without jurisdiction to entertain the claim in the context of a *habeas* petition, and the claim is due to be dismissed.

Similarly, Davis's conclusory claim that "[i]neffective assistance of counsel under the standards of *Strickland* arose through defense counsels' failure to raise this issue in the course of trial and direct appeal proceedings" warrants no relief.[372]

## Z.     The Execution of Mentally Retarded Persons With Borderline I.Q. Levels and Brain Damage is Cruel and Unusual

Davis contends that "imposition of the death penalty on an individual at [his] limited intelligence level constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution."[373]  In support of his position, Davis quotes *Atkins v. Virginia*, 536 U.S. 304, 306 (2002), for the proposition that "[b]ecause of their disabilities in areas of reasoning, judgment and control of their impulses however, [mentally retarded persons] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct."[374]  Davis asserts that "this principle is applicable" to him, as "an offender

---

[372] *Id.* at 89 (alteration supplied).

[373] *Id.* at 90 (alteration supplied).

[374] *Id.* (first alteration supplied, second alteration by petitioner).

over age eighteen who is borderline mentally retarded with a fifth grade reading level, and who suffered from frontal lobe brain damage as a child, thereby impairing [his] capacity for culpability or premeditation that a normal adult would have."[375]

Davis raised this claim in his Rule 32 petition, which was filed prior to the Supreme Court's *Atkins'* decision.[376]   He argued that the "United States is clearly marching towards a national consensus against executing those with mental retardation or significantly subaverage general intellectual functioning," and asserted that the imposition of the death penalty on an individual at his limited intelligence level constitutes cruel and unusual punishment.[377]   The trial court denied the claim on the merits.[378]   The Alabama Court of Criminal Appeals affirmed the trial court's denial of the claim:

> Davis argues that in his case the death sentence is cruel and unusual punishment in violation of *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), because he says he is mentally retarded and has frontal-lobe brain damage.

---

[375] Doc. no. 33, at 90 (alteration supplied).  He further asserts that his "combination of clinical dysfunction yields diminished capacity, diminished executive function in the brain, and diminished ability to form premeditation, as supported by Rule 32 expert testimony of forensic psychologist Dr. Kimberly Ackerson and the clinically-based diagnosis of Dr. Charles Golden."  *Id.* (citation omitted).

[376] Rule 32 C.R. Vol. 14, Tab. 52, at 38-39.

[377] *Id.*

[378] Rule 32 C.R. Vol. 62, Tab 80, at 60-62.

In denying this claim the circuit court stated that "[Davis] does not fall within the definition of defendants protected by the Court's decision in *Atkins* even under the broadest of definitions." (C.R. 1194.)

The United States Supreme Court in *Atkins* held that it was a violation of the Eighth Amendment to execute a mentally retarded individual. The *Atkins* Court left the definition of mental retardation to the individual states. Though Alabama has yet to enact legislation defining mental retardation, the Alabama Supreme Court in *Ex parte Perkins*, 851 So. 2d 453 (Ala. 2002), adopted the broadest definition of mental retardation used by those states that have legislation prohibiting the execution of the mentally retarded. To satisfy the *Perkins* test, the defendant must exhibit (1) significantly subaverage intellectual functioning – an IQ of 70 or below; (2) significant or substantial deficits in adaptive behavior; and (3) these two deficiencies must have manifested themselves during the developmental years – before the defendant reached the age of 18.

We have reviewed the records of Davis's trial and the Rule 32 proceedings. The record of the postconviction proceedings contains some of Davis's school records and report cards. A report card issued to Davis in the eighth grade shows that Davis made all B's and one C. (C.R. 1848.) Davis was also administered the Wechsler Intelligence Scale ("WISC-R") IQ test in the eighth grade. The test results showed that Davis's full-scale IQ was 74. This evaluation also contained the handwritten comment: "All areas are above grade level expectancy." (C.R. 1853.)

At the penalty phase of Davis's capital trial, Davis presented the testimony of Anne M. Storey, a counselor employed by Calhoun – Cleburne County Mental Health Center and the Oxford City School System. She testified that she administered IQ tests to Davis before his trial and that Davis had a full-scale IQ of 77.

At the postconviction hearing Davis presented testimony that when Davis was administered an IQ test while in the custody of the Alabama Department of Corrections his IQ measured in the high 70s.

