# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **JIMMY DAVIS, JR.,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:07-CV-518-CLS** |
| | ) | |
| **JEFFERSON S. DUNN,** | ) | |
| **Commissioner, Alabama** | ) | |
| **Department of Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

This court entered a Memorandum of Opinion and Order of Dismissal on May 26, 2016, denying Jimmy Davis's petition for writ of *habeas corpus* relief from his state conviction for capital murder and resultant death sentence, and denying a certificate of appealability.[1]

Davis subsequently filed a timely motion to alter, vacate, or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.[2]  This opinion addresses that motion.

## I. STANDARD OF REVIEW

---

[1] *See* doc. nos. 50 (Memorandum Opinion) and 51 (Order of Dismissal).

[2] *See* doc. no. 52 (Motion to Alter, Vacate, or Amend).

1

The text of Rule 59(e) does not set forth specific grounds for relief.[3] Accordingly, the decision of whether the prior judgment should be altered or amended is committed, at least in the first instance, to the sound discretion of the district court. *See, e.g., American Home Assurance Co. v. Glenn Estess & Associates, Inc.*, 763 F.2d 1237, 1238-39 (11th Cir. 1985).

The only grounds for granting a Rule 59(e) motion are newly-discovered evidence or manifest errors of law or fact. *United States v. Marion*, 562 F.3d 1330, 1335 (11th Cir. 2009) (citing *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (*per curiam*)).

Moreover, Rule 59(e) motions may "'not be used to relitigate old matters or to present arguments or evidence that could have been raised prior to judgment.'" *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (quoting *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005)).

Finally, a judgment should not be altered or amended when it would serve no useful purpose. *See* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2810.1 (3d ed. 2012).

---

[3] Federal Rule of Civil Procedure 59(e) states simply that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment" (alteration supplied).

## II. ISSUES PRESENTED FOR RULE 59(e) REVIEW

**A.     Does this Court's Decision Denying Relief on Davis's Claim That Counsel Were Ineffective for Failing to Obtain Mitigation Evidence Regarding His Childhood Trauma and Depravity Conflict With the Eleventh Circuit's Decision in *Daniel v. Commissioner, Alabama Department of Corrections*, 822 F.3d 1248 (11th Cir. 2016)?**

Davis argues that the court should alter or amend its judgment denying relief on his claim that his trial attorneys were ineffective for failing to obtain mitigation evidence regarding his childhood trauma and depravity because that decision conflicts with the Eleventh Circuit's decision in *Daniel v. Commissioner, Alabama Department of Corrections*, 822 F.3d 1248 (11th Cir. 2016).[4]  He maintains that, under *Daniel*, he met both the performance and prejudice prongs of *Strickland v. Washington*, 466 U.S. 668 (1984).[5]

The petitioner in *Daniel* argued that he received ineffective assistance of counsel because his trial attorneys failed to investigate and present mitigation evidence during the penalty phase of his trial. *See* 822 F.3d at 1254. Carolyn Daniel, the petitioner's mother and sole witness called by the defense, briefly testified as to

---

[4] Doc. no. 52 (Motion to Alter, Vacate, or Amend), at 2-18.

[5] *Id.* "To state a facially sufficient ineffective assistance of counsel claim, [a petitioner] must show both that his trial counsel's performance was deficient and that he was prejudiced as a result." *Daniel v. Commissioner, Alabama Department of Corrections*, 822 F.3d 1248, 1261-62 (11th Cir. 2016) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)) (alteration supplied).

"some of the low points" in her son's life.[6]  Less than three hours after the penalty

phase began, the jury returned a 10-2 verdict in favor of imposing the death penalty.

*Id*.  Following a sentencing hearing, Daniel was sentenced to death by the trial court.[7]

*Id*.  Daniel's convictions and death sentence ultimately were upheld in the appellate

courts. *Daniel v. State*, 906 So. 2d 991 (Ala. Crim. App. 2004), *cert. denied*, *id.* (Ala.

2005), *cert. denied*, *sub nom. Daniel v. Alabama*, 546 U.S. 405 (2005).