R. 771.)   Jan Vogelsang, a clinical social worker, also testified as follows:

> Jimmy had worked at a car wash.  He had worked at Glen Addie housing project.  Jimmy had not maintained consistent employment.  Job Corps, he went away first with Job Corps to Kentucky and he got homesick and came back.
>
> Then he went to Tuskegee.  In the Job Corps there they taught him with classes.  They taught him brick masonry.  He was gone about a year.  He got his GED while he was there.  Apparently did well.

R. 1004.)

Dr. Charles J. Golden, a professor of psychology at Nova Southeastern University and Director of the Neuropsychological Assessment Center, also testified at the Rule 32 hearing.  Dr. Golden stated that based on his assessment of Davis's IQ scores, Davis had frontal-lobe brain damage.  In rebuttal, the State presented the testimony of Dr. Glen D. King, a clinical psychologist.  Dr. King testified that after evaluating Davis and his IQ scores, it was his opinion that Davis "merely had borderline intellectual functioning" and that he would not refer Davis to a neurologist.  The experts testified that a CAT scan, a MRI, or a PET scan are traditionally used to diagnose brain damage.  However, none of these tests were administered in this case.

We have painstakingly reviewed the record of the trial and the Rule 32 proceedings and find no indication that Davis meets the most liberal definition of mental retardation adopted by the Alabama Supreme Court in *Perkins*.  Therefore, *Atkins* does not bar the imposition of the death penalty in Davis's case.

*Davis v. State*, 9 So. 3d 514, 528-29 (Ala. Crim. App. 2006) (alteration in original)

(footnote omitted).

Upon review of the record, the Alabama courts' rejection of Davis's "borderline mental retardation claim" was not contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts. In *Atkins*, the Supreme Court held that executing mentally retarded capital offenders violates the Eighth Amendment. Although the court did not dictate a national standard for determining mental retardation, leaving that determination to the individual states, it recognized that "clinical definitions of mental retardation require not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Atkins*, 536 U.S. at 318.

In Alabama, there is a three part test for determining whether mental retardation rises to the level of prohibiting execution: "(1) significantly subaverage intellectual functioning (i.e., an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the manifestation of these problems during the defendant's developmental period (i.e., before the defendant reached age eighteen)." *Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009) (citing *Smith v. Alabama*, No. 1060427, 2007 WL 1519869, at *8 (Ala. May 25, 2007) and *Ex Parte Perkins*, 851 So.2d 453, 456 (Ala. 2002)).

298

Davis neither disputes that he fails to meet the Alabama criteria for mental retardation, nor contends that the Alabama courts unreasonably determined that he was not mentally retarded.  Instead, he argues that the *Atkins* standard should be expanded to include defendants of limited intelligence, with evidence of frontal lobe damage.  However, he points to no clearly established federal law authorizing such an application.  Moreover, the Eleventh Circuit has denied a claim similar to the one propounded by Davis, holding that

> *Atkins* protects only those individuals who are mentally retarded, as is evident by the third prong of the mental retardation inquiry, which requires onset by age 18 . . . [t]hus, a constitutional rule exempting the 'functionally mentally retarded' from execution would go beyond the holding of *Atkins*, something this Court may not do when reviewing § 2254 petitions.

*Carroll v. Secretary, Dep't of Corrections*, 574 F.3d 1354, 1369 (11th Cir. 2009) (alteration and ellipses supplied).  Davis is entitled to no relief on this claim.

## VII.  EVIDENTIARY HEARING

Davis requests an evidentiary hearing.  "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations which, if true, would entitle the applicant to federal *habeas* relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  The deferential standards prescribed by § 2254 control whether to grant

*habeas* relief, and a federal court must take those standards into account when deciding whether an evidentiary hearing is appropriate. *Id.* at 474 (citing *Mayes v. Gibson*, 210 F.3d 1284, 1287-1288 (10th Cir. 2000) ("Whether [an applicant's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]")) (alterations in *Schriro*).

The record in this case refutes the applicant's factual allegations or otherwise precludes *habeas* relief. Accordingly, an evidentiary hearing need not be held and the request for a hearing is denied.

## VIII.  CONCLUSION

The petition for writ of *habeas corpus* is due to be denied. A separate final judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

DONE this 26th day of May, 2016.

United States District Judge

300