Daniel timely filed with the aid of new counsel a Rule 32 petition in the trial

court.  Daniel's second amended petition was accompanied by twenty-one exhibits,

> including school, mental health, and social service records, along with
> other documentary evidence, all in support of Mr. Daniel's allegations

---

[6] Specifically, Ms. Daniel told the jury that her son suffered from

Attention Deficit Hyperactivity Disorder (ADHD) and dyslexia; that he dropped out of school in the tenth grade; and that Mr. Daniel's biological father died when Mr. Daniel was three.  Mrs. Daniel also testified that Mr. Daniel's stepfather, Earnest Western, "abused [him] and I didn't know about it for a long time."  She described only one specific instance of abuse.  When Mr. Daniel was about twelve years old Mrs. Daniel said she left him "[o]ne night" with his stepfather and, when she got home, Mr. Daniel told her "that he had gotten a beating by his stepdad" and that he had blood in his urine.  When she took Mr. Daniel to the hospital, "[i]t was discovered that one of his kidneys had been damaged from the beating."  As a result, protective services removed Mr. Daniel and his two sisters from the home for about ten months, and Mr. Daniel was placed in a group home.  When the family reunited, Mrs. Daniel says Mr. Daniel was "withdrawn" and "always seem[ed] like he was hurting on the inside."  Mr. Daniel started drinking beer at about age sixteen, and "on one occasion" Mrs. Daniel found marijuana in his room.  Finally, Mrs. Daniel pleaded to the jury for her son's life.

*Daniel*, 822 F.3d at 1256 (alterations in original).

[7] Daniel's mother and sister testified at the sentencing hearing, asking the court to spare Daniel's life.  *Id.*

that if trial counsel had conducted even a cursory investigation of his background, they would have discovered compelling mitigating evidence.

*Daniel*, 822 F.3d at 1257. The trial court summarily dismissed the petition without allowing discovery or conducting an evidentiary hearing. *Id*. The Alabama Court of Criminal Appeals affirmed the trial court's summary dismissal of the petition at the pleading stage because Daniel failed to sufficiently and specifically plead his claims under Alabama law. *Id.* at 1258. The Alabama Supreme Court summarily denied *certiorari* review. *Id*.

Daniel timely filed a federal *habeas* petition, accompanied by motions for discovery and an evidentiary hearing. *Id*. The district court denied relief without an evidentiary hearing or discovery, finding that the Rule 32 court properly dismissed Daniel's penalty phase ineffective assistance of counsel claim for failure to plead the claim with sufficient specificity or failure to state a claim. *Id*. at 1258, 1260.

The Eleventh Circuit Court of Appeals vacated the district court's order denying the claim, finding that the Rule 32 state courts' summary dismissal of the claim was contrary to and an unreasonable application of clearly established Supreme Court precedent. *Daniel*, 822 F.3d at 1263-81. The Court first found that Daniel's "second amended Rule 32 petition pleaded more than sufficient specific facts about trial counsel's acts and omissions to show their penalty phase investigation 'fell

below an objective standard of reasonableness.'" *Id*. at 1263 (quoting *Strickland*, 466 U.S. at 688).

In concluding that "no competent attorney in 2003 would have failed to conduct timely and thorough background interviews with the defendant and his immediate family members when they were ready, willing, and available to speak with trial counsel and even contacted counsel on their own," *id*. at 1264-65, the Eleventh Circuit pointed to the following factual allegations:

> For starters, Mr. Daniel pleaded that trial counsel had almost no meaningful contact with him or his family prior to trial. Specifically, he pleaded that "[t]rial [c]ounsel first met [him] at the preliminary hearing for his capital case in October of 2001. The next time [t]rial [c]ounsel spoke to Mr. Daniel was sixteen months later – just three days before the commencement of Mr. Daniel's capital trial." During the sixteen months Mr. Daniel was waiting for his trial, he wrote letters to trial counsel seeking to meet with them about his case. "Trial [c]ounsel simply ignored his request for a meeting." Concerned about having such little contact with his trial counsel, Mr. Daniel wrote the Alabama Bar Association before his trial to lodge a complaint against trial counsel. Then when trial counsel did eventually meet with Mr. Daniel, rather than "focusing on the information about his case that Mr. Daniel was attempting to relay, [trial counsel] Mr. Hughes was far more interested in discussing Mr. Daniel's complaint to the Alabama Bar Association."
>
> Mr. Daniel also pleaded that his family fared no better in their attempts to communicate with trial counsel and as a result, "[t]rial [c]ounsel never interviewed in any meaningful way any members of [his] immediate family." Specifically, Mr. Daniel pleaded that trial counsel ignored numerous efforts by his mother and sister to provide relevant background information:

46. Carolyn Daniel, Mr. Daniel's mother, made a series of attempts to contact Mr. Hughes by phone and left several messages at his office. When Mr. Hughes finally returned one of those messages, he gave her no more than twenty minutes of his time and expressed no interest in meeting her or having further discussions. The extent of [t]rial [c]ounsel's pretrial communications with Mr. Daniel's mother was one brief telephone call.

47. Had [t]rial [c]ounsel had even a five minute conversation of substance with Mrs. Daniel, it is likely that they would have discovered facts about Mr. Daniel's tragic childhood, including that when Mr. Daniel was just 3 years old he was present when his mother shot and killed his biological father . . . and that his stepfather emotionally, physically, and sexually abused Mr. Daniel including forcing him to engage in sex acts with his two older sisters when Mr. Daniel was less than ten years old.

48. Tammi Daniel, Mr. Daniel's sister, also attempted to contact [t]rial [c]ounsel by telephone on a number of occasions before her brother's trial. After Mr. Hughes failed to return a single one of her calls, she took matters in her own hands and drove all the way from Atlanta to Birmingham to speak to Mr. Hughes in person. He was unavailable.

49. Despite Tammi's demonstrated willingness to assist in her brother's defense, Mr. Hughes spoke with Tammi for less time than he spoke to her mother in the sixteen months leading up to trial. Ms. Haskins never spoke with her. In the one or two abbreviated conversations that they had, Mr. Hughes never asked Ms. Daniel about . . . her family background, Mr. Daniel's character, or her opinion of Mr. Daniel's guilt. Nor did he seek her assistance in contacting any other family members. Had Mr. Hughes engaged in a meaningful

conversation with Mrs. Daniel he would have learned about Mr. Daniel's past.

*Daniel*, 822 F.3d at 1263-64 (alterations and ellipsis in original) (footnote omitted).

In addition, the Eleventh Circuit found that the second amended Rule 32 petition pleaded sufficient facts to show prejudice under *Strickland* and its progeny. *Id*. at 1274-77. The court found that the allegations of Daniel's excruciating life history, which were never presented to the jury, were sufficient to establish a reasonable probability that, but for counsel's failure to present the evidence to the jury, he would have been sentenced to life without parole instead of death:

Mr. Daniel's second amended Rule 32 petition specifically pleaded that trial counsel's deficient performance during the penalty phase prejudiced him as follows:

192. Trial [c]ounsel's absolute and admitted lack of preparation for the penalty phase all but ensured that Mr. Daniel's constitutional rights would be violated. As a result of [t]rial [c]ounsel's gross ineffectiveness, the jury never heard of the chronic physical and sexual abuse Mr. Daniel suffered at the hands of Mrs. Daniel's second husband, despite obvious indications of the presence of such evidence. The jury also never heard that Mrs. Daniel shot and killed Mr. Daniel's father when Mr. Daniel was only three years old, or that she was incarcerated for this crime, or that Mr. Daniel witnessed his father's death as a toddler. The picture [t]rial [c]ounsel painted for the jury of Mr. Daniel's mental capacity through Mrs. Daniel's testimony was also woefully incomplete. The jury never heard of the chronic problems that Mr. Daniel had in school, and was unaware that he had been diagnosed with

borderline intelligence by state officials at a young age and likely suffered from mental retardation. Nor did the jury hear that Mr. Daniel's mother was formally diagnosed with manic depression, a bipolar disorder that is known to run in families, or that Mr. Daniel currently suffers from auditory and visual hallucinations as a result of his childhood trauma. The jury heard no evidence concerning Mr. Daniel's long and troubled history of addiction or his nonviolent character, and was left with the impression that he came close to committing the heinous crime of rape.

193. Had available mitigating evidence been presented, there exists a reasonable probability that Mr. Daniel would have been sentenced to life without possibility of parole. *See Wiggins*, 539 U.S. at 536, 123 S.Ct. 2527 (noting that "had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence"); *see also Collier*, 177 F.3d 1184 (failure to present the available evidence of defendant's upbringing, compassion, his poverty, and gentle disposition rendered performance ineffective); *Harris v. Dugger*, 874 F.2d at 756 (because the jury knew little about defendant including the fact that family members described defendant as a devoted father, husband, and brother, counsel was ineffective); *Armstrong v. Dugger*, 833 F.2d at 1434 (finding the "demonstrated availability of undiscovered mitigating evidence clearly met the prejudice requirement" under *Strickland* ); *Blanco*, 943 F.2d at 1505 (finding a "reasonable probability" that "jury might have recommended a life sentence" had counsel presented the mitigating evidence that would have been available "had they more thoroughly investigated"). But for [t]rial [c]ounsel's errors, there is a reasonable probability that the jury would have recognized a very different balance of aggravating and mitigating circumstances. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

Beyond these paragraphs taken verbatim from Mr. Daniel's second amended Rule 32 petition, any fair reading of his Rule 32 petition and its supporting exhibits includes many details about Mr. Daniel's background and character that were never discovered by trial counsel. We have quoted many of those details already, such as Mr. Daniel's childhood sexual abuse and borderline intellectual functioning, and need not repeat them here.

*Daniel*, 822 F.3d at 1274-75 (alterations in original).

Here, Davis challenges this court's conclusion that counsel's failure to obtain mitigation evidence concerning his childhood was excused by the failure of both Davis and his family to divulge more detailed, unsavory evidence that he claims would have been beneficial to his case.[8] Davis argues that the court's conclusion was "inconsistent with the Eleventh Circuit's recent opinion in the *Daniel* [c]ase, the facts of which are similar to the facts at issue here."[9] Davis specifically points to this court's statement that:

> Ultimately, this court must confront the fact that the Eleventh Circuit has "repeatedly held that '[a]n attorney does not render ineffective assistance by failing to discover and develop childhood abuse that his client does not mention to him.'" *Puiatti v. Secretary, Florida Department of Corrections*, 732 F.3d 1255) (11th Cir. 2013) (quoting *Williams v. Head*, 185 F.3d 1233, 1237 (11th Cir. 1999)) (alteration in original).

Doc. no. 52 (Rule 59(e) Motion to Alter, Vacate, or Amend Judgment), at 3 (quoting

---

[8] Doc. no. 52 (Motion to Alter, Vacate, or Amend), at 2-3.

[9] *Id*. at 3 (alteration supplied).

doc. no. 50 (Memorandum Opinion), at 115)). Davis first argues that the "*Head* and *Puiatti* cases are distinguishable and the contrary conclusion is proper."[10] He points out that counsel in *Head* performed minimal work on the mitigation case, but had vast criminal experience, while counsel in *Puiatti* performed an extensive pretrial investigation, despite having a "misdirected mitigation strategy."[11] Davis argues that in contrast, Giddens, his trial attorney, had "limited criminal experience," "failed to conduct any investigative work," "did not prepare for trial until two weeks before," "failed to prepare for the penalty phase," "failed to obtain and review available DHR records," and "failed to engage in meaningful discussions with Petitioner's family or friends."[12]

Davis fails to mention, however, that Giddens did not represent him alone. Rather, Giddens was assisted by co-counsel Jonathan L. Adams, who was described by the trial court as an "experienced criminal defense attorney." *Davis*, 9 So. 3d at 556. Because Davis failed to call Adams to testify at the Rule 32 evidentiary hearing, *see id*. at 553, this court has no knowledge of the extent of his preparation for the penalty phase of the trial. Even so, the trial court noted that "Adams's involvement in the case was *not minor*." *Id.* at 564 (emphasis added). Thus, this court cannot say,

---

[10] *Id.*

[11] *Id*. at 6-7.

[12] *Id*. at 7.

based solely on the allegations concerning attorney Giddens, that *Puiatti* and *Head* are in fact distinguishable.

Davis further argues that this court's finding conflicts with *Daniel*. Specifically, he contends that, as in *Daniel*, there is nothing to indicate that his trial attorneys' limited investigation into his troubled family background was the product of a "reasonable professional judgment."[13] He maintains that Lillie Bell Davis's testimony regarding Davis "'giving her trouble,' dropping out of high school, and generally being uncontrollable" should have been a red flag alerting counsel to the need for more investigation.[14] Davis also argues that his case is like *Daniel* because his mother's trial testimony was "significantly exceeded" by her testimony at the Rule 32 hearing.[15] Finally, he argues that counsel should have tried harder to get his family to divulge family secrets, and that their failure in that regard was the result of Giddens' inadequate preparation and misunderstanding of mitigation testimony, rather than the family's "conspiracy of silence."[16]

Davis is correct that the facts of his case are similar to *Daniel,* in that his mother's trial testimony was "significantly exceeded" by the testimony she gave at

---

[13] *Id.* at 9-13.

[14] Doc. no. 52 (Motion to Alter, Vacate, or Amend), at 10-11.

[15] *Id.* at 11.

[16] *Id.* at 12-13.

12

the Rule 32 hearing. Even so, the differences between the facts of his case and *Daniel* do not warrant altering or amending this court's judgment.

In preparing for the penalty phase, trial counsel interviewed Davis, his mother, two of his siblings, and a cousin. *Davis*, 9 So. 3d at 553-66. At trial, counsel presented the following mitigation evidence:

> [Davis] called three witnesses: his mother, Lillie Bell Davis; his first cousin, Andre Lamont Sigler; and a counselor, Annie M. Storey. His mother testified generally about [Davis's] background and family life. She stated that she and her husband, who was [Davis's] father, separated when [Davis] was one year old, and that [Davis] never had the benefit of a father in the home when he was growing up. She stated that [Davis] went to Detroit to live with his father when he was 15 years of age, but that his father died shortly thereafter and that his death was devastating to [Davis]. She further testified that she began to have trouble with [Davis] when he was about 9 years old; that he would misbehave at school and at home; that he dropped out of school when he was 16; that he would not work, would stay out at night, and was frequently in trouble; that after he turned 17, she could not handle him; and that he left home when he was 19. She asked the jury to spare her son's life. Sigler also testified about [Davis's] background and home life. He stated that [Davis] missed not having a father in the home; that because of his circumstances he 'missed a lot' when he was growing up; that when he was growing up he had no one to rely on, to talk to, or to help him; that when his father died he was noticeably affected and his appearance and attitude changed; and that he had not had the advantages that Sigler had had. Sigler also asked the jury to recommend a sentence of life imprisonment without parole. Storey, a counselor employed by the Calhoun–Cleburne Mental Health Center and the Oxford city school system, testified that she administered intelligence and diagnostic educational tests to [Davis] before his trial; that he had a full-scale IQ of 77, which placed him at the 6th percentile, *i.e.*, 94% of the people in his age group scored higher; that an IQ of 77 is considered within the

borderline range of intelligence; that he is functioning 'between where we would consider an individual who is mentally retarded and one who is low average'; and that he functions at the 5th grade level academically. [Davis] called only one witness at the second sentencing hearing before the trial court, his mother, who testified again about her son's general background and family life, and asked the court for mercy."

*Davis*, 9 So. 3d at 563-64 (quoting *Davis v. State*, 718 So.2d at 1156) (alterations in original).

While it is true that Davis presented more evidence at his Rule 32 evidentiary hearing than his attorneys presented during the penalty phase of his trial, it is clear that Davis and his family bear the bulk of the responsibility for intentionally keeping that information from counsel. As the Alabama Court of Criminal Appeals found:

> The circuit court made very detailed findings of fact on this issue, and we quote extensively from its order:

> > In this claim, Davis has alleged that his trial counsel were ineffective in regard to the penalty phase of his trial. Quite simply, this claim can only be described as bizarre, based on the fact that [Davis's] own family seems to have concealed important information from trial counsel. Having considered the petition, having carefully reviewed the evidence presented at this hearing, as well as at the trial, and following the law governing Sixth Amendment claims — including the recent decision in *Wiggins v. Smith*, 123 S. Ct. 2527 (2003) — the court finds that this claim is due to be denied.

> > This finding is not meant to imply that the Court did not find compelling some of the mitigation evidence

presented by Petitioner during the evidentiary hearing. Much of the evidence presented at the Rule 32 hearing focused on abuse inflicted on Davis by his mother, Lillie Bell Davis. The Court finds that Davis was abused by his mother to an extent that would have rendered it relevant to the issue of the appropriate penalty determination in this case under existing law, though the Court, as explained below, finds that this evidence is insufficient to establish prejudice.

The Court's major concern, however, is that if this Court used this evidence to find the existence of deficient performance the Court would be engaging in the inappropriate activity of judging the performance of trial counsel through the use of hindsight. Further, the Court would be passing judgment on Attorney Adams without the benefit of his testimony. Even worse, this Court would be inappropriately shifting the blame for the inexcusable actions of Davis' family, particularly his mother, to his trial counsel. This Court must judge trial counsel's performance through their perspective at the time. That being the case, the Court does not find that trial counsel's performance was deficient.

To the contrary, Jimmy Davis' family — and to a very large extent his mother — bears a heavy burden in this case for their role in this matter. Because Adams did not testify, this Court does not know what Adams did or did not do in preparation for this case. The Court presumes, however, that Adams acted reasonably in the questions he asked his client and his client's mother and in preparing for the penalty phase. Further, the testimony of Giddens establishes that at no time did Davis ever mention to his attorneys the abuse suffered at the hands of his mother or the intervention of DHR in the Davis home.

. . . .

Further, the record establishes, by the Petitioner's own admission, that trial counsel did talk to two of Davis' siblings. (RR. 863.) Further, even in the time frame immediately before the evidentiary hearing, Davis did not speak in detail of the abuse inflicted on him as a child, instead generalizing that his background "wasn't rosy" and that he didn't have any privileges, only "every day survival." (RR. 863.) When specifically questioned about abuse, Davis only acknowledged that he was disciplined with a switch, in stark contrast to the evidence that Davis was, in fact, hit with belts, electrical cords, and with an open hand. (RR. 863-864.) As noted by Dr. King, "he was not – he was not too forthcoming. I had to ask a number of questions about that." (RR. 863-864.) Thus, the record supports a finding that even Davis continued to participate in the family's conspiracy of silence, even on the eve of his evidentiary hearing.

The Court also takes notice of the Petitioner's request, via motion to the Court, to keep the documents and evidence concerning Petitioner's abuse sealed. As noted by counsel for the Petitioner, this was done out of the family's concern for their privacy. (RR. 161-163) It was this desire by the family to keep this matter private – in addition to their fear of Lillie Bell Davis – that the witnesses before this Court during the evidentiary hearing noted was the reason behind their years of silence. Although the Petitioner's motion to keep these records private is not "evidence" in the formal sense of the word, it does allow this Court to once again view the family machinery that trial counsel were up against in this case, machinery that even collateral counsel had to deal with in this matter.

Further, this Court noted during the evidentiary hearing that Lillie Bell Davis failed to make an appearance during the entire week this matter was heard. Although

Lillie Bell Davis attended Davis's capital murder trial, she was noticeably absent as a witness or a spectator during the entire week of the evidentiary hearing. Although the Court can infer why Ms. Davis would choose not to come into court once this secret was made public, it certainly sheds light on the type of person Ms. Davis is and the type of person trial counsel were misled by. In any event, it is difficult for this Court to view the preparation of trial counsel through their eyes when the very people (Lillie Bell and the two, unnamed siblings) who were giving trial counsel information – apparently misleading information – were not called to recount their conversations with Giddens and Adams.

*Davis*, 9 So. 3d at 553-54.

In denying Davis's claim, this court found as follows:

It is apparent from a review of the state court record that counsel did not conduct an extensive investigation for the penalty phase of this capital trial. It is troubling that: counsel's notes reflect only two visits with Davis prior to trial; counsel spoke with Davis's mother only once, and then only days before the trial; much of the preparation, including the evaluation that was performed the weekend prior to the Monday morning trial, was conducted at the last minute; and, counsel did not meet with the penalty phase witnesses prior to the day they were scheduled to testify. It also is troubling that relevant mitigation evidence existed, but was not discovered.

Even so, counsel did not have many leads to pursue mitigating evidence. The record is clear that neither Davis nor his mother informed Giddens of the abuse Davis suffered. FN.

FN. Because Davis did not call Adams to testify at the Rule 32 hearing, the court has no way of knowing if Adams was informed of the abuse or the role Adams played in preparing for the sentencing phase of the trial.

Any suggestion that Davis might have opened up to counsel if they had spent more time with him, earning his trust, or perhaps explaining the importance of being completely truthful and forthright, is mere conjecture, and unsupported by any evidence. Although it undoubtedly would have been far better if counsel had gathered more background information prior to the capital sentencing proceeding, they were not constitutionally required to complete any set checklist of tasks, especially when counsel had received no information to indicate that potential mitigating evidence existed.

Ultimately, this court must confront the fact that the Eleventh Circuit has "repeatedly held that '[a]n attorney does not render ineffective assistance by failing to discover and develop childhood abuse that his client does not mention to him.'" *Puiatti v. Secretary, Florida Department of Corrections*, 732 F.3d 1255 (11th Cir. 2013) (quoting *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999)) (alteration in original).

Thus, it cannot be said that the determination of the Alabama Court of Criminal Appeals — *i.e.*, that counsel's investigation was not constitutionally deficient — was objectively unreasonable.

The Alabama court painstakingly considered the evidence presented, applied the controlling Supreme Court precedent, and found that,

> [b]ased on the unusual circumstances presented in this case and the fact that we do not know the extent of cocounsel's investigation because Adams was not called to testify, we cannot say that counsel was ineffective for failing to discredit the statements of Davis, his mother, and two of his siblings, and to conduct yet more investigations.

*Davis v. State*, 9 So. 3d 539, 566 (Ala. 2008) (alteration supplied). Davis has not shown that no reasonable factfinder would have arrived at the same conclusion.

Doc. no. 50 (Memorandum Opinion), at 114-16 (alterations in original).

Unlike *Daniel*, where counsel had almost *no* meaningful contact with the petitioner or his family prior to trial, and that despite repeated efforts by members of the defendant's family to talk to defense attorneys, Davis and his family intentionally thwarted counsel's attempts to uncover helpful mitigation evidence. Therefore, this court's judgment on this claim does not conflict with *Daniel*. Instead, Davis is merely attempting to relitigate this claim by making an unpersuasive argument under *Daniel*. There are no manifest errors of law or fact in the court's resolution of this claim.[17]

**B.** **Does this Court's Decision Denying Relief on Davis's Claim That Counsel Were Ineffective for Failing to Present Evidence Regarding His Prior Felony Conviction Conflict With the Eleventh Circuit's Decision in *Daniel*?**

Davis further argues that this court should alter or amend its judgment denying relief on his claim that trial counsel were ineffective for failing to discover and present mitigation evidence about his prior felony conviction, because that decision conflicts with *Daniel*. In *Daniel*, the Eleventh Circuit found counsel's mitigation investigation was constitutionally inadequate:

We have also reviewed the record regarding trial counsel's failure

---

[17] Davis also argues that under *Daniel*, he met the prejudice prong of the *Strickland* test. Doc. no. 52 (Motion to Alter, Vacate, or Amend), at 13-18. However, rather than actually making an argument based on *Daniel*, he simply reiterates arguments he previously raised and adds further arguments in support of the claim that could have been raised previously.

to investigate and challenge the state's characterization of Mr. Daniel's prior burglary conviction as a violent felony involving attempted rape. Mr. Daniel's second amended Rule 32 petition pleaded specific and sufficient facts to state a claim that trial counsel was deficient in that regard as well. During the penalty phase presentation to the jury, the state introduced documentary evidence that Mr. Daniel had a prior conviction for second degree burglary to prove the aggravating circumstance that he was previously convicted of a felony involving the use or threat of violence. The state addressed the "nature" of Mr. Daniel's second degree burglary during its closing argument, emphasizing to the jury that it "was a violent offense" that involved "entering or remaining in someone's home for the purpose of committing rape."

Mr. Daniel's second amended Rule 32 petition specifically alleged that "[t]rial [c]ounsel's failure to investigate the circumstances surrounding [Mr. Daniel's burglary] conviction left the jury with exactly the impression that the State wanted them to have" — "that Mr. Daniel was a habitually violent criminal, deserving of the death penalty." In support, the Rule 32 petition alleged trial counsel "had statutory notice of the aggravating circumstances on which the State could rely." The petition also pleaded that trial counsel had a "duty to investigate the circumstances of Mr. Daniel's prior convictions that could be used as statutory aggravators under" *Rompilla*. Mr. Daniel alleged the records of his prior burglary conviction were "available in the same courthouse as his capital murder trial and . . . even a cursory review of these records would have led [t]rial [c]ounsel to investigate the circumstances surrounding Mr. Daniel's conviction."

Noting that government records describing his burglary conviction did not mention the word "rape," Mr. Daniel alleged that "[t]rial [c]ounsel should have made some effort to discover how this element of the offense was added" to the indictment. It is a fact that the word "rape" does not appear in the case action summary, complaining witness affidavit, or plea agreement that Mr. Daniel signed. Neither does the word "rape" appear in an August 1998 report of the Alabama Board of Pardons and Paroles that described the details underlying Mr.

Daniel's second degree burglary conviction, as the Rule 32 petition noted. Although the second amended Rule 32 petition acknowledged that trial counsel objected to the introduction of Mr. Daniel's burglary conviction, it described the following:

> [P]rior to the penalty phase, [t]rial [c]ounsel had never even looked at Mr. Daniel's record, much less prepared arguments that could be advanced to negate the impact of that record in the minds of the jury. Trial [c]ounsel's ignorance rendered it impossible for them to rebut effectively the State's aggravation case because, at the time of trial, [t]rial [c]ounsel was completely ignorant of the basis upon which that case would be built.

> Besides the readily available legal records trial counsel failed to discover, the Rule 32 petition alleged trial counsel "neither sought nor discovered" other information that would have reduced the weight of the prior violent felony aggravator. Mr. Daniel alleged that trial counsel "did not make any effort to speak to Bonnie Stevenson, the complaining witness in the second degree burglary charge." According to an interview of Ms. Stevenson conducted by postconviction counsel, "Mr. Daniel never even came close to physically or sexually assaulting her or any other member of her family. . . . To the contrary, for the duration of the incident, Mr. Daniel was standing outside a barred window and had no ability to access the apartment."

*Daniel*, 822 F.3d at 1270-71 (alterations in original) (footnotes omitted).

In the present case, when discussing whether the Alabama Court of Criminal

Appeals' denial of this claim was reasonable, this court held that:

> Even if counsel's performance could be considered constitutionally deficient, however, Davis still must show that he suffered prejudice as a result. Davis's failure to prove prejudice appears to have formed the primary basis of the decision of the Alabama Court of Criminal Appeals to deny relief. That court noted that, unlike in

*Rompilla*, "there is no allegation that the file of Davis's prior conviction contained a plethora of mitigating evidence." *Davis v. State*, 9 So. 3d 539, 568 (Ala. Crim. App. 2008). The court also relied heavily on the fact that the jury knew that Davis was convicted of the lowest degree of robbery, and that one other aggravating circumstance was present.

Davis argues that, if the jury had learned the "underlying facts of [his] tagalong involvement in the group robbery of a few pizzas, the outcome of the penalty phase might have been different." Common sense does suggest that testimony that Davis went along with a group of boys who ordered and then stole several pizzas and $35 from a delivery person, where no gun or weapon was involved and no one was injured, could have been more compelling to a jury than an argument by defense counsel that his prior conviction and sentence were for the lowest degree of robbery in Alabama. Whether this would have been sufficient to sway the jury, and the court, to impose a sentence of life without parole is another matter. In Davis's case, unlike in *Rompilla*, the State was not relying solely on the prior conviction of a violent offense. It also relied upon the fact that the murder was committed during a robbery as an aggravating circumstance. Importantly, the fact of the robbery was undisputed once Davis was convicted as charged.

Moreover, a review of the Rule 32 testimony of Jadie Boozer, the attorney who represented Davis in his prior robbery case, reveals that the facts surrounding the robbery actually could have been more damaging to Davis than he claims. Although Boozer testified that no weapon was used or recovered, he also testified on cross-examination that the victim's narrative in the police report stated that "[o]ne black male wearing a jacket and some dark cloth over his face confronted [the victim] and said, '[g]ive it up, man,'" that a "[b]lack male had his hand – right hand in the jacket pocket as if he, black male, had a gun," and that the victim "gave up the money." The events as recorded in the police report mirror the facts of the instant case, and both sets of facts suggest an escalating pattern of violence by Davis. Because there was evidence of the threatened use of a firearm, the prior robbery, which Boozer also testified had originally been charged as a first degree offense, might not have been viewed by the jury as a mere "prank," as

> Davis now suggests. The state court's denial of this claim was not an
> unreasonable application of clearly established federal law, or based on
> an unreasonable determination of clearly established federal law.

Doc. no. 50 (Memorandum Opinion), at 138-40 (alterations in original).

Unlike counsel in *Daniel*, who failed to object to, and move to correct the record when the prosecution incorrectly informed the jury and the court that Daniel's prior felony conviction involved attempted rape, Davis's counsel correctly informed the jury and the court that Davis's prior conviction was for third degree robbery, and sought to minimize the effect of that conviction by explaining that it was "the lowest degree of robbery recognized in Alabama." *Davis*, 9 So. 3d at 568.

The judgment on this claim does not conflict with *Daniel*. Once again, Davis is merely attempting to relitigate this claim by relying upon *Daniel* to make an unpersuasive argument. There are no manifest errors of law or fact in the court's resolution of this claim.

C.    **Should this Court, At a Minimum, Issue a Certificate of Appealability to Permit Davis to Take His Penalty Phase Ineffective Assistance of Counsel Claims to the Eleventh Circuit?**

Finally, Davis "respectfully urges this Court to alter or amend the Court's Order of Dismissal with respect to the Court's denial of a certificate of appealability for all of the habeas claims and procedural rulings."[18]   However, Davis limits his

---

[18] Doc. no. 52 (Motion to Alter, Vacate, or Amend), at 24.

argument to his claim of ineffective assistance of counsel at the penalty phase of his trial, reiterating the arguments he has already made in support of that claim.[19]  The court declines to reconsider, alter, or amend its order denying a certificate of appealability, because Davis has failed to make a substantial showing of the denial of a constitutional right.

### III. CONCLUSION

Accordingly, following review of Davis's arguments, the record, and the Memorandum of Opinion and Order of Dismissal previously entered as document nos. 50 and 51, this court concludes that Davis's Rule 59(e) motion to alter, vacate, or amend judgment is due to be denied.  An appropriate order will be entered contemporaneously herewith.

**DONE** and **ORDERED** this 12th day of October, 2018.

_____
United States District Judge

---

[19] *Id*. at 24-27.